UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRIAN GAFFEY and KEVIN GAFFEY, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>ACADIA INSURANCE COMPANY, )<br>)<br>Defendant. ) | CIVIL ACTION<br>NO.: 04-CV-12354-RGS |

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. Plaintiffs' purchased a vessel, a 1999 Aquasport, in the summer of 2001 for $24,000.00. See Exhibit A Bill of Sale dated August 27, 2001.

2. Brian Gaffey borrowed $10,000.00 from his 401K to purchase this vessel. Exhibit B at transcript page (tp) 29.

3. Kevin Gaffey borrowed money from a Eastern Bank to purchases this vessel. Exhibit C at tp. 48, 50.

4. Eastern Bank secured its loan to Kevin Gaffey by maintaining a lien on the vessel. Exhibit C at tp. 48, 50. See Exhibit D at page 26 that is bate stamped 21.

5. The vessel was a Massachusetts registered vessel with a registration of MS5532B. See Registration. See Exhibit E.

6. The vessel was surveyed prior to purchase with a current value of $37,000.00. See Exhibit F at page 2.

7. The Plaintiffs' procured insurance from the Defendant for the vessel with the agreed value of the vessel as $37,000.00. Exhibit B at tp. 15-16. See also Exhibit G.

8. The Policy states in Section A:

> LOSSES COVERED - Subject to all terms, conditions and exclusions set forth elsewhere in this policy and to limitations as to the amount set forth below and on the Declaration Page ... we will pay for ...
> 1. Sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause.
> ...
> LOSSES NOT COVERED - We will not pay any loss, damage or expense caused by or resulting, whether exclusively or concurrently, from:
> 3. Theft or the unexplained disappearance of insured property from the yacht, unless there are visible marks of forcible entry or removal, or the entire yacht is stolen.
> WHAT WE WILL PAY - Subject to the Limit of Liability and Conditions set forth in the policy:
> 9. If an insured property is stolen and not recovered within 30 days after you present your claim to us or our agent, the property shall be considered totally lost.

> See Exhibit G - Policy

9. The words "theft" and "stolen" are not defined in the policy. See Exhibit G.

10. In May of 2003, while driving by Sea Dog Yacht Sales in Salisbury, Massachusetts, the Plaintiffs noticed a 23 foot Mako. See Exhibit C at tp. 25.

11. They made inquiry of the vessel and reached an oral agreement with Dale Friedman the President of Sea Dog Yacht Sales whereby if the Mako had a satisfactory boat survey, the Plaintiffs would pay Sea Dog Yacht Sales $39,000.00 for the vessel as long as Sea Dog Yacht Sales was able to sell their 1999 Aquasport so that they would net $24,000.00. See Exhibit B at tp. 17-20; Exhibit C at tp. 24-29.

12. The Mako did not have a satisfactory survey and Sea Dog Yacht Sales refunded the deposit the Plaintiffs' placed on the Mako. See Exhibit B at tp. 18-19; Exhibit C at tp. 27-28.

13. The Plaintiffs did not pursue the purchase of any other vessels after this Mako. See Exhibit C at tp. 33-34.

14. The Plaintiffs did not list their vessel with any broker for sale, nor did they advertise their vessel as being for sale any time after this brief encounter with Sea Dog Yacht Sales.  Id; Exhibit B at tp. 25-26.

15. While surfing the internet in August of 2003, Brian Gaffey found that Sea Dog Yacht Sales was listing his 1999 Aquasport for sale.  Exhibit B at tp. 23-24.  Exhibit D at bate stamp p. 35-38.

16. In late July or early August of 2003, Kevin Gaffey received a telephone call from Sea Dog Yacht Sales inquiring of him if he wanted to sell his vessel because Sea Dog had an interested buyer.  See Exhibit B at tp. 26; Exhibit C at tp. 35 -37.

17. After discussing the situation, the Plaintiffs decided to proceed with discussions with Sea Dog concerning the sale of their vessel to see where things lead.  Exhibit C at transcript p. 37, 41.

18. Eventually, an offer was made by a buyer, Pamela Jordan, in the amount of $27,000.00 that the Plaintiffs' accepted.  Exhibit B at tp. 31, 42-43.

19. A purchase and sales agreement was executed by Pamela Jordan and Kevin Gaffey. Exhibit B at tp. 31, 42-43; Exhibit D at bate stamp 39-40.

20. The Plaintiffs authorized Sea Dog Yacht Sales to conduct sea trials of the vessel and to transport the vessel from Newbury, Massachusetts to Sea Dog's facility in Salisbury for holding until a closing took place.  Exhibit C at tp. 58-59

21. The Plaintiffs understood that a closing would occur whereby they would transfer title of the vessel to Jordan and in turn would receive certified bank funds and verification that the Eastern Bank loan had been satisfied.  Exhibit C at tp. 46-47, 52-53, 56-57, 64-65 and 86.

22. The Plaintiffs did see the vessel at Sea Dog's facility. Exhibit B at tp. 27-28.

23. The Plaintiffs executed various documents that were to be held in escrow, including an incomplete completed bill of sale, however, they did not execute the Certificate of Title. See Exhibit H

24. Kevin Gaffey had several conversations with Dale Friedman of Sea Dog Yacht Sales in order to determine the closing date. Exhibit C at tp. 46-47, 52-53, 56-57, 64-65 and 86

25. Dale Friedman repeatedly put off the closing date alleging that Jordan was having trouble obtaining funds. Exhibit C at tp. 46-47, 52-53, 56-57, 64-65 and 86

26. Eventually, the Plaintiffs' learned that Dale Friedman could not be found and that their vessel was not at Sea Dog's facility. Exhibit B at tp. 35, 37, 41. Exhibit C at tp. 72-73

27. The Plaintiffs went to Sea Dog's facility to locate either Dale Friedman or their vessel.

28. At that time, they did not know the specific whereabouts of their vessel. Exhibit C at tp. 74-75.

29. The Plaintiffs filed a police report with the Salisbury Police outlining the fact that their vessel was removed from Sea Dog Yacht Sales without their authority and that a closing had not occurred. Exhibit C at tp. 74; Exhibit B at tp. 37-38. See Exhibit D at bate stamp 49-50.

30. The Plaintiffs later learned that the vessel was in Jordan's possession. Exhibit B at tp. 39-40; Exhibit C at tp. 76.

31. The Salisbury Police had informed the Plaintiffs that the District Attorney was going to be working towards resolving the situation as Dale Friedman had done the same sort of thing to other people. Exhibit B at tp 46.

32. The same day, Kevin Gaffey went to Eastern Bank to payoff his loan so that he could receive the Certificate of Title to the vessel. Exhibit C at tp 66-67; Exhibit I.

33. The Plaintiffs' filed a claim with the Defendant. See Exhibit D at bate stamp 47-48.

34. Acadia denied the claim on the basis that the theft was of money and not of a vessel. See Exhibit J at tp 29.

35. Claire Mullaney was the supervisor to Issac Howe who sent the denial letter. She was reviewed the claim file and the denial of coverage letter before it was sent to the Gaffeys. Exhibit J at tp 13-17.

36. Claire Mullaney understood that the Gaffeys still had the title to the vessel at the time the denial letter was sent. Exhibit J at tp 22; Exhibit K.

37. Claire Mullaney did not have any understanding of what it took to transfer title of a motor boat in Massachusetts or Rhode Island. Exhibit J at tp 24-25.

38. Claire Mullaney understood that the Gaffeys claimed they still owned the boat at the time it was removed from Sea Dog Yacht Sales. Exhibit J at tp 30.

39. Claire Mullaney concluded that the Gaffeys gave permission to Sea Dog Yacht Sales to move the boat to Rhode Island based upon the fact that the Plaintiff signed a purchase and sales agreement; gave permission for Friedman to pull the boat from where it was berthed to Sea Dog's facility; and agreed to turn over the title when the Plaintiffs received money at a closing. Exhibit J at tp 31-32.

40. Claire Mullaney understood that the closing never occurred and that the Gaffeys were expecting something else to occur before they relinquished ownership in the vessel. Id.

41. Claire Mullaney was asked at her deposition (Exhibit J) pages 34-35:

> Q. I'm asking specifically. Is there any specific reference in the claim file that they gave direct permission for the boat to be moved from Sea Dog Yacht Sales to Rhode Island?
> A. I don't know. Let me review this. Okay, could you ask your question again, please.
> ...
> MR LANGER: Objection.
> A. I would say it would not be an illogical assumption that the boat was going to be moved to the buyer.
> ...
> Q. That's something that Acadia has read into this situation?
> A. It is my interpretation, if I use a broker to sell something that, at some point, the money and the item need to get together and that's what the broker is for. So I would assume that implies permission. I guess that's my assumption. That is my assumption, yes. I'll give you that.

42. Claire Mullaney understood that the claims file contained specific references made by the Gaffeys that the vessel was removed from Sea Dog's facility without their approval. Exhibit J at tp 36-37.

43. The Plaintiffs were advised by various people, including law enforcement and their own legal counsel, not to execute self help to retake their vessel from Jordan. Exhibit B at tp 62-66.

44. Shortly thereafter, the Plaintiffs were sued in Rhode Island by Jordan for title to the vessel. See Exhibit D at bate stamp 27-45.

45. An evidentiary hearing was held before a Rhode Island Superior Court Judge on the Plaintiff's motion to dismiss for lack of jurisdiction. See Exhibit D at bate stamp 54-133.

46. Based upon the evidence produced at that hearing that included a forged bill of sale, the Court concluded that a sale had not taken place between these the Gaffeys and Jordan. See Exhibit D at bate stamp 125-133.

47. The Court dismissed the action for lack of personal jurisdiction based upon the Gaffey's representation that they would not take any action to re-take their vessel, e.g. filing an *in*

*rem* action in United States District Court for the District of Rhode Island. See Exhibit D at bate stamp 125-133.

48. The Gaffeys reached a settlement agreement with Jordan and her broker whereby the Gaffeys were paid $12,000.00 for the vessel and Jordan received a proper bill of sale and Certificate of Title to the vessel. See Exhibit D at bate stamp 20-26; Exhibit K at bate stamp 84.

49. The Gaffeys maintained the insurance coverage on the vessel until they executed the bill of sale and Certificate of Title to the vessel as they believed they were the legal and rightful owner of the vessel. See Exhibit B at tp 60.

50. The Gaffeys expended $9184.17 in legal fees and costs in defending the Jordan law suit and in resolving the title dispute to the vessel. See Exhibit D at bate stamp 134-152.

51. On September 15, 2004, the Plaintiffs through counsel forwarded a demand for coverage pursuant to M.G.L. c.93A. See Exhibit D.

52. Acadia denied coverage again citing to Massachusetts case law in support of its decision. See Exhibit L.

53. Barbara Taylor replaced Mullaney in Fall of 2003. She was aware of this claim at that time but did not participate in the claim until she received the 93A Demand letter. See Exhibit M at tp 7-8.

54. Barbara Taylor did not consider any facts that were not included in the original claim file. Exhibit M at tp 25.

55. Barbara Taylor attended the Gaffey's deposition and did not believe they were untruthful. Exhibit M at tp 27.

56. Barbara Taylor implies authority into the Friedman's actions despite that she understands that the Gaffeys did not give direct permission for Friedman to move the boat from Sea Dog's facility. Exhibit M at tp 33-36.

57. Barbara Taylor does not know the procedure that must be followed in order to transfer title to a Massachusetts or Rhode Island state registered vessel. Exhibit M at tp 26-27.

58. The policy in question has an agreed value of $37,000.00. Exhibit M at tp 36.

59. Acadia believed that Gaffeys at all times knew where there boat was located. Exhibit J at tp 29; Exhibit M at tp. 20.

60. The Rhode Island Superior Court discussion concerning whether a sale transpired between the Gaffeys and Jordan did not change Acadia's position. Exhibit M at tp 25; Exhibit M at tp 17-20; Exhibit D at Bate Stamp 125-133.

61. While handling the Gaffey claim, Acadia did note that there was a difference between another claim and the Gaffey claim in that the title to the boat had not been transferred. See Exhibit K at bate stamp 75.

    Respectfully submitted

    Brian and Kevin Gaffey
    By their attorney,

    /s/ David S. Smith

    _____
    David S. Smith, Esq., BBO# 634865
    Cianciulli & Ouellette
    163 Cabot Street
    Beverly, MA 01915
    (978) 922-9933

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 26th day of January, 2006.

    /s/ David S. Smith
    _____
    David S. Smith