**Page 1**

```
1                    Volume: I
                     Pages: 1-91
2                    Exhibits: 1-13
3         UNITED STATES DISTRICT COURT
4          DISTRICT OF MASSACHUSETTS
5
6    BRIAN GAFFEY AND KEVIN GAFFEY,
              Plaintiffs
7
         vs.           Docket No.
8                 CA 04CV12354-RGS
     ACADIA INSURANCE COMPANY,
9             Defendant
10
11
12         DEPOSITION of KEVIN GAFFEY, a
     witness called by and on behalf of the Defendant,
13   taken pursuant to the Federal Rules of Civil
     Procedure, before Heidi B. Stutz, Certified
14   Shorthand Reporter No. 146599S and Notary Public in
     and for the Commonwealth of Massachusetts, at the
15   offices of Cianciulli & Ouellette, 163 Cabot Street,
     Beverly, Massachusetts, on Friday, November 18,
16   2005, commencing at 9:55 a.m.
17
18
19
20
21
22
23
24
```

**Page 3**

```
1                     I N D E X
2
     WITNESS:    DIRECT  CROSS  REDIRECT  RECROSS
3
4    KEVIN GAFFEY    4    86
5
     EXHIBITS:       DESCRIPTION        PAGE
6
7    1      Amended Notice of Taking
            Deposition               4
8
     2      Boat Registration         9
9
     3      Sales Agreement          20
10
     4      Web page ad              29
11
     5      Fax dated 8/11/03 with P&S    42
12
     6      Bank Loan Payoff & Seller's Final
13          accounting               47
14   7      Promissory Note          54
15   8      Bill of Sale             54
16   9      Bill of Sale             62
17   10     Certificate of Title     67
18   11     General Release          84
19   12     Bill of Sale             84
20   13     Portion of 1/9/04 transcript
            (Cover page & pgs 34 & 35)    88
21
22
23
24   ***ALL EXHIBITS KEPT BY ATTORNEY LANGER***
```

**Page 2**

```
1    APPEARANCES:
2        DAVID S. SMITH, ESQ.
         Cianciulli & Ouellette
3        163 Cabot Street
         Beverly, Massachusetts 01915
4          on behalf of the Plaintiffs
5        LEONARD W. LANGER, ESQ.
         Tompkins, Clough, Hirshon & Langer, P.A.
6        Three Canal Plaza
         P.O. Box 15060
7        Portland, Maine 04112-5060
         207-874-6700
8          on behalf of the Defendant
9    ALSO PRESENT:  Barbara Taylor
                    Brian Gaffey
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1           P R O C E E D I N G S
2        (Deposition Exhibit No. 1
3         premarked for Identification.)
4    Whereupon:
5          KEVIN P. GAFFEY,
6    having been satisfactorily identified and duly sworn
7    by the Notary Public, was examined and testified as
8    follows:
9          DIRECT EXAMINATION
10   BY MR. LANGER:
11   Q.  Good morning, Mr. Gaffey.
12   A.  Good morning.
13   Q.  My name is Leonard Langer.  I represent
14   Acadia Insurance Company in the action that's been
15   brought on behalf of you and your brother in the
16   United States District Court for the District of
17   Massachusetts.
18          I'm going to ask you a series of
19   questions this morning.  If you don't understand any
20   of my questions, please feel free to ask me to
21   repeat it until you do understand it.  Please wait
22   until I finish my question before you answer it even
23   though you may know what the question is after I get
24   two or three words out, because it's difficult for
```

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 5

1 the court reporter to take down two of us talking at
2 the same time. Please try and make sure you answer
3 verbally rather than a shake of your head or even an
4 uh-huh, because again that's difficult for the court
5 reporter to take down. If Mr. Smith objects to any
6 of my questions, please wait until he finishes his
7 objection and then answer the question, unless he
8 instructs you not to answer the question. If you
9 want to take a break at any time, just let me know
10 and we'll try and accommodate you as best we can.
11        Do you understand those guidelines.
12    A. I understand the guidelines.
13    Q. Okay. Are they satisfactory to you?
14    A. They are fine, indeed.
15        MR. SMITH: Usual stipulations?
16        MR. LANGER: That's fine. Those are
17 all objections save as to form until trial.
18        MR. SMITH: Yes.
19        MR. LANGER: Usual stipulations
20 differ from --
21    Q. Could you please state your full name and
22 address?
23    A. It's Kevin Patrick Gaffey and it's 13
24 Timber Lane, Topsfield, Mass. 01983.

Page 6

1    Q. And your date of birth is July 27th, 1967?
2    A. That's correct.
3    Q. And your social security number is
4 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?
5    A. That's correct.
6    Q. Are you currently taking any kind of
7 medication that would impede your ability to
8 understand or answer my questions?
9    A. Not to my knowledge, no.
10    Q. What documents did you review in order to
11 prepare for the deposition here today?
12    A. What documents? Could you please repeat
13 that?
14    Q. Sure. What documents, what written
15 materials, if any, did you review in order to
16 prepare for your deposition today?
17    A. I believe the entire case matter, all the
18 evidence, exhibits, my deposition, the trial, my
19 testimony.
20    Q. That was down in Rhode Island?
21    A. In Rhode Island, right.
22    Q. Did you review the documents that your
23 attorney recently produced in this case?
24    A. I reviewed everything that I think is

Page 7

1 pertinent, yes.
2    Q. Okay. Let me show you what's been marked
3 as Exhibit No. 1, which is the notice of deposition
4 for today's deposition.
5        (Document handed to witness.)
6    Q. Have you seen that before?
7    A. Let's see. Yes, I did. This was e-mailed
8 to me, right.
9    Q. Okay. And attached to the notice is a
10 request that you produce a number of categories of
11 documents.
12    A. Right, absolutely.
13    Q. And I will represent to you that Mr. Smith
14 recently produced a package of materials. Are you
15 aware of any other documents that you have not
16 provided to your counsel that would be responsive to
17 the notice of deposition?
18    A. No. These are in fact the listing of all
19 the documents that I reviewed the other night.
20    Q. Okay.
21    A. And they are all the documents that I know
22 of relating to the case.
23        MR. LANGER: David, you're not aware
24 of any other documents?

Page 8

1        MR. SMITH: No, I am not. I've
2 given you everything. The only thing I didn't give
3 you was a mortgage statement for the boat, or a loan
4 thing, but it wasn't really responsive to your
5 request. If you want a copy of that, I'll give you
6 that.
7        MR. LANGER: I would like a copy of
8 that.
9        MR. SMITH: At a break I'll get it
10 for you.
11        MR. LANGER: Okay.
12    Q. Mr. Gaffey, let me just ask you to turn to
13 paragraph 5 of the notice or attached, the document
14 request.
15    A. Okay.
16    Q. It asks specifically for the 2002-2003
17 registration for the 1999 Aquasport. The document
18 that was produced --
19    A. Is the current one.
20    Q. Says expires August 28, 2005. To your
21 knowledge, do they issue a new registration for
22 every year?
23    A. I want to say that it's every two years.
24 I thought that's -- that's what I thought it was.

2 (Pages 5 to 8)

Page 9

1    Q.  Okay.  Is there, to your knowledge, a
2  registration that was in effect in 2002-2003 that
3  would be different than the one that expired in
4  August of 2005?
5    A.  Looking at what you have there, that one
6  was renewed.  That was the one that I had just
7  renewed, so the one that you're asking about in '02
8  and '03, that would have been prior to this.
9         MR. LANGER:  Okay.  Maybe we should
10  just mark this since we're talking about it.
11         (Deposition Exhibit No. 2
12           marked for identification.)
13    Q.  Let me show you what's been marked as
14  Exhibit No. 2, which is the registration that
15  indicates it expires in August 28th of 2005.
16    A.  Right.
17    Q.  Is it your understanding that there would
18  have been a separate registration that was in effect
19  in 2002-2003?
20    A.  I know in fact that there was, because I
21  renewed it.  And this was — I believe I renewed it
22  in August of '03.
23    Q.  Do you have a copy of that registration in
24  your files?

Page 10

1    A.  It's not in my files, no.
2    Q.  So you don't have a copy of the
3  registration, to the best of your knowledge?
4    A.  To the best of my knowledge, I don't have
5  one.  I may have discarded it at the time because
6  this was the most valid, this was the valid document
7  to use.
8    Q.  Does your signature appear on Exhibit 2?
9    A.  That's my signature.
10    Q.  Can you tell me why you were renewing the
11  registration for the 1999 Aquasport -- strike that.
12         The registration that you are
13  renewing is not for the same vessel that you allege
14  was stolen in 2003, is that correct?
15    A.  Wait a second.  Could you repeat that
16  again?
17    Q.  Let me ask this, what boat did you just
18  renew the registration for that's marked as Exhibit
19  No. 2?
20    A.  This registration, if I can -- let me take
21  a look at that.
22    Q.  Sure.
23    A.  Because we're spending a lot of time on
24  this.  Okay.  MS5532B is the Aquasport at the time

Page 11

1  that we owned that was a Mass. registration.  So
2  that was the boat in issue.
3    Q.  Can you -- so this is the boat that you're
4  alleging was stolen in August of 2003?
5    A.  That is true.
6    Q.  Can you tell me why -- let me strike that.
7         When was this registration that
8  expires in August of 2005, when was that
9  registration renewed?
10    A.  That -- well, there's a process with this.
11  The Massachusetts Department of Fish and Wildlife
12  Environmental Law, they send out a form, I think
13  it's a couple months prior to the expiration.  And
14  you send it back and with the fee and they send you
15  out a form and then I signed it.  That's -- so it
16  was probably a couple months prior to this date at a
17  minimum.
18    Q.  So would that, when would you have sent
19  that in?
20    A.  I'd have to say during the summer.
21    Q.  Of which year?
22    A.  Of 2003, I believe.
23    Q.  So this registration, Exhibit No. 2, would
24  have been effective in August of 2003, to the best

Page 12

1  of your knowledge?
2    A.  Yeah, yeah.  There was no, there was no
3  gap in the registrations or anything of that.
4    Q.  To the best of your knowledge, is Exhibit
5  No. 2 a true and accurate copy of the registration
6  that you signed for the 1999 Aquasport?
7    A.  Yes.
8    Q.  Have you ever been deposed before, Mr.
9  Gaffey?
10    A.  No.
11    Q.  Not in this case or any other case?
12    A.  I don't know the true definition of
13  "deposition" or "being deposed," but not like this,
14  no.
15    Q.  Other than the testimony that you gave in
16  Rhode Island back in early 2004, I believe --
17    A.  Right.
18    Q.  -- have you ever given testimony under
19  oath before in any proceeding?
20    A.  Yes.
21    Q.  What type of proceeding was that?
22    A.  Actually, let me think about that.  The
23  only reason why I said yes was because I was a juror
24  in Newburyport.  I don't know if that was oath or

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 13

1  not.
2      Q.  Fortunately jurors don't have to testify.
3      A.  Yeah.  So I'd say no, I can't say that I
4  have.
5      Q.  Okay.  So other than the one time in Rhode
6  Island in a related case to this case, you've never
7  provided testimony under oath before?
8      A.  It's been a long life.  You know, there
9  may have been one time when I worked for my father
10  when someone assaulted a customer in the store and I
11  had to provide testimony as being a witness.
12      Q.  Okay.
13      A.  That may have been one, one time that I
14  can remember.  I think that's about all.
15      Q.  Have you ever been a party to a lawsuit
16  other than this one?
17      A.  No, not that I can recall.
18      Q.  Other than the documents you reviewed in
19  preparation for the testimony today, have you ever
20  reviewed other documents related to either your
21  ownership or the sale of the 1999 Aquasport?
22      A.  I don't know that, if I understand that
23  question.
24      Q.  Okay.  Other than the documents you

Page 14

1  reviewed to prepare for your testimony here today,
2  which have been produced and you've identified them,
3  have there ever been any other documents that you've
4  reviewed, read, seen, that relate either to your
5  ownership of the 1999 Aquasport or which relate to
6  its disappearance and ultimately its sale in either
7  August of '03 or March of '04?
8      A.  No.
9      Q.  Other than Mr. Smith, did you talk to
10  anybody else to help you prepare for your testimony
11  today?
12      A.  Today?
13      Q.  Not just today, but in order to prepare
14  for your testimony today have you talked to anybody
15  other than Mr. Smith?
16      A.  I've discussed with it my brother.  He was
17  my partner in the ownership of the boat.
18      Q.  Other than talking to your brother with
19  Mr. Smith present, when was the last time you talked
20  to him about the testimony you thought you might be
21  giving today?
22      A.  Talk to who?
23      Q.  Your brother.
24      A.  Other than today?

Page 15

1      Q.  Other than with Mr. Smith present.
2      A.  Oh.  Last night.
3      Q.  What did you and your brother discuss last
4  night?
5      A.  We just reviewed the facts on the case.
6      Q.  As best you can recall, what did you talk
7  about?
8      A.  Well, we talked about — let me think.  We
9  talked about — I can't even think what we talked
10  about.  I don't even know.  We were just having
11  dinner up at — what was the name of that place?  I
12  don't know.  It was just conversation at dinner.
13      Q.  Other than your brother and Mr. Smith, did
14  you talk to anybody else about the testimony you
15  might be giving today?
16      A.  No.
17      Q.  Briefly describe for me your educational
18  history.
19      A.  I have a Bachelor of Arts.
20      Q.  From which institution?
21      A.  New England College.
22      Q.  When did you receive your Bachelor of
23  Arts?
24      A.  In 1990.

Page 16

1      Q.  And when did you graduate from high
2  school?
3      A.  In 1986.
4      Q.  And from which high school?
5      A.  Masconomet Regional High School, Boxford.
6      Q.  Have you had any formal education beyond
7  New England College?
8      A.  No.
9      Q.  Would you describe for me your work
10  history from the time you finished college in 1990
11  up until the present?
12      A.  Let's see.
13      Q.  Generally.  I don't need it to the day or
14  hour.
15      A.  I'm trying here.  All right.  Generally I
16  worked for Mass. General Hospital Partners Health
17  Care for ten years as an accountant, cash
18  management, general financial accounting skills.
19  And now I'm working with Brookwood Financial
20  Partners here in Beverly.  It's a venture capital
21  firm.  I'm doing general accounting.
22      Q.  So you worked at MGH from 1990 to about
23  2000?
24      A.  It was — exact dates were I'd say '91 to

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 17

1  '99. Prior to that I was working for my father, he
2  was self-employed, as a clerk, stock hand.
3      Q.  What type of store?
4      A.  Convenience store.
5      Q.  Whereabouts?
6      A.  He had three, so it was during summers and
7  weekends I'd work between Salem, Danvers and Malden.
8      Q.  Okay.  And then in 1999 you moved from MGH
9  to Brookwood Financial?
10     A.  That's correct, yeah.  That was in
11 November.
12     Q.  Are you a CPA?
13     A.  No, I'm not.
14     Q.  Describe for me your experience with
15 owning vessels.
16     A.  Okay.  Well, I have to say that my
17 experience has been generally good.
18     Q.  That's good.  When was the first time you
19 owned a vessel?
20     A.  First time I owned a vessel was this
21 particular one in question and it was a partnership
22 with my brother.
23     Q.  Is that the only vessel that you have ever
24 owned?

Page 18

1      A.  No.  I am also a joint owner in a boat
2  right now, as well.
3      Q.  What type of vessel is that?
4      A.  It's a pleasure craft.
5      Q.  What's the size?
6      A.  It is 26.11 is the, I believe that's the
7  LOA on it.
8      Q.  Okay.  And what's the manufacturer?
9      A.  It's a Grady White.
10     Q.  And when did you acquire the Grady White?
11     A.  I want to say it was -- let's see.  This
12 was our second year on it.
13     Q.  So sometime in 2004?
14     A.  Yeah, it was in I want to say April or
15 May.
16     Q.  And are you the sole owner?
17     A.  No, I'm not.
18     Q.  Who are the other owner or owners?
19     A.  My father and my brother.
20     Q.  Your brother Brian?
21     A.  Yes, my only brother.
22     Q.  And your father's name is?
23     A.  Patrick Gaffey, Patrick Hugh.
24     Q.  Other than those two boats, have you ever

Page 19

1  owned any other vessels?
2      A.  In terms of ownership, no.
3      Q.  What's your experience with other vessels
4  either in your family or friends, relatives that
5  might have had --
6      A.  Well, before this boat in question my
7  brother owned a boat which was an Aquasport.  It was
8  a 19-foot center console downsized from this one.
9  He owned it for a few years.  And we used that boat
10 and it pretty much got us introduced to boating.
11     Q.  How long, if you know, did Brian own the
12 19-foot Aquasport?
13     A.  Gee, I couldn't tell you exactly.  I think
14 it was somewhere in the neighborhood of five years.
15     Q.  Okay.  Other than your brother's Aquasport
16 and the two boats you've had an ownership in, have
17 you used other boats or had experience on other
18 boats?
19     A.  I'd have to say no.
20     Q.  Now, as I understand, in 2001, in August
21 of 2001 you and your brother purchased a 1999
22 Aquasport?
23     A.  If that's the one -- I'm not sure if
24 that's the year that it was manufactured.  Is this

Page 20

1  the boat you're referring to (indicating)?
2          MR. LANGER:  Mr. Gaffey is referring
3  to Exhibit No. 2.
4      Q.  Yes.
5      A.  Okay, 1999.
6      Q.  I believe it refers here to a 1999
7  Aquasport.
8      A.  Okay, yeah, that's the one.
9      Q.  So you purchased that in August of 2001?
10     A.  Yes, if that's what my bill of sale said
11 with Shawn Perkins.  These dates are all running
12 together for me.
13         MR. LANGER:  Would you mark that as
14 Exhibit 3?
15         (Deposition Exhibit No. 3
16         marked for identification.)
17     Q.  Let me show you what's been marked as
18 Exhibit No. 3 and ask if you recognize that
19 document.
20         (Document handed to witness.)
21     A.  Definitely recognize this document.
22     Q.  Is that the bill of sale when you and your
23 brother acquired the 1999 Aquasport?
24     A.  Yes, it is.

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 21

1    Q.   Is that your signature at the bottom?
2    A.   Yes, it is.
3    Q.   Purchase price for the vessel was $24,000?
4    A.   Yeah, that's exactly what it is.
5    Q.   Do you recall how that purchase price was
6   arrived at?
7    A.   To tell you the truth, my brother
8   negotiated that sale price.  My recollection of that
9   is he identified that as a potential -- we were
10   discussing a boat to buy, to move up from the
11   19-foot that he had owned, maybe together, and we
12   thought, he thought that this was a boat that we
13   could look at and he identified it in the newspaper.
14    Q.   So he was the one that negotiated the
15   price and the conditions?
16    A.   Yeah.  He was, Brian's pretty savvy that
17   way as far as knowing what boats were going for and
18   things like that.
19    Q.   Okay.  And were you involved after you
20   purchased the boat in arranging for insurance for
21   the boat or is that something that Brian did?
22    A.   Brian worked on the insurance on that
23   boat, as well.
24    Q.   Okay.

Page 22

1    A.   I was really secondary there.  I was
2   paying the bills.
3    Q.   Sounds like a good deal.
4         Do you know what the vessel was
5   insured for back in 2001?
6    A.   Well, I knew, I knew that when we had it
7   surveyed the surveyor valued it a lot higher than
8   what we purchased it for and then I realize that --
9   well, from that point, I believe that's what we had
10   the boat insured for was the amount that it was
11   surveyed for.  But Brian handled that part of it, as
12   well.
13    Q.   Okay.  Were you involved at all in making
14   the decision to have the vessel surveyed?
15    A.   Yes.
16    Q.   Was the boat surveyed before or after you
17   purchased it?
18    A.   Before.
19    Q.   And based on the survey, you agreed to
20   purchase the boat?
21    A.   Yes.
22    Q.   Or at least in part on the survey?
23    A.   It was -- I think, I mean, I speak for
24   myself that it was due to the survey that we decided

Page 23

1   to purchase the boat because it came back clean.
2   They told us it was a good boat, it was a good
3   investment.
4    Q.   Now, between August of 2001 and May of
5   2003 --
6    A.   Can you repeat those dates again?
7    Q.   Sure.  August 2001, which was when you
8   purchased the boat, and May of 2003, just describe
9   for me generally your use of the boat.
10    A.   I mean, weekends, days off, fishing, just
11   having a good time and enjoying life.
12    Q.   Would you use it every weekend or every
13   other weekend?
14    A.   Not every weekend, no.  You know, these
15   boats that I've owned, my mission isn't to use them
16   every time or every minute that I have off or spare.
17   I just want them available if I want to go boating
18   that day.  I don't know if that answers your
19   question.
20    Q.   Would you say that you would use it more
21   or that your brother would use it more?
22    A.   Well, during those days I think we used it
23   equally.  Today it's a little bit different with the
24   boat that we own now.

Page 24

1    Q.   Why is that?
2    A.   Because Brian has twins and I don't.
3    Q.   Okay.  Now, in May of 2003 you made a
4   decision to sell the boat, is that correct?
5    A.   In May of 2003.  I don't know if we
6   actually made a decision to sell the boat.  I think
7   we were thinking of selling the boat.  The decision
8   to sell the boat hadn't been made.
9    Q.   Did you talk with Dale Friedman at Sea Dog
10   Boat Sales or Yacht Sales in May of 2003 about
11   selling the Aquasport and purchasing a Mako?
12    A.   I was there for the discussions.  I know
13   Brian worked the deal at that time when we met Dale.
14    Q.   When was the first time you met Dale
15   Friedman?
16    A.   I couldn't even tell you.  I would have to
17   say in and around that time frame.
18    Q.   Mr. Friedman wasn't involved when you
19   purchased the Aquasport in 2001?
20    A.   Absolutely not.  I don't even know if he
21   even existed.
22    Q.   "He" being Sea Dog Yacht Sales?
23    A.   Yeah, yeah.
24    Q.   Okay.  So were you the one that made

6 (Pages 21 to 24)

Page 25

1  contact with him in May of 2003 or was that your
2  brother that contacted him?
3      A.  Contacted Dale Friedman?
4      Q.  Yes.
5      A.  I don't know.  That's a tricky question to
6  answer.  I'd have to say, you know, that Brian and
7  I, we used to spend time driving the marinas that
8  would, had boats for sale and we were always, you
9  know, looking to see if there was a deal that we
10  could do.  I couldn't, I don't even know how to
11  answer that question.
12      Q.  What's your first recollection of talking
13  to Mr. Friedman?
14      A.  Probably during that, during that process.
15      Q.  And describe for me as best you can recall
16  the first meeting you had or the first conversation
17  you had with Mr. Friedman sometime around May of
18  2003.
19      A.  I know that we were going to have a boat,
20  the Mako, surveyed and I liked the boat.  We thought
21  it was a step up from this Osprey.  This is just a
22  general, the direction.  I'm not sure if this
23  conversation actually took place or not with him,
24  but this was the direction of the sale or if there

Page 26

1  ever was going to be one.  I know that they wanted a
2  deposit and I wrote them a check for a deposit.
3      Q.  "Them" being Sea Dog?
4      A.  Sea Dog, yeah.
5      Q.  All right.
6      A.  Pending a survey.
7      Q.  What was the check for, do you remember?
8      A.  It was for $3,900.
9      Q.  What was the purchase price of the Mako?
10      A.  From recollection, I can't tell you
11  exactly.  I think it was 10 percent.  It might have
12  been 39,000.
13      Q.  And Mr. Friedman was the broker for the
14  Mako?
15      A.  I believe so, yeah.
16      Q.  Were you willing to pay him a commission
17  for your purchase of the Mako had the purchase gone
18  through?
19      A.  If the purchase had gone through,
20  everything was going to be done by the books.  He
21  would have received his commission, yes.  And I
22  think that's what the $3,900 represented up front.
23      Q.  Now, was there an agreement with Mr.
24  Friedman that if you bought the Mako, he would act

Page 27

1  as the broker for the Aquasport?
2      A.  You know, you're getting into an area that
3  I don't know if there was an agreement or not.  I
4  know that Brian was, had discussions with him on it
5  and I know that he was going to buy our boat, but I
6  wasn't having, I wasn't negotiating with Dale.
7      Q.  So your brother handled the negotiations
8  with Mr. Friedman?
9      A.  More clearly, yeah.
10      Q.  Do you recall reaching an agreement with
11  your brother based on his conversations with Mr.
12  Friedman that Mr. Friedman was going to try and sell
13  the Aquasport and if he couldn't sell it, he'd buy
14  it from you for $24,000?
15      A.  Yes, yes, yes.
16      Q.  And that was all contingent on your buying
17  the Mako?
18      A.  Yes, I believe so.
19      Q.  Do you believe that $24,000 for the
20  Aquasport in May of 2003 was a fair price?
21      A.  Well, yeah.  I mean, that's what we
22  decided.  We weren't going to lose any money on the
23  deal.
24      Q.  Now, as I understand it, the Mako didn't

Page 28

1  survey out?
2      A.  Right.
3      Q.  And so you made a decision not to buy the
4  Mako?
5      A.  That's correct.
6      Q.  And you got your deposit back?
7      A.  Yes.
8      Q.  And you and your brother and Mr. Friedman
9  parted ways at that point?
10      A.  Yes.
11      Q.  Now, when you were discussing the Mako
12  with Mr. Friedman did you authorize him to advertise
13  the Aquasport for sale?
14      A.  Authorize.  I don't believe I authorized
15  him.
16      Q.  I'm sorry, I didn't mean to interrupt you.
17      A.  Yeah, but I believe that there were some
18  photos on the web page.
19      Q.  You understood when you were discussing
20  the possibility of buying the Mako and were having
21  it surveyed that Mr. Friedman was going to market
22  your boat and so if you ended up buying the Mako,
23  he'd be able to either sell your boat or at least he
24  would take title to it?

7 (Pages 25 to 28)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 29

1    A.   That's a fair assumption, yeah.
2         MR. LANGER:  Can you mark that as
3    Exhibit 4?
4         (Deposition Exhibit No. 4
5         marked for identification.)
6    Q.   In May of 2003 --
7    A.   May of '03, okay.
8    Q.   -- do you recall signing any sort of
9    brokerage agreement or other agreement with Mr.
10   Friedman for the sale of the Aquasport?
11   A.   I can't say that I do.
12   Q.   Would it be fair to say that it was a
13   verbal agreement that you had with him with regard
14   to the purchase of the Mako and the sale of the
15   Aquasport?
16   A.   I really, I would say yes, I would say
17   yes, yeah.  I don't have any documents to prove that
18   otherwise.
19   Q.   Right.  You've looked through your files
20   with regard to both the potential purchase of the
21   Mako and then the later sale of the Aquasport --
22   A.   Right.
23   Q.   -- to see all the documents you have in
24   your possession?

Page 30

1    A.   Right.
2    Q.   And you didn't find any written agreement?
3    A.   Right, because I would have seen it the
4    other night and immediately I would have been able
5    to recall that, yeah.
6    Q.   So the agreement that you had with Mr.
7    Friedman in May of 2003 was a verbal agreement?
8    A.   I have to say so, yeah.
9    Q.   Let me show you what's been marked as
10   Exhibit No. 4 and ask if you recognize that
11   document.
12        (Document handed to witness.)
13   A.   I recognize it.
14   Q.   Fair to say that this is a printout of the
15   advertisement for the 1999 Aquasport on Sea Dog
16   Yacht Sales' Internet site?
17   A.   Yes.
18   Q.   When was the first time you either saw the
19   Internet site or saw the printout?
20   A.   You're asking for dates here.
21   Q.   Well, generally.
22   A.   I'd have to say in or around that May Mako
23   transaction.
24   Q.   Did you go on the Sea Dog site to see

Page 31

1    whether he was advertising your boat?
2    A.   I don't even have a computer, tell you the
3    truth.  I use one at work.  I can't stand computers,
4    so you know.
5    Q.   You think somebody would have printed out
6    a copy and shown it to you?
7    A.   No one would actually print a copy out and
8    say, here, look at this.
9    Q.   Do you remember seeing it when you were at
10   Brian's house or maybe at work taking a look?
11   A.   We may, I know we may have looked at it at
12   Brian's house.  I know this exhibit came from the
13   Rhode Island hearing, I recall that.
14   Q.   I understand.  But what I'm trying to find
15   out is when you first would have either looked at
16   the website or had seen a printout of what was on
17   the website.
18   A.   Like I say, I think it must have been in
19   May.
20   Q.   Okay.  Were you involved at all in
21   providing Mr. Friedman the information that was then
22   posted on the Sea Dog website?
23   A.   Well, let me take a look.
24        I may have told him the fuel tank

Page 32

1    capacity, the length and the beam, may have told him
2    what belonged with the boat, the T top.  Yeah, I
3    would say I would -- not everything entirely, but
4    part of it.
5    Q.   Did you take Mr. Friedman down to look at
6    the boat?
7    A.   I never took him in person, no, anywhere.
8    Q.   Did you provide him with any photographs
9    of the boat?
10   A.   I never provided him with any photographs
11   at any time.
12   Q.   The photographs that appear in Exhibit
13   No. 4, are those photographs of your vessel?
14   A.   They are, indeed.
15   Q.   Can you tell from looking at the
16   photographs in Exhibit 4 where the vessel was
17   located when they were taken?
18   A.   Yeah.
19   Q.   Where was the vessel located?
20   A.   That was at Riverfront Marina in Newbury,
21   Massachusetts right off of Route 1A.
22   Q.   Is that typically where you kept the boat?
23   A.   At the time.  Actually, when we owned the
24   boat or during our ownership of the boat that's

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 33

1  where it was a hundred percent of the time.
2      Q.  Do you remember telling Mr. Friedman that
3  that's where you kept the boat?
4      A.  Yes, I do.
5      Q.  When the boat wasn't in the water where
6  was it kept?
7      A.  It was on blocks in storage there.
8      Q.  So it was either in the water or at the
9  marina in Newbury 12 months of the year?
10     A.  Absolutely.
11     Q.  Now, after the deal with the Mako fell
12 through --
13     A.  Wait a second.  I have to -- we may have
14 -- sorry.  We may have brought that to Brian's house
15 one winter for storage.
16     Q.  Okay.  Do you remember which winter?
17     A.  I think it might have been the first one.
18 I think we only did that once because it tore up his
19 yard.
20     Q.  So after that first year it was stored at
21 the marina during the winter?
22     A.  Yeah.
23     Q.  Okay.  After the Mako deal fell through
24 did you make any attempt to continue to market the

Page 34

1  boat?
2      A.  No, I didn't.
3      Q.  Had you and your brother pretty much made
4  a decision in the spring of 2003 that you wanted to
5  sort of trade up to a bigger boat?
6      A.  Well, there's so many dynamics involved in
7  buying a boat.  I mean, at the time it may have
8  seemed like a good deal, but then -- or a good idea,
9  but then after, when the survey came back, something
10 may have happened in my life when I decided, you
11 know, we're not going to buy another boat.  I
12 couldn't tell you what those facts are, because
13 mostly I don't remember, but I know my life was
14 pretty fluid at the time.
15     Q.  Are you married?
16     A.  No.  But I was looking for a place just to
17 live, you know.
18     Q.  And fair to say that in May of 2003 you
19 were prepared to sell the Aquasport?
20     A.  Yeah.
21     Q.  And move on a different vessel?
22     A.  Or -- yeah, yeah.
23     Q.  Okay.  When was the next time after May of
24 2003 when you had any discussions with Mr. Friedman

Page 35

1  about selling the Aquasport?
2      A.  2003.  When I had a discussion with him.
3  Actually, when he called me.
4      Q.  Okay.
5      A.  Yeah.  He called me at home I want to say
6  sometime in August out of the blue.
7      Q.  Early August, late August?
8      A.  It could have even been, let's see, July.
9  It would have been early August or late July, in
10 those summer months preceding this fiasco that's why
11 we're sitting here today.
12     Q.  Okay.  So Mr. Friedman called you late
13 July, early August.  What did he tell you?
14     A.  He told me that he had someone that was
15 interested in the boat and I was, like, what are you
16 talking about?
17     Q.  Well, as best you can recall the actual
18 conversation, what did he say?
19     A.  Essentially that.  He said, first of all,
20 there's someone on the phone named Dale Friedman and
21 I didn't -- so I didn't even, wasn't even being --
22 Brian and I hadn't even had a discussion that it was
23 being up for sale.  And he was telling me that he
24 had a buyer, someone who was interested in the boat.

Page 36

1  And I recall telling him, gee, I don't even know if
2  this boat's even for sale.  I don't own it, my
3  brother and I own it.  We have to discuss it.  I'll
4  get back to you.
5      Q.  Okay.  Was it a five-minute conversation,
6  ten minutes?
7      A.  At the most that, because I know that's
8  exactly what I would have said to him at the time.
9      Q.  Do you have a specific recollection of
10 that or do you just believe that's what you would
11 have told him?
12     A.  No, that's most definitely what I said to
13 him.
14     Q.  Okay.  And after you talked with Mr.
15 Friedman did you call your brother?
16     A.  Yeah, I did.
17     Q.  Same day?
18     A.  Probably moments after, if not.  There
19 might have been phone records of that call.
20     Q.  And what did you tell your brother?
21     A.  Just that.
22     Q.  What was his response?
23     A.  He couldn't believe it, either, you know,
24 that this boat was for sale and that, you know,

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 37

1  there was a buyer for it.
2      Q.  After your discussion with your brother or
3  during your discussion with your brother did you
4  decide to find out more about what the buyer was
5  prepared to pay you for the boat?
6      A.  I just know we were going to get back to
7  him.  We had to think about it.  I know Brian was
8  going on vacation.  We weren't, it wasn't like I was
9  jumping on it.
10     Q.  Was it you that got back to Mr. Friedman
11 or was it your brother?
12     A.  I believe I did.
13     Q.  And how long after the first conversation
14 did you call him back?
15     A.  I would have to say within the week.
16     Q.  And describe for me as best you can recall
17 the conversation you had with Mr. Friedman when you
18 called him back.
19     A.  My general recollection of that
20 conversation would be just finding out more facts on
21 what this potential buyer wanted to pay for the
22 boat.
23     Q.  And what did Mr. Friedman tell you?
24     A.  I think they said something like, I don't

Page 38

1  know, like 27, 30,000 or something like that.
2      Q.  Did he tell you anything else?
3      A.  I can't tell you for sure.
4      Q.  Do you think that was a fair price for the
5  boat?
6      A.  At the time I thought it was a pretty fair
7  price, yeah.
8      Q.  And what else did Mr. Friedman tell you
9  other than 27 to 30,000 for the boat?
10     A.  I can't, I can't tell you because I don't
11 remember.
12     Q.  Okay.  Back in the spring, in May when you
13 --
14     A.  Back in May, yeah.
15     Q.  -- May of 2003 when you talked with Mr.
16 Friedman about selling the boat the first time did
17 you give him a number, a price that you wanted to
18 get for the boat?
19     A.  I think it was somewhere in the ballpark
20 of 27,000, 24,000, somewhere around there.
21     Q.  And after Mr. Friedman talked to
22 you in August and said that he thought he had a
23 buyer in the 27 to 30,000 range, did you call your
24 brother again?

Page 39

1      A.  Could you repeat that again?
2      Q.  Sure.  When you called Mr. Friedman back
3  --
4      A.  Okay, we're fast-forwarding up in August?
5      Q.  We're back in August, I apologize.  And
6  you called him back and wanted to get more details
7  about the potential buyer he said he had for your
8  boat.
9      A.  Yeah.
10     Q.  And he told you he thought the price would
11 be 27 to $30,000.
12     A.  Right.
13     Q.  And you can't recall anything else he told
14 you at that time?
15     A.  Specifically, I can't tell you.
16     Q.  Okay.  After he gave you the information,
17 did you call your brother up at that point?
18     A.  I believe isn't this what I had just told
19 you?  I'm not sure, but I did call my brother after
20 he called me the first time, yeah.
21     Q.  Then you called him back?
22     A.  Yeah.
23     Q.  And he gave you a price?
24     A.  Right.

Page 40

1      Q.  Did you then call your brother a second
2  time and tell him what Mr. Friedman had told you
3  about what you could get for your boat?
4      A.  I'm getting caught up in this.  We're
5  going to have to start over.  I'm not sure what
6  you're getting at.
7      Q.  Mr. Friedman called you out of the blue --
8      A.  Yeah.
9      Q.  -- one day and said I've got a buyer for
10 your boat.
11     A.  Yeah.
12     Q.  And as a result of that conversation, you
13 called your brother and said I just got a call from
14 Dale Friedman, he's got a buyer for our boat.
15     A.  Right.
16     Q.  And after that conversation, you said
17 about a week later you called Friedman back.
18     A.  Yeah.
19     Q.  And you said give me the particulars about
20 what this person is offering us for the boat.
21     A.  Right.
22     Q.  And Mr. Friedman said I think I can get 27
23 to $30,000.
24     A.  Okay.

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 41

1    Q.   Do you recall any other specifics that he
2   gave you during that phone call?
3    A.   No, I don't.
4    Q.   Okay.  After that — did that phone call
5   last five minutes, ten minutes?  How long did it
6   last?
7    A.   Every conversation I had with him was
8   short.
9    Q.   After that second conversation you had
10  with him did you then call your brother and tell him
11  that Dale Friedman says we can get 27 to $30,000 for
12  our boat?
13   A.   I would absolutely have called him, yeah.
14   Q.   Do you recall what your brother told you
15  at that point?
16   A.   I think the consensus at that time was
17  let's see where this goes, let's go forward with it.
18   Q.   Fair to say that you and your brother were
19  willing to sell your boat for $27,000 after that
20  conversation?
21   A.   It's fair to say we were willing to enter
22  into the bargaining of it.
23   Q.   And would it be fair to say that you were
24  willing to sell the boat at that point for $27,000?

Page 42

1    A.   We were willing to bargain for the price,
2   yeah.
3    Q.   Had somebody said to you I'll pay you
4   $27,000, would you have said okay?
5    A.   Yeah, I think so, I think so.
6        MR. LANGER:  Mark that as Exhibit 5.
7        (Deposition Exhibit No. 5
8         marked for identification.)
9    Q.   Mr. Gaffey, let me show you what I've
10  marked as Exhibit No. 5 and ask if you recognize
11  that document.
12       (Document handed to witness.)
13   A.   I recognize the first page.  I recognize
14  the second page and the third page.  This was faxed
15  to me at work and I signed it.
16   Q.   Okay.  Exhibit No. 5 originally was a fax
17  that Mr. Friedman sent to you at work, is that
18  correct?
19   A.   That's true.
20   Q.   And it enclosed a purchase and sale
21  agreement for the sale of the Aquasport?
22   A.   It was a purchase and sale agreement that
23  was faxed to me at work, that's true.
24   Q.   And the buyer was a woman named Pamela

Page 43

1   Jordan?
2    A.   At the time that's all I knew.
3    Q.   And she lived in Rhode Island?
4    A.   At the time, yeah.  This is everything I
5   knew of the transaction.
6    Q.   And the purchase price was $27,000?
7    A.   That's right.
8    Q.   And you read through it and it was
9   satisfactory to you and you signed it, is that
10  correct?
11   A.   Actually, I talked about it with Brian.
12   Q.   Okay.  So before you signed it did you
13  call your brother?
14   A.   Yeah.
15   Q.   And you went over the contents of the
16  purchase and sale agreement?
17   A.   Yeah.
18   Q.   And the two of you agreed that it was
19  satisfactory?
20   A.   I asked him if I could sign it and he said
21  sure.
22   Q.   Did you send it over to your brother then
23  to sign?
24   A.   No.

Page 44

1    Q.   You then sent it back to Mr. Friedman?
2    A.   That's right.
3    Q.   Do you believe that you had authorized Mr.
4   Friedman to go forward with the sale of your boat
5   based on your signature?
6        MR. SMITH:  Objection.  Go ahead.
7    A.   I don't know how to answer.  What do I do?
8    Q.   You can answer that.
9    A.   Did I authorize him?
10   Q.   Did you believe when you signed that
11  purchase and sale agreement and sent it back to Mr.
12  Friedman that you had authorized him to move forward
13  with the sale of your boat?
14       MR. SMITH:  Objection.
15   Q.   You can answer it.
16   A.   Okay.  Yes.
17   Q.   And the purchase price was $27,000?
18   A.   Yes.
19   Q.   And Mr. Friedman was going to get a
20  commission?
21   A.   That's true.
22   Q.   In fact, you made a change to the purchase
23  and sale agreement to limit his commission to
24  10 percent?

11 (Pages 41 to 44)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 45

1    A. I did. I didn't know what -- you know, I
2    just, I wanted to make it clear there that's what it
3    was, because I didn't know what other hidden fees or
4    whatever, you know, there's like all these little
5    costs and things like that. I just wrote it in
6    there black and white equivalent to 10 percent.
7    Q. And you turned around and faxed it back to
8    Mr. Friedman?
9    A. Yes, I did.
10    Q. You told him in the cover sheet you made a
11    change to number 3?
12    A. That's true.
13    Q. Now, after you sent that back did you
14    believe at that time that your brother was going to
15    sign this document?
16    A. No.
17    Q. You were acting on behalf of both you and
18    your brother with Mr. Friedman, isn't that true?
19    A. That's true, yeah. I had his authority to
20    sign it, I thought.
21    Q. Now, after you -- strike that.
22        This fax is dated August 11th, 2003?
23    A. Yeah.
24    Q. And that also is the date that you signed

Page 46

1    the purchase and sale agreement?
2    A. That's true.
3    Q. Now, did you talk with Mr. Friedman on
4    August 11th?
5    A. I most certainly did, yeah.
6    Q. Okay. Describe for me the telephone
7    conversation you had with Mr. Friedman on August
8    11th.
9    A. It was probably extremely brief saying
10    that I'm faxing this over to you, sign it, just what
11    it says, this lady, she's in Block Island and fax it
12    back to me and we can get this thing going. And he
13    was rushing it and so that's -- and then I signed
14    it. And that's the reason why Brian didn't sign it.
15    Q. Okay. And you sent it back to him?
16    A. Yeah.
17    Q. When was the next time you talked with Mr.
18    Friedman after August 11th?
19    A. Let's see, that was August 11th? I don't
20    know. I can't give you an exact date.
21    Q. Well, do you remember the content of the
22    conversation?
23    A. I don't know. Let me look at this some
24    more, maybe I'll remember something.

Page 47

1        I know that, I just recall that we
2    were, we wanted a closing.
3    Q. Okay.
4    A. And that's what we were looking for.
5        MR. LANGER: Mark that as the next
6    exhibit.
7        (Deposition Exhibit No. 6
8        marked for identification.)
9    Q. Mr. Gaffey, let me show you what's been
10    marked as Exhibit No. 6 and ask if you recognize
11    that document.
12        (Document handed to witness.)
13    A. I recognize this document.
14    Q. What is that document?
15    A. Well, first of all, there's two separate
16    documents here.
17    Q. Okay. What's the first page?
18    A. The first one is, it's a payoff. I had
19    called my bank and asked for a payoff and the per
20    diem.
21    Q. Is this a loan that you and your brother
22    had taken out to purchase the Aquasport?
23    A. No. This was my own loan.
24    Q. This was a loan you had taken out --

Page 48

1    A. Yeah.
2    Q. -- for your half of the Aquasport?
3    A. Not even half. I owned ten thousand, so
4    this was my ten thousand, yeah. This was the
5    balance.
6    Q. So you were looking for a payoff on your
7    loan?
8    A. Yeah.
9    Q. Now, when you had purchased the vessel did
10    Eastern Bank have a lien on the vessel to secure its
11    loan of $10,000 to you?
12    A. Absolutely.
13    Q. Now, page 1 is on Sea Dog fax cover sheet?
14    A. Right.
15    Q. And did you prepare that document or did
16    Mr. Friedman prepare it?
17        MR. SMITH: Can I just object for a
18    quick second? You said a fax cover sheet.
19        MR. LANGER: I'll rephrase it.
20    Q. First page of Exhibit No. 6 is on a sheet
21    with Sea Dog Yacht Sales at the top?
22    A. Yeah.
23    Q. And did you prepare that document or did
24    Mr. Friedman?

12 (Pages 45 to 48)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 49

1    A.  I filled in the information that was
2  required.  This is my writing.
3    Q.  Did you do that at Sea Dog Yacht Sales or
4  in your office?
5    A.  I can't tell you exactly.  I'd have to
6  look at a calendar.  Because if the 13th was a
7  weekend — it's most likely that I got the
8  information, filled this out, and personally brought
9  this back to him.
10    Q.  "Him" being Mr. Friedman?
11    A.  Yeah.  But if I looked at a calendar, I
12  could tell you for sure what I did.  Because if the
13  13th was the weekend, I would have gone up there.
14    Q.  Gone up to?
15    A.  To Sea Dog, yeah.
16    Q.  Okay.  Now, second page of Exhibit No. 6,
17  what is that?
18    A.  That is a seller's final accounting.  And
19  that was done at Sea Dog on the 16th of August 2003.
20    Q.  Okay.  So the first page is dated August
21  13th?
22    A.  Right.
23    Q.  And that's your handwriting?
24    A.  Yeah.

Page 50

1    Q.  You don't recall whether you filled it out
2  at Sea Dog or took it back to Sea Dog on that day?
3    A.  I definitely didn't fill this out at Sea
4  Dog because I would have had to get this information
5  from the bank and then I filled it in on my own
6  time.  And I wouldn't have done that at Sea Dog.
7    Q.  Would you have then faxed the first page
8  of Exhibit 6 to your bank?
9    A.  No.  This has my social security number on
10  here and banking information.  It's something I
11  wouldn't have faxed, no.
12    Q.  So would you have hand-delivered that to
13  Eastern Bank?
14    A.  I wouldn't have, no.  This is something
15  that, this is information that Eastern Bank gave me
16  that I put on here and then gave to Sea Dog.
17    Q.  Okay.  So page 1 is information you got
18  from Eastern Bank?
19    A.  Yeah.
20    Q.  And filled it out on the 11th -- or excuse
21  me, on the 13th?
22    A.  On the 13th, yes.
23    Q.  And then you gave that to Mr. Friedman?
24    A.  That's correct.

Page 51

1    Q.  And do you recall whether you faxed it to
2  Mr. Friedman or hand-delivered it to Mr. Friedman?
3    A.  I would not have faxed this to him because
4  it's got my social security number, it's got all my
5  vitals on there.
6    Q.  Okay.  Now, it's actually at the bottom of
7  the first page, but somewhat upside down there is,
8  looks like a fax reference from Sea Dog.
9    A.  Yeah.
10    Q.  Do you know how that got to be there?
11    A.  No.  I mean, that could be -- I don't even
12  know.  He may have faxed that to me and then I
13  filled it out, but I didn't fax it back to him.
14    Q.  Okay.  Do you know what Mr. Friedman did
15  with page 1 of Exhibit 6 after you gave it to him?
16    A.  I don't know what he did with it, no.
17    Q.  Now, we were talking about page 2 which
18  you correctly identified as a seller's final
19  accounting.
20    A.  Yeah.
21    Q.  And is it fair to say that that's
22  information that was provided to you by Eastern
23  Bank?
24    A.  No.  That information -- can I answer the

Page 52

1  question?
2    Q.  Sure.
3    A.  That information was information that Dale
4  Friedman provided to Brian and I that we signed and
5  agreed to.
6    Q.  Okay.  And that was your understanding of
7  how the sale proceeds from the vessel were going to
8  be distributed?
9    A.  Right.  6,744.55, the payoff amount on the
10  13th was the, 6,728.05.  So $1.65 a day tells you how
11  many days after we agreed.
12    Q.  When you -- and this was prepared at Sea
13  Dog?
14    A.  Yes, it was.
15    Q.  Okay.  Is that your signature at the
16  bottom?
17    A.  Yes, it is.
18    Q.  And to your knowledge, is that your
19  brother's signature?
20    A.  He was with me, yes, it is.
21    Q.  And the purpose of this document was both
22  you and your brother's acknowledgment that of the
23  sale proceeds, you were going to end up with
24  $17,555.45?

13 (Pages 49 to 52)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 53

1    A.  Yeah, after the lien was paid off and
2  there was a closing, that's what was going to
3  happen.
4    Q.  Okay.  On the 16th of August when did you
5  anticipate there would be a closing?
6    A.  I recall him telling me that there were
7  some issues with the money, what's her name, Jordan,
8  getting the money and it was moved up in the month
9  to around the 26th or so.
10    Q.  Did you realize that the longer the
11  closing was delayed, that the numbers on page 2 of
12  Exhibit 6 would change a little bit?
13    A.  Yeah, I did.  That's why we had the per
14  diem amount on there.
15    Q.  But there was no question in your mind
16  that Mr. Friedman was going to get $2,700 out of the
17  sale?
18    A.  Yeah.  He got more than that.
19    Q.  And that the bank would get somewhere
20  between 6,744 and another number depending on how
21  long it took you to close?
22    A.  Right.
23    Q.  Now --
24      MR. SMITH:  Can we take a break at

Page 54

1  some point before you get into another document?
2      MR. LANGER:  This is fine, this is
3  fine.
4      MR. SMITH:  All right.
5      (Recess 11:01-11:12 a.m.)
6      (Deposition Exhibit Nos. 7-8
7      marked for identification.)
8    Q.  Mr. Gaffey, a moment ago you indicated
9  that you had taken out a loan from Eastern Bank for
10  $10,000 to help defray your portion of the purchase
11  price of the boat?
12    A.  Yes, I did.
13    Q.  And that was the information that was
14  being gathered in Exhibit 6?
15    A.  Uh-huh, yes.
16    Q.  Let me show you what's been marked as
17  Exhibit 7.
18      (Document handed to witness.)
19    Q.  Is that in fact a copy of the promissory
20  note that you signed back in August of '01?
21    A.  Yes, it is.
22    Q.  Let me show you what's been marked as
23  Exhibit No. 8 and ask if you recognize that
24  document.

Page 55

1      (Document handed to witness.)
2    A.  Yeah, I recognize this document, too.
3    Q.  Okay.
4    A.  Yes.
5    Q.  Exhibit 8 is a bill of sale for your
6  Aquasport to Pamela Jordan?
7    A.  It's a bill of sale, uh-huh.
8    Q.  And there are two signatures at the bottom
9  under the reference "Sellers."  Is one of those
10  signatures yours?
11    A.  Yes.
12    Q.  Is, to the best of your knowledge, is the
13  other one your brother's?
14    A.  Yes.
15    Q.  And did you in fact sign that bill of sale
16  on August 17th, 2003?
17    A.  I did.
18    Q.  And where were you when you signed the
19  bill of sale?
20    A.  I was in the office with Elizabeth Warren.
21    Q.  Was that at Sea Dog's?
22    A.  No.  It was in Topsfield.
23    Q.  Okay.  Who had provided the bill of sale
24  to you?

Page 56

1    A.  That was Dale.
2    Q.  Mr. Friedman?
3    A.  Dale Friedman, right.
4    Q.  Okay.  And is that, to the best of your
5  knowledge, his handwriting at the top of the page?
6    A.  I don't even know whose handwriting that
7  is.
8    Q.  Okay.  And you were in Topsfield, where in
9  Topsfield?
10    A.  At the Prudential Real Estate building.
11    Q.  Okay.  Why were you there?
12    A.  My brother's wife is a real estate agent
13  and her boss is Elizabeth Warren and she's a notary.
14    Q.  Okay.  So the two of you went to that
15  office to sign the bill of sale and have your
16  signatures notarized?
17    A.  Uh-huh.
18    Q.  You have to answer yes.
19    A.  Yes.
20    Q.  What did you do with the bill of sale
21  after you signed it on August 17th?
22    A.  Well, it was a draft.  We gave it to Dale
23  for a closing that never took place.
24    Q.  But you say it's a draft.  Did you

14 (Pages 53 to 56)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 57

1  envision any changes that would be made to the bill
2  of sale after — when you signed it?
3    A.  Well, the date could have changed.  I know
4  that the title had to go along with that, too.
5    Q.  So you and your brother signed the bill of
6  sale and returned it to Mr. Friedman?
7    A.  Uh-huh, yes, yes, I did.
8    Q.  And the purpose of returning it to Mr.
9  Friedman was to facilitate the sale of your vessel
10  to Ms. Jordan?
11    A.  It was a draft for — it was essentially
12  an escrow, my understanding was for safekeeping.  It
13  was an agreement that, look, we are really
14  interested in selling this boat and this is our best
15  faith in doing that.
16    Q.  Okay.  So you'd signed a P&S, is that
17  correct?
18    A.  The purchase and sale agreement, myself,
19  yes.
20    Q.  And you had given that to Mr. Friedman?
21    A.  Yes.
22    Q.  And you then, you and your brother then
23  signed a bill of sale on August 17th and gave that
24  to Mr. Friedman?

Page 58

1    A.  Uh-huh, yes.
2    Q.  Now, at some point you had a discussion
3  with Mr. Friedman about moving the boat from its,
4  from the marina to Sea Dog?
5    A.  Yes.
6    Q.  Was that a conversation you had or your
7  brother had?
8    A.  I had that conversation.
9    Q.  Okay.  When was that conversation with Mr.
10  Friedman?
11    A.  Oh, jeez.  I can't give you an exact date,
12  but I know it was, I think it was after, it may have
13  been after this.
14    Q.  Okay.  You're referring to Exhibit No. 8?
15    A.  Yeah.
16    Q.  So after August 17th you had a
17  conversation with Mr. Friedman in which you
18  authorized him to move the boat from the marina to
19  Sea Dog's place of business?
20    A.  I can't say for absolute certainty if it
21  was after, but I can't give you an exact date, to
22  tell you the truth.
23    Q.  Fair to say, though, that you did have a
24  conversation with him —

Page 59

1    A.  I did.
2    Q.  — around this time in which you
3  authorized —
4    A.  Yes.
5    Q.  — Mr. Friedman to move the boat from the
6  marina to his place of business?
7    A.  I did, yeah.
8    Q.  Did you also authorize Mr. Friedman to
9  have sea trials for the boat at the marina for Ms.
10  Jordan?
11    A.  Yes.
12    Q.  Did you attend and participate in the sea
13  trials?
14    A.  No.
15    Q.  To your knowledge, were there in fact sea
16  trials of the vessel at the marina?
17    A.  To my knowledge, I can't tell you because
18  I never saw them.
19    Q.  Fair enough.  Had you provided the keys to
20  the boat to Mr. Friedman so that they could operate
21  it?
22    A.  I never provided them because the keys
23  were in the boat.
24    Q.  Did you tell Mr. Friedman the keys were in

Page 60

1  the boat and you can go ahead and operate it for sea
2  trial purposes?
3    A.  We told him the keys were in the boat.
4    Q.  You expected him to make the boat
5  available for sea trials to Miss Jordan?
6    A.  To tell you the truth, Miss Jordan was not
7  part of, I recall that she was not part of the
8  trial, the sea trials.  It was I think that he was
9  doing it, their own mechanic was doing it at Sea
10  Dog.
11    Q.  Sea Dog's mechanic?
12    A.  Sea Dog's mechanic, yeah.  I don't think
13  — and Pamela Jordan was going to get the report of
14  that.
15    Q.  Fair to say that you had authorized Mr.
16  Friedman to operate the boat for purposes of a sea
17  trial to report its condition to Ms. Jordan?
18    A.  Yes.
19    Q.  Now, at the top of Exhibit No. 6 there
20  appears to be some handwriting, although some of
21  it's cut off.  It appears to say, "Notarized copies
22  returned."
23    A.  Uh-huh.
24    Q.  Is that how you would read it?

15 (Pages 57 to 60)

Page 61

1    A. It looks that way.

2    Q. Is that your handwriting?

3    A. It could be.

4    Q. Do you have any recollection as to why you

5    would have put "Notarized copies returned" at the

6    top of page 2 of Exhibit 6?

7    A. I think the only recollection that I could

8    have had was that at the time when this was done,

9    and this was the day after -- that's exactly what it

10   was. We were at Sea Dog on the 16th. We executed

11   this document and he asked us for two notarized

12   copies. We returned it on the following day.

13   Q. Okay. Just so the record is clear, you're

14   referring to page 2 of Exhibit 6 which was the

15   payout information that's dated August 16th. At

16   that time Mr. Friedman provided you with two copies

17   of a bill of sale?

18   A. I'm not sure if it was two. I can't tell

19   you if it was two or not.

20   Q. Again --

21   A. But it says two there. You know, I can't

22   tell you.

23   Q. But your best recollection is that the

24   reference at the top of page 2 of Exhibit 6 where it

Page 62

1    says "Notarized copies returned," the copies that

2    are referred to are the bill of sale dated August

3    17th, 2003 that you and your brother signed --

4    A. Yeah.

5    Q. -- in Topsfield?

6    A. Yes.

7        MR. LANGER: Mark that as Exhibit 9.

8        (Deposition Exhibit No. 9

9         marked for identification.)

10   Q. Mr. Gaffey, let me show you what's been

11   marked as Exhibit No. 9 and ask if you recognize

12   that document.

13       (Document handed to witness.)

14   A. I recognize this one, too.

15   Q. Okay. What is Exhibit No. 9?

16   A. This is a forged document.

17   Q. It's a bill of sale running from you and

18   your brother to Ms. Jordan?

19   A. This isn't even from me. I didn't sign

20   this.

21   Q. I'm not asking you, I'm asking you is the

22   -- I'll strike that.

23       Is that your signature at the bottom

24   of Exhibit No. 9?

Page 63

1    A. No.

2    Q. To your knowledge, is that your brother's

3    signature?

4    A. No, it is not his signature.

5    Q. Now, after you had authorized the movement

6    of the vessel from the marina to Sea Dog did you

7    have any other conversations with Mr. Friedman?

8    A. None that really stick out in my mind

9    right now, no.

10   Q. Okay. And well, let me ask you this,

11   after you authorized him to move the vessel to Sea

12   Dog did you ever speak with him again?

13   A. That's a more open question. I would have

14   to say yes.

15   Q. So when was the next time? Was it within

16   a day or two or a couple of days?

17   A. After we delivered the boat, or after the

18   boat was, they moved it to Sea Dog, I can't even

19   tell -- I don't even know. Without a document that

20   says that this was when --

21   Q. I'm trying to figure out whether you have

22   a recollection of speaking with Mr. Friedman at any

23   time after you had authorized him to move the boat

24   up until today.

Page 64

1    A. Up until today?

2    Q. Right.

3    A. Recollection of talking with him. Well, I

4    had a lot of conversations with him after that,

5    yeah. I remember calling him, asking him, you know,

6    about the closing.

7    Q. Well, tell me, let's start off the first

8    conversation that you can recall after the boat was

9    moved, what did you discuss during that

10   conversation?

11   A. Well, I recall asking, you know, when the

12   closing was going to be. I know we agreed on a

13   certain date. We wanted to get this thing done in

14   Massachusetts and at Sea Dog. And he kept telling

15   me that the buyer hadn't sent the money and that's

16   why the date kept getting moved out. I recall

17   having conversations or attempting to get in touch

18   with him on those dates and I know that he kept

19   moving the date up.

20   Q. When you say "date up," further and

21   further in August?

22   A. Yeah, further and further, yeah.

23   Q. Okay. And would it be fair to say that if

24   Mr. Friedman had called you up and said, Kevin, I've

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 65

1  got a check for you in the amount of approximately
2  17,500 and some dollars, come and get it, that would
3  have been satisfactory to you?
4      A.  I don't think so, no.
5      Q.  Why not?
6      A.  Because I wanted a certified check and I
7  wanted confirmation that my lien was going to get
8  paid off.
9      Q.  If he had called you and said I have a
10 certified check payable to you and your brother for
11 17,500 and some odd dollars and I've paid off the
12 lien from the bank, that have been satisfactory to
13 you?
14     A.  If there was proof from the bank, yeah,
15 that it was paid off.
16     Q.  Let me show you what's been marked as
17 Exhibit No. 7.
18         (Document handed to witness.)
19     Q.  We've already identified that as the note
20 that you signed for Eastern Bank.
21     A.  Right.
22     Q.  There's a stamp in the middle of that that
23 says "Paid August 29th, 2000."
24     A.  Yes.

Page 66

1      Q.  Do you know how that stamp got to be put
2  there?
3      A.  Well, I didn't put that stamp there, but I
4  made payment.
5      Q.  2003, excuse me.
6      A.  I made the payment.
7      Q.  When did you make the payment?
8      A.  It would have been days -- I have it in my
9  checkbook.
10     Q.  You wrote the bank a check for
11 approximately $6,750 on August 29th, 2003?
12     A.  On the 29th, it couldn't have been the
13 29th, no.  I can tell you this, the days leading up
14 to that payment went like this.  The day that I went
15 to Sea Dog and found that my boat was no longer
16 there and we never had a closing and we never
17 received payment and there was nothing there and
18 Dale wasn't available and no one knew where he was
19 and I filed the police report, I went down the next
20 day and paid that note off because I wanted to make
21 sure that I had the title.  I actually had called
22 the bank and made sure that the title was there,
23 that they still had it.  I was really concerned
24 about that title because that was the only thing

Page 67

1  that I had any proof of my ownership of that boat in
2  my mind.  So I went to the bank and I only had
3  $10,000 in my savings account and I paid that off.
4      Q.  And did they stamp the note that day and
5  give it back to you?
6      A.  I assume they did, because they must have.
7      Q.  And did they give you the title to the
8  boat that day?
9      A.  They didn't give it to me that day, but
10 they mailed it to me.
11         MR. LANGER:  Mark that as the next
12 exhibit.
13         (Deposition Exhibit No. 10
14         marked for identification.)
15     Q.  Mr. Gaffey, let me show you what's been
16 marked as Exhibit No. 10.
17         (Document handed to witness.)
18     Q.  Do you recognize that document?
19     A.  This is the title.
20     Q.  And on the front of the title Eastern Bank
21 has released the lien on August 29th, 2003?
22     A.  That's true.
23     Q.  And is it your recollection that that
24 title was mailed to you at some point after August

Page 68

1  29th?
2      A.  Yes, I received it.
3      Q.  Do you still have a copy of the cancelled
4  check that you used for the bank to pay off the
5  bank?
6      A.  My records aren't that great, my bank
7  statements.  I would assume I must have it
8  somewhere, but I can't find it.
9      Q.  Have you looked for either the statement
10 or the check?
11     A.  I haven't looked for it, no.
12     Q.  Would you look for it and if you find it,
13 provide a copy to Mr. Smith?
14     A.  I do have a receipt of the payment that I
15 received from the bank that corresponds with the
16 payoff.  I do have that.
17         MR. SMITH:  Didn't I give that to
18 you?
19         MR. LANGER:  I don't believe so.
20         THE WITNESS:  I don't think so.  I
21 have that.
22         MR. SMITH:  Hold on.
23         THE WITNESS:  I don't think so.  I
24 was talking to --

17 (Pages 65 to 68)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 69

1    MR. LANGER: Hold on until Mr. Smith
2  gets back.
3    MR. SMITH: Off the record for a
4  second.
5    (Discussion off the record.)
6    Q.  Mr. Gaffey, you're going to review your
7  records to try and find either the receipt that you
8  received from the bank and provide that to Mr.
9  Smith. Your recollection is that you paid with a
10  check?
11    A.  I know I paid with a check, yeah.
12    Q.  Okay.
13    A.  And I'll do the best I can to find that
14  check. I can't guarantee that I will find it.
15    Q.  Either the check or your statement that
16  would reflect the payment and the receipt would be
17  --
18    A.  Okay.
19    Q.  You had described a moment ago the
20  conversation, a conversation you had had with Mr.
21  Friedman where he indicated that Ms. Jordan hadn't
22  sent the money and therefore the closing was
23  delayed.
24    A.  Uh-huh.

Page 70

1    Q.  You have to answer yes or no.
2    A.  Excuse me, yes.
3    Q.  Do you recall having any other
4  conversations with Mr. Friedman after that
5  conversation?
6    A.  I'd have to say no, because I remember
7  talking to other people in that office and we were
8  looking for Dale.
9    Q.  Did you have any conversations with
10  anybody else in Mr. Friedman's office before you
11  learned that your vessel was no longer at the Sea
12  Dog facility?
13    A.  Only in discussions with this transaction,
14  you know, trying to find out what was going on and
15  where was Dale and things like that.
16    Q.  Was this all before you learned that the
17  boat was no longer at Sea Dog Yacht Sales or was it
18  after?
19    A.  I mean, I have talked to, I have talked to
20  other people in the office, but -- could you please
21  repeat that question?
22    Q.  Sure. What I'm trying to find out is at
23  some point you discovered that your boat was not at
24  Sea Dog.

Page 71

1    A.  Yeah.
2    Q.  Now, from the time you had the last
3  conversation with Mr. Friedman where he said Ms.
4  Jordan hasn't sent her money, so the closing --
5    A.  Right.
6    Q.  Up until the time you discovered that your
7  boat was not at Sea Dog --
8    A.  Right.
9    Q.  -- did you have any conversations with
10  anybody at Sea Dog during that time?
11    A.  No. After we had, like, a discussion of
12  when the closing was going to be and then I remember
13  calling, you know, and trying to figure out, you
14  know, when that closing was going to happen, and
15  then the next thing I know that the boat's gone and
16  Dale's gone. Those are my recollections.
17    Q.  As far as the division of labor between
18  you and your brother --
19    A.  Yeah.
20    Q.  -- were you the one that was handling the
21  negotiations with Sea Dog for the sale of the
22  vessel?
23    A.  For the most part, yeah.
24    Q.  To your knowledge, did your brother ever

Page 72

1  call Dale Friedman and talk with him about the sale
2  of the vessel or was that sort of your job?
3    A.  I think I was the one that was handling
4  the deal, yeah, yes.
5    Q.  Okay. At some point you found out the
6  boat was not at Sea Dog?
7    A.  Yeah, I did.
8    Q.  How did you find out that it wasn't there?
9    A.  I called up and asked, because I couldn't
10  get a hold of Dale.
11    Q.  And who did you talk to at Sea Dog?
12    A.  I don't know his name.
13    Q.  It was a man, not a woman?
14    A.  It was a man.
15    Q.  Tell me as best you can recall what the
16  conversation entailed.
17    A.  I said -- I think there was probably like
18  three or four days that I had called looking for
19  Dale and he wasn't there, and then finally I said is
20  my boat there? And they said -- they asked me who I
21  was and they said that it's gone. And I didn't know
22  what to do at that point. I called Brian and said
23  we've got a big problem here. Dale's not -- can't
24  find Dale and the boat's gone.

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

**Page 73**

1     Q.  Do you know roughly when that was?  Are we
2  still in August or into September?
3     A.  That was like, I want to say a day before
4  we filed the police report that we actually went to
5  Sea Dog.  It was like two days prior to the filing
6  of the police report.
7     Q.  And so that was when you had this
8  telephone call?
9     A.  Yeah, right.
10     Q.  Did you then call your brother and told
11  him that the boat's not there, and what happened
12  then?
13     A.  We went up to Sea Dog the next day or
14  perhaps even that day.  I can't tell you if it was a
15  Friday or not.  If it was a Friday, we went up
16  there.
17     Q.  And did you talk with anybody at Sea Dog?
18     A.  We met someone at the door and there were
19  a lot of unhappy people there.  And our boat was
20  gone and it was chaos.  And there was no Dale.  And
21  we asked where our boat was and no one knew where it
22  was.
23     Q.  Did you talk to any other boat owners that
24  day about what their situation might be?

**Page 74**

1     A.  I don't think I did, but I think my
2  brother may have.  I know there were some really
3  unhappy people up there.
4     Q.  Okay.  So what happened after you went up
5  to Sea Dog and found out that your boat wasn't
6  there?
7     A.  I could have had a breakdown.  I was
8  really upset.  We went to the police station, filed
9  a report.  We didn't know what to do.
10     Q.  Did anybody at Sea Dog suggest you go to
11  the police department and file a report?
12     A.  I think they did.
13     Q.  And so you and your brother went to which
14  police department?
15     A.  Went to Salisbury.
16     Q.  And what did you tell them?
17     A.  I filled out the police report and it's in
18  my statement what I said.  I just said that, you
19  know, our boat's missing.  We're supposed to have a
20  closing that never happened.  There was no
21  transaction.  Our boat's gone.  And they said fill
22  out a report.  They didn't know if it was -- how to
23  classify it and they said that there were other
24  people had come in that day and were filing reports.

**Page 75**

1     Q.  So you weren't the only one?
2     A.  No.
3     Q.  Do you remember the name of the officer
4  you talked with?
5     A.  I can't remember his name, but he was a
6  detective.
7     Q.  Now, did you think of calling Pamela
8  Jordan and asking her whether she had paid money or
9  whether she had your boat?
10     A.  Well, I think that night Brian and I
11  talked about what could we do, what can we do?  We
12  didn't even know where our boat was.  We didn't even
13  know who had it.  And we certainly didn't have any
14  money from any sale or any closing that ever took
15  place.
16     Q.  Well, the question was did you -- you knew
17  that Pamela Jordan was the prospective buyer?
18     A.  Yeah.  Well, we assumed it was -- at that
19  point in time we'd been had, yeah.
20     Q.  My question, Mr. Gaffey, is you knew at
21  that point that Pamela Jordan was the prospective
22  buyer?
23     A.  I assumed at that point that she was.
24     Q.  And you had her name and her address in

**Page 76**

1  the purchase and sale agreement?
2     A.  I had her name and address, yes.
3     Q.  Did you attempt to call her to see whether
4  she had your boat or knew where the boat was?
5     A.  I didn't, but my brother did.
6     Q.  Okay.  That day or a couple of days later?
7     A.  I think it was that night, yeah.
8     Q.  And did he -- were you present when the
9  call was made?
10     A.  I most likely was.
11     Q.  What do you recall about that conversation
12  between your brother and Pamela Jordan?
13     A.  I just recall that she -- that we found
14  our boat, that we knew that someone had the boat and
15  that was at least a plus.
16     Q.  So the night you went to the police
17  department --
18     A.  Right.
19     Q.  -- and made your report --
20     A.  Right.
21     Q.  -- you knew that the boat was in Rhode
22  Island and you knew that Pamela Jordan had paid Mr.
23  Friedman the purchase price of the boat?
24     A.  Wait a second.  Could you please repeat

19 (Pages 73 to 76)

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 77

1  that?
2      Q.  Sure.  After the conversation your brother
3  had with Pamela Jordan --
4      A.  Right.
5      Q.  -- the night you made the police report,
6  you knew that she had the boat, is that correct?
7      A.  Well, I didn't really know she had the
8  boat.  She said she had the boat.  I hadn't seen it
9  with her, you know.
10      Q.  Do you have any reason to believe that she
11  was lying to your brother?
12      A.  At this point I didn't know.  I had been
13  lied to.  I didn't know who to --
14      Q.  Did your brother tell you that Pamela
15  Jordan told him --
16      A.  Yeah.
17      Q.  -- that she had the boat?
18      A.  Yeah, right.
19      Q.  And did your brother tell you that Pamela
20  Jordan had told him that she had paid Mr. Friedman
21  for the boat?
22      A.  Yes.
23      Q.  And so to the best of your knowledge, the
24  boat was in Wakefield, Rhode Island?

Page 78

1      A.  To the best of my knowledge.
2      Q.  Did you call up the police that night and
3  tell them you knew where the boat was?
4      A.  I don't think I did, no.
5      Q.  Did you ever go back to the police
6  department and tell them you knew where the boat
7  was?
8      A.  The Salisbury police called us and both of
9  us went back, I'm not sure if it was that weekend or
10  it was a few days or a week or so later, but we did
11  ultimately go back I believe one time.
12      Q.  And when you went back did you tell them
13  that you know where the boat was?
14      A.  I believe so.
15      Q.  And did you give them Ms. Jordan's address
16  and phone number?
17      A.  I believe so, yeah.
18      Q.  Have you ever talked to Pamela Jordan
19  yourself not with your brother?
20      A.  I talked to her.
21      Q.  When did you first talk to Pamela Jordan?
22      A.  I don't remember the exact date, but she
23  was really upset.  She cried a lot and I didn't want
24  to talk to her any more.

Page 79

1      Q.  How many times did you talk to her?
2      A.  Very limited.  One, two.  It was one time
3  when I think she was, there was like a cell phone
4  involved, we got disconnected.  I tried calling her
5  back.  I don't know.  I tried not to talk to her.
6      Q.  So during the one to two times you talked
7  with her do you recall any of the specifics of what
8  either you told her or she told you?
9      A.  All I know, it was, essentially it was
10  just like a process where we were just trying to get
11  a feeling for who we were as individuals in this
12  process and how can we resolve it.  And the next
13  thing I know, I'm being sued.
14      Q.  Did she ever ask -- strike that.
15          During the one to two times you did
16  talk with her did you ever ask her to return the
17  boat to you?
18      A.  I'm not sure if I did.  I didn't want to
19  upset her any more.  Brian was dealing with her.
20      Q.  Okay.
21      A.  Plus I think the police were involved in
22  that situation.  I thought they were going to help
23  us out.  I thought they could sort this thing out
24  for us.  I didn't make any demands.

Page 80

1      Q.  Have you ever talk to anybody at Acadia
2  Insurance?
3      A.  Only you, I think.
4      Q.  Other than today, you and I have never
5  spoken before today?
6      A.  No.
7      Q.  You never talked with --
8          THE WITNESS:  What's going on here?
9          MR. SMITH:  I was just teasing him,
10  I'm just teasing him.
11      Q.  You've never talked with anybody in the
12  Acadia claims department?
13      A.  No.  Oh, you know something?  I may have
14  talked to somebody, to tell you the truth.  After we
15  got the response back from, the initial response
16  that, I don't remember who the person was that Brian
17  made our initial contact with, I think it was a
18  letter or something.  I thought -- I wanted to call
19  this individual and talk to them, I don't know who
20  they were, and get a feel for the decision and that
21  I disagreed with the decision.  And that was that.
22  And I don't know who the person was.  I know it was
23  the name that, of the man that we made, he made the,
24  Brian made the initial report with.

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 81

1    Q.  Isaac Howe?
2    A.  Yeah, that's the guy.
3    Q.  How many times did you speak with Mr.
4  Howe?
5    A.  I think it was just one time.
6    Q.  And do you remember when you called?
7    A.  It was in an afternoon.  I don't remember
8  the date or anything like that.
9    Q.  What did Mr. Howe tell you?
10    A.  Essentially that he couldn't help us.
11    Q.  Did he discuss the basis that Acadia was
12  denying your claim, why he was denying your claim?
13    A.  I don't remember the specifics of the
14  conversation other than, you know, there was really,
15  generally there was nothing you could do for us,
16  that you saw this as a non-claim item, you know.
17    Q.  And what did you tell him?
18    A.  I don't know.  I may have told him I
19  disagreed, gave him a five cent, you know,
20  disagreement conversation and, you know, told him
21  have a nice day.  I wasn't angry with him or
22  anything like that and that was about it.
23    Q.  A moment ago you said after you talked to
24  Ms. Jordan once or twice, the next thing you knew

Page 82

1  you were being sued.
2    A.  Yeah.
3    Q.  And this was the action that was pending
4  in Rhode Island?
5    A.  Right.
6    Q.  And you contested, you and your brother
7  contested the court's jurisdiction over the two of
8  you in Rhode Island?
9    A.  Yes.
10    Q.  Why didn't you want to resolve the issue
11  of who owned the boat at that point?
12    MR. SMITH:  Objection.  You can
13  answer the question.  You might be calling for
14  attorney/client.
15    MR. LANGER:  I'm not asking him for
16  any advice, but I'm asking him why he didn't want
17  to.  He can answer it any way he wants.
18    Q.  But I don't want your attorney's advice as
19  far as what your attorney told you.
20    A.  As far as I was concerned, she was not
21  willing to negotiate.  She wanted the whole thing,
22  you know.  She wanted the whole boat.  And it was
23  just like an impossible situation, you know.
24    Q.  My question, Mr. Gaffey, is you understood

Page 83

1  that the purpose of the lawsuit in Rhode Island was
2  to resolve the issue of who owned the boat, is that
3  correct?
4    A.  Well, that was the initial purpose, but
5  then secondly we did a jurisdiction where we
6  questioned should it even be tried in Rhode Island.
7    Q.  I understand.  But my question is the
8  lawsuit that was filed in Rhode Island, to the best
9  of your knowledge, was to resolve the issue of who
10  owned the boat?
11    A.  Right.
12    Q.  And you contested the court's jurisdiction
13  over you in Rhode Island?
14    A.  Right.
15    Q.  My question is why didn't you want to
16  resolve the issue of ownership at that time?
17    A.  I didn't want to drive to Rhode Island.  I
18  live in Massachusetts.  That's a long haul.  It's
19  days off.
20    Q.  Okay.  Now, the court initially or
21  eventually agreed with you that there was no
22  jurisdiction in Rhode Island.
23    A.  Uh-huh, yes.
24    Q.  And not long after that you and your

Page 84

1  brother and Ms. Jordan came to a resolution of the
2  title questions?
3    A.  Yes.
4    Q.  And at that point she paid you an
5  additional $7,000?
6    A.  I believe she paid $7,000, if that's
7  what's in our documents.  I believe she paid $7,000.
8    Q.  And her broker paid you an additional
9  $5,000?
10    A.  That's correct.
11    MR. LANGER:  Mark that as whatever
12  the next number is and that the next number.
13    (Deposition Exhibit Nos. 11-12
14  marked for identification.)
15    Q.  Mr. Gaffey, let me show you what's been
16  marked as Exhibit No. 11.
17    (Document handed to witness.)
18    Q.  Do you recognize that document?
19    A.  Let me see what we've got here.  This is
20  the general release.  I signed it, I recognize it.
21    Q.  That is your signature on page 2?
22    A.  Absolutely.
23    Q.  And to the best of your knowledge, that's
24  your brother's signature?

21 (Pages 81 to 84)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

Page 85

1    A.   Yes.
2    Q.   Were you present when he signed it?
3    A.   Yes.
4    Q.   Let me show you what's been marked as
5  Exhibit No. 12 and ask if you recognize that
6  document.
7           (Document handed to witness.)
8    A.   Bill of sale, yes.
9    Q.   And is that your signature?
10   A.   Yes, it is.
11   Q.   And to your knowledge, is that your
12  brother's signature?
13   A.   Yes.
14   Q.   What's the date of that document?
15   A.   March 23rd, 2004.
16   Q.   And that bill of sale recites that you and
17  your brother sold the Aquasport to Pamela Jordan for
18  the sum of $27,000?
19   A.   Yes.
20   Q.   And referring back to Exhibit No. 10 to
21  page 2, it reflects -- I think you had already
22  identified your signature and your brother's
23  signature.  That reflects transfer of title of the
24  vessel to Pamela Jordan?

Page 86

1    A.   True.
2           MR. LANGER:  Why don't we take a
3  break for a minute?  I'm just about done, I think.
4           (Recess 11:56-12:02 p.m.)
5           MR. LANGER:  I have no other
6  questions for Kevin Gaffey.
7           MR. SMITH:  Okay.  I'll clarify
8  two points.
9           CROSS EXAMINATION
10  BY MR. SMITH:
11   Q.   Kevin --
12   A.   Yes.
13   Q.   -- Mr. Langer talked about, early on when
14  he was questioning you, about moving forward towards
15  the sale of the boat.  What did you understand, when
16  did you understand the sale to take place?  When was
17  it going to take place?
18   A.   Sale was going to take place with the
19  closing.  It was going to be, we were going to
20  exchange cash, have a title transfer and the boat
21  was, we were going to release the boat at Sea Dog.
22   Q.   Okay.  I'm going to ask you during the
23  Rhode Island proceeding, I want to just clarify one
24  part of that record, give you an opportunity to do

Page 87

1  that.
2           MR. SMITH:  Len, I'll mark these
3  pages as an exhibit.  I just want to do it after we
4  finish.
5           MR. LANGER:  What pages are you
6  talking about?
7           MR. SMITH:  I was going to mark page
8  34 and 35 of the transcript from the Rhode Island
9  action.
10          MR. LANGER:  Well, I mean, you can
11  -- sure.  I'll wait and see.
12   Q.   At the bottom it says -- you were in a
13  series of discussions with, you were being asked
14  questions --
15          Let me back up.  You've read the
16  transcript today?
17   A.   Yes.
18   Q.   And is there something you want to clarify
19  on this, in this transcript?
20   A.   There's one thing I would like to clarify
21  and that was my answer to question "Have you ever
22  signed any bill of sale in connection with the
23  Aquasport?"  And the reason why I did answer no at
24  the time was because I was responding to the

Page 88

1  evidence that was in front of me at the time.  In my
2  mind if I had answered yes, I would have had to have
3  respond with any bill of sale I signed at any time.
4  That's how I made a distinction.
5           MR. SMITH:  I have nothing further.
6  Just if you want to ask him on those.
7           MR. LANGER:  Do you have the cover
8  sheet?
9           MR. SMITH:  Yeah, I just want to
10  make a copy of that because I want -- can I make a
11  copy and let you stamp that one instead?
12          MR. LANGER:  Sure.
13          MR. SMITH:  Thanks.
14          (Deposition Exhibit No. 13
15           marked for identification.)
16          MR. LANGER:  Just for the record,
17  we've marked as Exhibit 13 the cover sheet of the
18  transcript of testimony of January 9th, 2004, as
19  well as pages 34 and 35.
20          I have no other questions.
21          For the record, I'll maintain the
22  original exhibits and provide copies to Mr. Smith.
23          MR. SMITH:  And we will forward you
24  a copy of any of the bank information that shows

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8

Page 89

1   that he paid off that promissory note.
2        MR. LANGER:  Okay.
3        (Whereupon, the deposition in the
4        above-entitled matter was concluded
5        at 12:07 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 91

1   COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF SUFFOLK
2
3
         I, HEIDI B. STUTZ, Certified Shorthand
4   Reporter No. 146599S and Notary Public duly
    commissioned and qualified in and for the
5   Commonwealth of Massachusetts, do hereby certify
    that KEVIN P. GAFFEY, the witness whose testimony is
6   hereinbefore set forth, came before me on November
    18, 2005, at 9:55 a.m. who was by me duly sworn to
7   testify to the truth and nothing but the truth of
    his knowledge touching and concerning the matters in
8   controversy in this case; that he was thereupon
    examined upon his oath, and his examination reduced
9   to typewriting under my direction; and that the
    transcript is a true record of the testimony given
10  by the witness to the best of my knowledge, skill
    and ability.
11
         I further certify that I am neither
12  attorney nor counsel for, nor related to or employed
    by any of the parties to the action in which this
13  deposition is taken; and further that I am not a
    relative or employee of any attorney or counsel
14  employed by the parties hereto or financially
    interested in the action.
15
         IN WITNESS WHEREOF, I have hereunto set
16  my hand this 21st day of November, 2005.
17
18
19
20
21        HEIDI B. STUTZ
22
23
24

Page 90

1        C E R T I F I C A T E
2   I, KEVIN P. GAFFEY, do hereby certify under the
    pains and penalties of perjury that I have read the
3   foregoing transcript of my testimony given on
    November 18, 2005, and I further certify that said
4   transcript is a true and accurate record of said
    testimony (with the exception of the following
5   corrections listed below):
6   Page    Line    Correction
7
8
9
10
11
12
13
14
15
16
17                        .
18
19
20
21
22  Dated at              , this
    day of        , 2005.
23
24  HBS              DEPONENT

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

50c52ed5-0fbc-42f5-b47a-b1b88f99b2e8