# OFFENSE REPORT

*Seller*

## SALISBURY POLICE DEPARTMENT
### 24 RAILROAD AVENUE, SALISBURY, MA 01952

Name _Brian Kevin Gaffey_    DOB _7-27-17_  S.S. # _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_  Case _03-739-OF_

Address _13 Tucker Ln Tewksbury MA 02083_    Phone _978-880-3112_  (work 978-909-1800)

Offense _7 C + D / Boat Sale_    Place of Occurrence _Sea Dog Boat Broker_

Date and time offense committed _August 2003_    Officer Assigned _____

Report received by _phone_    at _1:20_ P.M. Date _8/29_ 20_03_  How reported _Walk in_

Time of investigation _____ M. Date _____

Suspects and/or persons arrested _____

---

**DETAILS OF OFFENSE [State fully all other circumstances of this offense and its investigation]**

As owner of Boat MASS. Registration
MS 5532 B - Serial # AQABHA51A999 - 1999 - (225-
(model) (Osprey) AQuaSport - Motor Boat. We have not Received
$24,300 from sale, - Cash was paid by wire
from Buyer to Sea Dog - Dale Friedman in second week
of August
Boat Broker - Dale Friedman
                Sea Dog Yacht Sales
                161 Bridge Rd, Salisbury MA
Co Broker :     → cell # 603-498-6438
Boats Unlimited
Rhode Island / Contact Paul Lawson

Buyer:

Pamela Jordan
Cranston
Rhode Island


Payment to Seller was ____ by delivery: Boat was sold with no
written consent or approval or cash ____

---

**Signed on this date,** _____ **of my own free will and accord and under the pains**

# OFFENSE REPORT

## SALISBURY POLICE DEPARTMENT
### 24 RAILROAD AVENUE, SALISBURY, MA 01952

Name _Brian _____ Kahn_ DOB _____ S.S. # _____ Case # _03 787_

Address _____ Phone _____

Offense _____ Place of Occurrence _Salisbury Ma_

Date and time offense committed _____ Officer Assigned _____

Report received by _____ at _____ M. Date _____ 20___ How reported _____

Time of investigation _____ M. Date _____

Suspects and/or persons arrested **Dale Friedman**

**DETAILS OF OFFENSE (State fully all other circumstances of this offense and its investigation)**

Reference Case # 037370F

Dale Friedman advertised and Marketed My 1997 Seasport Boat without an Signed agreement or My Permission.

In May 03 we went put a deposit on a MAKO 23ft. At That Time Dale agreed to sell our boat if we were to buy the MAKO. IF he couldn't sell it in 2 weeks he would buy it for $24,000. He would be Only do this if we went through w/ the purchase of the MAKO. The deal Fell apart due to a bad Survey. At this point The Deal was Dead. We gave Dale no permission to Market my Boat after that point. He returned our $3,900 deposit.

Signed on this date, _____ of my own free will and accord and under the pains

978 465 6148

1 03 03:27p      Sea Dog Yacht Sales, Inc.   978 465 6148              p.1



**Sea Dog Yacht Sales Inc.**
Boat Brokerage & Marine Services
Phone: 978-465-9063 Fax: 978-465-6148
161 Bridge Road Salisbury, MA 01952
http://www.seadogyachtsales.com

## FACSIMILE TRANSMITTAL SHEET

To: KEVEN GAFFEY

Company

Fax Number 978-927-0499

Phone Number:

From: DALE.F.

Date: 8/11/03

Total No. Pages Including Cover: 3

Sender's Reference Number:

KEVEN —

PLEASE SIGN + FAX BACK.

SHE'LL SIGN TOMORROW AM

(SHE'S ON BLOCK ISLAND TODAY)

THANX,

DALE



*Boats Unlimited*
*401-783-6600*

**Sea Dog Yacht Sales Inc.**
Boat Brokerage & Marine Services
Phone: 978-465-9063   Fax: 978-465-6148
161 Bridge Road Salisbury, MA 01952
http://www.seadogyachtsales.com

*Paul Larson*

## Purchase & Sales Agreement

This agreement is made by and between ___PAMELA JORDAN___ of ___54 FORDSON AVE. CRANSTON, RI 02910___ ("Buyer"), and ___KEVON + BROWN GAFFEY___ of ___76 LAWRENCE RD. BOXFORD, MA___ ("Seller"), and owner of the ___1999 22' AQUASPORT___ ("Yacht"), and named ___—___
The Selling Broker is ___BOATS UNLIMITED___ Listing Broker is ___SEA DOG YACHT SALES___.

The Selling Price of the "Yacht" is ___TWENTY SEVEN THOUSAND___ dollars (US $ ___27,000___ ). The "Deposit" amount shall be equivalent to 10% of the "Selling Price" and as such is ___Twenty Seven Hundred___ Dollars (US $ ___2,700___ ), and is due upon execution of this agreement. The Deposit will be Paid to the "Selling Broker" and held by "Selling Broker" in their escrow account pending the successful close of this sale. The balance will be paid at closing in the form of Bank Check, Wire or Cash.

The "Brokers" strongly recommend the "Buyer" have the "Yacht" surveyed. Said survey (and related costs) is solely at "Buyers" expense. "Broker(s) also agrees to provide "Buyer" with a full and accurate Inventory of the "Yacht" prior to survey. The "Seller" agrees that the "Yacht" will be accessible for survey and all included inventory will be at the "Yacht" day of survey. "Seller" further agrees that the "Buyer" and/ or his agents may survey the "Yacht" (with proper notice to "Seller") and location of survey must be approved by "Seller". It is understood that the "Buyers" offer to purchase is subject to survey and/ or Sea-Trial and that the selling price may be negotiated after the survey. Should the boat be on-stands, it is the buyers' responsibility to pay to haul the boat to and from sea trial (minimum of $125).

The "Buyer" agrees that the Surveyor(s) contracted by the "Buyer" has been selected by the "Buyer" and that the Brokers will not be held liable for any omissions, errors or incorrect information that may "come to light" as a result of the survey.

The "Buyer" must notify the "Selling Broker" of his acceptance or rejection of the "Yacht" (and its Inventory) no later than Three o'clock PM local time on/ or before ___8/15/03___ (in writing). It is the "Buyer's" responsibility to accept or reject the "Yacht" by the above date and to secure satisfactory finance and/ or insurance for the "Yacht".

Should the "Buyer" reject the "Yacht" (under the provisions of this agreement). Both the "Buyer" and "Seller" agree that the "Buyer's" deposit may be immediately returned to the "Buyer" (minus any costs incurred by "Buyer"). If the buyer fails to accept of reject the boat by dates specified above and/or fails to close on boat by date below the buyers deposit may be forfeited.

Should the "Buyer" accept the "Yacht" (under the provisions of this agreement), both the "Buyer" and "Seller" agree that the "Closing" shall occur by Three o'clock PM local time on/ or before ___8/15/03___ at the office of ___SEA DOG + VIA AVANNEZIA___

*Sea Dog Yacht Sales*
*Purchase & Sales Agreement, Continued*

The "Seller" shall deliver the "Yacht" "Free and Clear" of any liens, mortgages or applicable bills at time of closing or, if there are outstanding liens, mortgages or applicable bills "Seller" agrees that "Brokers" may deduct the applicable funds from the proceeds of the sale. "Seller" further agrees that the "Brokers" Commission is to be paid at Closing and that "Brokers" are authorized to deduct Commissions from the proceeds of the sale.

It is understood by the "Buyer" of the "Yacht" that neither the "Brokers(s)" nor "Seller" have made any express or implied warranties regarding the "Yacht". The "Buyer" further agrees that the "Broker" and "Seller" shall not be held liable for any apparent or hidden defects in the "Yacht". It is the "Buyer's" sole responsibility to examine the "Yacht" (and all applicable inventories) and accept responsibility for determining the condition of the "Yacht".

**It is understood and agreed by the "Buyer" that the "Buyer" will pay a $95.00 administrative closing fee at the time of close.** _____ *(Initial)*

Additional Provisions:

① DEPOSIT FULLY REFUNDABLE SUBJECT TO
SURVEY + SEA-TRIAL.                                KPG

② SELLER RESERVES THE RIGHT TO NEGOTIATE ONLY
MAJOR ISSUES AFTER SURVEY —      KPG

③ TOTAL COMMISSION PAID IS EQUIVALENT TO 10% — TEN PERCENT.
                                          KPG

Buyer: _____   Date: ___/___/___

Buyer: _____   Date: ___/___/___

Seller: _____   Date: 8/11/03

Seller: _____   Date: ___/___/___

Should "Buyer" elect not to survey the "Yacht", He/ She acknowledges that the "Broker(s)" has reviewed the survey process (with the "Buyer") and the "Buyer" understands that the Boat is sold "As Is-Where is" with no express or implied warranty from "Broker(s)" or "Seller".

Buyer: _____N/A_____   Date: ___/___/___ Phone # _____

Revised March 24, 2003

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

WASHINGTON Sc.                                    SUPERIOR COURT

PAMELA JORDAN                          )
                                       )
          VS.                          ) NO: WC2003-0664
                                       )
KEVIN GAFFEY                           )

HEARD BEFORE THE HONORABLE MR. JUSTICE JEFFREY LANPHEAR

JANUARY 9, 2004

APPEARANCES:

DOMENIC A. MOSCA, ESQUIRE
FOR THE PLAINTIFF

PATRICK J. DOUGHERTY, ESQUIRE
FOR THE DEFENDANT

JAMIE K. HALPIN
CERTIFIED SHORTHAND REPORTER

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAMELA JORDAN | 2 | 17 | | |
| BRIAN GAFFEY | 23 | 26 | | |
| KEVIN GAFFEY | 32 | 36 | | |
| PAUL LARSON | 47 | 52 | 58 | |

* * * * * * * *

## E X H I B I T S

| PLAINTIFF'S | IDENTIFICATION | FULL |
|---|---|---|

| DEFENDANT'S | IDENTIFICATION | FULL |
|---|---|---|
| A, Yacht World Website | | 3 |
| B, Purchase and Sale Agreement | | 3 |
| C, Bill of Sale | | 3 |

* * * * * * * * * * * *

# C E R T I F I C A T I O N

I, Jamie K. Halpin, CSR, hereby
certify that the succeeding pages, 1 through 82
inclusive, are a true and accurate transcript
of my stenographic notes.


_____
JAMIE K. HALPIN, CSR
Court Reporter

1    (FRIDAY, JANUARY 9, 2004)

2    AFTERNOON SESSION, 2:40 P.M.

3         THE CLERK:    Your Honor, the matter before the

4    Court is WC2003-0664, Pamela Jordan versus Kevin

5    Gaffey.

6         MR. DOUGHERTY:  Good afternoon.  Patrick

7    Dougherty for the defendants, Kevin and Brian Gaffey.

8         MR. MOSCA:  For the record, Domenic A. Mosca,

9    Junior from North Kingstown, Rhode Island for the

10   Plaintiff, Pamela Jordan.

11        THE COURT:  Thank you.  This is defendant's

12   motion; is that correct?

13        MR. DOUGHERTY:  Yes, your Honor.  We're here today

14   on defendants', Brian and Kevin Gaffeys' motion for

15   dismission for lack of Personal Jurisdiction.  Your

16   Honor, in keeping with the request earlier in the

17   conference we had, we'd like to have a little testimony

18   from the parties.

19        THE COURT:  Sure.  You may proceed.

20        MR. DOUGHERTY:  Thank you.  The defendants would

21   like to call Pamela Jordan to the stand, please.

22   **PAMELA JORDAN,** called as a witness, first having been

23   **duly sworn, testified as follows:**

24        THE CLERK:  Please state your full name and spell

25   the last name for the record.

1        THE WITNESS:  Pamela Jordan,  J-O-R-D-A-N.

2        THE COURT:  Thank you.  Sit, if you'd like.

3        MR. DOUGHERTY:  If I may just have a short second

4   with Mr. Mosca to stipulate to the exhibits?

5        THE COURT:  That would be fine.  Thank you.

6   **DIRECT EXAMINATION BY MR. DOUGHERTY:**

7  Q  Good afternoon.  Could you please state your full name

8   for the record.

9  A  Pamela Ann Jordan.

10  Q  Are you the Pamela Jordan who entered into a purchase

11   and sale agreement with Brian and Kevin or with Kevin

12   Gaffey for the purchase of a 22-foot Aquasport 225

13   Osprey?

14  A  Yes.

15  Q  I'm showing you what's been marked as Defendant's

16   Exhibit A or I will be showing you.

17        MR. DOUGHERTY:  Your Honor, for purposes of

18   following along, I believe these are all exhibits

19   attached to both the complaint and Mr. Mosca's

20   objection.

21        THE COURT:  Excellent.  I appreciate that.  Are

22   those full exhibits or any objection to them being full

23   exhibits?

24        MR. MOSCA:  No.

25        THE COURT:  Okay.  I appreciate that.  They may all

1    be.

2         MR. DOUGHERTY:  We have all, A, B, and C, agreed

3    to.

4         THE COURT:  Thank you.

5    (EXHIBITS A, B AND C, MARKED)

6  Q   I'm showing you Defendant's Exhibit A.  I'd

7    like you to take a look at those three pages and when

8    you're done, if you could just look up, please.  Do you

9    recognize that document, Ms. Jordan?

10 A   Yes.

11 Q   What do you recognize it to be?

12 A   It's the website that I saw the Aquasport on.

13 Q   And is that how you came to know of the Aquasport being

14   offered for sale by the Gaffey brothers?

15 A   Yes.

16 Q   And where did you see that advertisement?

17 A   You mean this?

18 Q   Yes, ma'am.

19 A   Saw it on the website.

20 Q   Do you know the name of the website on which that

21   internet advertisement was located?

22 A   I saw that on -- yeah.  Yeah.  It was on YachtWorld.com,

23   and you put certain criteria for the boat that you are

24   looking for, and this was one of the boats that came up

25   as listed as Sea Dog Yacht Sales.

1  Q   Sea Dog Yacht Sales, how did you come to know of them?

2  A   Just through this.

3  Q   Okay.  Through the internet advertisement?

4  A   Yes.

5        MR. DOUGHERTY:  May I approach?

6        THE COURT:  Yes.

7  Q   What did you do upon seeing the advertisement?  Did you

8     contact anybody?

9  A   I was at my brokers.  We saw that on the internet

10    together.  He printed it out for me, and he contacted

11    Sea Dog Yacht Sales, and I made an appointment to go see

12    the boat.

13  Q   Where was Sea Dog Yacht Sales located?

14  A   Newbury, Massachusetts or Salisbury, Massachusetts.

15  Q   But it clearly wasn't in Rhode Island?

16  A   Right.

17  Q   Now, you were -- Your broker's office, where was that

18    located when you made reference to that?

19  A   Wakefield, Rhode Island.

20  Q   So you said that you went up to take a look at the boat?

21  A   Uh-huh.

22  Q   Approximately, when did you go to take a look at that

23    boat?

24  A   I guess it was sometime in August.

25  Q   August?

1   A   I don't know the exact date.

2   Q   Of what year?

3   A   Of 2003.

4   Q   And at that point did you take any further action with

5       regard to the 22-foot Aquasport?

6   A   I came-- after I looked at it, I again talked to my

7       broker about it.

8   Q   Where did that conversation take place?

9   A   That was here in Rhode Island at his office.

10  Q   Okay.

11  A   I looked at a few other boats and decided that I wanted

12      to make an offer on this particular boat, on the

13      Aquasport, so I went to my broker and gave them a check

14      for a deposit as an offer on the boat.

15  Q   Okay.  For purposes of the record as well, what is the

16      name of your broker?

17  A   Boats Unlimited.

18  Q   Was there a particular person that you worked with or

19      dealt with at Boats Unlimit in regard to this particular

20      boat that's the subject of this lawsuit?

21  A   Yes, Paul Larson.

22  Q   Paul Larson, thank you.  You mentioned that you drafted

23      a check for the deposit and what happened to that check;

24      do you know?

25  A   I turned that over to my broker.

```
 1  Q   Okay.  And do you know if that check was cashed?

 2  A   Yes, it was.

 3  Q   All right.  And do you know where it was cashed?

 4  A   No, I don't know.

 5  Q   Now, did you subsequently enter into a purchase and sale

 6      agreement for the purchase of that 22-foot Aquasport?

 7  A   Yes.

 8  Q   I'm showing you  --

 9          MR. DOUGHERTY:  Sorry.  I didn't ask permission to

10      approach.

11          THE COURT:  Yes.

12  Q   I'm showing you what has been marked as Defense Exhibit

13      B and with the exception of the handwriting at the top

14      and bottom identified as Exhibit B and the exception of

15      the fax origin numbers on the top and bottom of that, do

16      you recognize the document?

17  A   I don't know for sure that I do.

18  Q   May I direct your attention to the second page of that

19      document, please.  Down below I notice there are a

20      number of signature lines, one of which appears on the

21      first one identified as buyer.  Is that your signature

22      located on that line adjacent to the word buyer?

23  A   No.

24  Q   Have you ever seen this document before?

25  A   I saw it attached to some paperwork that my attorney
```

1     did.

2  Q  So you don't recognize this as your signature on this

3     document on Page 2?

4  A  No, I don't.  No.

5  Q  Do you have-- but it does say something for Pam Jordan.

6     Did you authorize anyone to sign your name to a purchase

7     and sale agreement for the 22-foot Aquasport?

8  A  I'm just trying to think.  I know I signed so many-- I

9     know I signed something in Paul's office, but I don't

10    think it was this.  I did sign a purchase agreement,

11    yes.

12 Q  Let me direct your attention to the third page of that

13    document, ma'am.  Is that your signature at the bottom

14    of the third page of Exhibit B to the right over there?

15 A  Yes.

16 Q  And do you recognize that document, that particular page

17    of that document?

18 A  Yes.

19 Q  So it's your testimony that you signed personally Page 3

20    of Exhibit B?

21 A  Yes.

22 Q  And not Page 2 of Exhibit B?

23 A  Correct.

24 Q  Thank you.  Now, Ms. Jordan, were you aware of the terms

25    for the delivery for the closing on this boat?

1   A   Yes.

2   Q   And what were the terms for the purchase and sale of

3       this boat?

4   A   After it was agreed upon, the price was agreed upon, I

5       had to wire sender-- in this instance, I wired the

6       balance of the boat to Sea Dog Yacht Sales.

7   Q   Now, let me ask you a question.  In preparing to

8       purchase this boat-- strike that.  Are you familiar with

9       the term Power of Attorney?

10  A   Uh-huh.

11  Q   Do you know what a Power of Attorney is?

12  A   Well, I know that they can-- they would represent you or

13      can represent you.

14  Q   All right.  Did you ever sign a document in the form of

15      a Power of Attorney authorizing Paul Larson to endorse

16      documents for you in regard to the purchase and sale of

17      this 22-foot Aquasport?

18  A   As far as a Power of Attorney, no.

19  Q   Okay.  Did you ever sign any other document authorizing

20      Mr. Larson to endorse your name on any purchase and sale

21      agreements in relation to the 22-foot Aquasport?

22  A   For him to represent me, no, I guess the answer would be

23      no.  Anything I signed, I was in his office.

24  Q   But as far as this-- I'm going to show it to you again,

25      Plaintiff's Exhibits B on Page 2.  Did you specifically

9

1   authorize Mr. Larson to sign your name with his

2   signature after that?

3  A   I guess I'd have to say no.  Although, he was authorized

4   by me to do whatever he needed to do.  I know there was

5   faxing back and forth and phone calls back and forth so

6   I did authorize him to represent me in a sense, yes, I

7   did.

8  Q   But the question that I'm asking you is a specific one.

9   Did you authorize Mr. Larson to sign your name on

10   purchase and sale documents?

11  A   No.

12  Q   Now, as far as this purchase and sale is to be

13   concerned, where was the delivery of the vessel proposed

14   to take place in the sale as far as you are aware?

15  A   I don't understand what you mean.

16  Q   All right.  Well, where was the closing going to take

17   place for the sale of this boat or for the purchase of

18   the boat?

19  A   I guess at my broker's.

20  Q   Where was your broker?

21  A   Wakefield, Rhode Island.

22  Q   All right.  What other things were to take-- how did you

23   come to that understanding that it was supposed to take

24   place at your broker's in Wakefield, Rhode Island?

25  A   Well, that's-- he explained to me that after the Gaffeys

1     accepted my check and the price that I offered that I

2     would then wire the money to Sea Dog Yacht Sales.

3  Q   In Massachusetts?

4  A   Yes.

5  Q   Okay.  And what was to occur after that?

6  A   Well, assuming everything had been okay, I would have

7     received a title and would have registered the boat.

8  Q   And that would have comprised the closing, your receipt

9     of the title?

10  A   Yes.

11  Q   Now, I understand that the Aquasport was delivered to

12     Wakefield, Rhode Island?

13  A   Correct.

14  Q   Now, is that-- whose request was that done at?

15  A   Mine.

16  Q   Who did you direct that request to deliver the boat to

17     Wakefield, Rhode Island to?

18  A   I believe I spoke to Dale Friedman who is the owner of

19     Sea Dog Yacht Sales.

20  Q   Did Mr.-- did you sign any documents with Mr. Friedman

21     regarding the delivery of the boat to Wakefield, Rhode

22     Island?

23  A   No.

24  Q   Did you make any payment to Mr. Friedman over and above

25     the purchase price of the Aquasport as you know it?

1  A    I paid for the transportation of the boat from

2       Massachusetts to Rhode Island.

3  Q    Okay.  And how much did you pay for that?

4  A    It was 600 something.

5  Q    And when did you have this conversation with Mr.

6       Friedman, I believe you said?

7  A    Yes.

8  Q    When did you have this conversation with Mr. Friedman

9       regarding his delivering the boat to Rhode Island?

10 A    It was after the paperwork had been signed, and I had

11      called him to ask him when the boat was going to be

12      delivered, and at that point he said to me it's on the

13      trailer in my yard and it's going to be delivered today

14      which was a Monday.  I don't remember the date, but it

15      was a Monday.

16 Q    Now, when you say after the paperwork was signed, what

17      paperwork are you referring to?

18 A    The purchase agreement and the bill of sale.

19 Q    All right.  Now, the purchase agreement I'm going--

20           MR. DOUGHERTY:  May I approach again, your Honor?

21           THE COURT:  Yes.

22 Q    I'm showing you again Exhibit B.  Is the purchase

23      agreement, as you understand it, part of this packet

24      of-- this set of documents that are marked?

25 A    No.  There was another piece of paper.  There was this.

1     This is really in a sense, I believe, my offer to the

2     Gaffeys and then there was something else I signed, a

3     bill of sale or something.  It wasn't this.

4 Q   Ms. Jordan, I'm showing you what has been marked as

5     Defendant's Exhibit C.  On the front at the bottom

6     you'll note that it's got, I believe, someone in your

7     attorney's office -- I'll represent to you it's someone

8     at your attorney's office referring to Exhibit F. We're

9     going to refer to this exhibit as C for purposes of the

10    document.  This is the other document you're referring

11    to that you know as Defendant's Exhibit C?

12 A   Yes.

13 Q   Are there any other documents you remember signing in

14    regard to the purchase and sale of the boat?

15 A   I don't think so.

16 Q   Okay.  Now, when did you first see this bill of sale?

17 A   When I was in my broker's office.

18 Q   All right.  When was that -- strike that.  Was that

19    before or after you wired the money to Massachusetts?

20 A   Before.

21 Q   And was the document, the Exhibit C, this bill of sale,

22    was that signed or did it contain the signatures that

23    are listed at the bottom of that document when you saw

24    it at your broker's office?

25 A   As far as I recall, yes.

1   Q   When I say the signatures, let's me parse this out a

2       little bit.  Did it have your signature on that document

3       at the time that you saw it at your broker's office

4       after or before you wired the funds?

5   A   No.  I signed it there.  Does that answer your question?

6   Q   You signed it that day in his office?

7   A   Okay.

8   Q   Now, were the other signatures that are listed to the

9       right or the single signature listed to the right of

10      seller, was that on the document when you signed it?

11  A   I believe it was.

12  Q   All right.  And was this an original document that you

13      had?

14  A   No. It was a fax.  It came through.

15  Q   And was the other signatures on the line below the

16      seller on that document when you signed it in the

17      broker's office?

18  A   I believe it was.

19  Q   Okay.  And I believe -- was the 22nd of August the date

20      that you signed this document?

21  A   I guess.

22  Q   Well, I don't want you to guess.

23  A   I just-- I'm sorry, but it was taxed over.  I was at the

24      broker's office, and I signed it.  I cannot say it was

25      the 22nd.  I signed it.

```
 1  Q   You're clear on one thing, that you received this
 2      document and signed it prior to wiring the funds up to
 3      Massachusetts to Sea Dog?
 4  A   I believe so.
 5  Q   Now, do you recall receiving a call from Brian Gaffey?
 6  A   Yes.
 7  Q   And was that-- when did that call occur?
 8  A   I don't recall the date, but I do recall it was a day or
 9      two after I had wired the money, and as far as I was
10      concerned the sale was final and everything was done.
11  Q   Okay.  Did Mr. Gaffey make any statements to you
12      concerning the boat on that-- in that conversation with
13      you?
14  A   We spoke about the boat.  We spoke about-- let me see.
15      We talked about-- we talked a little bit about the boat
16      in the beginning, and he mentioned to me about it in
17      terms of fuel efficiency.  He usually ran it at 3,200
18      rpms.  I know I asked him about the GPS owners manual.
19      He said he thought his brother had it, but if I wanted
20      to get  it, I could go onto Furuno's website and
21      download the owners manual for the GPS on the boat, but
22      his primary reason for calling me really was to ask me
23      if I would call my broker and see if he would call Sea
24      Dog Yacht Sales because they hadn't received their money
25      for the boat yet.
```

1  Q    When you received the boat, were you present when the

2       boat was delivered?

3  A    Yes.

4  Q    That was at Boats Unlimited in Wakefield?

5  A    No.  It went to my marina.

6  Q    Where is your marina?

7  A    In Wakefield.

8  Q    When you say my marina, are you a marina

9       owner?

10  A   I had a previous boat so I still had the same boat.

11  Q   What type of boat did you have prior to this one?

12  A   26-foot Mako.

13  Q   What year was that?

14  A   1977.

15  Q   Did you purchase that boat new in 1977?

16  A   No.  I boat it used.

17  Q   Where did you buy that boat?

18  A   Mystic River Marina.

19       THE COURT:  What is the purpose of this proceeding,

20  to determine what the contacts of the defendant are with

21  Rhode Island?

22       MR. DOUGHERTY:  I'll save that for another day.

23       THE COURT:   I appreciate that.

24       MR. DOUGHERTY:  I have no further questions of this

25  witness, your Honor.

1    MR. MOSCA:  Judge, can I take a look at those

2    exhibits?

3        THE COURT:  Of course.

4        MR. DOUGHERTY:  They're sitting on the left in

5    front of Carol.

6    **CROSS-EXAMINATION BY MR. MOSCA:**

7  Q   When you had that conversation with Brian Gaffey that

8    you referenced in your affidavit to the Court, were you

9    in possession of the boat at that time?

10 A   Yes.

11 Q   So the boat was in Rhode Island?

12 A   Yes.

13 Q   In the water?

14 A   Yes.

15 Q   Had you used it?

16 A   I don't think I had yet at that time because it was only

17   a day or two after all of the paperwork and everything

18   had been resolved.

19 Q   But you had the boat?

20 A   Yes.

21 Q   And there is no mistake in your mind that he contacted

22   you, Mr. Gaffey contacted you?

23 A   Yes, he contacted me.

24 Q   Where was the telephone call?

25 A   At my home.

1  Q   Where would that be?

2  A   Cranston, Rhode Island.

3  Q   This was a land phone?

4  A   I don't know how he was calling me, but it was on my

5      home phone, yes.

6  Q   This was at your residence at Cranston on a land phone?

7  A   Yes.

8  Q   You already testified as to what you discussed with him?

9  A   Yes.

10 Q   His concern was could you talk to your broker, Mr.

11     Larson, because I don't have my money?

12 A   Right.

13 Q   Did you do that?  Did you talk to Paul Larson?

14 A   The next day.  The next day because I was going down to

15     the boat.  Paul's business is one marina over so rather

16     than call, I went in person.  We were talking about the

17     boat, and I asked Paul or actually I told Paul that

18     Brian had called and requested that he call Sea Dog

19     Yacht Sales because Brian said he was having a hard time

20     getting his money and would I ask Paul to call and see

21     if he could do anything.

22 Q   Okay.

23 A   I said yes, I would, so that next day I saw Paul and

24     requested that.  I said, I don't know what you can do,

25     but do me a favor and call Sea Dog and see if you can

```
 1        get the money for Brian, and it was actually that day
 2        that Paul came to the marina and that's when we found
 3        out that -- I guess Paul did call, and that's how we
 4        found out that Dale Friedman had taken off.
 5   Q    When you say taken off, what do you mean by that?
 6   A    I guess left the country, disappeared with.
 7   Q    Did you later determine that he disappeared with sales
 8        proceeds from your boat?
 9   A    Yes.
10   Q    And many other boats?
11   A    Yes.
12   Q    Now, did you have any other conversations with Brian
13        Gaffey?
14   A    Yeah.  I had conversations with Brian and with Kevin
15        back and forth.  We talked maybe a half a dozen times.
16   Q    Let me back up.  You indicated that you had subsequent
17        conversations with them, both of them?
18   A    Yes.
19   Q    When was that?
20   A    I believe it was the same day that Paul called Sea Dog
21        and we found out that he had taken off later on that
22        day.  I received a phone call.  I believe it was from
23        Brian; although, it could have been Kevin.  I'm not
24        honestly sure.
25   Q    Where did you receive the phone call?
```

1   A   That was on my cell phone.

2   Q   Do you recall where you were when you got the call?

3   A   I was actually on my way home from the marina that day.

4   Q   You were in Rhode Island?

5   A   Yes, I was in Rhode Island.

6   Q   And how close in time was that to the first phone call

7       you had with Brian when he made an inquiry about can you

8       help me get my money?

9   A   Well, it was a day or two after.

10  Q   What was the substance of that conversation?

11  A   Well, we-- he had actually called me to tell me to say

12      to me, gee, did you hear Sea Dog has taken off with, you

13      know, our money and there is a big ruckus going on and

14      so on and so forth.  At that point I said, yes, that my

15      broker had when I called to see if he could get the

16      money for you.  That's how he found out that Dale

17      Friedman had at that point left the country  so we had

18      conversations about that.

19  Q   How many others -- how many other conversations were

20      there?

21  A   I'm going to say half a dozen back and forth.  Brian

22      would call me because of him being in Massachusetts, and

23      it was in local papers what had happened.  He had called

24      telling me what was going on with Dale Friedman and the

25      conversations he had had with the police department and

1    things like that.

2  Q    Any further conversations with the boat?

3  A    Not really other than gee, I don't know what we're going

4        to do kind of a thing, but other than that, no.

5  Q    Did he ask you any questions about insurance on the

6        boat?

7  A    We did talk about insurance because at that point we

8        didn't know what was going to happen, and I said to him,

9        you know, it's insured.  I said I wasn't going to turn

10       over or wire any money to Sea Dog Yacht Sales so I made

11       sure it was insured so I said it's insured on my

12       insurance; you should probably take the insurance up on

13       your end but that's all.

14 Q    Any conversations about the whereabouts of the boat?

15 A    No.

16 Q    In the subsequent conversations?

17 A    No.  He didn't ask specifically where it was.  He just

18       asked if I had gone out in the boat and used the boat,

19       and I said yes, I had.

20 Q    But there was some conversation about you still having

21       the boat, the boat is in your possession?

22 A    Yes.  Yes because we talked about did I like it and

23       those kinds of things.

24 Q    You've already testified that any business that you did

25       referencing the purchase of this boat was done in Rhode

| | |
|---|---|
| 1 | Island? |
| 2 | A    That's correct. |
| 3 | Q    Correct? |
| 4 | A    Yes. |
| 5 | Q    Under the terms of that purchase agreement? |
| 6 | A    Yes. |
| 7 | Q    Although there is some question of your signature on one |
| 8 | page, that is definitely your signature on the other |
| 9 | page? |
| 10 | A    Yes. |
| 11 | Q    You recognize it? |
| 12 | A    Yes. |
| 13 | Q    Money was deposited in Rhode Island, the initial |
| 14 | deposit? |
| 15 | A    Yeah.  It wasn't from my bank in Rhode Island and was |
| 16 | wired to a bank in Massachusetts. |
| 17 | Q    That was the final payment? |
| 18 | A    Yes. |
| 19 | Q    The initial payment was delivered in Rhode Island? |
| 20 | A    Yes. |
| 21 | Q    Who wired the second payment to Massachusetts? |
| 22 | A    I did or my bank did, Washington Trust. |
| 23 | Q    Did you do that personally? |
| 24 | A    Yes. |
| 25 | Q    You authorized Washington Trust to send that out to a |

1     bank in Massachusetts, correct?

2  A    Yes.

3          MR. MOSCA:  I don't have any further questions,

4     your Honor, not of this witness.

5          THE COURT:  Thank you.  Any further questions?

6          MR. DOUGHERTY:  No, your Honor, I don't have

7     anything further.

8          THE COURT:  The witness is excused.  You may sit

9     down.

10         THE WITNESS:  Thank you.

11         MR. DOUGHERTY:  Your Honor, if I may, defense would

12    like to call Brian Gaffey to the stand, please.

13         THE COURT:  Very well.

14    **BRIAN GAFFEY, called as a witness, first having been**

15    **duly sworn, testified as follows:**

16         THE CLERK:  Please state your full name and spell

17    the last name for the record.

18         THE WITNESS:  Brian H. Gaffey, G-A-F-F-E-Y.

19         MR. DOUGHERTY:  Your Honor, for purposes of

20    brevity, I would ask the Court accept the affidavit of

21    Brian and Kevin Gaffey that are attached to the Motion

22    to Dismiss for Lack of Personal Jurisdiction.  His

23    testimony is subject to Cross-Examination by Mr. Mosca.

24         THE COURT:  I was going to suggest that, including

25    all the affidavits with the signature and reviewed the

1    signatures of the documents and if some of them are

2    forged, you can highlight those to me, but the last

3    thing I want to do is make them take another drive from

4    Massachusetts, but I want to the provide you with time

5    to make your argument and conclude today, if possible,

6    so I will accept them subject to Cross-Examination, of

7    course.

8        MR. DOUGHERTY:  The same goes as with Kevin Gaffey

9    as well?

10       THE COURT:  So ordered.

11       MR. DOUGHERTY:  Thank you.

12   **DIRECT EXAMINATION BY MR. DOUGHERTY:**

13 Q  Mr. Gaffey, obviously you're the owner of the 22-foot

14   subject of this matter along with your brother, correct?

15 A  Correct.

16       THE COURT:  That's a conclusion of law.

17       MR. MOSCA:  I object to the term of owner.

18       THE COURT:  Let's move on.  That is a conclusion of

19   law.

20 Q  Mr. Gaffey, the 22-foot Aquasport, the subject of this

21   action, was purchased by you and your brother, Kevin, at

22   some point, correct?

23 A  Correct.

24 Q  When you heard some testimony from Ms. Jordan regarding

25   some calls, did you-- did you make calls to Ms. Jordan?

1    A    Yes, I did.

2    Q    Where were you when you placed those calls?

3    A    I was at my home for the first call I made to her, and

4         other times I was on a cell phone on a bus.

5    Q    Where is your home located?

6    A    Boxford, Massachusetts.

7    Q    When you were using your cell phone to make these

8         calls, were you located outside of Massachusetts?

9    A    No.

10   Q    Were you located in Massachusetts?

11   A    Yes.

12   Q    Are you clear about that?

13   A    Yes.

14   Q    Now, have you had a chance to review the affidavit of

15        Pamela Jordan filed in connection with the objection to

16        the Motion to Dismiss?

17   A    No, I haven't.

18   Q    Well, let me ask you a question.  Did you ever

19        acknowledge that you had sold the 22-foot Aquasport to

20        Ms. Jordan?

21   A    No.

22   Q    In a conversation?

23   A    No.

24   Q    Did you ever acknowledge that to her in person?

25   A    No.

1  Q    Did you have an -- did you have any written agreements

2       with Sea Dog Yacht Sales?

3  A    No.

4  Q    Did you authorize Sea Dog Yacht Sales to deliver the

5       boat to Rhode Island?

6  A    No.

7  Q    I'm going to show you what's been marked as Defendant's

8       Exhibit B.  With the exception of the fax origin and

9       Exhibit B listed on that, do you recognize that

10      document?

11 A    Yes.

12 Q    All right, and is this a purchase and sale agreement for

13      this 22-foot Aquasport?

14 A    Yes, it is.

15 Q    Did you sign that purchase and sale agreement?

16 A    No, I didn't.

17 Q    All right.  I'm also going to show you now what's been

18      marked as Defendant's Exhibit C  --

19          MR. MOSCA:  Yes.

20 Q    Which I'm going to refer to as a bill of sale in

21      accordance with the title.  Is that your signature at

22      the bottom of that document?

23 A    Definitely not.

24 Q    Do you conduct any business activity in the State of

25      Rhode Island?

1  A    No.

2  Q    What do you do for a living?

3  A    I work for Gillette.

4  Q    All right.  And keeping with your business with

5       Gillette, do you ever have occasion to conduct any

6       transactions in Rhode Island?

7  A    Over the past 20 years I've probably been to Rhode

8       Island three times since I graduated college.

9  Q    Okay.  Have you ever been to Rhode Island and had

10      connection -- did you ever take the 22-foot Aquasport

11      into Rhode Island water?

12 A    No.

13 Q    Did you ever trail it into Rhode Island?

14 A    Never.

15 Q    Did you authorize the delivery of the vessel from Sea

16      Dog Yacht Sales to Wakefield or to Rhode Island?

17 A    No.

18 Q    Did you ever turn over-- sorry.

19           MR. DOUGHERTY:  Sorry, your Honor.  I want to stick

20      to the jurisdiction.  I don't want to get into it any

21      further.  I believe I have no further questions of Mr.

22      Gaffey.

23           THE COURT:  Thank you.

24      CROSS-EXAMINATION BY MOSCA:

25 Q    Mr. Gaffey, you testified that you didn't have written

```
 1           listing agreement with Sea Dog.  What was your

 2           agreement with Sea Dog?

 3   A       The agreement with Sea Dog was verbal, and they

 4           contacted us.  I believe it's in an affidavit.  Actually

 5           they contacted my brother on August 4 stating they had a

 6           buyer for our boat if we were still interested in

 7           selling it, and he told us what the offer was or

 8           approximately what he thought the offer would be, and he

 9           would be interested in hearing more.

10   Q       When you say he called us -- he said we have an

11           interest -- who was that?

12   A       Dale Friedman, owner of Sea Dog Yacht Sales.

13   Q       What other information did he give you during that

14           conversation?  Did he tell you who?

15   A       My brother had the conversation.

16   Q       Your brother did?

17   A       Yes.

18   Q       Although it was no written listing agreement with Sea

19           Dog, it was definitely a relationship between you and

20           your brother and Sea Dog Yacht Sales regarding the sale

21           of this boat?

22               MR. DOUGHERTY:  Objection, your Honor.  The term

23           relationship is a very ambiguous term.  I think you

24           could be more finite.

25               THE COURT:  If you would rephrase.
```

```
1   Q    How about a principle-agency relationship.  I use the

2        word relationship because you're a layman.

3              MR. DOUGHERTY:  Objection to the principle-agency

4        relationship.  That's a legal term of art again.

5              THE COURT:  Do you understand what he means?

6              THE WITNESS:  I think he's asking me if I have some

7        sort of an agreement or relationship with Sea Dog that

8        would make this --

9              THE COURT:  I understand what he's asking what a

10       legal principle-agency relationship is.  Maybe add

11       something to this so you want-- could you ask that

12       question again rather than us reading it.

13             MR. MOSCA:  The same question I just asked?

14             THE COURT:  Do you want to answer that question?

15             THE WITNESS:  Yes.  Ask the question again.

16             THE COURT:  Did you have a principle-agency

17       relationship with Sea Dog Yacht Sales?

18             THE WITNESS:  At that point, no.

19  Q    Did you ever have one regarding the sale of this boat?

20  A    Several months before we had looked at a Mako that he

21       had, and at that point we were going to potentially sell

22       our boat to him, and that deal didn't go down, and then

23       we didn't have any ordeals with him until that call

24       really on August 4.

25  Q    This particular Aquasport, I don't want to put words in
```

1    your mouth, but you had a verbal agreement with Sea Dog

2    that if you could find a buyer for that boat, please do?

3        MR. DOUGHERTY:  Objection, your Honor.  I think

4    this is a statute of fraud issue dealing with the sale

5    of goods of over $500.

6        MR. MOSCA:  I'm trying to find out.

7        THE COURT:  Overruled.

8  Q  Tell me what your agreement was with Sea Dog.  That's

9    all I'm trying to find out.

10 A  Prior to that phone call there was no agreement at all.

11   We didn't have anything in writing.  We found out that

12   he had our boat on his website.

13 Q  When did you find that out?

14 A  We found that out during the summer, I think just like

15   browsing the web.  We saw our boat on there but didn't

16   give him permission to put it on there.

17 Q  Was that July or June?

18 A  For me it was in August because I saw the boat in August

19   on vacation and called my brother to tell him.

20 Q  Then what happened?  You let it sit on the website?

21 A  No.  I came home from vacation and called Kevin.  I

22   said, you're not going to believe this; our boat is on

23   the Sea Dog website.

24 Q  Then what happened?

25       THE COURT:  One at a time.  The stenographer can

```
 1        only take down one at a time.

 2   A    In the same conversation with Kevin I said, you're not

 3        going to believe this.  I got a call from Dale Friedman

 4        saying he has a buyer for our boat.  I asked is our boat

 5        for sale?  He says, well, he has a good offer.  Why

 6        don't we see what he has to say.

 7   Q    What were the terms of the offer?

 8   A    At that point he didn't-- it was kind of we just said

 9        he'll get back to us.  The time between August 4 when he

10        made that phone call to us and then at that point then

11        Kevin started dealing with Dale and then there was a

12        purchase and sale agreement that you just showed me here

13        which is dated.  Kevin signed on August 11.

14   Q    Did Kevin sign it, to the best of your knowledge?

15   A    Yes.

16   Q    So Kevin did sign that purchase and sale agreement?

17   A    Yes, he did.

18   Q    So when the two of you found out that the boat was on

19        the website --

20   A    We were surprised.

21   Q    You were surprised but simultaneously there was an offer

22        that came in on the boat?

23   A    Yes.

24   Q    So you didn't say to Sea Dog, get my boat off that

25        website; you don't have any authority to keep it on the
```

1      website?  Basically at that point there was an offer

2      forthcoming so that issue became unimportant so to

3      speak?

4  A   Yes.

5  Q   It wasn't an issue; it was a non-issue at that point?

6  A   Yes.

7  Q   Who dealt with Dale Friedman regarding the particulars

8      of this, your brother?

9  A   My brother did.

10 Q   You eventually did sign that purchase and-- sorry, your

11     brother, to the best of your knowledge, did eventually

12     sign the purchase and sale agreement?

13 A   Yes.

14 Q   So there was knowledge on your brother's part at least

15     that this boat was going to be sold to Pamela Jordan for

16     $26,500?

17 A   Yes.  Her name is on a purchase and sale.

18 Q   Did your brother share that with you?  Did he keep you

19     posted?

20 A   Yes.

21 Q   Did he call you and say I signed that sales agreement?

22 A   Yes he did.

23 Q   We're selling to a gal in Rhode Island named Pam Jordan

24     and can get $26,000 for the boat less the commission?

25 A   Yes, he did.

1   Q   So you were aware there was a commission being paid to

2       an agent in Massachusetts under the terms of the

3       contract?

4   A   Yes.  My broker received a commission.

5   Q   And also you were aware of the fact that there was a

6       commission being paid to an agent in Rhode Island?

7   A   At some point I became aware of that, yeah.

8           MR. MOSCA:  I don't have any further questions.

9           MR. DOUGHERTY:  No Redirect, your Honor.

10          THE COURT:  Thank you.  You may step down, sir.

11          MR. DOUGHERTY:  Your Honor, the defendant, if it's

12      okay with you, would like to call Kevin Gaffey to the

13      stand.

14          THE COURT:  Certainly.

15  **KEVIN GAFFEY, called as a witness, first having been**

16  **duly sworn, testified as follows:**

17          THE CLERK:  Please state your name for the record

18      and spell the last name.

19          THE WITNESS: Kevin Patrick Gaffey, G-A-F-F-E-Y.

20  **DIRECT EXAMINATION BY MR. DOUGHERTY:**

21  Q   Good Afternoon, Mr. Gaffey.  Mr. Gaffey, for purposes of

22      the record, you are the Kevin Gaffey in a--

23  A   Yes, I am.

24  Q   You have to let me finish the question -- that purchased

25      a 22-foot Aquasport, at one point the subject of this

1    action?

2  A    Yes.

3  Q    Now, Mr. Gaffey, I'm going to show you what's been

4    marked as Defendant's Exhibit B; and again, with the

5    exception of the handwritten Exhibit B and the fax

6    origins notations on the top and bottom, do you

7    recognize that document?

8  A    Yes.

9  Q    All right.  You're looking at Page 28 right now.  I

10    direct your attention to a signature line for seller.

11    Is that your signature there on that line?

12  A    Yes, it is.

13  Q    And I'm going to show you the third page of that.  Do

14    you recognize this document Or that page rather, Exhibit

15    B?

16  A    No.

17  Q    Okay.  Have you ever seen that before today?

18  A    Perhaps with the initial court filing documents but that

19    would be the first time I've seen this document.

20  Q    Okay.  Thank you.  Now I'm also going to show you what's

21    been marked as C.  I'd like you to look at that

22    document?

23  A    Uh-huh.

24  Q    I note that there is a line at the bottom entitled

25    Seller.  Is that your signature next to that line?

1   A    No.

2   Q    All right.  Until the filing of this lawsuit, had you

3        ever seen this document before?

4   A    No.

5   Q    Okay.  Thank you.  Mr. Gaffey, what do you do for a

6        living?

7   A    I am an accountant for a real estate firm or financial

8        investment firm.

9   Q    Where is that located?

10  A    Beverly, Massachusetts.

11  Q    As part of your employment, do you ever have occasion or

12       do you have occasion to do business in Rhode Island?

13  A    No.

14  Q    All right.  Have you ever had occasion to do business in

15       Rhode Island?

16  A    No.

17  Q    Have you ever vacationed in Rhode Island?

18  A    No.

19  Q    Mr. Gaffey, did you authorize Sea Dog and Dale Friedman,

20       its principle, to deliver the Aquasport to Rhode Island?

21  A    No.

22  Q    Have you ever endorsed a title certificate over to

23       Pamela Jordan in connection with the Aquasport?

24  A    Title, no.

25  Q    Have you ever signed any bill of sale in connection with

1    the Aquasport?

2 A   No.

3 Q   Have you ever-- sorry.  You heard some testimony earlier

4     from Ms. Jordan concerning some calls.  Did you ever

5     indicate to Ms. Jordan that you had sold her the 22-foot

6     Aquasport?

7 A   No.

8 Q   What do you recall is the substance of those

9     conversations?

10 A  My initial conversation with Pam Jordan was on August

11    29.  She had phoned me.  It was following a conversation

12    that she had with my brother on the prior day, the 28th.

13    I think we were both kind of in a mind of distress over

14    the fact that something had gone ary in this transaction

15    that we had hoped would transpire, and I had very

16    somewhat limited conversations with her after that,

17    after that day, and I primarily asked my brother to

18    handle those conversations so I wanted to  have one

19    person dealing with Pam in case things didn't work out.

20 Q  When you had your conversations, were you the person

21    that called, initiated the call?

22 A  Excuse me.  Could you repeat that?

23 Q  When you did have these conversations, were you the

24    person that initiated the call with Pamela Jordan?

25 A  With Pam?

1  Q    Yes.

2  A    I don't think I ever called Pam directly unless it was

3       -- I know there was one time she had called me on her

4       cell phone and it got cut off, and I called back to try

5       to get in touch with her, but I never really picked up

6       the phone to call her.

7  Q    All right.  When you made this call, were you located in

8       Massachusetts?

9  A    Yes, I was.

10 Q    All right.  Did you ever make any calls to her when you

11      were in Rhode Island concerning this Aquasport?

12 A    I was never in Rhode Island, no.

13          MR. DOUGHERTY:  I have no further questions of this

14      witness, your Honor.  Thank you.

15          THE COURT:  Thank you.

16      **CROSS-EXAMINATION BY MR MOSCA:**

17 Q    Brian or  Kevin?

18 A    Kevin.

19 Q    I wanted to make sure.  You heard your brother testify

20      earlier?

21 A    Yes.

22 Q    About the boat being on the website?

23 A    Yes, I did.

24 Q    About your conversation with him about the boat on the

25      website?

1   A   I heard a conversation, yes.

2   Q   Is that true, you brought the fact to his attention?

3   A   You'd have to state what your question is in order to

4       say it's true.

5   Q   I'll let you know.  You brother testified he got a call

6       from you advising him that your jointly-owned boat was

7       on Sea Dog's website?

8   A   That is true.

9   Q   That is accurate, okay.  Your brother also testified

10      that you advised him you had heard from Sea Dog that

11      they had a buyer for the boat?

12  A   That is true.

13  Q   That's true, okay.  Your brother testified that he never

14      notified Sea Dog that, you know, he was concerned or

15      upset that the boat had been advertised on the website?

16  A   He never notified and I never notified mostly because we

17      never knew.

18  Q   Your brother said he never had any written agreement

19      with Sea Dog?

20  A   That's true.

21  Q   Did you ever have a written agreement with Sea Dog?

22  A   There was no written agreement whatsoever at any time.

23  Q   All right, but there was this sales agreement that you

24      have in front of you that Sea Dog prepared, correct?

25  A   There was a subsequent purchase and sale agreement.

1              THE COURT:  He hasn't answered the question.

2    Q    Sorry.  Go ahead.

3    A    There was a subsequent purchase and sale agreement

4         signed that I made with my signature.

5    Q    Okay.  Was there ever any other sales agreement

6         presented to you with reference to this transaction by

7         Sea Dog?

8    A    No.

9    Q    I'm only confused because you say there was agreement.

10        You mean there was just one purchase and sale agreement?

11   A    That's right.

12   Q    Referencing this transaction?

13   A    Right.

14   Q    The one that's the exhibit that your lawyer introduced

15        is the sales agreement?

16   A    Right, subsequent.  What I meant by that is later on.

17   Q    After the phone call?

18   A    Right.

19   Q    Okay.  That's the sales agreement referencing the boat?

20   A    I don't have it in front of me, but --

21            MR. MOSCA:  It's one of the exhibits.

22            MR. DOUGHERTY:  It's over by Carol, Mr. Mosca.

23   Q    It's marked Exhibit B.  Have you had an opportunity to

24        review that?

25   A    Yes, I have.

1  Q    That is your signature?

2  A    Yes, it is.

3  Q    That was prepared by whom, do you know?

4  A    My signature?

5  Q    No, the agreement itself.

6  A    The agreement that-- to tell you the truth, I couldn't

7       tell you exactly.  I note know that I made one comment

8       on here, Number 3, that the total commission paid is

9       equivalent to 10 percent and I initialed it KPG.  The

10      two comments listed, 1 and 2, were written by who I

11      believed was Dale Friedman in order to get this deal

12      done or started.

13  Q    You knew the terms?

14  A    Right.

15  Q    You signed the agreement?

16  A    Yes, I did sign the agreement.

17  Q    And you advised your brother that you would sign the

18      agreement?

19  A    I advised him.

20  Q    He knew?

21  A    I told him I signed it, yes.

22  Q    He was aware of the fact that you signed the agreement?

23  A    Yes.

24  Q    The agreement contained a commission to your broker, Sea

25      Dog?

1    A    Right.

2    Q    And also contains a commission statement to the selling

3         broker, the Rhode Island broker?

4    A    I don't think it does.  I found out about that late.

5    Q    But I mean does that particular document that you signed

6         contained that language that the secondary broker was

7         going to be paid commission?  Yes?

8    A    I don't think it does.  Actually I found that out later

9         in a separate conversation with Dale about this Boats

10        Unlimited that I had no knowledge of.

11   Q    May I take a look at that?

12   A    Yeah.

13   Q    I'd like to bring a particular section to your attention

14        as a reference on the first page for broker plural is

15        the third paragraph.  I'm somehow -- this in the second.

16            MR. MOSCA:  May I have a moment, your Honor?

17            THE COURT:  Yes.

18   Q    Could you take a look at the last page of the agreement?

19   A    Sure.

20   Q    You will see in the commission section here it talks

21        about the commission and 50-50 to Sea Dog and it

22        says --

23   A    Excuse me.  As I have stated earlier, I've never seen

24        this.

25   Q    That wasn't attached to the agreement you signed?

```
1    A    Absolutely not.

2    Q    No? You know the boat was being sold to Pamela Jordan?

3    A    Yes, I did.

4    Q    Did you know--

5    A    As it's stated.

6    Q    Did you know she was a Rhode Island resident?

7    A    54 Cranston Avenue, Cranston, Rhode Island.  That's all

8         I knew.

9    Q    Did you know the boat was being shipped to Rhode Island?

10   A    No.

11   Q    How were you supposed to get your money?

12   A    Well, first of all, there had to have been a sale, and

13        like in any customary transaction once title was

14        transferred and the property was released, I would

15        receive my cash.

16   Q    Okay.  Was title transferred?

17   A    No, it wasn't.

18   Q    Never?

19   A    Never.

20   Q    Okay.  Were you waiting?  Were you waiting-- in other

21        words, you acknowledge signing that?

22   A    I acknowledge.

23   Q    What was the next step to be?

24   A    I acknowledged signing the purchase and sale agreement.

25   Q    Yeah, okay.  In your mind, what was the next step?
```

1    A    What was the next step?

2         MR. DOUGHERTY:  Your Honor, I would like to object

3    on the grounds of relevance as to motion.

4         THE COURT:  I'm not sure what that has to do with

5    his contacts to Rhode Island, Mr. Mosca.

6         MR. MOSCA:  I understand, your Honor.

7         THE COURT:  I'll give you some latitude, if you

8    know the next step.

9         THE WITNESS:  I'm a little confused of the next

10   step in the process.

11   Q    As a process.

12   A    There was a survey going to be conducted, and I know

13   there was an inspection that took place.

14   Q    Yeah.

15   A    I knew that we had discussions on the sale price that I

16   had with Dale.

17   Q    Yeah.

18   A    I didn't exactly agree with the money they wanted to

19   sell it to me for or that they wanted to give it to me.

20   Q    But at some point that was resolved, correct?

21   A    It was later resolved.

22   Q    When the sales agreement was signed?

23   A    Yes, it was.  It was still subject to negotiation.  The

24   boat was picked up, let's see, on the -- I believe it

25   was the 15th of August and delivered to Sea Dog and held

1    there in escrow.  There was going to be a closing that

2    was going to be held at Sea Dog.  It never took place

3    then this whole fiasco happened with Mr. Friedman.

4  Q   Okay.  That boat had some additional equipment?

5  A   Yes, it did.

6  Q   Correct?  What was that; do you recall that?

7  A   Yes.  Well, are you talking about the model?  Are you

8    talking about the model of the boat?  That particular

9    model is a--

10  Q   No.  Some equipment that was delivered in addition to

11    the boat, do you recall any equipment being delivered in

12    addition to the boat?

13  A   Are you talking about the--

14        MR. DOUGHERTY:  Objection.  That's very vague.

15        THE COURT:  If you don't understand the question,

16    just say so.

17        THE WITNESS:  Okay.

18  Q   Sea Dog had the boat?

19  A   Yes, they did.

20  Q   Did you have any equipment that belonged on the boat?

21  A   Personal equipment that was going to remain with myself.

22  Q   Any other equipment that should have been delivered with

23    the boat that was left on the boat?

24        MR. MOSCA:  May I have a minute?

25        THE COURT:  Yes.

1  Q   When you owned the boat, did the boat have bow cushions?

2      MR. DOUGHERTY:  Objection, your Honor.  We're

3      talking about legal conclusions and owned in a past

4      tense.  What's good for the goose is good for the

5      gander.

6      THE COURT:  Having bow cushions is not a legal

7      conclusion, but I don't know what this has to do about

8      the Gaffeys' minimum contacts.

9      MR. MOSCA:  I'm attempting to  --

10     MR. DOUGHERTY:  I object to the use of the term own

11     in past sense.  That is the subject of dispute.  It's a

12     legal conclusion.

13     MR. MOSCA:  Absolutely.  I'm not suggesting that

14     we're making a determination of ownership but --

15     THE COURT:  Sustained.

16 Q   At some point did that boat have front bow cushions?

17 A   We installed two custom cushions.

18 Q   How about a dodger, what they call a dodger?  It's like

19     a --

20 A   I never liked the thing, but it was there.

21 Q   Was that at Sea Dog?

22 A   I don't know.  I didn't really care that much about it,

23     but I think it was.

24 Q   You think it was?

25 A   Yeah.

1  Q   You didn't deliver any of those items to Sea Dog?

2  A   I made every best effort to bring everything pertained

3      to that vessel to Sea Dog.

4  Q   Okay.  Was that before the sales agreement was signed or

5      after, if you recall?

6  A   That was after the agreement.

7  Q   Okay.  So after you signed the agreement, what did you

8      bring down to Sea Dog that belonged to the boat?

9  A   First of all, I didn't bring anything down to Sea Dog.

10     They took it.

11 Q   They came up to get it?

12 A   They took it from the marina.

13 Q   Okay.  Is the marina a different site than where Sea Dog

14     is?

15 A   Yes.  It's miles away, different direction.

16 Q   Okay.  With authority?  Pardon me.  With your authority?

17 A   It was like we're going to do this.

18 Q   In other words, we got to get this stuff on the boat?

19 A   Yeah.  It was rushed.

20 Q   Was the boat being shipped or delivered to Rhode Island

21     at that point?

22 A   That boat stayed in that yard until cash was received.

23 Q   But I mean, you just testified that they said we're in a

24     rush.  We've got to get these other things that belong

25     to the boat.

1      THE COURT:  Obviously he didn't know what was about

2    to take place.  What does this have to do about his

3    minimum contacts to Rhode Island?

4      MR. MOSCA:  I'd like to approach that witness one

5    more time, please, your Honor.  Is that exhibit up

6    there, that bill of sale?

7      THE WITNESS:  Yes.

8  Q  Getting back to the double commission, in the first

9    paragraph there is a statement, and I was having trouble

10   finding; but the bottom of the first paragraph does

11   indicate, and I'll have you confirm this, the sales

12   broker is Boats Unlimited, listing broker as Sea Dog

13   Yacht Sales.  Was that there?  Was that language there

14   when you signed the bill of sale?

15 A  I think what I added to my statement is that I didn't

16   know a payment was to each particular broker on this.

17   I assumed that my broker was going to get the 10 percent

18   regardless of what that document said.

19 Q  But the document makes a reference to the selling

20   broker, the last--

21 A  I'd have to read it again.

22 Q  It's the last sentence.

23 A  It's the last sentence?  The last line of the first

24   paragraph makes reference to a selling broker being

25   Boats Unlimited.

1          MR. DOUGHERTY:  Your Honor, we can stipulate to the

2     fact that the document says what it says.

3          THE WITNESS:  I'm not contesting anything this

4     document says.

5          MR. MOSCA:  Great.  Thank you.  No further

6     questions.

7          THE COURT:  Any more questions?

8          MR. DOUGHERTY:  No. Thank you, your Honor.

9          THE COURT:  Thank you, sir.

10         THE WITNESS:  Thank you.

11         MR. DOUGHERTY:  The only thing left is argument.  I

12    have no further witnesses to call.

13         THE COURT:  Mr. Mosca, do you have any other

14    witnesses?

15         MR. MOSCA:  I'd like to consult with Mr. Larson in

16    the courtroom.

17         THE COURT:  Sure.

18         MR. MOSCA:  I'm going to call Paul Larson, your

19    Honor.  I have some brief testimony.

20         THE COURT:  Okay.

21    **PAUL LARSON, called as a witness, first having been duly**

22    **sworn, testified as follows:**

23         THE CLERK:  State your name and spell the last name

24    for the record.

25         THE WITNESS:  Paul Larson, L-A-R-S-O-N.

48

1    <u>DIRECT EXAMINATION BY MR. MOSCA:</u>

2  Q    Paul, where are you employed?

3  A    I'm hard of hearing, I apologize.

4         THE COURT:  Yes.

5  Q    Where are you employed?

6  A    Boats Unlimited.

7  Q    Okay.  And is this a sole proprietorship?

8  A    Yeah, corporation.

9  Q    It's a corporation?

10  A    Yes.

11  Q    Are you the principle?

12  A    That's correct.

13  Q    President?

14  A    Yeah.

15  Q    You're familiar with this transaction?

16  A    Yes.

17  Q    I'm going to bring to your attention this  Exhibit B

18    which is a purchase and sale agreement.  Can you take a

19    look at that?

20  A    Yes.

21  Q    That's the purchase and sale agreement which is

22    referencing the Aquasport, the subject matter of this

23    complaint before the Court?

24  A    That's correct.

25  Q    Who prepared that?

1    A    The initial two pages were done by Sea Dog Yacht Sales.

2         The last page was mine, the initial offered proposed.

3    Q    You heard Pam's testimony regarding her signature on the

4         second page?

5    A    Correct.

6    Q    Now, on that buyer signature line, can you read it?

7    A    Yeah.  That's my signature.  It's Paul Larson for Pam

8         Jordan.  I had a phone conversation with Pam that said

9         they've sent a document.  It's essentially the same

10        numbers.  It's okay to sign.  So they gave me permission

11        to sign.

12   Q    She signed that?

13   A    She did not sign it.  I signed it for her.

14   Q    You signed that on her behalf?

15   A    That's correct.

16   Q    You heard Mr. Gaffey's testimony that he signed it?

17   A    Yes.

18   Q    But on this last page dealing with commissions only,

19        what do you call this?

20   A    They state you had a purchase and sale agreement and

21        deposit offer.  It's really how we initiated an offer on

22        a boat sale.

23   Q    That's dated August 7?

24   A    Yes.

25   Q    That's the initial offer form?

1   A    That's correct.

2   Q    That is Pam's signature?

3   A    I believe it is because I witnessed it.

4   Q    You witnessed her signature on the 7th?

5   A    That's correct.

6   Q    That form predates the sales agreement, that particular

7        form?

8   A    This is the one initially done.  This came afterwards.

9   Q    Now, have you -- have you personally had any

10       conversations with either of these gentlemen, either

11       Brian or Kevin?

12  A    I had one phone call.  I didn't know their names or

13       anything until the walls came crumbling down, but I got

14       a phone call after funds were transferred by Pam.  They

15       were wired to Sea Dog that, Number One, they called to

16       make sure, Number one, I existed.  That was one comment

17       that stuck into my mind.

18  Q    When you say they called?

19  A    One of the brothers.

20  Q    Do you know which one?

21  A    No.  I'm afraid I don't recall, but they called because

22       they wanted to make sure.  They said, gee, I want to

23       make sure you exist, Number One and Number Two, we have

24       not seen the payoff on our lien at the bank yet and

25       recollection-- it was quite a while ago but banks are

1     typically slow on issuing titles out so I said sometimes

2     it take as few days but they have been trouble

3     contacting Dale Friedman at Sea Dog.  They're not

4     getting return phone calls.

5  Q   Where were you when you received this call?

6  A   At my office.

7  Q   Your office is in?

8  A   Wakefield.

9  Q   Were you on a land phone?

10  A   Yes.

11  Q   They definitely initiated that conversation?

12  A   Absolutely because I didn't know how to reach them.  I

13     never knew their names.

14  Q   Okay.  That was the first one.  Were there any others?

15  A   With them, no.

16  Q   Okay.  That was the one and only call?

17  A   (INDICATING).

18  Q   Typically in the boating business there is a lot of this

19     business done by fax?

20  A   Yeah, it is.  Especially more and more now because of

21     the internet.  Boats are in different places than the

22     buyers and sellers are.

23  Q   Normally do boat brokers rely on facsimiles with the

24     assurance that the original documents will be

25     forthcoming?

1    A    Absolutely, yes.

2    Q    Is that pretty much how this all went down?

3    A    Yes, it was.  As I said, we put the initial offer

4         through.  It was some negotiations involved.  When the

5         numbers were agreed, Dale taxed back.  He wanted on his

6         paper head offer, whatever his offer form was signed by

7         up there, and sent down to us.

8    Q    Was it irregular that only one other brothers signed the

9         agreement?

10   A    No.  It happens now and again.  I get it with husbands

11        and wives too.

12            MR. MOSCA:  I have no further questions.

13   **CROSS-EXAMINATION BY MR. DOUGHERTY:**

14   Q    Mr. Larson, during that conversation did Kevin Gaffey

15        represent to you that that boat was still owned by them,

16        by he and his brother?

17   A    Well, as far as we were concerned down here, no.

18   Q    That's not my question.  I'm asking you if Kevin Gaffey

19        stated in that conversation that the boat was still

20        owned by he and his brother?

21   A    No.  Not that I recall, no.

22   Q    You don't recall?

23   A    I do not recall that.

24   Q    But is it possible that could have taken place in the

25        conversation?

1    A    I guess it could be.  Again --

2    Q    All right.  Now, Mr. Larson, you signed for or you took

3         a check for a deposit from Ms. Jordan for the boat?

4    A    Correct.

5    Q    What did you do with that?

6    A    That gets deposited in my escrow account of Boats

7         Unlimited.

8    Q    What happened to that deposit after it was-- sorry, what

9         happened to that check after it was deposited?  Did

10        those funds go anywhere else or did you hold it?

11   A    Not until after the closing because those are typically

12        the 10 percent involved with the commission for the

13        brokers so afterwards I cut a check for Dale Friedman

14        for their part of the commission.

15   Q    Now, are you-- when you were holding the deposit, is it

16        normal for a buyer's broker to hold the deposit for a

17        boat?

18   A    Absolutely.

19   Q    For the buyer to hold?

20   A    That's correct.

21   Q    Is there any written form of escrow involved?

22   A    No.  It's just acknowledged on the offer form.

23   Q    Right.  Now, Mr. Larson, you signed what is marked as

24        Exhibit B, the purchase and sale agreement on Sea Dog?

25   A    Sea Dog's part, yes.

1    Q    All right.  Did that identify the terms of the agreement

2         between the parties?

3    A    Yes.

4    Q    As far as you were concerned, the boat was to be sold as

5         in accordance with the agreement as written?

6    A    Typically a finished bill of sale is stated as is where

7         is the bill of the sale.

8    Q    As far as purchase and sale it is as is where is?

9    A    I didn't read that, but it is probably in the statement.

10        It almost always is.

11   Q    That's your understanding of the deal?

12   A    Correct.

13   Q    And do you have any knowledge of how the boat came to be

14        delivered to Rhode Island?

15   A    Well, Number One, there is no trailer on the boat so

16        eventually it had to get back here because that's where

17        Pam keeps the boat, and Sea Dog had a trucker that could

18        ship it down and because everybody wanted the boat in a

19        hurry and wanted to close so she contacted the trucker

20        of their choice.

21   Q    When you say everybody wanted the boat in a hurry, are

22        you talking about  --

23   A    Pam Jordan.  I don't know what was going on up there.

24        Pam wanted to use the boat.

25   Q    I was just concerned with your use of everybody.  When

1          you used that term, you were referring to Pam Jordan or

2          any family or people with her?

3     A    Yes.

4     Q    Now, you also mentioned that it's, in your opinion,

5          customary or it's not out of the ordinary, rather.  I

6          don't mean to-- correct me if I'm wrong on the wording

7          of this.  You said it's not out of the ordinary for a

8          single person to sign a purchase and sale agreement?

9     A    On offer forms, no, just to an agreement, but once it

10         closes bills of sale acknowledge everybody as far as

11         ownership.

12    Q    And title as well is transferred?

13    A    Generally with boat liens on them we don't see the

14         titles.  It's held by the bank.

15    Q    Did you know whether or not there were any liens on this

16         boat at the time of signing the purchase and sale

17         agreement?  Did you know of any liens on that boat?

18    A    I can't say if it was the day before or after but it was

19         in a very tight frame.  We knew there was a lien to the

20         boat.

21    Q    But the purchase and sale agreement and wording of it

22         had a representation by the seller that there were no

23         liens, correct?

24    A    It's stated on their format and mine.  Also because

25         before we close we have to make sure the liens are

1    satisfied.

2    Q    But it states, it makes the representation there,

3         correct?

4    A    I'd have to read the document again.

5    Q    Well, in other words, whatever is on that document would

6         speak for itself, all right.  Did you have any dealings

7         with Dale Friedman or anyone else at Sea Dog for that

8         matter to where the agreement to deliver the boat to

9         Rhode Island was discussed?

10   A    Just Dale.

11   Q    Just Dale and you spoke to him personally?

12   A    Yes.

13   Q    Over the telephone?

14   A    Yes.

15   Q    And what was the agreement?

16   A    Well, he wanted to make sure he was paid so the

17        payments, I would make the payments to him for the

18        trucking ahead of time before the boat left.

19   Q    So the trucking was a separate payment?

20   A    Yes.

21   Q    For my purposes, let me finish, separate and apart for

22        any purchase price for the boat?

23   A    Correct.

24   Q    And were there any written documents entered into for

25        the transportation of the boat to Rhode Island?

```
1   A    No.

2   Q    And the purchase and sale agreement didn't even mention

3        anything about that?

4   A    That's correct.

5   Q    That's a separate agreement between Sea Dog and Pamela

6        Jordan?

7   A    I don't know if Pam talked to Sea Dog or talked to the

8        trucker, I don't know.

9   Q    Did you ever discuss it with Kevin or Brian Gaffey?

10  A    No.

11  Q    Delivering--

12  A    Sorry.

13  Q    Delivering the boat to Rhode Island, did you ever

14       discuss that?

15  A    No.

16       MR. DOUGHERTY:  Thank you.  I have nothing further.

17       THE COURT:  Did you say you signed a document for

18  Sea Dog or did I mishear you?

19       THE WITNESS:  Yeah, I did.  They sent their own

20  purchase and sales here which they wanted to make sure

21  the terms and the numbers were correct and that they

22  were agreeing for it.  I called Pam Jordan.  She agreed

23  with the number so I signed it here.  It says Paul

24  Larson for Pam Jordan acknowledging we're going to go

25  ahead with the sale.
```

```
1            THE COURT:  You may have misheard me.  I asked if

2      you signed for Sea Dog?

3            THE WITNESS:  For Sea Dog, no.

4            THE COURT:  Then I misheard you.  I have no

5      questions.  Do you have any questions, Mr. Mosca?

6            MR. MOSCA:  Just very quickly.

7      REDIRECT-EXAMINATION BY MOSCA:

8  Q   The listing agreement, sorry.  The purchase and sale

9      agreement in the first paragraph Boats Unlimited is

10     described as the selling broker?

11 A   Yes.

12 Q   In your business what does that mean?

13 A   Well, it's almost easier to say we're representing the

14     buyer, we're the agent for the buyer.

15 Q   Does it mean that as the selling broker you consummate

16     the transaction?

17 A   No.

18 Q   With the buyer?

19 A   No, not necessarily.

20 Q   But the purchase proceeds are funneled through your

21     office, correct?

22 A   No.  Typically as a scheduling agent the list--

23 Q   Agreement -- go ahead.

24 A   The listing agent is typically the ones securing the

25     funds because he's representing the seller so he's the
```

59

```
 1        one making sure the ducks are all lined up in a row for

 2        his client.

 3   Q    But it's your office that arranges the flow of the

 4        money?

 5   A    Yeah.

 6   Q    You collected the initial deposit?

 7   A    Generally I collect the funds.

 8   Q    And the balance?

 9   A    Correct.

10   Q    Flows from Rhode Island to Massachusetts?

11   A    That's correct.

12   Q    That's what typically happens.  If you've got a buyer,

13        the agreement does say selling agent?

14   A    Uh-huh.

15   Q    It's the seller's agent that's the listing agent,

16        correct?

17   A    No.  In this case, that's what the document says.

18   Q    Sea Dog is the listing agent?

19   A    Correct.

20   Q    For the seller?

21   A    Correct.  Good.

22   Q    Boats Unlimited is the selling agent for the buyer?

23   A    That's correct.

24   Q    That's the way this deal was structured?

25   A    That's correct.
```

60

```
1           MR. MOSCA:  No further questions.

2           THE COURT:  Thank you.  Mr. Dougherty?

3           MR. DOUGHERTY:  Nothing further.  There is a

4      personal jurisdiction issue.

5           THE COURT:  Thank you.  You may step down.  Any

6      more witnesses, Mr. Mosca?

7           MR. MOSCA:  No further witnesses, Judge.

8           MR. DOUGHERTY:  No rebuttal, your Honor.

9           THE COURT:  Well, I recognize it's defendant's

10     motion to dismiss, but given that the burden in this

11     case seems to be for plaintiff to show the contacts of

12     defendant in Rhode Island, if you wish to proceed first,

13     Mr. Mosca, I'd appreciate it.

14          MR. MOSCA:  I'll make my arguments brief because I

15     think in our memos and in the testimony before the Court

16     I feel that the plaintiff has established sufficient

17     contact on behalf of the defendants and also defendant's

18     agent.  It's clear the agent had many contacts with the

19     State of Rhode Island.  We have a purchase and sale

20     agreement which the defendant, one of the defendants,

21     has personally testified that he was aware of, signed

22     it, was aware that the selling broker was actually a

23     Rhode Island broker.  It's our position that the

24     contract itself was consummated in the State of Rhode

25     Island, in Wakefield, Rhode Island.
```

1           I would also like to bring two cases to the

2    attention of the Court that we were able to research

3    between our conference this morning and the court

4    session.  One is Del Sesto versus Transworld Airlines.

5    That is dealing with Transworld Airlines having an agent

6    in Rhode Island that sold airline tickets for them and

7    took a commission, and Transworld as the principle was

8    found to have sufficient contact with the State of Rhode

9    Island which resulted in personal jurisdiction in this

10   lawsuit as a result of this principle-agency

11   relationship.  I have a copy of it for the Court.

12          Also in Westphal versus Stone Manufacturing Company

13   you have a situation where you have, I believe, it's a

14   South Carolina corporation doing business in Rhode

15   Island using a Massachusetts commissioned agent to make

16   sales in Rhode Island, and the holding was the contact

17   of the agent in Rhode Island was sufficient to confer

18   jurisdiction by the Rhode Island courts upon the

19   principle so there are these two cases.

20          THE COURT:  If you have that, I'd like to see that.

21          MR. MOSCA:  I have two of them.

22          MR. DOUGHERTY:  May I request the indulgence of the

23   site?

24          MR. MOSCA:  I have the case.

25          THE COURT:  It's Westphal, W-E-S-T-P-H-A-L, versus

1     Stone Manufacturing Company, District of Rhode Island,

2     1993.

3          MR. MOSCA:  Both those cases, your Honor, deal with

4     principles out of state.  The Transworld case they had

5     an agent in Rhode Island.  It was an airline case.  They

6     did not provide transportation.  They were not providing

7     airplanes.  It was merely a principle-agency

8     relationship.  That particular one-- they had a Rhode

9     Island agency there.  That can be given from Westphal

10    with this was corporation with a Massachusetts agent

11    doing business in Rhode Island selling their goods.

12    They were a clothing manufacturer.  They sold their

13    goods through a MASS agent in Rhode Island, and in both

14    instances the Federal Court held that the contacts of

15    the agent in Rhode Island was sufficient to confer

16    jurisdiction, personal jurisdiction, over the principle

17    in each case, in Rhode Island.

18         THE COURT:  Stone Manufacturing is regularly

19    shipping and billing customers in Rhode Island?

20         MR. MOSCA:  They were.  That's true, but they also

21    had a Rhode Island agent-- sorry.  In Westphal, they had

22    a MASS agent.  They would come in from Massachusetts,

23    sell their goods in Rhode Island pick up contracts in

24    Rhode Island then ship the goods to Rhode Island.

25         THE COURT:  Regularly?

```
 1          MR. MOSCA:  Yes, regularly.

 2          THE COURT:  Unlike the Gaffeys?

 3          MR. MOSCA:  Unlike the Gaffeys, your Honor, but my

 4     position is there were sufficient contacts in Rhode

 5     Island through their agent, Sea Dog, so you know, in a

 6     case like this, your Honor, everyone is a victim.  We're

 7     all aware of that, but I think that the defendants had--

 8     they've acknowledged a principle-agency relationship.

 9     Their testimony is clear.  We had one.  They acknowledge

10     that Sea Dog was their defendant.  They-- not their

11     defendant, their agent so we've established by their own

12     testimony it was a principle-agency relationship.

13          It's very clear that Sea Dog had a number of

14     contacts in Rhode Island, and you've also heard

15     testimony directly from one of the defendants that he

16     made some phone calls into Rhode Island.  You've heard

17     the testimony of Paul Larson that he received a phone

18     call in Rhode Island from one of these defendants.  I'm

19     hoping that-- I don't think we have the burden of

20     establishing multiple contacts or a regular course of

21     business to establish personal jurisdiction over these

22     defendants.

23          I also think the Court has to take into

24     consideration both Westphal and Transworld.  The Court

25     takes a look at the true inconvenience to the
```

1    out-of-state defendant, and in this case your Honor, I

2    don't think there is a true inconvenience to them.

3    They're a neighboring state, an adjoining state.  They

4    already engaged local counsel.  We have the plaintiff

5    here, the boat here.  We have the selling broker here.

6    The listing broker, well, we'd like to know where he is,

7    but we won't be able to see him until the authorities

8    catch up with him so what I'm suggesting to the Court is

9    you've got plaintiff's broker here.  You've got the

10   selling broker here in Rhode Island, a listing broker,

11   you know, not going to be much help to anybody because

12   when they do catch up with him, he's going to end up in

13   prison.

14       I suggest for all those reasons jurisdiction be

15   maintained over this court by this defendant.

16       THE COURT:  Thank you.

17       MR. DOUGHERTY:  Your Honor, I'll be brief.  Again,

18   I just received these cases, but I can-- you don't have

19   to go any further than the head notes and summary at the

20   beginning of these cases to show they really don't apply

21   here.

22       With regard to Westphal, there was a five year

23   track record and sales of goods worth more than $750,000

24   that were purposefully sold in Rhode Island to Rhode

25   Island retailers, a systematic contact with Rhode Island

1    with shipping, mailing of goods over a five year track

2    record, and you found the defendant was doing business.

3        This Westphal case has no application whatsoever to

4    the Gaffeys as well as the Del Sesto case.  If you look

5    initially at the case summary, the defendants in that

6    case solicited business in Rhode Island through its

7    employees, other air carriers and authorized other air

8    carriers and these employees to issue the tickets so

9    this, again, is a purposeful availing of themselves to

10   the laws of the State of Rhode Island.

11       This case-- the Transworld Airline/Delsesto has no

12   application whatsoever.  Here the only agency

13   relationship we have, your Honor, is as a listing broker

14   and a seller relationship of the Gaffeys to Sea Dog.

15   That in and of itself along with whatever contact Sea

16   Dog made in Rhode Island have nothing to do with the

17   Gaffeys.

18       The reasons you can say that, your Honor, is the

19   only apparent implied or other agency that could

20   reasonably be relied upon would be contained within the

21   four corners of that purchase and sale agreement

22   executed by only one of my clients and Pamela Jordan or

23   actually -- sorry -- the broker for Pamela Jordan and

24   not in actuality her that provided for the sale of that

25   boat which was in Massachusetts, that provided for the

1   funds to be paid to a broker in Massachusetts.  It

2   provided for sea trials to be made in Massachusetts and

3   for the survey to be conduct in Massachusetts.

4       The Gaffeys here did nothing to put themselves

5   within the personal jurisdiction of the State of Rhode

6   Island.  They had no contacts whatsoever.  Phone calls

7   made from Rhode Island gathering information after the

8   fact in and of itself cannot be held to be the

9   purposeful systematic type of minimum contacts to

10  subject a person to jurisdiction.

11      Again, your Honor.  We're taking testimony off the

12  cuff, and if the Court is looking at that as a business

13  is, I would certainly like the opportunity to brief that

14  singular issue, but here we have an analysis that must

15  be undertaken by the Court as to whether or not they

16  have subjected themselves by purposefully availing

17  themselves to the forum state here in Rhode Island, and

18  clearly the evidence and the testimony has shown that

19  they have not.

20      Your Honor, what we have here is a situation where

21  we have to determine what substantial justice and the

22  interest of fairness would demand in this situation.  It

23  was Pamela Jordan that solicited a broker that solicited

24  the sale of this boat, the intended sale of this boat,

25  from Rhode Island, but they were the ones that crossed

67

1    the border.  They are the ones that purposefully availed

2    themselves to doing business in Massachusetts.  They

3    crossed the border from south to the north to go to the

4    sea trial, to do the inspection, to contemplate a

5    closing that was supposed to take place that never did

6    so, your Honor, my clients are not the persons who have

7    gone into another jurisdiction and subjected themselves.

8    I would argue that the proper forum for this would be

9    Massachusetts.

10        My clients would be subjected after having no

11   contact with this state in connection with this intended

12   purchase and sale except for a few phone calls from

13   their home State of Massachusetts after the fact.  They

14   are not the people who should be subjected to the

15   travel, the time and the expense of coming into this

16   state to litigate this.  There is no connection of Rhode

17   Island that satisfies the notions of justice, a

18   substantial justice and fair play here.

19        I would say that they've more than satisfied their

20   burden, the testimony that the Court has heard.  The

21   documentary evidence that speaks for themselves clearly

22   show Rhode Island was not at all contemplated to be the

23   forum state or state in which any of the activities of

24   any of these parties would have taken place.

25        The wire transfer, that authorization that's

68

1    attached to the objection to the motion, that was Pamela

2    Jordan transferring funds from Rhode Island to

3    Massachusetts not vice versa, not the opposite so

4    clearly we're not talking about even a close question

5    here.  We're talking about a situation where there is no

6    meaningful contact with Rhode Island by the Gaffeys, and

7    they're not the ones that should have to bear the burden

8    and the expense of travelling down here to litigate this

9    case.  This case is properly brought in Massachusetts.

10       If this Court is inclined or decides to grant the

11   Motion to Dismiss, it doesn't preclude Ms. Jordan from

12   doing anything in connection with her sought after

13   relief in a Massachusetts court.  It would not be

14   adjudication on the merits, simply a validation of my

15   client's truthful statements under oath and validation

16   of the documentary evidence that do not show any contact

17   with the state sufficient to say a long-arm jurisdiction

18   nor has the Court can see and hear from the testimony,

19   is there any general jurisdiction over these parties.

20   They don't vacation here.  They don't do any business

21   here.  They've never done any business here, and

22   therefore, it's clearly not even a close call on this

23   matter.

24       The cases cited, those were the purposeful

25   availment of systematic business activities within the

1   formum of the State of Rhode Island. I would ask the

2   Court to grant the Motion to Dismiss for Lack of

3   Personal Jurisdiction.

4       THE COURT: First, I would state everyone before me

5   is a victim as Mr. Mosca indicated. Neither Pamela

6   Jordan or Mr. Gaffey or Larson was the culprit here.

7   The victim is not before me. You are all in different

8   ways victims. There is no way this proceeding or

9   perhaps any proceeding after it that will be resolved

10  unless the fraudulent party is called to answer for.

11      This event, this case, arises out of a fraud that

12  occurred in Massachusetts systematic, of what appears to

13  be a systematic number of frauds that occurred.

14  The Court is called upon to determine whether or not the

15  defendants have sufficient minimum contacts with Rhode

16  Island. That arises out of a number of cases all

17  familiar with, the International Shoot case which I

18  won't go through. All the attorneys have read that

19  enough and Rhode Island General Laws Section 9-5-33

20  which provides for jurisdiction over nonresidential

21  individuals where they have sufficient minimum contacts.

22      A variety of cases place limits upon the court in

23  finding those minimum contacts. The most often quoted

24  is the Hanson versus Denkla, D-E-N-K-L-A, Supreme Court,

25  which looks for quote, unilateral activity of those who

1    claim some relationship with a nonresident defendant;

2    that unilateral activity is not enough.

3       World-wide Auto versus Volkswagon, another Supreme

4    Court case said quote, there must be some act which  the

5    defendant which purposely avails itself, close quote, of

6    jurisdiction.

7       There are a number of other cases from Rhode Island

8    Supreme Court that help us even further Ben's Marine

9    Sales versus Sleek Craft Boats at 502A.2d 808, a 1985

10    case happened to involve a sale of a boat delivered to

11    Rhode Island on defendant's boat carrier truck at which

12    time the plaintiffs paid the defendants the balance of

13    the purchase price, and the Rhode Island Supreme Court

14    reviewed the World-Wide/Volkswagon and says when the

15    defendant delivered its products into the stream of

16    commercial industry with the expectation they have

17    reached the forum state.  The forum court may assert

18    jurisdiction.

19       The courts have frequently held that the direct or

20    indirect shipment of goods into the forum by a

21    nonresident defendant with knowledge of their

22    destination is sufficient contact upon which to base

23    jurisdiction.  However, in the case before me, the

24    Gaffeys do not seem to have known the boat was actually

25    going to Rhode Island.

1          The Rhode Island Supreme Court also touched the

2     issues a couple of times very recently in this case

3     this.  The Rose versus Firstar Bank at 819 a.2d 1247

4     case, the Rhode Island Supreme Court quoted Hanson

5     versus Denkla then stated that the defendants have no

6     office in the state.  They transact no business here.

7     They do not hold nor administer any trust assets here,

8     and they have not engaged in any activities in the state

9     which resulted in, end of quote, jurisdiction.  That

10    involved a trust.  It was a little more complex set of

11    facts.

12         A case very recently come out on December 19, 2003

13    from the Rhode Island Supreme Court called Cerberus,

14    C-E-R-B-E-R-U-S, Partners, LP versus Gadsby,

15    G-A-D-S-B-Y, & Hannah.  That's a December 19, 2003 case.

16    It is extremely well-written case by a highly qualified

17    Justice Suttell.  On Page 5 of the advance sheets the

18    court quotes Ben's Marine Sales.  It says obviously a

19    determination of the minimum contacts will satisfy the

20    requirements of due process.  The fundamental question

21    here is whether the defendants conduct and connection

22    with the forum state are such he should reasonably

23    anticipate being haled into court there.  That

24    statement, anticipates being haled into court there,

25    seems to be appear over and over again in these cases.

1       The court briefly goes through general jurisdiction

2    as counsel suggested where a TWA or McDonald's normally

3    conducts business through sales to Rhode Island

4    residents and should be held responsible for Rhode

5    Island in Rhode Island courts even those when its

6    offices are not in Rhode Island and it's not Rhode

7    Island business.

8       That's not the case here.  The Gaffeys are

9    Massachusetts residents and do not regularly do business

10   in Rhode Island so that gets us to a question of whether

11   or not there is specific jurisdiction in this case to

12   hold Mr. Gaffey responsible in this court.  For specific

13   jurisdiction the Cerberus Partners case again at Page 6

14   states for specific personal jurisdiction to exist;

15   however, the defendant must have performed some act by

16   which purposefully avail itself of the privilege of

17   conducting activities with the forum state thus invoking

18   the benefits and protections of its laws.

19      On Page 8, we agree with the motion, Judge, that

20   the mere fact that O'Melveny sent bills and invoices

21   into Rhode Island substantial though may have been

22   aggravating in the hundreds of dollars, it's not

23   sufficient to that specific jurisdiction in this act.

24   No act was performed within the state whatsoever by

25   which O'Melveny has purposely availed itself of the

1    conducting of activities here.

2        If there is an act, then we go to Page 11 which

3    discusses the Gastalt, G-A-S-T-A-L-T, factors  These

4    factors include the burden on the defendant, the forum

5    state interests in adjudicating the dispute, the

6    plaintiff's interest in obtaining the most effective

7    resolution in the controversy in shared interests of

8    several states in furthering substantive social

9    policies.

10       When I saw that, there is a problem here because

11   eventually the plaintiff wants a Rhode Island title, but

12   then again she must do so by clearing up the

13   Massachusetts title so although Rhode Island has an

14   interest or very clear interest in this, Court could

15   order DEM in the end to issue the title to confirm the

16   bill of sale, the title is going to start in

17   Massachusetts, I believe, so even though there is a

18   Rhode Island interest, there is also a Massachusetts

19   interest as well; but as the Cerberus case says these

20   factors don't come into play, however, until it has been

21   shown the defendant has purposefully established minimum

22   contact with the forum state.

23       Let's look at the minimum contacts with the forum

24   state that the plaintiff proffers.  First, that the

25   contract was-- these were proffered by Mr. Mosca a few

1  moments ago -- the contract was consummated in Rhode

2  Island but both claims they were never in Rhode Island.

3  One of the Gaffeys indicated they signed the document in

4  Massachusetts.  There is that.

5      Mr. Mosca then alleges that there is a

6  principle-agency relationship of the defendants with Sea

7  Dog and that because Sea Dog is doing business with

8  Rhode Island, we should hold them responsible as we

9  would hold their agency through the principle-agency

10  relationship. However, it was never shown that Sea Dog

11  had regular contacts with Rhode Island.  The only thing

12  we see here is the link of Sea Dog having put this boat

13  on the internet.  That's what gets them to Rhode Island.

14  It just so happens that the testimony here is that they

15  were, Sea Dog, was not authorized to put it on the

16  internet or list the boat.

17      The third reason proffered is the calls to Mr.

18  Larson and to the plaintiffs in Rhode Island.  Again, as

19  Mr. Dougherty has said, all of these calls were after

20  the fraud was discovered or as the fraud was being

21  discovered, and the first question was they wanted to

22  make sure you really exist because we're in the process

23  for looking for our money.  That's not the type of

24  contact where a defendant is availig himself of Rhode

25  Island jurisdiction.  They're only trying to get

1   themselves out of a fraud.

2       The deliveries in Massachusetts, contract doesn't

3   say-- the contract says that the survey and the delivery

4   and the funds are apparently all to be delivered in

5   Massachusetts.  Certainly the Gaffeys are not supposed

6   to come to Rhode Island.  In fact, when Kevin Gaffey was

7   asked whether or not he knew Ms. Jordan was a Rhode

8   Island resident, he did answer yes, but he only could do

9   so after he looked at the purchase and sale agreement to

10  know she was a Rhode Island resident.

11      In this case the defendants didn't agree to have a

12  sale of the boat.  They signed the purchase and sale

13  agreement, but thought much more would happen, for one

14  thing they would get money.  They never signed a title,

15  never signed a bill of sale, never consummated the sale.

16  I simply don't think they avail themselves of

17  jurisdiction enough to make themselves subject to Rhode

18  Island courts.  There is not enough Rhode Island

19  minimumal contact.

20      It's very unfortunate I have to do this and dismiss

21  the case because whether I dismiss the case-- whether or

22  not the Gaffeys have to run to Rhode Island or Ms.

23  Jordan is running to Massachusetts we are compounding

24  the fraud here, not that the attorneys are doing

25  anything here.  You're representing yourself

1    excellently.  It's very unfortunate the Court has to

2    determine between which state you go to, and I feel, Ms.

3    Jordan, you're definitely a victim here, and now you

4    have to go to Massachusetts to get the title cleared up.

5    Frankly, it's not fair.  It's not the Court's fault, not

6    the attorney's fault.  Your attorney did an excellent

7    job presenting the case, but unfortunately as a man who

8    can commit a significant fraud and the damage, the harm

9    to all of you is continuing.  I sincerely regret that.

10        The case must be dismissed.  The case is dismissed.

11   It's without prejudice not on the merits and hence, it

12   is without prejudice for plaintiff to bring a case in

13   the Massachusetts courts or wherever else you may people

14   convened.

15        MR. MOSCA:  Your Honor, are you dismissing as to

16   Sea Dog as well because they brought no motion to

17   dismiss?  Are you retaining jurisdiction as to Sea Dog?

18   The only reason I ask that question is I'm going to

19   orally move that the Court have a status quo order

20   because my concern is because the boat is in Rhode

21   Island we're going to need an opportunity to commence

22   suit in Massachusetts, and I don't want anyone --

23        THE COURT:  Did you get service of process on Sea

24   Dog?

25        MR. MOSCA:  We got service of process, but we

1    mailed it under Rule 4.

2        THE COURT:  Did you get a green card back?

3        MR. MOSCA:  Yes, got green cards back from some of

4    the officers listed with the Secretary of State's

5    office.

6        THE COURT:  I won't dismiss the case of Sea Dog.

7        MR. MOSCA:  If you're retaining jurisdiction with

8    reference to Sea Dog, I want a status quo order because

9    I want to keep the parties in their present positions

10   until the case moves or travels into Massachusetts.  I

11   don't think anybody should be get an upper hand on-- I'm

12   concerned that the Gaffeys may move or file some type of

13   conversion action in the interim, get an order to

14   retrieve the boat.  The boat is Rhode Island.  I just

15   want to keep the parties in their present position.

16       THE COURT:  I would love to accommodate the parties

17   in any way we can.  Why don't we go off the record a

18   little bit to see if we can resolve some things.

19       (BENCH CONFERENCE)

20       THE COURT:  So judgment won't enter but the

21   defendants, Mr. Brian Gaffey and Kevin Gaffey, are

22   dismissed.

23   (Adjourned at 4:30 p.m.)

24

25

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

*617-951-2800*
*Fed. I.D. 04-2379708*



BRIAN H. GAFFEY                                             Page:    1
76 LAWRENCE ROAD                                   December 3, 2003
BOXFORD, MA  01921                    Account No.        12967.000
                                                   Invoice No.                    2

ATTN:


Work Description:
    BRIAN GAFFEY v. PAMELA JORDAN


        PREVIOUS BALANCE                                        -$1,000.00

                            FEES

                                                    HOURS
11/03/2003
    BES      TELEPHONE CONFERENCE WITH CLIENT; LETTER TO
             CLIENT; REVIEW CLIENT FILE; 2ND LETTER TO
             CLIENT; CALL TO DOMENIC MOSCA; REVIEW MOSCA
             BACKGROUND; TELEPHONE CONFERENCE WITH
             MOSCA.                                           1.20

11/04/2003
    BES      CALL TO CLIENT; TELEPHONE CONFERENCE WITH
             GAFFEY; LETTER TO MOSCA.                         0.60

11/12/2003
    BES      CALL TO MOSCA.                                   0.10

11/17/2003
    BES      TELEPHONE CONFERENCE WITH CLIENT.                0.10
             BERTRAM E. SNYDER                                2.00

11/21/2003
    WSC      REVIEW SUMMONS AND COMPLAINT RECEIVED VIA
             FACSIMILE FROM BRIAN GAFFEY; TELEPHONE
             CONFERENCE WITH BRIAN GAFFEY REGARDING
             TIMETABLE FOR ANSWER; MEMO TO BES.               0.50
             WESLEY S. CHUSED                                 0.50


        FOR CURRENT SERVICES RENDERED              2.50     375.00

        TOTAL CURRENT WORK                                  375.00

Page        2
12/03/2003

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

Account No.     12967.000
Invoice No.            2

CREDIT BALANCE                                                    -$625.00

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

617-951-2800
Fed. I.D. 04-2379708

BRIAN H. GAFFEY                                                   Page:   1
76 LAWRENCE ROAD                                          January 13, 2004
BOXFORD, MA  01921                      Account No.              12967.000
                                        Invoice No.                      3

ATTN:

Work Description:
BRIAN GAFFEY v. PAMELA JORDAN

PREVIOUS BALANCE                                                  -$625.00

## FEES

|            |     |                                                                                                                                                                        | HOURS |
|------------|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
| 12/01/2003 | BES | REVIEW COMPLAINT; REVIEW CLIENT MEMO; TELEPHONE CONFERENCE WITH CLIENT.                                                                                                 | 0.60  |
| 12/02/2003 | BES | CONFERENCE WITH CLIENTS AT HOME IN TOPSFIELD; DRAFT AFFIDAVIT; TRAVEL TIME; PREP PRO HAC VICE PLEADINGS; 2 CALLS TO PAT DOUGHERTY.                                       | 3.10  |
| 12/03/2003 | BES | E-MAIL TO CLIENT; LETTER TO PAT DOUGHERTY; FURTHER ATTENTION TO AFFIDAVITS; DRAFT DOCUMENTS REGARDING PRELIMINARY INJUNCTION HEARING AND LACK OF JURISDICTION; TELEPHONE CONFERENCE WITH PAT DOUGHERTY AND CLIENTS. | 4.00  |
| 12/04/2003 | BES | TELEPHONE CONFERENCES WITH AND E-MAILS WITH CLIENT; EDIT AFFIDAVITS; TELEPHONE CONFERENCE WITH PAT DOUGHERTY.                                                            | 2.50  |
| 12/12/2003 | BES | CALL TO PAT DOUGHERTY; TELEPHONE CONFERENCE WITH PAT DOUGHERTY.                                                                                                         | 0.30  |
| 12/15/2003 | BES | TELEPHONE CONFERENCE WITH BRIAN GAFFEY; CALL TO PAT DOUGHERTY; TELEPHONE CONFERENCE WITH KEVIN GAFFEY; TELEPHONE CONFERENCE WITH PAT DOUGHERTY.                          | 0.70  |

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

01/13/2004
Account No.     12967.000
Invoice No.     3

HOURS

| Date | | Description | Hours | Amount |
|---|---|---|---|---|
| 12/17/2003 | BES | TELEPHONE CONFERENCE WITH MOSCA; TELEPHONE CONFERENCE WITH BRIAN GAFFEY; CALL TO BRIAN GAFFEY; CALL TO PAT DOUGHERTY; TELEPHONE CONFERENCE WITH PAT DOUGHERTY. | 0.60 | |
| | | BERTRAM E. SNYDER | 11.80 | |
| | | FOR CURRENT SERVICES RENDERED | 11.80 | 1,770.00 |

## EXPENSES

| Date | Description | Amount |
|---|---|---|
| 12/04/2003 | FACSIMILE | 2.00 |
| 12/04/2003 | FACSIMILE | 2.00 |
| 12/04/2003 | FACSIMILE | 2.00 |
| 12/31/2003 | COPIES - IN HOUSE | 17.00 |
| | TOTAL EXPENSES | 23.00 |

## ADVANCES

| Date | Description | Amount |
|---|---|---|
| 12/04/2003 | TRAVEL BERTRAM E. SNYDER - TRAVEL TO CLIENT'S HOUSE IN TOPSFIELD FOR CONFERENCE ON 12/2/03 | 2.40 |
| 12/08/2003 | DELIVERIES FEDERAL EXPRESS TO PATRICK DOUGHERTY, ESQ. 12/03/03 | 10.91 |
| | TOTAL ADVANCES | 13.31 |
| | TOTAL CURRENT WORK | 1,806.31 |
| | BALANCE DUE | $1,181.31 |

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

617-951-2800
Fed. I.D. 04-2379708

BRIAN H. GAFFEY                                              Page:    1
76 LAWRENCE ROAD                                    February 10, 2004
BOXFORD, MA  01921                  Account No.          12967.000
                                    Invoice No.                  4

ATTN:

Work Description:
   BRIAN GAFFEY v. PAMELA JORDAN

      PREVIOUS BALANCE                                      $1,181.31

                            FEES

                                                      HOURS
01/05/2004
      BES     E-MAIL FROM AND TO CLIENT.                     0.10

01/12/2004
      BES     TELEPHONE FROM (VOICEMAIL) PAT DOUGHERTY;
              TELEPHONE CONFERENCE WITH CLIENT; REVIEW
              E-MAIL; TELEPHONE CONFERENCE WITH PAT
              DOUGHERTY.                                      0.30

01/27/2004
      BES     TELEPHONE CONFERENCE WITH CLIENT AND PAT.      0.50

01/28/2004
      BES     REVIEW E-MAIL; CALL TO CLIENT.                 0.20

01/29/2004
      BES     TELEPHONE CONFERENCE WITH CLIENT.              0.20

01/30/2004
      BES     TELECONFERENCE TO CLIENT.1
              TELECONFERENCE S. ROCHE.5
              CALL TO CLIENT.1
              TELECONFERENCE.1                               0.80
                                                             ─────
              BERTRAM E. SNYDER                              2.10

01/26/2004
      POM     CONFERENCE WITH BES REGARDING STATUS OF
              CASE.                                          0.20

Page    2
02/10/2004

BRIAN H. GAFFEY                                                   Account No.      12967.000
BRIAN GAFFEY v. PAMELA JORDAN                                     Invoice No.              4

|  |  | HOURS |  |
|---|---|---|---|
| 01/28/2004 |  |  |  |
| POM | CONFERENCE WITH BES REGARDING STATUS OF CASE AND CONFIRMATION OF NO EXISTING CONFLICT OF INTEREST. | 0.40 |  |
|  | PAT O. McALEER | 0.60 |  |
|  | FOR CURRENT SERVICES RENDERED | 2.70 | 426.00 |

ADVANCES

|  |  |  |
|---|---|---|
| 12/08/2003 | DELIVERIES FEDERAL EXPRESS TO PATRICK DOUGHERTY, ESQ.  12/04/03 | 10.91 |
|  | TOTAL ADVANCES | 10.91 |
|  | TOTAL CURRENT WORK | 436.91 |
|  | BALANCE DUE | $1,618.22 |

Gaffey v. Acadia - 93A Demand   139

# Looney & Grossman LLP

*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

617-951-2800
Fed. I.D. 04-2379708

BRIAN H. GAFFEY
76 LAWRENCE ROAD
BOXFORD, MA 01921

Page: 1
March 8, 2004
Account No.        12967.000
Invoice No.                 5

ATTN:

Work Description:
BRIAN GAFFEY v. PAMELA JORDAN

PREVIOUS BALANCE                                            $1,618.22

FEES

|  |  | HOURS |
|---|---|---|
| 02/03/2004 | | |
| BES | TELEPHONE CONFERENCE WITH JORDAN'S ATTORNEY. | 0.20 |
| 02/09/2004 | | |
| BES | CALL TO ROCHE; TELEPHONE CONFERENCE WITH LARSON; TELEPHONE CONFERENCE WITH ROCHE; CALL TO GAFFEY; TELEPHONE CONFERENCE WITH KEVIN GAFFEY. | 1.20 |
| 02/18/2004 | | |
| BES | 1 CALL FROM AND 2 CALLS TO STEVE ROCHE. | 0.20 |
| 02/19/2004 | | |
| BES | CALL FROM STEVE ROCHE; CALL TO STEVE ROCHE; TELEPHONE CONFERENCE WITH STEVE ROCHE. | 0.40 |
| 02/20/2004 | | |
| BES | CALL TO CLIENT; TELEPHONE CONFERENCE WITH CLIENT. | 0.20 |
| 02/23/2004 | | |
| BES | TELEPHONE CONFERENCE WITH LARSON; CALL TO ROCHE; E-MAIL TO CLIENTS; TELEPHONE CONFERENCE WITH ROCHE. | 0.60 |
| | BERTRAM E. SNYDER | 2.80 |
| 02/17/2004 | | |
| KW | PREPARED PACKAGE TO AL TANGER; REVIEW OF | |

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

Page      2
03/08/2004
Account No.      12967.000
Invoice No.      5

|  |  | HOURS |  |
|---|---|---|---|
|  | EXCEPTIONS, CHANGES TO POLICY. | 1.25 |  |
|  | KIMBERLY WORMSTEAD | 1.25 |  |
|  | FOR CURRENT SERVICES RENDERED | 4.05 | 532.50 |

### ADVANCES

| 02/13/2004 | POSTAGE |  | 0.37 |
|---|---|---|---|
|  | TOTAL ADVANCES |  | 0.37 |
|  | TOTAL CURRENT WORK |  | 532.87 |
|  | CURRENT PAYMENTS THRU 03/08/2004 |  | -1,181.31 |
|  | BALANCE DUE |  | $969.78 |

# Looney & Grossman LLP
### *Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

617-951-2800
Fed. I.D. 04-2379708

BRIAN H. GAFFEY
76 LAWRENCE ROAD
BOXFORD, MA 01921

ATTN:

|  |  |
|---|---|
| Page: | 1 |
| April 21, 2004 | |
| Account No. | 12967.000 |
| Invoice No. | 6 |

Work Description:
BRIAN GAFFEY v. PAMELA JORDAN

PREVIOUS BALANCE                                                                    $969.78

### FEES

|  | | HOURS |
|---|---|---|
| 03/03/2004 | | |
| BES | TELEPHONE CONFERENCE WITH S. ROCHE; CONFERENCE WITH PAT MCALEER. | 0.50 |
| 03/05/2004 | | |
| BES | CONFERENCE WITH PAT MCALEER. | 0.10 |
| 03/08/2004 | | |
| BES | CALL TO BRIAN GAFFEY; TELEPHONE CONFERENCE WITH BRIAN GAFFEY. | 0.20 |
| 03/09/2004 | | |
| BES | CALL TO STEVE ROCHE; CALL TO PAUL LARSON. | 0.20 |
| 03/10/2004 | | |
| BES | TELEPHONE CONFERENCE WITH BRIAN GAFFEY; TELEPHONE TO BRIAN GAFFEY (VOICEMAIL); TELEPHONE TO (VOICEMAIL) STEVE ROCHE; TELEPHONE CONFERENCE WITH STEVE ROCHE; CALL TO LARSON (VOICEMAIL); TELEPHONE CONFERENCE WITH LARSON; CONFERENCE WITH PAT MCALEER. | 0.80 |
| 03/15/2004 | | |
| BES | CALL TO STEVEN ROCHE. | 0.10 |
| 03/16/2004 | | |
| BES | TELEPHONE CONFERENCE WITH STEVE ROCHE; CALL TO CLIENT. | 0.20 |

Page    2
04/21/2004

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

Account No.    12967.000
Invoice No.    6

| | | | HOURS |
|---|---|---|---|
| 03/17/2004 | | | |
| | BES | TELEPHONE CONFERENCE WITH PAT DOUGHERTY. | 0.10 |
| 03/18/2004 | | | |
| | BES | REVIEW RELEASE; LETTER TO CLIENT. | 0.30 |
| 03/23/2004 | | | |
| | BES | E-MAIL TO CLIENTS. | 0.20 |
| 03/29/2004 | | | |
| | BES | TELEPHONE CONFERENCE WITH ROACH. | 0.10 |
| | | BERTRAM E. SNYDER | 2.80 |
| 03/09/2004 | | | |
| | AH | CHECKED ON STATUS OF TM APPLICATION; DISCUSSED STATUS WITH RCB; REVIEWED THOMPSON & THOMPSON REPORT. | 1.20 |
| | | ANDY HENDERSON | 1.20 |
| 03/03/2004 | | | |
| | POM | CONFERENCE WITH BES REGARDING DRAFT COMPLAINT, CASE STATUS AND FURTHER HANDLING; BEGIN REVIEW OF FILE REGARDING DRAFT COMPLAINT. | 0.90 |
| 03/05/2004 | | | |
| | POM | CONFERENCE WITH BES REGARDING FURTHER HANDLING AND DRAFT OF COMPLAINT. | 0.20 |
| 03/08/2004 | | | |
| | POM | CONFERENCE WITH BES REGARDING FURTHER HANDLING OF MATTER. | 0.20 |
| 03/10/2004 | | | |
| | POM | CONFERENCE WITH BES REGARDING DRAFT COMPLAINT AND FURTHER HANDLING. | 0.40 |
| 03/17/2004 | | | |
| | POM | REVIEW FILE AND DRAFT COMPLAINT FOR NEGLIGENCE, BREAK OF 3RD PARTY CONTRACT AND CONVERSION. | 1.80 |
| 03/23/2004 | | | |
| | POM | DRAFT COMPLAINT; RESEARCH REGARDING THIRD PARTY BENEFICIARY TO BROKER K. | 2.40 |
| | | PAT O. McALEER | 5.90 |
| | | FOR CURRENT SERVICES RENDERED | 9.90    1,709.50 |

Page    3
04/21/2004
BRIAN H. GAFFEY                                              Account No.    12967.000
BRIAN GAFFEY v. PAMELA JORDAN                               Invoice No.              6

### EXPENSES

| | | |
|---|---|---|
| 03/31/2004 | COPIES - IN HOUSE | 2.20 |
| | TOTAL EXPENSES | 2.20 |

### ADVANCES

| | | |
|---|---|---|
| 03/19/2004 | POSTAGE | 0.74 |
| | TOTAL ADVANCES | 0.74 |
| | TOTAL CURRENT WORK | 1,712.44 |
| | BALANCE DUE | $2,682.22 |

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

*617-951-2800*
*Fed. I.D. 04-2379708*

BRIAN H. GAFFEY                                          Page:     1
76 LAWRENCE ROAD                                      June 11, 2004
BOXFORD, MA  01921                    Account No.        12967.000
                                       Invoice No.               7

ATTN:

Work Description:
    BRIAN GAFFEY v. PAMELA JORDAN


        PREVIOUS BALANCE                                    $2,682.22

                            FEES

                                                         HOURS
04/05/2004
    BES      LETTER TO JORDAN'S ATTORNEY.                  0.20

04/12/2004
    BES      TELEPHONE CONFERENCE WITH ROCHE; REVIEW
             ROCHE LETTER.                                 0.20

04/14/2004
    BES      REVIEW LARSON COMPLAINT.                      0.10

04/21/2004
    BES      CALL FROM AND TO STEVE ROCHE.                 0.10

04/26/2004
    BES      TELEPHONE CONFERENCE WITH R. MIDDLEMAN;
             TELEPHONE CONFERENCE WITH ROCHE; LETTER TO
             ROCHE; CALL TO GAFFEY; CONFERENCE WITH ROCHE;
             TELEPHONE CONFERENCE WITH BRIAN GAFFEY.       0.80

04/29/2004
    BES      TELEPHONE CONFERENCE WITH CLIENT.             0.10

04/30/2004
    BES      CALL TO LARSON'S ATTORNEY MIDDLEMAN.          0.10

05/03/2004
    BES      CALL TO RICHARD MIDDLEMAN; TELEPHONE
             CONFERENCE WITH MIDDLEMAN AND CALL TO
             CLIENT; TELEPHONE CONFERENCE WITH GAFFEY.     0.40

Page    2
06/11/2004

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

Account No.    12967.000
Invoice No.    7

HOURS

05/04/2004
BES     TELEPHONE CONFERENCE WITH MIDDLEMAN
REGARDING SETTLEMENT.                                       0.20

05/06/2004
BES     TELEPHONE CONFERENCE WITH MIDDLEMAN; CALL
TO CLIENT; CALL TO ROCHE; TELEPHONE
CONFERENCE WITH ROCHE.                                      0.40

05/17/2004
BES     TELEPHONE CALL TO CLIENT (VOICE MAIL);
TELEPHONE CONFERENCE WITH CLIENT.                           0.20

05/18/2004
BES     CALL TO MIDDLEMAN; TELEPHONE CONFERENCE
WITH MIDDLEMAN.                                             0.20

05/27/2004
BES     CALL TO ROBERT MITTLEMAN; TELEPHONE
CONFERENCE WITH MIDDLEMAN; CALL TO GAFFNEY;
LETTER TO MITTLEMAN; E-MAIL CLIENT; DRAFT
AGREEMENT NOT TO SUE.                                       1.20
        BERTRAM E. SNYDER                                   4.20

04/06/2004
POM     REVIEW OF FILE REGARDING SETTLEMENT AND
REVISED COMPLAINT;                                          0.50

04/12/2004
POM     COMPLETE DRAFT COMPLAINT; REVIEW STATUS OF
POLICE INVESTIGATION AND SHERIFF'S AUCTION OF
SEA DOG ASSETS.                                             2.60

04/16/2004
POM     COMPLETE REVISIONS TO DRAFT COMPLAINT FOR
BREACH OF THIRD PARTY CONTRACT AND
NEGLIGENCE AS TO BOATS UNLIMITED.                           1.20

04/19/2004
POM     DRAFT CORRESPONDENCE TO PAUL LARSEN OF
BOAT'S UNLIMITED REGARDING ENCLOSED DRAFT
COMPLAINT AND REQUEST FOR SETTLEMENT
NEGOTIATIONS.                                               0.40
POM     COMPLETE DRAFT COMPLAINT AND REVISIONS PER
ATTORNEY SNYDER.                                            0.70
POM     TELEPHONE CONFERENCE WITH ATTORNEY TIM
McHUGH REGARDING AUCTION OF SEA DOG ASSETS
AND POSSIBLE TRUST FUND.                                    0.30

04/20/2004
POM     COMPLETE DRAFT CORRESPONDENCE TO PAUL
LARSON REGARDING ENCLOSED COMPLAINT AND

Page    3
06/11/2004

BRIAN H. GAFFEY
BRIAN GAFFEY v. PAMELA JORDAN

Account No.    12967.000
Invoice No.    7

|  |  |  | HOURS |  |
|---|---|---|---|---|
|  | REQUEST FOR SETTLEMENT NEGOTIATIONS. | | 0.40 | |
| 05/04/2004 | | | | |
| POM | REVIEW STATUS OF MATTER REGARDING RESPONSE FROM LARSON AND RECENT ARREST OF DARYL FRIEDMAN. | | 0.50 | |
| 05/13/2004 | | | | |
| POM | TELEPHONE CONFERENCE WITH ATTORNEY MITTLEMEN REGARDING SETTLEMENT OF MATTER AND CURRENT OFFER. | | 0.30 | |
|  | PAT O. McALEER | | 6.90 | |
|  | FOR CURRENT SERVICES RENDERED | | 11.10 | 1,906.50 |

### EXPENSES

| 04/20/2004 | FACSIMILE | 6.00 |
|---|---|---|
| 04/30/2004 | COPIES - IN HOUSE | 9.40 |
|  | TOTAL EXPENSES | 15.40 |

### ADVANCES

| 04/05/2004 | POSTAGE | 0.37 |
|---|---|---|
| 04/05/2004 | POSTAGE | 1.11 |
| 04/13/2004 | POSTAGE | 1.20 |
|  | TOTAL ADVANCES | 2.68 |
|  | TOTAL CURRENT WORK | 1,924.58 |
|  | BALANCE DUE | $4,606.80 |

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

*617-951-2800*
*Fed. I.D. 04-2379708*

BRIAN H. GAFFEY                                        Page:    1
76 LAWRENCE ROAD                                       July 7, 2004
BOXFORD, MA 01921                    Account No.       12967.000
                                     Invoice No.              8

ATTN:

Work Description:
  BRIAN GAFFEY v. PAMELA JORDAN

        PREVIOUS BALANCE                                        $4,606.80

## FEES

|            |     |                                              | HOURS |       |
|------------|-----|----------------------------------------------|-------|-------|
| 06/21/2004 |     |                                              |       |       |
|            | BES | REVIEW CLOSING PAPERS; LETTER TO MITTLEMAN.  | 0.30  |       |
|            |     | BERTRAM E. SNYDER                            | 0.30  |       |
|            |     | FOR CURRENT SERVICES RENDERED                | 0.30  | 45.00 |

## EXPENSES

| 06/01/2004 | FACSIMILE          | 4.00  |
|------------|--------------------|-------|
| 06/01/2004 | FACSIMILE          | 4.00  |
| 06/30/2004 | COPIES - IN HOUSE  | 6.40  |
|            | TOTAL EXPENSES     | 14.40 |

## ADVANCES

| 06/01/2004 | POSTAGE        | 0.74 |
|------------|----------------|------|
| 06/08/2004 | POSTAGE        | 0.74 |
| 06/14/2004 | POSTAGE        | 0.60 |
| 06/21/2004 | POSTAGE        | 1.48 |
| 06/21/2004 | POSTAGE        | 0.60 |
|            | TOTAL ADVANCES | 4.16 |

        TOTAL CURRENT WORK                                       63.56

        BALANCE DUE                                            $4,670.36

# Looney & Grossman LLP
*Attorneys at Law*

*101 Arch Street*
*9th Floor*
*Boston, MA 02110*

*617-951-2800*
*Fed. I.D. 04-2379708*

BRIAN H. GAFFEY                                                Page:    1
76 LAWRENCE ROAD                                        August 19, 2004
BOXFORD, MA 01921                        Account No.          12967.000
                                          Invoice No.                 9

ATTN:

Work Description:
BRIAN GAFFEY v. PAMELA JORDAN

|  | | PREVIOUS BALANCE | | $4,670.36 |

### FEES

| | | | HOURS | |
|---|---|---|---|---|
| 07/07/2004 | | | | |
| | BES | TELEPHONE CONFERENCE WITH CLIENT. | 0.20 | |
| | | BERTRAM E. SNYDER | 0.20 | |
| | | FOR CURRENT SERVICES RENDERED | 0.20 | 0.00 |

### EXPENSES

| 07/31/2004 | COPIES - IN HOUSE |
|---|---|

### ADVANCES

| 07/02/2004 | POSTAGE |
|---|---|
| 07/06/2004 | POSTAGE |
| 07/07/2004 | POSTAGE |

| CURRENT PAYMENTS THRU 08/19/2004 | -4,670.36 |
|---|---|
| BALANCE DUE | $0.00 |

DOUGHERTY ANGELL
ATTORNEYS & COUNSELORS AT LAW

March 17, 2004

To:    Kevin Gaffey
       & Brian Gaffey
       13 Timber Lane
       Topsfield, MA 01983

                                                 Stephen J. Angell, Esq.
                                                 Patrick J. Dougherty, Esq.

## INVOICE

**Re:**    **Fees for Services rendered in connection with Representation of**
           **clients in *Pamela Jordan v. Kevin Gaffey, Brian Gaffey and Sea Dog***
           ***Yacht Sales, Inc.*, Washington Co. C.A. WC2003-664**
           *Services rendered from December 4, 2003 – March 17, 2004*
           *(see attached time records for detailed description of services rendered)*

13.95 hours @ reduced rate of $150.00/hour =          $2,092.50
Expenses paid out:  (see attached receipt) =          $  240.00

Total Amount Due Payable Upon Receipt................................$2,332.50

Includes only time *actually* billed, *does not* represent all time expended on your behalf

*If you have any questions regarding this Invoice, please call (401)273-9770*

**Please send Payment to:**

        **Patrick J. Dougherty, Esquire**
        **155 South Main Street, Suite 203**
        **Providence, RI 02903**

155 South Main Street
Providence, RI 02903
P  401-273-9770
F  401-273-4750
W doughertyangell.com

December 4, 2003      Receipt and review of documents from Bertram E. Snyder;
conferring re: same to formulate plan of action to deal with defense of lawsuit.
                                                            (0.7 hours)


December 7, 2003      Electronic research of cases on point in preparation for drafting
Motion to Dismiss for Lack of Jurisdiction; reviewing file materials in preparation for
drafting motion; drafting motion using affidavits and documentation/evidence previously
obtained from BES and clients; editing motion and putting same into final form for
anticipated filing on following day.
                                                            (4.2 hours)


December 8, 2003      Drafting Motion for Admission pro hac vice of Bertram E. Snyder,
Esq.; transmitting same to opposing counsel and requesting position on whether there
will be objection to same; appearing at Washington County Superior Court to file Motion
to Dismiss for Lack of Jurisdiction and obtain assignment from clerk and judge for
hearing of motion and also arrange to continue Plaintiff's Motion for Declaratory Relief
to a date after hearing and decision on Motion to Dismiss for Lack of Jurisdiction in order
to minimize expense to clients.
                                                            (1.7 hours)


December 12, 2003    Appearing at Washington County Superior Court to file limited
entry of appearance with clerk and conference with Judge Lanphear re: procedure and
scheduling of hearing.
                                                            (0.5 hours)


January 6, 2004      Review and analysis of Plaintiff's Memorandum in Support of
Objection to Motion to Dismiss for Lack of Personal Jurisdiction; briefly reviewing cases
cited in memorandum in preparation for pressing motion to dismiss.
                                                            (1.4 hours)


January 9, 2004      Preparing for and appearing in Washington County Superior Court
to conduct evidentiary hearing on Motion to Dismiss for Lack of Personal Jurisdiction;
participating in chambers conference to minimize issues and coordinate scheduling in
order to minimize cost to clients.
                                                            (5.25 hours)


January 20, 2004     Obtaining certified copy of transcript from court reporter for use
by clients in proceeding with matter.
                                                            (0.2 hours)

January 20, 2003


Patrick J. Dougherty, Esquire

**PAYABLE TO:**        Jamie K. Halpin, CSR
                      Court Reporter
                      R.I. Superior Court, Rm. 423
                      250 Benefit Street
                      Providence, Rhode Island 02903


        Providing a transcript copy in the matter of
**PAMELA JORDAN VS. KEVIN GAFFEY.,** Case No. WC/2003-0664
heard before the Honorable Mr. Justice Jeffrey Lanphear
on January 9, 2001.


        AMOUNT DUE UPON RECEIPT:  =  $ 240.00

        Thank you.

        JAMIE K. HALPIN, CSR
        Court Reporter

Paid - Ck # 3379