Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3              DISTRICT OF MASSACHUSETTS
 4           Civil Action No. 04-CV-12354-RGS
 5
 6
 7   BRIAN AND KEVIN GAFFEY,
 8            Plaintiffs,
 9        vs.
10   ACADIA INSURANCE COMPANY,
11            Defendant.
12
13
14            DEPOSITION of CLAIRE MULLANEY, taken
15   pursuant to notice, at the offices of Tompkins, Clough,
16   Hirshon & Langer, 3 Canal Plaza, Portland, Maine, on
17   December 19, 2005, commencing at 11:07 A.M., before
18   Catherine Cook, a Notary Public in and for the State of
19   Maine.
20
21
22
23
24        Downing & Peters Reporting Associates
25      79 Atlantic Place, South Portland, Maine 04106
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3        David Smith, Esq.
 4   Cianciulli & Ouellette, 163 Cabot Street,
 5   Beverly, Massachusetts 01915 - (978) 922-9933
 6
 7   For the Defendant:
 8        Leonard W. Langer, Esq.
 9   Tompkins, Clough, Hirshon & Langer, Three Canal Plaza,
10   P.O. Box 15060, Portland, Maine 04112-5060 - (207) 874-6700
```

Page 3

```
 1                      INDEX
 2                                              PAGE
 3   EXAMINATION BY MR. SMITH                     4
 4
 5
 6                    EXHIBITS
 7   NO.  DESCRIPTION                            PAGE
 8    1   Policy                                  20
 9    2   Documents from Claim File               20
10
11
12        (The exhibits were retained by Mr. Smith.)
```

Page 4

```
 1       CLAIRE MULLANEY, having been sworn by the Notary
 2   Public, was examined and deposed as follows:
 3       EXAMINATION BY MR. SMITH:
 4   Q. Good morning, could you please state your name.
 5   A. Claire Mullaney.
 6   Q. I'm David Smith. I represent the Gaffeys in a matter
 7   against Acadia Insurance Company. I'm going to ask you a
 8   series of questions today. If at any time you do not
 9   understand my questions, please say so. If you need a
10   break, please, say so. I ask the first couple of questions
11   of everybody, so please don't take offense. Are you under
12   the influence of any drugs or alcohol that would impair
13   your ability to answer my questions today?
14   A. No.
15   Q. Do you have any physical or mental impairments that
16   would hinder your ability to answer my questions today?
17   A. No.
18   Q. Claire, where do you live?
19   A. I live in Westbrook, Maine.
20   Q. Where are you employed?
21   A. I work for Acadia Insurance Company. Why that was
22   hard, I don't know.
23       MR. LANGER: It's Monday morning.
24       THE DEPONENT: It must be.
25   Q. Can you give me an overview of your education.
```

Page 5

1  A. My education, I graduated from Somerset High School
2  Somerset, Massachusetts. I attended North Adams State
3  College for a year and what's now known as UMass Dartmouth
4  for three years.
5  Q. Did you get --
6  A. I did not get a degree. Then I went to work for Aetna
7  Life & Casualty and I have spent the last almost 30 years
8  getting various pieces of my insurance education.
9  Q. Okay. How long have you worked at -- how long did you
10 work at Aetna?
11 A. Seventeen years.
12 Q. And from Aetna, where did you go?
13 A. Acadia.
14 Q. When you went to Acadia, what position were you hired?
15 A. I believe my title was property claims specialist when
16 I was first hired.
17 Q. How long did you hold that position?
18 A. Probably about five years.
19 Q. Your card says AIC on it, AMIM.
20 A. Right.
21 Q. What are those certifications?
22 A. Those are designations -- AIC is Associate In Claims.
23 The other one is Associate In Marine Insurance Management.
24 Q. Is that something -- a title that Acadia gives you?
25 A. No, there's an organization that helps educate the

Page 6

1  insurance industry. There are actually several. That one
2  is the Insurance Institute of America.
3  Q. Does AIC come from that --
4  A. Same organization, yes.
5  Q. Let's try not to talk at the same time.
6  A. Sorry.
7  Q. After being the property claims specialist for
8  approximately five years, what position did you hold next?
9  A. I became claim director.
10 Q. How long did you hold that position?
11 A. Until now, essentially.
12 Q. You have been with Acadia 13 years?
13 A. Twelve years in March.
14 Q. Can you tell me what the normal procedure is when a
15 claim comes in for a loss on a boat?
16     MR. LANGER: Objection.
17     MR. SMITH: Let me rephrase it.
18 Q. Is there a standard procedure that Acadia uses when a
19 claim comes in, generally speaking?
20 A. Any claim or a boat claim?
21 Q. Any claim.
22 A. It is assigned to an adjuster and the adjuster is
23 tasked with looking into the coverage, circumstances of the
24 loss and determining what the damages are.
25 Q. Now, when it is assigned to an adjuster, are there

Page 7

1  different level of adjusters at Acadia?
2  A. Yes.
3  Q. Can you tell me what levels there are?
4  A. There is claim rep. There's a senior claim rep and at
5  that time --
6      MR. LANGER: He is just asking you in general.
7  Q. Just asking in general.
8  A. Okay. And there is a general adjuster. We have a
9  general adjuster position.
10 Q. In 2003, was there a different set-up?
11 A. No, I think that was about it.
12 Q. As a claim director, how do you fit into this -- into
13 that?
14 A. Well, my job is to look at the loss notices as they
15 come in, make sure they are getting sent to the appropriate
16 person to handle.
17 Q. So, you get the claims first and then assign them --
18 A. Yes.
19 Q. -- so every claim goes to a director first?
20 A. I'm not sure every claim does, but the majority of
21 claims do.
22 Q. What's the -- the claim comes into a director, claim
23 director and then is assigned to either a claim rep senior,
24 a senior claim rep or a general adjuster?
25 A. Yes.

Page 8

1  Q. What's the difference between those three positions?
2  A. Generally speaking, it is experience level.
3  Q. Well, is there different authorities for the various
4  individual positions?
5  A. There are different authorities for individuals, not
6  necessarily individual positions.
7  Q. What does a general adjuster do?
8  A. We only have one general adjuster in Acadia and he
9  handles the larger property claims throughout the company.
10 Q. How many senior claim reps do you have?
11     MR. LANGER: Today?
12 A. Companywide?
13 Q. Companywide, today, if you know.
14 A. Oh, my, I don't know.
15 Q. How about 2003?
16 A. I wouldn't even be able to guess.
17 Q. Are senior claim reps broken down -- let me strike
18 that. Say it a different way. How many senior claim reps
19 handle marine claims?
20     MR. LANGER: Today?
21     MR. SMITH: Today.
22 A. One.
23 Q. How many handled marine claims in 2003?
24 A. I believe we also had one at that time.
25 Q. Who is it now?

Page 9

1  A. Amy Leonard.
2  Q. Who was it then?
3  A. I'm not positive. I think Pat O'toole was still our
4  senior person at that time.
5  Q. How many claim reps does Acadia have to handle marine
6  claims now?
7  A. Two.
8  Q. How many did they have in 2003?
9  A. Three.
10 Q. Who were they in 2003?
11 A. Amy Leonard, Pat O'Toole and Isaac Howe.
12 Q. Who are the claim reps now?
13 A. Amy Leonard and Wallace Nichols.
14 Q. Who?
15 A. Wallace Nichols.
16 Q. I'm sorry, did you -- I thought you said Amy Leonard
17 was the senior claim rep now?
18 A. She is.
19 Q. You categorized her also as a claim rep now?
20 A. Maybe I misunderstood you.
21 Q. Let's see -- okay. How many claim -- not including
22 senior claim reps, how many claim reps are there in the
23 marine department?
24 A. One.
25 Q. Wallace Nichols?

Page 10

1  A. Yes.
2  Q. In '03, was there just two, Amy and Isaac --
3  A. Two.
4  Q. -- claim reps, non-senior claim reps?
5  A. Yes.
6  Q. Do senior claim reps supervise the regular claim reps?
7  A. No.
8  Q. So the claim director supervises the claim reps?
9  A. Yes.
10 Q. Claim director supervises the senior claim reps?
11 A. Yes.
12 Q. As far as handling the claim itself, for claim reps
13 not senior claim reps, and specifically in the marine
14 department now, today, when a claim is -- assume the claim
15 rep arrives at a conclusion that the claim must be paid as
16 opposed to denial of coverage. Is that something a claim
17 rep would review with you as a claims director?
18      MR. LANGER: Object to the form of the question.
19 A. I guess I'm not exactly sure what you are asking me.
20 Q. Okay. Someone brings a claim, puts a claim in for
21 something in the marine department, I'm just trying to
22 understand the relationship that you as claim director
23 would have with the claim reps, not the senior claim rep.
24 A. Okay.
25 Q. If someone brings a claim to you, and -- outside

Page 11

1  person, insured brings a claim, you assign it to the claim
2  rep, the claim rep, after reviewing all the stuff, says:
3  This claim should be paid. Does that claim rep then go to
4  you and say I'm going to pay on this claim X amount of
5  dollars?
6       MR. LANGER: Object to the form of the question.
7  A. Not unless it exceeds their authority.
8  Q. Same idea, but if the claims rep decides that coverage
9  needs to be denied, does the claims rep come to you and
10 say: I'm going to deny this claim?
11      MR. LANGER: Objection to the form of the
12 question.
13 A. There is usually a discussion between the adjuster and
14 the -- or I should say the claim rep and the director.
15 Q. Is that same procedure utilized for the senior claims
16 rep?
17 A. Probably, but there is probably less discussion.
18 Q. Does the discussion include a review of the claim file
19 by the claims director?
20 A. Sometimes.
21 Q. And is that determined on a case-by-case basis or is
22 there some sort of --
23 A. It would be case by case.
24 Q. Are there any guidelines that helps the claims
25 director to determine when the claims director is going to

Page 12

1  review a denial of a claim?
2  A. No.
3  Q. Who is above the claim director?
4  A. It depends. In my case, I report directly to the vice
5  president of claims.
6  Q. Is the group of people who talked about the -- handle
7  marine claims, is that basically all the people that are
8  involved in handling marine insurance claims?
9       MR. LANGER: During what time period?
10      MR. SMITH: Now. Let's say now.
11 A. The people that I mentioned previously?
12 Q. Yes.
13 A. Yes, there is another person who has, on occasion,
14 handled marine losses, but that's really not part of his
15 responsibilities any longer. I guess if we got extremely
16 busy, we might call on him.
17 Q. The same for 2003 --
18 A. In 2003, that was it. Those were the only options
19 that we had.
20 Q. Is the marine aspect of the claims department for
21 Acadia relatively small compared to the rest of the claims
22 department?
23 A. Yes.
24
25

Page 13



16  Q. Isaac Howe, how long did he work at Acadia?
17  A. He was with us about a year, possibly a little longer
18  than that.
19  Q. When you say with us, was it just the marine
20  department or with Acadia fully?
21  A. With Acadia.
22  Q. Why did he leave?
23  A. I believe he moved away.
24  Q. Did he report directly to you?
25  A. Yes.

Page 14

1   Q. What kind of experience did he have prior to coming to
2   Acadia?
3   A. He was right out of college.
4   Q. This was his first job out of college?
5   A. I think he did some summer stuff. He came to us in
6   the fall. I think he did some summer stuff between
7   graduation, but not --
8   Q. What college did he go to?
9   A. We went to Texas A & M.
10  Q. Do you know what his degree was in?
11  A. I don't recall exactly what his degree was in.
12  Q. Did he have any maritime experience prior to coming to
13  Acadia?
14  A. He had taken maritime law and various courses in
15  maritime areas.
16  Q. While in college?
17  A. Yes.
18  Q. In 2003, September 2003 timeframe, what was his, what
19  authority did he have with respect to --
20  A. I don't remember.
21       MR. LANGER: By that, you mean his claims
22  settlement authority?
23       MR. SMITH: Claims settlement authority.
24  A. I don't remember. I would just be guessing.
25  Q. Well, is it something that -- would he have had a

Page 15

1   million dollars claim authority?
2   A. No.
3   Q. Well, that helps me. Would he have had a hundred
4   thousand claims authority?
5   A. No.
6   Q. Would he have 50,000 claims authority?
7   A. That's a possibility. I don't know any more specific
8   than that.
9   Q. Did you assign -- now, you are familiar with the
10  Gaffey claim that we are here to discuss, correct?
11  A. Yes.
12  Q. And did you assign the Gaffey claim to Isaac Howe?
13  A. I don't recall if it was me. I'm not in the office
14  every single day, so sometimes someone else would do it.
15  Q. Who would that be?
16  A. It could have been any of the other claim directors,
17  if I were out of the office.
18  Q. Would there have been a notation of that in the claims
19  file?
20  A. I don't know. Our claims system has changed
21  significantly. We are now in a completely computerized --
22  in that version, there definitely would be a record of who
23  assigned it. Back then, I'm not sure if there would have
24  or not.
25  Q. Do you have a present memory of the Gaffey claim

Page 16

1   coming in?
2   A. No.
3   Q. Now, you understand that Isaac Howe denied the Gaffey
4   claim?
5   A. Yes.
6   Q. Did Isaac Howe speak to you about the denial prior to
7   sending the denial letter out?
8   A. Yes.
9   Q. What did you guys discuss?
10  A. Coverage, whether we felt it was a covered loss.
11  Q. What did he tell you about the situation -- let me --
12  A. I can't remember the specific discussion.
13  Q. Let me back up again. In this situation, did you
14  review the claims file prior to the denial going out?
15  A. Yes.
16  Q. You reviewed that with him?
17  A. Yes.
18  Q. Him being Isaac Howe?
19  A. Yes.
20  Q. What did you review, as you sit here today, if you
21  remember?
22  A. I would have looked at whatever documents he had
23  obtained in his investigation. I probably would have read
24  his statement or at least discussed the statement that he
25  took. It may not have been transcribed at that point, I'm

4 (Pages 13 to 16)

Page 17

1  not sure, but we would have discussed it. We would have
2  had looked through the policy together.
3  Q. Did you review his coverage letter that went out,
4  denial itself?
5  A. Normally, I do. I must have. I don't remember
6  specifically me looking at that one, but I normally looked
7  at those letters that he sent, yes.
8  Q. What documents did you review prior to coming here
9  today?
10 A. I looked at -- I reviewed the depositions that were
11 taken of the Gaffeys. Briefly took a look at our claim
12 manual and I looked at the denial letter.
13 Q. Did you ever look at the transcript from Rhode Island
14 Superior Court?
15 A. I don't remember if that -- I don't know.
16 Q. Did you look at it today or prior to coming today?
17 A. I knew it existed and Len sort of showed it to me, but
18 I can't remember if anything I read was from that I guess
19 is what I'm saying.
20
21
22
23
24                                                  in the
25



Page 18

1
2
3
4
5
6
7
8
9  Q. Just so I understand your work history better at
10 Acadia, after those denials went out, did you have anything
11 more to do with either claim?
12 A. No, I don't believe I did.
13 Q. So when the Gaffey claim, the denial letter went out,
14 you haven't had anything to do with the file until today?
15 A. Yeah, I think that's a fair assessment.
16 Q. You didn't have any knowledge of any 93-A demand that
17 was sent in the Gaffey matter?
18 A. It might have been mentioned to me, but I was no
19 longer supervising the file.
20 Q. Who was supervising the file at that point?
21 A. It was being handled and supervised by Barbara Taylor.
22 We were in the transition period.
23 Q. Explain that transition.
24 A. Barbara took over the ocean marine department. We had
25 some change in personnel and I moved on to a -- same job

Page 19

1  title but different responsibilities.
2  Q. Are they still marine responsibilities?
3  A. Part of my job is marine responsibilities, yes.
4  Q. Did you have any part in assisting with the answers to
5  interrogatories in this case?
6  A. No, I don't think so.
7  Q. I show you a document. Are you familiar with that?
8  A. Yes.
9  Q. What is that document?
10 A. It looks like the yacht policy that was issued to the
11 Gaffeys on October 10, 2002.
12 Q. That's the policy in question that we are reviewing on
13 the Gaffeys' loss?
14 A. Yes.
15 Q. I'm going to ask you to help me a little bit here --
16    MR. SMITH: Len, unless you have a simpler way of
17 handling this.
18 Q. I'm trying to understand what was in your claims file
19 at the time -- at the time the denial letter went out,
20 okay. The policy would have been part of that claims file,
21 correct?
22 A. No, not necessarily.
23 Q. But you would have understood what policy was in play?
24 A. Absolutely.
25 Q. So that document there is the policy that would have

Page 20

1  been in play at the time of filing the lawsuit?
2  A. It looks like it, yes.
3  Q. Show you another --
4     MR. LANGER: Are you going to mark this as
5  Exhibit 1? If we are going to refer to it, I would like to
6  mark them just so it is clear what we have been talking
7  about.
8     MR. SMITH: That's fine. That's fine.
9       (Discussion off the record.)
10    (Exhibit 1, Policy, marked for identification.)
11    (Exhibit 2, Documents from Claim File, marked for
12 identification.)
13 Q. I am going to show you what we have marked as Exhibit
14 No. 2 and ask you, are you familiar with those documents?
15 A. Yes.
16 Q. What are these documents?
17 A. These look like the various pieces of information and
18 documentation in our claim file.
19 Q. Typically, when you are reviewing a claim, do you also
20 look at the underwriting file?
21 A. No.
22 Q. Tell me, with the handwritten information on there,
23 first page, do you know whose handwriting that is?
24 A. No, I'm not sure.
25 Q. Next page, Bates stamp 72, do you know whose

Downing & Peters Reporting Associates
1-800-540-3376        79 Atlantic Place, South Portland, Maine 04106        207-772-6221

Claire Mullane

Page 21

1  handwriting that is?
2  A. I think this is Isaac's, which makes me think that
3  probably is too, on the --
4  Q. On the prior page?
5  A. Yes.
6  Q. 73?
7  A. Appears to be Isaac's.
8  Q. As far as all of those additional pages we just went
9  through that have to do with vessel owner statement of
10 loss, documents from Sea Dog and offense reports, you
11 didn't write anything on those documents?
12 A. I did not.
13 Q. As far as you know, Isaac did not either?
14 A. I don't believe so.
15 Q. Now, when we were talking about earlier that it was
16 possible -- it may be possible to determine which claims
17 director assigned Isaac Howe with this claim based upon the
18 computer records, is that computer record contained in this
19 document?
20 A. No, when I was referring to computer records, I was
21 saying our current system clearly -- it's clear who would
22 have assigned it. Our old system it is not always evident.
23 Q. Do you know how long he worked on this claim prior to
24 the denial?
25 A. I can't tell from what's here. I can tell between

Page 22

1  September 24th and October 6th he worked on it, but I can't
2  tell what preceded September 24th from what I have in front
3  of me.
4  Q. It says in here with respect to --
5      MR. LANGER: What are you referring to?
6  Q. Bates stamp No. 75. It says S/W. I assume that's
7  spoke with. That's Claire being you?
8  A. Yes.
9  Q. No. 75 is a note that was written into the system by
10 Isaac Howe?
11 A. Yes.
12 Q. How do I know it is Isaac Howe?
13 A. His initials are next to the date and time.



Page 23



12 Q. If -- at the time that this was going on, did you have
13 an understanding of what the law was in Massachusetts
14 regarding the transfer of Massachusetts state registered
15 vessels?
16     MR. LANGER: Object to the foundation.
17 A. I don't recall.
18 Q. Do you know what it takes to transfer or sell a boat
19 from one person to another in Massachusetts, a
20 state-registered boat?
21 A. No.
22 Q. Do you know what it takes to register a boat in
23 Rhode Island that was formerly a boat registered in
24 Massachusetts?
25 A. No.

Page 24

1  Q. When you -- as part of the claims handling process,
2  what legal research is done into understanding -- strike
3  that. As part of the claims process, what do you do to
4  investigate the laws that are applicable in a given case?
5      MR. LANGER: Objection to the form of the
6  question.
7  A. It varies tremendously depending on that individual's
8  circumstances.
9  Q. Is there -- in this case, did anybody undertake, prior
10 to the denial letter going out, the Gaffeys' case, did
11 anyone, either yourself or Isaac Howe, look into what is
12 necessary in order to sell a boat in Massachusetts?
13 A. No.
14 Q. So, you didn't take -- no investigation was done into
15 determining what documents are necessary in order to sell a
16 boat in Massachusetts?
17 A. I don't believe so.
18 Q. No research was done into determining -- no research
19 was done into what is necessary in order to sell a boat in
20 Rhode Island?
21     MR. LANGER: Objection to form and foundation.
22 A. No.
23 Q. Would that type of information be relevant in
24 determining whether a sale had actually taken place when
25 evaluating this claim?

1-800    eters Reporting Associates    South Portland, Maine 04106    207-772-6221

Page 25

1  MR. LANGER: Objection to the form. Seeks a
2  legal conclusion.
3  A. Would you repeat it again.
4      (The reporter read the requested matter.)
5  MR. LANGER: Same objection.
6  A. No.
7  Q. Why?
8  A. We were trying to determine whether the -- what
9  happened here was covered under the terms of our policy.
10 I'm not sure that -- all we needed to know was what
11 happened, what took place here, and so I think we had those
12 facts. I don't know if we needed to research whether a
13 legal sale had taken place.
14 Q. Okay. You understand -- you understood from reviewing
15 the claim file at the time -- you actually spoke -- let me
16 back up, you actually spoke to Isaac about the statement he
17 took from Brian Gaffey?
18 A. Yes.
19 Q. And you are not sure whether you actually saw the
20 transcribed version of it?
21 A. I can't remember if it was transcribed at that time.
22 Q. But you understood that Brian Gaffey expected a
23 closing to occur before he released his boat?
24 A. I don't remember.
25 Q. I'm going to show you part of Exhibit 2, marked as

Page 26

1  Bates stamp 80. If you need to go back a page in order to
2  get it in context, that's fine. Take a look at the second
3  question and then the answer, and then the next question
4  and answer.
5  MR. LANGER: You mean the one that starts:
6  Mmm-hmm?
7  MR. SMITH: Yes, exactly.
8  A. This is an answer that starts: So he could.
9  Q. Go ahead.
10 A. Sign over the title to the new people and he would
11 give us our money.
12 Q. Go to the next answer underneath.
13 A. And, at that point, which that was on August 26th,
14 that was going to happen.
15 Q. Does that help refresh your recollection to the facts
16 in this case?
17 A. Not really.
18 Q. The fact that now that you have read that and clearly
19 in that statement he indicated that he expected a closing
20 to occur, exchange title for money.
21 MR. LANGER: If that's a question, I object to
22 the form of the question.
23 Q. Do you see that in there, right?
24 A. I guess. I'm not sure I do, frankly. I don't mean to
25 be argumentative, but it seems to me that he expected to

Page 27

1  have the money turned over to him and I don't know if he
2  expected that to include some formal closing. I don't know
3  if that's what he expected from -- I can't tell that from
4  reading this.
5  Q. If there was going to be a formal closing and that did
6  not occur because the boat was obviously removed, wouldn't
7  that constitute theft under the policy?
8  MR. LANGER: Objection. Form and foundation,
9  seeks a legal conclusion.
10 A. Could you repeat that again.
11     (The reporter read the requested matter.)
12 MR. LANGER: Same objections.
13 A. No.
14 Q. What section of the policy were you working from when
15 the denial letter went out; do you know?
16 A. We would look at our insuring agreement, what did we
17 actually agree to insure and for what types of perils did
18 we agree to pay, and how we would pay, actually comes out
19 to that.
20 Q. Is theft of a vessel covered under a policy?
21 MR. LANGER: Objection. Calls for a legal
22 conclusion. Document speaks for itself.
23 A. Yes.
24 Q. Where does it say that?
25 A. Sudden and accidental direct physical loss of or

Page 28

1  damage to the insured property due to an external cause.
2  Q. And it is not later -- theft is not later excluded
3  from the policy, correct?
4  A. I believe there is a limitation later on in the policy
5  for theft of equipment or personal items often of a boat.
6  Theft or the unexplained disappearance of insured property
7  from the yacht, unless there are visible marks of forceable
8  entry or removal or the entire yacht is stolen. That's to
9  prevent theft claims for parts of the yacht basically. To
10 encourage, when an insured has them laid up, encourage them
11 to take off anything that can be removed.
12 Q. Have you ever paid out any claims for theft of a
13 vessel?
14 A. Me, personally?
15 Q. Yes, you personally.
16 A. No.
17 Q. Did Isaac Howe ever while he was there?
18 A. I don't remember. It is not a common occurrence, I
19 would say.
20 Q. Has Acadia paid out for the theft of a vessel?
21 A. Yes.
22 Q. Do you know what circumstances -- can you give me an
23 example of when they have?
24 A. I can't remember specifics off the top of my head, no.
25 Q. I'm trying to understand why, if the Gaffeys' did not

Page 29

1  authorize removal of that vessel from Sea Dog's yacht
2  facility, why Acadia is taking a position there was not a
3  theft of a vessel?
4  　　MR. LANGER: Objection to the form and foundation
5  of the question.
6  A. Because we believed that what was actually stolen here
7  was the Gaffeys' money, not their boat. They entrusted
8  that boat to a broker and that broker sold the boat with
9  their permission. They know where the boat is. They
10 always knew where the boat was. It doesn't fit the
11 definition of a theft. There was something stolen though,
12 definitely and it was their money.
13 Q. Did Acadia ever -- strike that. If Isaac Howe had
14 made any other inquiry such as to discuss the matter with
15 other people, would that be reflected in the claims file?
16 A. Not necessarily.
17 Q. I don't mean that internally. I mean like if he
18 called the police department or he called the potential
19 purchaser of this particular boat.
20 A. That would be in the claim file, yes.

25 Q. Besides yourself and Isaac Howe, was there anybody

Page 30

1  else working on the claim prior to the denial letter going
2  out?
3  A. I don't believe so.
4  Q. Did you ever talk to the Gaffeys yourself?
5  A. No.
6  Q. In order for there to be a theft of the insured's
7  property, insured has to own the property, correct?
8  　　MR. LANGER: Objection. Form foundation, calls
9  for a legal conclusion.
10 A. I can think of there may be circumstances where there
11 is a theft, but the insured didn't own the item, a lease
12 for instance.
13 Q. Okay, but if we agree in order for the theft to
14 have -- in order for there to be coverage for a theft,
15 there has to be some sort of incidence of ownership or
16 control, direct control like a lease, for example.
17 　　MR. LANGER: Objection. Form, foundation and
18 also seeks a legal conclusion.
19 A. I'm not sure, I guess.
20 Q. You understand, in this case, the Gaffeys are claiming
21 they still owned the boat at the time it was removed from
22 Sea Dog Yacht Sales?
23 A. Yes, I guess I understood that.
24 Q. You understood that when it was removed, they did not
25 give authority for it to be removed in their opinion?

Page 31

1  A. No, I'm not sure I would agree to that.
2  Q. Why?
3  A. It seemed to me they gave the broker the authority to
4  sell their boat and they said they could take it to be
5  surveyed.
6  Q. Granted they gave authority to take the boat out of
7  the water from where its location to Sea Dog Yacht Sales.
8  I'll give you that. But what -- where in the file is there
9  information that leads you to believe that they gave him
10 permission to move the boat to Rhode Island or have the
11 boat moved to Rhode Island?
12 　　MR. LANGER: Objection to the form of the
13 question.
14 A. I don't know that that is in the claim file.
15 Q. Is that a conclusion that you reached based upon what
16 you reviewed?
17 A. Is what a conclusion, that that's not in the claim
18 file?
19 Q. No, no. I'm sorry. That's fair.
20 A. Sorry.
21 Q. That's fair. The denial of the claim is based in part
22 because Acadia believes there was a theft of money?
23 A. Exactly.
24 Q. And Gaffeys contend, no, it is the theft of a boat?
25 A. I understand that.

Page 32

1  Q. I'm wondering where -- how you or Isaac Howe
2  individually or together came to the conclusion that the
3  Gaffeys did give permission to Sea Dog Yacht Sales to allow
4  the boat to be moved out of Sea Dog Yacht Sales facility?
5  　　MR. LANGER: Object to the question. Calls for a
6  legal conclusion.
7  A. He signed a purchase and sales agreement. They gave
8  permission for him to pull the boat, and they agreed to
9  turn over the title when they got the money for it.
10 Q. At a closing?
11 　　MR. LANGER: Objection.
12 A. I guess so.
13 Q. On a date of August 26th?
14 A. Yes.
15 Q. And they said that that never occurred, correct?
16 A. Apparently.
17 Q. So, in order to complete the transaction, that needed
18 to occur based upon Gaffeys' statement?
19 　　MR. LANGER: Objection. Seeks a legal
20 conclusion.
21 A. Right, I'm not sure. Like you said before, I never
22 researched what it takes to sell a boat but --
23 Q. It's clear from reading just what you've read so far,
24 they expected something else to take place?
25 A. It sounds that way.

8 (Pages 29 to 32)

Page 33

1  Q. That did not take place -- that something else did not
2  take place?
3  A. I guess not.
4  Q. You understood that they were holding the title to the
5  boat and would release it when they got the money?
6  A. Yes.
7  Q. If you understood that, why isn't that a theft -- why
8  isn't that a covered loss?
9       MR. LANGER: Objection.
10 A. Because we know where the boat -- the boat is not
11 stolen. The boat is exactly where they agreed for it to
12 be, in the hands of the purchaser that they agreed to, the
13 sale price they agreed to. The boat is not a stolen item.
14 The boat was transferred to another property with the
15 permission of the owner. That makes it not a --
16 Q. But there is no permission in anything in the file
17 that says that they gave permission to Sea Dog to turn the
18 boat over to the person in Rhode Island prior to the
19 exchange of title and money?
20      MR. LANGER: Objection to the form of the
21 question.
22 A. I'm not sure I would agree with that.
23 Q. Why?
24 A. I think there is something implicit in the fact that
25 they arranged for this man to handle the sale of their

Page 34

1  boat. He talked about an actual price and a buyer that he
2  had. The Gaffeys gave him permission to move the boat. I
3  understand you make a distinction between moving it for
4  survey and moving it to Rhode Island, but I'm not sure I
5  do. It gave that permission. It gave Friedman that
6  permission. I don't think it is illogical for them to
7  assume that it was going to continue on its way to the
8  buyer.
9  Q. That wasn't discussed when -- at least by Isaac Howe
10 with the Gaffeys?
11 A. What wasn't discussed?
12 Q. The next step, the moving of the boat to Rhode Island.
13      MR. LANGER: I object. The document speaks for
14 itself. If you are asking Ms. Mullaney about what
15 Mr. Gaffey and Mr. Howe spoke about, I mean there is a
16 transcript and the document speaks for itself.
17 Q. I'm asking specifically. Is there any specific
18 reference in the claim file that they gave direct
19 permission for the boat to be moved from Sea Dog Yacht
20 Sales to Rhode Island?
21 A. I don't know. Let me review this. Okay, could you
22 ask your question again, please.
23      (The reporter read the requested matter.)
24      MR. LANGER: Objection.
25 A. I would say it would not be an illogical assumption

Page 35

1  that the boat was going to be moved to the buyer.
2  Q. Okay. That's an assumption you are making based on
3  reviewing those documents?
4  A. Right.
5  Q. But there is no --
6  A. I guess what I'm saying is, I don't think it is
7  illogical to assume that that permission was part of the
8  arrangement in working with a broker.
9  Q. But that's --
10 A. That's why you have a broker.
11 Q. That's something that Acadia has read into this
12 situation?
13 A. It is my interpretation, if I use a broker to sell
14 something that, at some point, the money and the item need
15 to get together and that's what the broker is for. So I
16 would assume that implies permission. I guess that's my
17 assumption. That is my assumption, yes. I'll give you
18 that.
19      MR. SMITH: Can I have a few minutes.
20      (A short break was taken.)
21 Q.
22                                              Do you
23 know Bertram Snyder?
24 A. Yes. Well, I never met him, but I know who he is.
25 Q. Is he someone Acadia has retained on occasions?

Page 36

1  A. I believe we have used him on occasion.
2  Q. Tim McHugh, do you know him?
3  A. No.
4  Q. Have you ever retained him?
5  A. I haven't personally. Someone at Acadia may have.
6  Q. What about Patrick Dougherty in Rhode Island?
7  A. I don't believe so.
8  Q. In Exhibit 2, as part of the claim file, you had
9  vessel owner's and/or master's statement of loss?
10 A. Yes.
11 Q. In that statement of loss, it clearly indicates -- who
12 completed that document?
13 A. Brian Gaffey.
14 Q. In that statement, it clearly indicates that he did
15 not give authority for the vessel to leave Sea Dog Yacht
16 Sales?
17      MR. LANGER: Objection. The document speaks for
18 itself.
19 A. It says that he did not. It was hauled without my
20 permission.
21 Q. As a point of reference, we are talking about Bates
22 stamp No. 83 and 84.
23 A. Yes.
24 Q. You have an offense report also as part of the claims
25 file?

Page 37

1  A. Yes.
2  Q. That's Bates stamped 87?
3  A. Yes.
4  Q. In that report, it also indicates at the bottom that
5  the vessel was -- two-thirds of the way down or one-third
6  of the way up, as the case may be, something along the
7  lines the vessel was removed without their approval?
8      MR. LANGER: Objection. The document speaks for
9  itself.
10 A. Boat was delivered to Rhode Island without consent or
11 approval.
12 Q. And these documents were in the file at the time
13 denial was made?
14 A. Yes.
15 Q. That denial was strictly -- is based upon, back to the
16 assumption that you are making, that it was logical that
17 the boat was going to go to Rhode Island at some point?
18     MR. LANGER: Objection.
19 A. I don't know if that was the sole reason I agreed with
20 the denial.
21 Q. What else would there -- what other reason besides
22 that assumption did you --
23 A. We know where the boat is. Insured always knew where
24 the boat was.
25 Q. You understood that to be in someone else's

Page 38

1  possession?
2  A. Yes.
3  Q. Were you -- are there times when Acadia changes its
4  position on coverage?
5      MR. LANGER: Objection to the form and foundation
6  of the question.
7  A. Sure.
8  Q. They can change it from granting coverage to denial;
9  is that fair to say?
10     MR. LANGER: Objection. Form and foundation.
11 A. I guess they could, yes.
12 Q. At times, if there are new facts given to Acadia, is
13 it fair to say that they could change their opinion from
14 denial to -- denial of coverage to granting coverage?
15 A. Yes.
16 Q. So in your evaluation -- Acadia's position is that you
17 would not -- you would only grant coverage if the boat was
18 stolen and you didn't know where it was?
19     MR. LANGER: Objection.
20 A. We would pay for the theft of a boat.
21 Q. And even though there was no authority here, at least
22 as stated in your file, for the boat to be removed from Sea
23 Dog Yacht Sales, you are still saying that's not a theft?
24 A. Yes.
25     MR. LANGER: Objection. It's argumentative.

Page 39

1  Q. That's regardless of what documents had been handed
2  over one way or the other?
3      MR. LANGER: Same objection. Argumentative.
4  A. I believe so.
5  Q. So if Dale Friedman had -- I'm just trying to
6  understand. In your analysis of the situation, if there
7  wasn't a bill of sale or purchase and sales agreement,
8  would that have changed the situation in any way?
9  A. If there were no bill of sale, yet the boat was still
10 with -- I can't remember her name, the woman?
11 Q. Jordan, Pam Jordan.
12 A. I would still be of the same opinion, that a theft
13 hadn't taken place.
14 Q. Did you ever -- so, you didn't review this -- you
15 don't remember reviewing the Rhode Island Superior Court
16 information?
17     MR. LANGER: Objection. Asked and answered.
18 A. No.
19 Q. So, if after you are all done with the file and go
20 continue on your business, you change the handling of the
21 situation to Barbara, any new additional information
22 surrounding the loss would be something that Barbara would
23 review to determine whether a change in coverage should
24 be --
25 A. Yes.

Page 40

1  Q. Does Acadia compromise claims?
2      MR. LANGER: Objection to the form and foundation
3  of the question. Objection. You mean does Acadia settle
4  claims.
5  A. I guess I'm not really sure what you are asking me
6  there.
7  Q. The policy in question, is that an agreed valuation
8  policy?
9  A. Yes.
10 Q. So if there is a loss, the agreed value is what is
11 paid, if it is a full loss?
12     MR. LANGER: Objection to the form of the
13 question.
14 A. Yes, total loss.
15 Q. Is it fair to say that Acadia has never made an offer
16 to the Gaffeys in this case?
17 A. Not to my knowledge.
18 Q. Is it fair to say that Acadia doesn't often tend to
19 compromise coverage issues?
20     MR. LANGER: Objection. Foundation.
21 A. That we do not?
22 Q. Do not?
23 A. Yes, that would be fair.
24 Q. If there is a legal determination at some point -- if
25 there was a subsequent legal determination regarding the

10 (Pages 37 to 40)

Page 41

1  facts of this case, as it pertains to Gaffey and Jordan,
2  would that information be relevant to your determination as
3  to whether there is coverage or not?
4      MR. LANGER: Objection. Foundation. Calls for
5  speculation.
6  A. I don't know.
7      MR. SMITH: Thank you. I have nothing further.
8      (The exhibits were retained by Mr. Smith.)
9      (TIME: 12:30 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1
2
3             CERTIFICATE
4      I, Catherine Cook, a Notary Public in and for the
5  State of Maine, hereby certify that the within-named
6  deponent was sworn to testify the truth, the whole truth,
7  and nothing but the truth, in the aforementioned cause of
8  action.
9      I further certify that this deposition was
10 stenographically reported by me and later reduced to print
11 through Computer-Aided Transcription, and the foregoing is
12 a full and true record of the testimony given by the
13 deponent.
14     I further certify that I am a disinterested
15 person in the event or outcome of the above-named cause of
16 action.
17     IN WITNESS WHEREOF, I subscribe my hand and affix
18 my seal this date: December 21, 2005.
19
20 Dated at      _____
21 Portland, Maine.      Catherine Cook, Notary Public
22 My Commission Expires: October 31, 2008
23
24
25

Page 42

1        SIGNATURE PAGE
2  TO BE COMPLETED BY DEPONENT:
3      I, _____ have read the
4  foregoing pages of my testimony or have had the foregoing
5  pages of my testimony read to me and have noted any changes
6  in form or substance of my testimony together with their
7  respective corrections and the reasons therefor, on the
8  following ___ Errata Sheet(s).
9      (Signature) _____
10     (Date) _____
11
12 _____
13
14 TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:
15     I, _____, a Notary
16 Public/Attorney in and for the State of Maine, hereby
17 acknowledge that the above-named deponent personally
18 appeared before me, swore to the truth of the foregoing
19 statements and affixed his/her signature above as his/her
20 own true act and deed.
21
22     (Signature) _____
23     (Date) _____
24
25 My Commission Expires: _____