## Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              DISTRICT OF MASSACHUSETTS
 4         Civil Action No. 04-CV-12354-RGS
 5
 6
 7
 8   BRIAN AND KEVIN GAFFEY,
 9        Plaintiffs,
10   vs.
11   ACADIA INSURANCE COMPANY,
12        Defendant.
13
14
15        DEPOSITION of BARBARA TAYLOR, taken pursuant
16   to notice, at the offices of Tompkins, Clough, Hirshon &
17   Langer, 3 Canal Plaza, Portland, Maine, on December 19,
18   2005, commencing at 1:00 P.M., before Catherine Cook, a
19   Notary Public in and for the State of Maine.
20
21
22
23
24        Downing & Peters Reporting Associates
25        79 Atlantic Place, South Portland, Maine  04106
```

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3        David Smith, Esq.
 4   Cianciulli & Ouellette, 163 Cabot Street,
 5   Beverly, Massachusetts 01915 - (978) 922-9933
 6
 7   For the Defendant:
 8        Leonard W. Langer, Esq.
 9   Tompkins, Clough, Hirshon & Langer, Three Canal Plaza,
10   P.O. Box 15060, Portland, Maine 04112-5060 - (207) 874-6700
```

## Page 3

```
                      INDEX
                                              PAGE
     EXAMINATION BY MR. SMITH                    4


                    EXHIBITS
     NO.  DESCRIPTION                          PAGE
     1    9/15/04 Letter From Mr. Smith with Attached   12
          Documents
     2    Letter From Ms. Taylor                14
     3    Document Referencing A Case           15


          (The exhibits were retained by Mr. Smith.)
```

## Page 4

```
 1        BARBARA TAYLOR, having been sworn by the Notary
 2   Public, was examined and deposed as follows:
 3        EXAMINATION BY MR. SMITH:
 4   Q.  Barbara, you were here for the earlier deposition of
 5   Claire Mullaney.  You heard me go through all the
 6   explanations.  I assume you understand all that, correct.
 7   A.  Yes.
 8   Q.  Have you ever been deposed before?
 9   A.  I believe so.
10   Q.  You have some understanding of what goes on in a
11   deposition, right?
12   A.  Yes.
13   Q.  I ask this question of everybody.  Are you under the
14   influence of drugs or alcohol that would impair your
15   ability to answer my questions today?
16   A.  No.
17   Q.  Do you have any physical or mental impairments that
18   would hinder your ability to answer my questions today?
19   A.  No.
20   Q.  Good.  Give me a summary of your education post high
21   school.
22   A.  Post high school, I went to the University of Southern
23   Maine, graduated with a bachelor's degree in business
24   administration, minor in economics.  Then various insurance
25   courses, designations.
```

Page 5

1  Q. Any other formal education?
2  A. Other than insurance designations, no.
3  Q. So what is -- you gave me your business card. What is
4  CCLA?
5  A. Casualty Claims Law Associate.
6  Q. How do you become a Casualty Claims Law Associate?
7  A. That one and the LL --
8  Q. LPCS?
9  A. Those are two American Educational Institute Insurance
10 certified courses. It's a series of basically seven
11 courses per designation.
12 Q. What does the LPCS stand for?
13 A. Legal Principles -- I'm not sure of the rest.
14 Specialist -- Claims Specialist.
15 Q. And AIC, stands for what?
16 A. Associate In Claims.
17 Q. And your current position with Acadia is what?
18 A. Current position right now is director of claim
19 recovery.
20 Q. And when did you get that position?
21 A. October of this year.
22 Q. What were you before that?
23 A. Claim director.
24 Q. You were in the marine department at that -- when you
25 were claim director?

Page 6

1  A. That was one of my responsibilities.
2  Q. These law designations that you have, you said it
3  was -- CCLA is law associate?
4  A. Casualty Claims Law Associate.
5  Q. What does that allow you to do?
6  A. Basically, the legal principles is understanding the
7  whole legal system first. That's the first course when you
8  take any other course, then you become associate, so I
9  chose the casualty claim section. It just gives you a
10 broader understanding of practices, statutes, case law.
11 Q. How do you use that as a claim director?
12 A. As a reference, if applicable.
13 Q. As a -- well, do you have access to statutes and case
14 law?
15 A. Within the these courses, it references to help you
16 understand certain ideas it is presenting.
17 Q. But as far as in your job, in your position, do you
18 have a law library somewhere that you can access in order
19 to help you in any way?
20 A. There are some online or we seek them from counsel.
21 Q. The ones online, how do you get that information, was
22 it --
23 A. Depends what it is.
24 Q. Do you have a law library that you access on line,
25 like Lexus or WESTLAW?

Page 7

1  A. Not that I have access to, no.
2  Q. So is the law online that you reference, is that from
3  governmental web pages?
4  A. Yes.
5  Q. Are there other web pages that you access?
6  A. I, personally?
7  Q. Yes.
8  A. Probably not outside of the state websites.
9  Q. Now, you heard Claire talk about the claims procedure,
10 that the claim would come into the claims director and get
11 assigned to one of the individuals?
12 A. Uh-huh. Yes.
13 Q. One of the individuals that was working in that
14 instance in the marine department, right?
15 A. Yes.
16 Q. Is that how it works today? Prior to October of 2005,
17 when you were claims director, is that how you handled
18 things?
19 A. The new losses -- it's a little bit different because
20 we've gone paperless. Same concept, new claims comes in,
21 gets set up, goes to a director, director assigns it based
22 on type, level.
23 Q. When did you assume Claire's responsibilities?
24    MR. LANGER: In the marine department?
25    MR. SMITH: In the marine department.

Page 8

1  A. I can't pinpoint exactly. There was a slow
2  transition. It was between -- it was the fall of 2003.
3  Q. Do you know when you took responsibility of the Gaffey
4  file?
5  A. When it reopened per your letter.
6  Q. That's a demand letter, is that what you mean? This
7  letter? I'm showing you a letter dated September 15th.
8  A. Yes.
9  Q. That's September 15th, 2004?
10 A. Correct.
11
12
13 Q. How long have you worked at Acadia?
14 A. Since June of 2000.
15 Q. Where did you work before that?
16 A. I worked at Electric Insurance for four years.
17 Q. Before that?
18 A. State Farm since '87. I started with State Farm in
19 '87. Went to Electric in '96.
20 Q. When did you get your degree from the University of
21 Maine?
22 A. '85.
23 Q. So you have been in the insurance industry since
24 graduation basically?
25 A. Basically.

2 (Pages 5 to 8)

Page 9

1  Q. Has it always been on the claims side?
2  A. Yes.
3  Q. What position did you have at State Farm when you
4  left?
5  A. When I left, I was a -- what did they call them?
6  Superintendent. It's supervisor, superintendent.
7  Q. Is it equivalent to a claims director?
8  A. I would equate it to a claims manager.
9  Q. What was your position with Electric when you left?
10 A. I believe they called that a manager.
11 Q. When you came into Acadia in June of 2000, what were
12 you hired as?
13 A. Director, same job, different names they gave them
14 all.
15 Q. As claims director, did you handle claims yourself for
16 Acadia?
17 A. I would handle employee claims at that time. We were
18 running personal lines. If a claim involved an Acadia
19 employee, myself or another director would handle it. It
20 wouldn't be handled by up here.
21 Q. So, in other words, you were playing more of a
22 supervisory role?
23 A. Correct. Correct.
24 Q. Now, besides your involvement with the marine
25 department, let me say it a different way. Is there

Page 10

1  overlap in your responsibilities with respect to the marine
2  department, as to other departments? I'm trying to
3  understand is the marine department very separate from all
4  the other stuff that you were working on when you were
5  claims director?
6  A. Marine department, it was all claims. It was more
7  people were designated for marine, designated for property,
8  designated for auto physical damage.
9  Q. Do you know Isaac Howe?
10 A. Yes.
11 Q. How do you know him?
12 A. I supervised him when Claire and I -- when Claire
13 transferred the director of claims to me until his
14 departure.
15 Q. Do you know when he departed?
16 A. I believe it was May or June of '04.
17 Q. Why did he leave?
18 A. He wanted to become a surveyor, marine surveyor.
19 Q. Did you ever have a chance to work with Isaac Howe on
20 this particular case?
21 A. On this particular case -- it's difficult -- I had no
22 direct supervision of Isaac on this particular case. I was
23 aware of this particular case because the overlapping --
24 the transition between Claire and I.
25 Q.

Page 11

4  Q. What do you mean by aware?
5  A. Losses that come in, it is a small office. Directors
6  talk about losses. I was aware of these cases particularly
7  since I was transitioning into supervising this department.
8  It was a good thing for me to know. It was a different
9  case from the normal collisions.
10 Q. Have you talked to Isaac Howe about this case since my
11 letter of September 15th, 2004?
12 A. No.
13 Q. Have you talked to Isaac Howe since he left Acadia?
14 A. No.
15 Q. Do you know if anybody at Acadia has talked to Isaac
16 Howe since he left?
17 A. I don't know.
18 Q. So, you were aware of the claim -- of the Gaffeys'
19 claim in the fall of '03, right?
20 A. Yes.
21 Q. And after the denial letter went out, this was
22 basically a closed issue for you at that point until it was
23 reopened?
24 A. Correct.
25 Q. When you got the -- you received my letter dated

Page 12

1  September 15, 2004, correct?
2  A. Correct.
3       MR. SMITH: I will mark this letter.
4       MR. LANGER: Why don't you do it as Taylor 1. If
5  you are marking that whole packet, I ask her to go through
6  and make sure that you agree that everything that's in
7  there was in there when you got it, if you can. If you
8  don't know about all these documents, say you are not sure.
9       (Discussion off the record.)
10      (Exhibit 1, 9/15/04 Letter From Mr. Smith with
11 Attached Documents, marked for identification.)
12 Q. You have that letter in front of you, the 93-A letter
13 that I sent to you -- sent to Acadia, not specifically to
14 you?
15 A. Yes.
16 Q. You remember receiving a letter with a lot of
17 documents attached, correct?
18 A. Correct.
19 Q. As you sit here now, you don't know if all the
20 documents that are attached to that letter are exactly what
21 you received?
22 A. Correct.
23 Q. But if you had your file, you would be able to compare
24 the two in order to determine that there is some documents
25 that you did not get or --

### Page 13

1  A. Yes.
2  Q. Do you mind when -- we will make a copy of this later
3  and go back and check so we can agree that that is the
4  document?
5      MR. LANGER: I'll let you know if all those
6  documents are in Acadia's file.
7      MR. SMITH: Or part of that letter?
8      MR. LANGER: Right. If we are able to determine
9  from the file that there is a package that arrived,
10 including everything that's been marked Exhibit No. 1, I
11 will let you know.
12     MR. SMITH: Just so it helps you out, it was all
13 Bates stamped at the bottom of the exhibit.
14 Q. After you received that letter, what did you do?
15 A. Pulled the closed file, reviewed the documents.
16 Q. What else?
17 A. Reviewed the basis of the initial denial, reviewed the
18 paperwork I received with your letter and responded to your
19 letter.
20 Q. Did you discuss it with anybody?
21 A. Yes.
22 Q. Who did you discuss the case with?
23 A. Counsel.
24 Q. Anybody else?
25 A. I don't believe so. Maybe Claire Mullaney.

### Page 14

1  Q. I show you the letter and ask you if you are familiar
2  with it?
3  A. Yes.
4  Q. What is it?
5  A. It is the response back to you regarding the 93-A.
6      MR. SMITH: Can I have that marked as Taylor 2.
7  (Exhibit 2, Letter From Ms. Taylor, marked for
8  identification.)
9  Q. Did you draft that letter?
10 A. Yes.
11 Q. And did you put the citation that's in the letter,
12 legal citation? Turn to page 2. Yes, where your finger is
13 on page 2.
14 A. I typed the letter, yes.
15 Q. Okay. All right. Fine. You typed the whole letter?
16 A. Yes.
17 Q. How did you come across -- why did you decide to put
18 that case in there?
19 A. I sought legal opinion.
20 Q. I want to make sure I understand without breaching
21 attorney-client privileges, did you do your own independent
22 legal research outside of contacting counsel?
23 A. No.
24 Q. So, did you actually read that case that is in -- that
25 you cite in that letter?

### Page 15

1  A. Not in full.
2  Q. How much of it did you read?
3  A. Portions of what I have stated here. I'm not sure how
4  to answer that. It was part of a legal opinion that I
5  received.
6  Q. You received an opinion -- legal opinion from counsel?
7  A. Correct. I did not receive the actual -- I don't
8  recall receiving the actual case.
9  Q. So, you don't recall -- you don't recall receiving the
10 actual case. Let me show you this document. I'll ask you
11 if you are familiar with the case?
12     MR. LANGER: The question is have you seen that
13 before.
14 A. Yes.
15 Q. You have seen that?
16 A. I have seen it before.
17     MR. SMITH: Can I have that marked as Taylor 3.
18 (Exhibit 3, Document Referencing A Case, marked for
19 identification.)
20 Q. Did you review any other cases when you drafted that
21 letter?
22 A. Not that I recall.
23 Q. Why did you put that cite to that case in your letter?
24 A. At the time, it was pertinent with transactions and
25 authority.

### Page 16

1  Q. But the case in question doesn't involve insurance
2  coverage, correct?
3  A. Correct.
4  Q. And it actually involves a case where one person is
5  seeking money from another person where there was an agent
6  in between?
7  A. Correct.
8  Q. It is not a case where there is an allegation that the
9  agent stole the money, the case you have cited?
10 A. Correct.
11 Q. How is it germane to this case, the case you have
12 cited to, based upon the fact that there is an allegation
13 that Sea Dog Yacht Sales stole a boat from my clients?
14 A. It stems back to Acadia's belief that the theft was of
15 money, not of the vessel itself. In signing the bill of
16 sale and the agreements that the Gaffeys had with Friedman,
17 and the fact that he was allowed to move it from the
18 original marina for the survey, there was implied
19 authority. This case is pertinent to implied authority.
20 Q. How is Acadia the same as the defendant in that case?
21     MR. LANGER: Objection. Form, foundation and
22 relevance, go ahead. You can answer.
23 Q. Let me back up. How is that case relevant to implied
24 authority?
25     MR. LANGER: I object to the extent it seeks a

Page 17

1  legal conclusion or legal opinion. You can answer if you
2  can.
3  A.  I can only re-read what I wrote. I can't recall last
4  year. Again, it supports our position that the proceeds
5  were stolen, not the vessel itself, because he had implied
6  authority to sell the vessel.
7  Q.  Now you got part of the package that I sent to you,
8  Exhibit No. 1. There is a transcript in there from the
9  Rhode Island case, correct?
10 A.  Presumably, yes.
11 Q.  Did you read the transcript of the Rhode Island case
12 in 2004?
13 A.  There were several. If you can point out -- I read
14 all of this.
15 Q.  Thank you. I appreciate that.
16 A.  I don't know which one you are referring to.
17 Q.  Right there where your finger is, that's a transcript.
18 A.  All right.
19 Q.  There is a Bates No. at the bottom right-hand corner?
20 A.  54.
21 Q.  So you read through that transcript?
22 A.  Yes.
23 Q.  You went to page -- so you've read through page --
24 bottom No. 125. So, you read that page and the pages to
25 follow, correct?

Page 18

1  A.  Yes.
2  Q.  Just want to make sure. Taking you through your
3  process?
4  A.  Awhile ago, but, yes, I read the whole thing.
5  Q.  You read it prior to sending me the response that you
6  did dated -- marked as Exhibit 2?
7  A.  Correct.
8  Q.  And so -- and the Court clearly at that page said that
9  they were all victims, meaning the Gaffeys --
10 A.  What line are you on?
11     MR. LANGER: I am going to object. The document
12 speaks for itself. What you are asking her to do is
13 interpret what the document says and I object to that.
14 Q.  You read the document.
15 A.  Yes.
16 Q.  The document clearly says -- the Court clearly stated
17 at line 7 to 8, says: You are all in different ways
18 victims, correct?
19 A.  That's what it says, yes.
20 Q.  You understood that the issue, at least between them
21 is a question of -- strike that.
22     You understood that they were there on a motion
23 to dismiss for lack of jurisdiction?
24 A.  Correct.
25 Q.  You understood that the underlying facts concerned the

Page 19

1  transfer of a title to a boat?
2      MR. LANGER: Objection. Not -- I object. As you
3  indicated, the purpose of the hearing was to determine
4  jurisdiction. The issue of ownership was not litigated and
5  I object. I understand your position that the judge hands
6  out some dicta in there, but I object and I think Judge
7  Stearns has already indicated he would object, as well.
8      MR. SMITH: When did he say that?
9      MR. LANGER: You indicated at one point to Judge
10 Stearns that the judge in Rhode Island said X, and the
11 judge said: I don't care. That's what I'm here for.
12     MR. SMITH: Oh, I agree that he has -- you're
13 right. He is going to make the ultimate determination.
14     MR. LANGER: I guess the point I'm trying to make
15 is I object to any attempt to try and use this transcript
16 as some sort of an adjudication of ownership either in
17 Ms. Jordan or the Gaffeys, at any point. That wasn't what
18 the purpose of this proceeding was about, nor were there
19 any findings in that regard.
20 Q.  Okay. You agree with me what -- he indicated that
21 they were all victims in some fashion, correct?
22 A.  That's what he wrote.
23     MR. LANGER: Object. The document speaks for
24 itself.
25 Q.  You read part of that as part of your evaluation?

Page 20

1  A.  Yes.
2  Q.  At page 131, bottom right-hand corner. It says at
3  line 11 to 12: The defendants didn't agree to have a sale
4  of the boat?
5      MR. LANGER: If you're asking does the page say
6  that --
7  Q.  That's what it says, right?
8  A.  Yes.
9  Q.  So you read all of these materials and were not swayed
10 that there was a theft of a boat?
11 A.  Correct.
12 Q.  Why?
13 A.  Gaffeys knew where the boat was. They could go pick
14 it up at any time. It was their property.
15 Q.  How are they going to get it?
16 A.  It is their property.
17 Q.  How were they supposed to get it?
18 A.  I don't know.
19 Q.  You understood that -- you understood the hearing on
20 this matter took place in January 2004?
21 A.  Yes.
22     MR. LANGER: Again, the document speaks for
23 itself.
24 Q.  You also received -- provided you with a copy of a
25 complaint in that action, right? Looking at No. 31 in the


Page 21

1  right-hand corner.
2     MR. LANGER: Do you recall reading that?
3  A. Yes.
4  Q. That complaint is signed for November of 2003?
5  A. Yes.
6  Q. At the time, you were reviewing the file, you
7  understood that the initial denial of this claim to at
8  least the November timeframe, a lot had taken place?
9     MR. LANGER: Objection to the form of the
10 question.
11 A. Are you asking me a question?
12 Q. Yes.
13 A. I did not receive these documents until September of
14 '04.
15 Q. I'm sorry. At the time -- maybe I misstated. At the
16 time you received these documents --
17 A. A year later.
18 Q. -- a year later, you understood at least in the fall,
19 after Acadia had denied the claim, that other events had
20 transpired with respect to this particular boat and the
21 Jordan -- Gaffeys and Jordan, right?
22 A. Yes.
23 Q. And you understood Acadia's denial on this claim was
24 October 6, 2003?
25 A. Yes.

Page 22

1  Q. You understood that on September 15, 2004, I included
2  it in the letter, that as part of that hearing that took
3  place in Rhode Island that the parties were to remain in a
4  status quo until they attempted to resolve the situation?
5     MR. LANGER: Objection to the form and foundation
6  of the question.
7  Q. Look at the second page of my letter, at the bottom
8  after page 75, read that sentence.
9  A. The Court dismissed the action but ordered the parties
10 to remain in status quo. In other words, the Gaffeys could
11 not commence action in Rhode Island Federal Court in
12 Admiralty to retake possession of the vessel.
13 Q. So, at least in September of 2004, you were aware of
14 that allegation that they could not, at that time that the
15 hearing took place, they had to agree not to take further
16 action --
17 A. In Rhode Island.
18 Q. -- in Rhode Island to retake the boat?
19    MR. LANGER: Objection to the form. The letter
20 says what you say it says. What you are asking her is her
21 knowledge beyond what you are telling her.
22    MR. SMITH: I'm simply asking for the allegation,
23 that we were making that allegation.
24    MR. LANGER: Question is, did you read that?
25    THE DEPONENT: Yes.

Page 23

1  Q. And you are aware that they -- the Gaffeys entered
2  into negotiations with Jordan in order to resolve the
3  issues that were started by Sea Dog?
4  A. Yes.
5  Q. And that also included Jordan's broker was involved in
6  those negotiations, correct?
7  A. Yes.
8  Q. You didn't review any other case law prior to writing
9  the letter to me dated October 13, 2004?
10 A. Not that I recall.
11 Q. Do you understand what Massachusetts case law or
12 statutory law -- how Massachusetts defines theft?
13 A. I'm not sure. Are you asking if I understand the
14 Court's legal definition of theft?
15 Q. Yes.
16 A. Off the top of my head, I cannot say at this moment.
17 Q. Did you have an understanding at the time you wrote
18 the letter?
19 A. Probably through legal opinion. I'm not sure I
20 understand what you are asking me.
21    MR. LANGER: If you have an independent
22 understanding of what theft might be defined as in
23 Massachusetts, other than from conversations you had with
24 counsel, then you can answer his question; otherwise, don't
25 answer the question.

Page 24

1  A. I can't answer it.
2  Q. Is theft defined in Acadia's policy?
3  A. This policy in question?
4  Q. Yes.
5  A. No, it is not. It is not defined.
6  Q. Is the word stolen defined?
7  A. Not in the definition section.
8  Q. You agree with me that the only way the Gaffeys were
9  going to be able to recover under this policy, on this
10 claim, was to file a lawsuit, correct?
11    MR. LANGER: Objection.
12 A. Can you repeat that again.
13 Q. You would agree with -- you would agree with me that
14 the only way the Gaffeys were going, after your October
15 denial letter of October 2004, the only way they were going
16 to recover under this policy is to file a lawsuit against
17 Acadia?
18    MR. LANGER: Objection. Form and foundation.
19 A. That would be for a court to determine, not me.
20 Q. Well, based upon everything you had reviewed at this
21 point, Acadia was denying the claim?
22 A. Correct.
23 Q. And Gaffeys disagreed with that determination; is that
24 fair?
25 A. Fair.

Page 25

1  Q. And so the only way they could force Acadia to change
2  its position, based on the information that was before
3  Acadia, was to take it before an arbitrator or court?
4      MR. LANGER: Same objection.
5  A. If prevailed.
6  Q. How come when you responded to me in this letter, you
7  didn't reference anything that took place at least from a
8  timeline perspective after the initial denial of
9  October 2003?
10 A. Reviewing the documents, I don't think -- it didn't
11 change our position. We still viewed this as a theft of
12 money, not a theft of vessel, so my position had not
13 changed. 93-A allegations were to the claim handling.
14 What I had was what already had been done. That's how I
15 answered it.
16 Q. But there was new information with respect to the
17 loss, was there not?
18     MR. LANGER: Objection to the form of the
19 question.
20 A. It didn't change the facts of how we viewed them, as a
21 theft of money, not theft of vessel.
22 Q. So, what was taken from Pamela Jordan?
23     MR. LANGER: Objection.
24 Q. Let me back up. Was there anything taken from Pamela
25 Jordan?

Page 26

1      MR. LANGER: Objection. Form and foundation.
2  Also seeks a legal conclusion.
3  A. She had the boat.
4  Q. But at the time I sent you that letter, you understood
5  she had to pay again for the boat; is that fair to say?
6      MR. LANGER: Objection. Form and foundation.
7  A. I understand they negotiated a deal.
8  Q. Has anybody from Acadia spoken to Pamela Jordan?
9  A. Not that I'm aware.
10     MR. LANGER: If you know.
11 A. Not that I'm aware.
12 Q. Do you know if anyone from Acadia has spoken to the
13 broker that was involved for Pamela Jordan?
14 A. Not that I'm aware of.
15 Q. Are you familiar with any laws in Massachusetts
16 concerning what documents are necessary in order to
17 transfer ownership of a vessel?
18 A. Not firsthand knowledge, no.
19 Q. Do you have secondhand knowledge?
20 A. I don't have any direct knowledge, no.
21 Q. Do you have any understanding of what it takes to
22 transfer ownership of a vessel in Rhode Island?
23     MR. LANGER: Objection.
24 Q. These are state-registered vessels.
25     MR. LANGER: Objection to the extent it seeks a

Page 27

1  legal conclusion.
2  A. No.
3  Q. You attended depositions with the Gaffeys?
4  A. Yes.
5  Q. What did you think of Brian Gaffey?
6      MR. LANGER: Objection. Form and foundation.
7  Instruct you not to answer that question. Don't answer the
8  question.
9  Q. Did you think Brian Gaffey was lying to you?
10     MR. LANGER: Objection. Form and foundation.
11 Q. Lying to any of the questions that were asked?
12     MR. LANGER: Objection.
13     MR. SMITH: She can answer that?
14     MR. LANGER: You can answer whether you thought
15 he was being truthful or not.
16 A. Which one was he, the first or the second?
17 Q. Did you think -- fair enough. Did you think either
18 one of them was untruthful at the deposition?
19     MR. LANGER: Objection.
20 A. No, I didn't think they were untruthful.
21 Q. Thank you. Have you ever had, on the claims you have
22 been working on, have reason to deal with Bert Snyder?
23 A. Yes, not directly.
24 Q. But he is an attorney that Acadia has hired for their
25 insureds in the past?

Page 28

1  A. Occasionally.
2  Q. Tim McHugh, do you know him?
3  A. Only heard the name.
4  Q. Patrick Dougherty from Rhode Island?
5  A. No.

14 Q. You understood that the Gaffeys had not turned over
15 title to the vessel to Sea Dog?
16     MR. LANGER: Objection. Calls for a legal
17 conclusion.
18 Q. You understand that Massachusetts has -- issues a
19 certificate of title? Did you understand that?
20 A. Yes.
21 Q. Did you understand that when you received my letter in
22 September of 2004?
23 A. That they had not?
24 Q. No, did you understand that Massachusetts -- that
25 Massachusetts issues a certificate of title to boat owners?

Page 29

1  A. Yes.
2  Q. Did you understand that in September 2004?
3  A. Yes.
4  Q. You understand that the Gaffeys never turned over the
5  certificate of title until they reached an agreement with
6  Pamela Jordan?
7       MR. LANGER: You mean the physical document?
8       MR. SMITH: Yes.
9       MR. LANGER: If you know.
10 A. You provided me with a copy of it.
11 Q. You understand that the Gaffeys have alleged in the
12 claims file that they expected to turn over the title in
13 exchange for a check at a closing?
14 A. I can't say 100 percent. I know they were expecting
15 money. I know that.
16 Q. You know in the claims file they have statements in
17 there that the Sea Dog was not authorized to take the boat
18 to Rhode Island -- the boat was not authorized to leave Sea
19 Dog's facility, I should say?
20 A. I did not review the statement.
21 Q. Let me back up. When you wrote the denial letter of
22 October 2004, you reviewed the claims file, correct?
23 A. Correct.
24 Q. The claims file has -- you were here when Claire was
25 going through Exhibit 2 from her deposition, right?

Page 30

1  A. Yes.
2  Q. And you looked at all those documents, as well?
3  A. Yes.
4  Q. So presumably you would have read in there where it
5  says they did not authorize removal of the boat from Sea
6  Dog's facility, correct?
7  A. If it is in their statement, yes.
8  Q. So part of Exhibit 2, Bates stamp No. 83, towards the
9  bottom, it indicates there was no authority for the boat to
10 leave Sea Dog Yacht Sales facility, correct?
11      MR. LANGER: The document speaks for itself.
12 A. That's what the document says.
13 Q. You would have reviewed that prior to writing it?
14 A. Yes.
15 Q. Let me finish speaking before you answer. You would
16 have reviewed this document prior to writing the
17 October 2004 letter?
18 A. Correct.
19 Q. The one that's Bates stamped No. 87 and at the bottom,
20 take a look at that last three lines of chicken scratch.
21 A. Yup.
22 Q. So you would have read that document, as well, prior
23 to writing the October 2004 denial letter?
24 A. Yes.
25 Q. Just so I understand, is the legal counsel that you

Page 31

1  relied upon inside counsel or outside counsel?
2  A. Outside.
3  Q. Was it this firm that we are in today?
4  A. Yes.
5  Q. Did Acadia rely on a legal opinion as part of the
6  initial denial?
7  A. I can't answer that.
8  Q. Is there anything in the file that's a legal opinion
9  regarding the claim initially, that's prior to the initial
10 October 6, 2003 denial?
11 A. Not that I saw.
12 Q. I know I asked this earlier. You were the primary
13 person working on the file after it was reopened, correct?
14 A. Correct.
15 Q. There was nobody else that you worked with from Acadia
16 on this particular file outside of maybe a conversation
17 with Claire?
18 A. Correct.
19 Q. It was outside counsel that assisted you, as well?
20 A. Correct.
21 Q. Do you remember any other cases that you looked at
22 prior to writing the October 2004 letter?
23 A. No.
24      MR. SMITH: Can I take ten minutes?
25      (A short break was taken.)

Page 32

1  Q. I want to make sure I understand the workings of the
2  policy in question at -- Acadia's position. If the Gaffeys
3  had gone back and gotten their engine -- gotten their boat
4  in some fashion, whatever circumstances, and they found the
5  engine was blown and needed a new engine, would that have
6  been a covered loss in this circumstances?
7       MR. LANGER: Objection to the form of the
8  question.
9  A. I can't answer that. I don't have enough information.
10 Q. Well, assuming that the engine was working prior to --
11 when it left Sea Dog's facility --
12 A. Okay.
13 Q. -- and it got down to Rhode Island, Gaffeys get the
14 boat back somehow and find that the engine was blown, is it
15 a covered loss?
16      MR. LANGER: Objection to the form of the
17 question. It's an improper hypothetical.
18 A. It is a coverage question that would have to be
19 researched.
20 Q. If the Gaffeys had brought the vessel into Sea Dog
21 Yacht Sales for service on the engine, and Dale Friedman
22 sold the boat, and they didn't have any purchase or sale
23 agreement contract, would that be covered as a theft?
24      MR. LANGER: Objection. Improper hypothetical.
25 A. You are asking me to give you an answer when I don't

8 (Pages 29 to 32)

Page 33

1  have all the facts, I would have to investigate it to
2  answer that question.
3  Q. What does theft mean to you?
4      MR. LANGER: Objection. Calls for a legal
5  conclusion.
6      MR. SMITH: I disagree with that.
7  Q. What does theft mean to you?
8  A. Theft means taking property from an owner without --
9  taking property from the rightful owner without the ability
10 to get it back. Unauthorized taking, let's put it that
11 way. I'm sorry.
12 Q. So are you making the same assumption as Claire --
13 based upon your interpretation of theft, are you making the
14 same assumption as Claire that Dale Friedman was authorized
15 somehow to deliver the boat to Rhode Island?
16 A. Dale Friedman was authorized to be the broker on the
17 deal. He was allowed to move the boat for the survey. He
18 was allowed to conduct business to facilitate that
19 transaction.
20 Q. And you're implying, I take it, that he had the
21 authority to move the boat -- allow the boat to be moved
22 from his facility to go to Rhode Island?
23 A. Yes.
24 Q. This is despite the fact that the insured here did not
25 give him that authority to do that?

Page 34

1      MR. LANGER: Objection. Form and foundation,
2  argumentative.
3  Q. Well, go ahead and answer.
4      MR. LANGER: You can answer it, if you can.
5  A. Can you repeat the question.
6      (The reporter read the requested matter.)
7      MR. LANGER: Same objection.
8  A. I'm sorry, I think that ties from the question before.
9      (The reporter read the requested matter.)
10 A. I believe the insured did give him permission.
11 Q. Where is it?
12 A. The fact that he allowed him to move it before, did he
13 tell him, no, he couldn't move it again? It was only when
14 Gaffey did not receive the money.
15 Q. No. Let me back you up. You read the statement that
16 Gaffey gave Isaac Howe, correct?
17 A. Correct.
18 Q. In there it talks about giving title to the boat, that
19 there was going to be a closing, correct?
20 A. Yes.
21 Q. You understood that was going to take place on
22 August 26th based upon the statement?
23 A. Based upon the statement.
24 Q. There was going to be a closing which the title would
25 exchange for the money?

Page 35

1  A. Correct.
2  Q. And the boat would be released at that point?
3  A. I guess so.
4  Q. But there is nothing in any other documents in
5  Acadia's file that gives express permission to Dale
6  Friedman or Sea Dog Yacht Sales to leave its facility prior
7  to any closing?
8  A. I think there is definitely implied.
9  Q. Nothing direct, though, right?
10 A. There's a broker facilitating a deal. There's a bill
11 of sale there.
12 Q. There's no direct statement or signature or anything
13 like that says that this boat can leave your facility, Dale
14 Friedman, by the Gaffeys.
15 A. There is no paperwork in my file that says:
16 Mr. Friedman, you can take the boat.
17 Q. Okay. Just -- and so you agree with me that the only
18 thing that's in your file is the statements by the insured
19 saying that he didn't have authority to let the boat be
20 moved?
21     MR. LANGER: Objection to the extent it seeks --
22 seems to me you keep going back to try to get her to
23 discuss a legal theory, as opposed to specific documents.
24 If you are asking her, if there was a document in her file
25 in which the Gaffeys say: Mr. Friedman, you have authority

Page 36

1  to take it, I think she has answered that.
2  Q. The policy in question is an agreed value policy?
3  A. Yes.
4  Q. So, if there is a total loss of the vessel, the policy
5  pays out the agreed value?
6  A. Correct.
7  Q. And the agreed value of this vessel at the time of the
8  loss was what?
9  A. According to the policy, 37,000.
10 Q. You understood that the Gaffeys maintained insurance
11 on the vessel? You understand now is a better way to say
12 it. Do you have an understanding now as to whether the
13 Gaffeys maintained insurance on the vessel after denial of
14 the claim?
15 A. Only through their deposition.
16 Q
17
18 A
19 Q
20
21 A
22
23
24 Q
25

Page 37

1  A
2  Q
3  o
4
5  re                                           d by
6  A
7  st                                             t
8  fi
9  d
10 P
11
12 p
13 A
14        MR. SMITH: I have nothing further.
15        MR. LANGER: I have nothing. Ms. Taylor will
16 read and sign, as will Ms. Mullaney.
17        (The exhibits were retained by Mr. Smith.)
18        (TIME: 2:21 P.M.)

Page 38

1            SIGNATURE PAGE
2  TO BE COMPLETED BY DEPONENT:
3     I, _____ have read the
4  foregoing pages of my testimony or have had the foregoing
5  pages of my testimony read to me and have noted any changes
6  in form or substance of my testimony together with their
7  respective corrections and the reasons therefor, on the
8  following ____ Errata Sheet(s).
9         (Signature) _____
10        (Date) _____
11
12 _____
13
14 TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:
15    I, _____, a Notary
16 Public/Attorney in and for the State of Maine, hereby
17 acknowledge that the above-named deponent personally
18 appeared before me, swore to the truth of the foregoing
19 statements and affixed his/her signature above as his/her
20 own true act and deed.
21
22        (Signature) _____
23        (Date) _____
24
25 My Commission Expires: _____

Page 39

1
2
3              CERTIFICATE
4    I, Catherine Cook, a Notary Public in and for the
5  State of Maine, hereby certify that the within-named
6  deponent was sworn to testify the truth, the whole truth,
7  and nothing but the truth, in the aforementioned cause of
8  action.
9       I further certify that this deposition was
10 stenographically reported by me and later reduced to print
11 through Computer-Aided Transcription, and the foregoing is
12 a full and true record of the testimony given by the
13 deponent.
14      I further certify that I am a disinterested
15 person in the event or outcome of the above-named cause of
16 action.
17      IN WITNESS WHEREOF, I subscribe my hand and affix
18 my seal this date: December 21, 2005
19
20 Dated at _____
21 Portland, Maine.    Catherine Cook, Notary Public
22 My Commission Expires: October 31, 2008
23
24
25