# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 04-CV-12354-RGS

BRIAN AND KEVIN GAFFEY           )
                                 )
                    Plaintiffs   )
         v.                      )
                                 )
ACADIA INSURANCE                 )
COMPANY                          )
                                 )
                    Defendant    )


## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, WITH INCORPORATED STATEMENT OF MATERIAL FACTS AND MEMORANDUM OF LAW

NOW COMES Defendant Acadia Insurance Company ("Acadia"), by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and pursuant to Rules 7.1(B)(2) and 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, opposes Plaintiffs' Motion for Partial Summary Judgment and states as follows:

## INTRODUCTION

This is a coverage dispute arising from the sale of an insured motor yacht. The insureds' broker thereafter absconded with the sale proceeds. Because the insureds' loss did not involve "sudden and accidental, direct, physical loss of or damage to the insured property," but instead arose from the theft of money, which is not a peril insured against under Acadia's policy, the Plaintiffs' Motion for Partial Summary Judgment should be denied.

<u>STATEMENT OF MATERIAL FACTS</u>

1.      Plaintiffs Brian and Kevin Gaffey owned a 1999 Aquasport vessel, Massachusetts Registration No. MS 5532 B.  *See* Complaint, ¶5.

2.      Acadia issued to Plaintiffs a yacht policy, Policy No. YPA 0071550-11, for their vessel, for the policy period from October 10, 2002 to October 10, 2003.  *See* Plaintiffs' Exhibit G.

3.      The policy states in pertinent part:

>        LOSSES COVERED – Subject to all terms, conditions and exclusions set forth elsewhere in this policy and to limitations as to the amount set forth below and on the Declaration Page, Section A, we will pay for the following which occurred during the policy period:

>        1.  Sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause[.]
>        …
>        LOSSES NOT COVERED – We will not pay any loss, damage or expense caused by or resulting, whether exclusively or concurrently, from:
>        …
>        3.  Theft or the unexplained disappearance of insured property from the yacht, unless there are visible marks of forcible entry or removal, or the entire yacht is stolen[.]

*See id.* at 2, 4.

4.      The policy further provides, with respect to total loss or total constructive loss: "You will, if we ask, transfer title of that property to us or to a salvage buyer designated by us." *See id.* at 3.

5.      Additionally, the policy provides:

>        TRANSFER OF INTEREST – If you give, sell, conditionally sell, transfer, mortgage or pledge the insured yacht or any interest in it, policy coverage will terminate without notice to you unless such change is accepted by us in writing.

*See id.* at 8.

6.      The Gaffeys purchased the vessel for $24,000.00.  *See* Deposition of Kevin Gaffey ("Kevin Dep.") at 21 and Exhibit 3; Deposition of Brian Gaffey ("Brian Dep.") at 14.

7.      In May 2003, the Gaffeys entered into an agreement with Dale Friedman, a boat broker with Sea Dog Yacht Sales, whereby Friedman would attempt to sell their Aquasport or, if he could not do so, buy it from them for $24,000.00, subject to the Gaffeys purchasing a Mako motor yacht from Friedman.  *See* Kevin Dep. at 27; Brian Dep. at 20.

8.      The agreement between the Gaffeys and Friedman was oral.  *See* Kevin Dep. at 29-30; Brian Dep. at 18.

9.      The Gaffeys understood that pursuant to their agreement, Friedman would market their vessel.  *See* Kevin Dep. at 28-29.

10.     The Gaffeys furnished Friedman with pertinent data on the vessel, such as length and beam, fuel tank capacity, what equipment came with the boat, and where the boat was located.  *See id.* at 31-33; Brian Dep. at 21.

11.     In May 2003 Kevin Gaffey reviewed an advertisement for the Aquasport generated by Friedman, incorporating the pertinent information.  *See* Kevin Dep. at 30-31 and Exhibit 4.

12.     As of May 2003, the Gaffeys were prepared to sell their vessel through Friedman. *See id.* at 34.

13.     In July or August 2003, Friedman called Kevin Gaffey and advised that he had an interested buyer who was willing to pay $27,000.00 to $30,000.00 for the boat.  *See id.* at 35, 38.

14.     The Gaffeys decided to pursue this prospect.  *See id.* at 41.

15.     Friedman sent the Gaffeys a purchase and sale agreement, indicating that the buyer was Pamela Jordan of Cranston, Rhode Island, that the purchase price was $27,000.00, and that Friedman would receive a ten percent commission. *See id.* at 42 and Exhibit 5.

16.     The Gaffeys deemed the purchase price to be fair and acceptable. *See id.* at 38; Brian Dep. at 31.

17.     The Gaffeys agreed that Kevin would sign the purchase and sale agreement on behalf of both of them; and he did so on August 11, 2003. *See id.* at 43, 45 and Exhibit 5.

18.     The Gaffeys understood that they were authorizing Dale Friedman to proceed with the sale and to pay him a commission as their broker. *See id.* at 44.

19.     On August 13, 2003 Kevin Gaffey obtained a payoff statement on the secured loan for the Aquasport and provided the payoff statement to Friedman. *See id.* at 48 and Exhibits 6-7.

20.     On August 16, the Gaffeys executed and delivered to Friedman a Sellers Final Accounting, setting forth how the sale proceeds would be distributed. *See id.* at 49, 52 and Exhibit 6; Brian Dep. at 32.

21.     On August 17 both of the Gaffeys signed a notarized bill of sale, selling the Aquasport to Ms. Jordan for $27,000.00. *See* Kevin Dep. at 55 and Exhibit 8; Brian Dep. at 34.

22.     The Gaffeys gave the signed purchase sale agreement and the signed bill of sale to Dale Friedman. *See* Kevin Dep. at 57-58.

23.     The Gaffeys authorized Dale Friedman to move the Aquasport from the marina where they had been keeping the vessel to Friedman's place of business. *See id.* at 58-59.

24.     The Gaffeys authorized Friedman to operate the vessel and to conduct sea trials in connection with Ms. Jordan's purchase of the vessel. *See id.* at 59-60.

25.     The Gaffeys told Friedman that the keys were in the boat.  *Id.* at 60.

26.     The night after the Gaffeys realized that neither Friedman nor the Aquasport were still at Sea Dog Yacht Sales, Brian Gaffey called Ms. Jordan; and she confirmed at that time that she had paid for and taken possession of the vessel.  *See id.* at 76-77; Brian Dep. at 42.

27.     Ms. Jordan confirmed that she had wired the $27,000.00 purchase price directly to Friedman's account.  *See* Brian Dep. at 42.

28.     The Gaffeys and Ms. Jordan each felt they had been victimized by Friedman, who had similarly victimized others. *See id.* at 36, 44, 47.

29.     As a result of the initial phone call to Ms. Jordan, the Gaffeys knew from then on where the vessel was and that it was safe.  *See id.* at 43, 45, 52.

30.     The Gaffeys realized they had the ability to repossess the Aquasport; according to Brian Gaffey, "at the time I knew I could have gone down there probably and got it."  *Id.* at 45.

31.     The Gaffeys refrained from taking back the Aquasport, because they had been advised by both the police and a number of lawyers that if they did so, they could be sued by Ms. Jordan and could lose their boat.  *See id.* at 62-63, 65.

32.     On August 29, after Friedman's defalcation, Kevin Gaffey paid off the loan on the Aquasport, and the bank mailed him the title.  *See* Kevin Dep. at 66-68.

33.     Also on August 29, the Gaffeys signed a statement with the Salisbury Police Department, stating: "We have not received $24,300.00 from sale; - cash was paid by wire from buyer to Sea Dog – Dale Friedman in second week of August."  *See* Plaintiff's Exhibit D at Bates Stamp 87.

34.     Ms. Jordan sued the Gaffeys in Rhode Island over title to the vessel; but the Gaffeys succeeded in having the suit dismissed for lack of personal jurisdiction.  *See id.* at 81-82.

35.     The Rhode Island Court dismissed the case without prejudice, with the expectation that Ms. Jordan would re-file in Massachusetts.  *See* Plaintiff's Exhibit D at Bates Stamp 132.

36.     Shortly thereafter, the Gaffeys and Ms. Jordan came to an out-of-court resolution, whereby the Gaffeys received a total of $12,000.00 from Ms. Jordan and her broker in exchange for a release and the transfer of title to the vessel.  *See id.* at 84 and Exhibits 10-11; Brian Dep. at 57-58.

37.     The Gaffeys executed a new bill of sale dated March 23, 2004, selling the Aquasport to Ms. Jordan "for the sum of $27,000.00."  *See* Kevin Dep. at 85 and Exhibit 12; Brian Dep. at 57.

38.     The Gaffeys concede that Ms. Jordan did not commit any theft; rather, Friedman committed theft.  *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment at 10.[1]

39.     Acadia specifically contests paragraphs 11, 14, 21 and 29 of Plaintiffs' Statement of Material Facts.  *See* DSMF ¶¶ 7, 10-11, 33; Kevin Dep. at 65.

<u>ARGUMENT</u>

<u>Plaintiffs Have Not Shown that the Theft of the Proceeds from the Sale of Their Vessel Was a Covered Loss.</u>

Plaintiffs have the burden of proving that their loss falls within the scope of insurance coverage provided under the policy.  *See, e.g*., *Antilles Steamship Co., Ltd. v. Members of American Hull Insurance Syndicate,* 733 F. 2d 195, 199 (2d Cir. 1984); *S. Felicione & Sons Fish Co. v. Citizens Casualty Co.*, 430 F. 2d 136, 138 (5th Cir. 1970) ("It is too well settled to require

---

[1]  A statement made by a party through counsel in connection with litigation constitutes admissible evidence.  *See*, *e.g*., *United States v. Amato*, 356 F.3d 216, 220 (2d Cir. 2004); F.R. Evid. §801(d)(2)(D).

citation that the burden of proving a loss by a peril insured against is on the insured."); *Jibbar v. Calvert Fire Insurance Co.*, 623 F. 2d 41, 44 (8th Cir. 1980); *Allied Marine*, 151 F. Supp. 2d at 122; *See generally* 2 Schoenbaum, *Admiralty and Maritime Law* §19-17 at 347 (4[th] ed. 2004) ("The burden of proving the loss was caused by a peril insured against is on the assured.").  This means that Plaintiffs must initially come forward with proof of a "sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause."

A party moving for summary judgment must demonstrate an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2448, 2553, 91 L. Ed. 2d 265 (1986).  In determining if this burden is met, the court must view the record in the light most favorable to the non-moving party and "give that party the benefit of all reasonable inferences to be drawn in its favor."  *Ortega-Rosario v. Alvarado- Ortiz*, 917 F.2d 71, 73 (1st Cir. 1990).

The standards for granting summary judgment are even stricter where (as here) the movant has the burden of proof at trial, in view of the factfinder's prerogative to disbelieve affirmative evidence.  The movant's evidence must be so powerful that no reasonable jury would be free to disbelieve it.  *See, e.g.*, *Cockrel v. Shelby County School District*, 270 F.3d 1036, 1056 (6th Cir. 2001); *Eddison v. Reliable Life Insurance Co.*, 664 F.2d 1130, 1131 (9th Cir. 1981); *Gilbert Imported Hardwoods, Inc. v. Holland*, 176 Supp. 2d 569, 578 (S.D.W. Va. 2001); *Lawyer v. Hartford Life & Accident Insurance Co.*, 100 F. Supp. 2d 1001, 1008 (W.D. Mo. 2000); 11 *Moore's Federal Practice* §56.13(1) at 56-138 (3d ed. 2004).

Rather than seeking to show that their claim falls within the general scope of coverage (*i.e.*, "sudden and accidental, direct, physical loss of or damage to" the vessel), Plaintiffs try to fit their loss within an exception to an exclusion.  The policy specifically excludes theft of property

from the yacht, unless "the entire yacht is stolen." However, the undisputed evidence demonstrates there was neither a theft *of the vessel* nor, indeed, loss of or damage to the vessel.

The Plaintiffs authorized Friedman to sell their vessel to Pamela Jordan for $27,000.00. They further authorized the relocation of the vessel to Friedman's place of business and committed the Aquasport to Friedman's custody. They allowed Friedman to operate the vessel. However, he did not abscond with the vessel. Rather, Pamela Jordan took the vessel after paying for it. Plaintiffs concede that Ms. Jordan did not steal the vessel. *See* DSMF ¶26. They fail to explain how Friedman could have stolen it.

Plaintiffs argue that the boat could not have been transferred without a certificate of title; but this is a red herring. Once Ms. Jordan paid the full purchase price to Plaintiffs' authorized agent, satisfying her end of the bargain, she was entitled pursuant to the signed purchase and sale agreement to possession of the vessel, as well as good title. Plaintiffs surely must concede that if they had received the purchase money, they could not have claimed the boat was stolen merely because they had not yet turned over the title. Rather, they would have had the affirmative obligation to furnish a good certificate of title as soon as possible. *See* 323 CMR 1.04. By the same token, Friedman had no right to prevent Ms. Jordan from taking the vessel once she paid for it. The aspect of Friedman's conduct that was, shall we say, irregular was not in letting her take the boat, but rather in misappropriating the sale proceeds.

Moreover, if Plaintiffs are correct and Ms. Jordan did not acquire a right of possession of the vessel upon payment, then Plaintiffs had the ability to retrieve the boat at any time. They could not claim that the boat was lost, nor had it been damaged. Conversely, Plaintiffs are wrong and Ms. Jordan did have the right of possession, then the boat was neither lost nor stolen. The fact that instead of litigating this issue with Ms. Jordan, Plaintiffs chose to compromise and

ultimately settled for receipt of less than what they had originally bargained for does not mean that the vessel was either lost or stolen.  Furthermore, the fact that Plaintiffs transferred title to Ms. Jordan and executed a bill of sale, selling the vessel to her for the stated sum of $27,000.00, utterly confutes their assertion that they lost their vessel through theft.  Their conduct also voids coverage.  *See* DSMF ¶5.

Acadia's position is well supported.  It should be noted initially that federal maritime law applies to coverage disputes involving yacht policies.  *See, e.g*., *New England Mutual Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 30-35, 20 L. Ed.90 (1871); *Acadia Insurance Co. v. McNeil*, 116 F.3d 599, 601(1st Cir. 1997).  On the other hand, in the absence of an entrenched federal doctrine, federal law is to be supplemented by state law.  *See Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S. Ct. 368, 99 L. Ed. 337(1955).

For insurance purposes, Massachusetts courts have defined theft as "the taking and carrying away of the personal property of another with the intent unlawfully to deprive that other permanently of the use of it."  *Swift v. American Universal Insurance Co.*, 349 Mass. 637, 641, 212 N.E.2d 448 (1965); *Rich v. United Mutual Fire Insurance Co*., 328 Mass. 133, 134, 102 N.E.2d 431 (1951).  No one disputes that Friedman committed theft; but the sole item he personally "took and carried away" was the money from the sale.  Only Pamela Jordan took and carried away the Aquasport, but Plaintiffs concede that she did not do so with any unlawful intent.

Moreover, the law of agency makes it clear that there was no theft of the vessel.  The existence of agency can be implied from "a course of conduct showing that a principal has repeatedly acquiesced therein and adopted acts of the same kind."  *LaBonte v. White Construction Co.*, 363 Mass. 41, 45, 292 N.E.2d 352 (1973); *Hurley v. Ornsteen*, 311 Mass. 477,

481, 42 N.E.2d 273 (1942); *See Restatement (Second) of Agency* §7, comment c and §43 (1958).

Apparent authority is that which discloses "written or spoken words or any other conduct of the

principal which, reasonably interpreted, causes a third person to believe that the principal

consents to have the act done on his behalf by the person purporting to act for him." *Neilson v.*

*Malcolm Kenneth Co.*, 303 Mass. 437, 441, 22 N.E.2d 20 (1939); *Weisman v. Saetz*, 11 Mass.

App. Ct. 440, 442, 416 N.E.2d 1007 (1981).

Under these tests, Friedman had either actual or apparent authority to consummate the

sale according to its terms by accepting payment of the purchase price and releasing the vessel to

the buyer. "It may be inferred from business customs that the other party to a contract has

agreed with the agent to pay the purchase price to the agent and not to the principal in person or

to any other agent of the principal." *New England Tel. Co. v. Kazarian*, 1999 Mass. App. Div.

296, 297 (1999), quoting *Restatement (Second) of Agency* §364. Even more significantly, it has

been observed: "As to whether an agent has authority to receive payments on behalf of his

principal, the rule is that, 'unless otherwise agreed, authority to receive payment is inferred from

authority to conduct a transaction if the receipt of payment is incidental to such a transaction,

usually accompanies it, or is a reasonably necessary means for accomplishing it.'" *Pampegian v.*

*Richmond*, 319 Mass. 216, 218, 65 N.E. 2d 316, 317 (1946) quoting *Restatement (Second) of*

*Agency* §71.

Since the broker had actual or apparent authority to accept payment of the purchase price,

then payments to the broker must be deemed payment to Plaintiffs. This principle is illustrated

in a case where a dishonest insurance broker purloined two-thirds of a three-year prepaid

premium. *See Hobbs Brook Agency, Inc. v. North River Insurance Co.*, 7 Mass. App. Ct. 885,

386 N.E.2d 1315, 1316 (1979). Because the broker was acting as the agent of the insurance

company when he received the premium, the insurance company had to bear the loss.  *Id.* at 885, 286 N.E.2d at 1316.  Likewise, it has been held that an insurer's obligation was discharged when it issued its check to the insured's agent.  *Aetna Casualty & Surety Co. v. Fennessey*, 37 Mass. App. Ct. 668, 674, 642 N.E.2d 1050 (1994).

The cases cited by Plaintiffs do not support their position.  None of them stands for the counterfactual proposition that the theft of the proceeds from an authorized sale may be deemed a theft of the item sold.  *Bloom v. Ohio Farmers' Insurance Co*., 255 Mass. 528, 152 N.E. 345 (1926) involved garden-variety car theft.  Similarly, in *Farnum v. Bankers' & Shippers' Insurance Co*., 281 Mass. 364, 368, 183 N.E. 718, 720 (1933), the court held that if a third party had driven away with the plaintiff's car without permission, intending to keep it, there was theft. In *Rich, supra*, a directed verdict for the insurer was sustained, because, although the plaintiff's car was moved, there was no evidence that it was intentionally moved with the intention of permanently depriving the Plaintiff of its use.  *Rich*, 328 Mass. at 432.  In *Feinberg v. Insurance Co. of North America*, 260 F.2d 523, 526 (1st Cir. 1958), where a yacht was scuttled but retrieval was inevitable, the court noted that "under Massachusetts law there was strictly speaking no theft of the entire yacht…." *Id.* at 527.  *Schiappa v. National Marine Underwriters*, *Inc*., 53 Mass. App. Ct. 161, 775 N.E.2d 791 (2000) involved theft by stripping a vessel of its parts.  Finally, in *Imperial Insurance Co. v. Ellington*, 491 S.W.2d 368 (Tex. Civ. App. 1973), a thief stole the plaintiff's boat by pretending to pay him for it with a worthless check and worthless promissory note.

In contrast to all these cases, Dale Friedman, the putative thief, did not make away with any vessel, components, or vehicle of Plaintiffs; he simply stole money.  The entire goal and result of his scheme was to acquire, not the Aquasport, but, rather, funds that did not belong to

11

him.  The vessel was simply the means for obtaining that end.  If he had stolen the sale proceeds and, for some reason, Ms. Jordan had refrained from taking the Aquasport, Plaintiffs still would have found themselves in the same boat, so to speak: The sale proceeds would still be gone, and they would still have had the same dispute with Ms. Jordan over who had the better claim to the vessel.

In short, the undisputed evidence shows that Plaintiffs' boat was not stolen or otherwise lost.  Rather, the boat was sold, and the sale proceeds stolen.  Even if Plaintiffs had not authorized the sale, that would not make the boat stolen.  At worst, the buyer labored under a misunderstanding when she took the vessel and retained it until the parties had reached a new and final agreement on the vessel's sale.  Plaintiffs acknowledged that they still maintained control over the vessel by executing a bill of sale and accepting funds in March, 2003.  A vessel can hardly be stolen if the owner can issue a bill of sale and receive the proceeds for such sale. Plaintiffs undoubtedly sustained a loss; but it was not a loss for which they had procured insurance coverage.  Acadia never agreed to insure Plaintiffs for loss of the proceeds of the sale of their vessel.  To rule that peculation of such sale proceeds amounts to the theft of "the entire yacht" would be to rewrite the parties' insurance contract under the guise of interpretation.  *Cf. C.K. Smith & Co. v. Motiva Enterprises LLC*, 269 F.3d 70, 77 (1st Cir. 2001).

Plaintiffs herein seek what is, in essence, recovery for a total loss.  The Acadia policy, however, requires that "with respect to total or constructive total loss", the insured will "transfer title of that property to [Acadia] . . .".  Plaintiffs have already transferred title of the vessel to Ms. Jordan.  They cannot, therefore, provide title to Acadia, a condition precedent to a recovery for a total loss.  Thus, Plaintiffs cannot prevail on their coverage claim.

CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Partial Summary Judgment.

Dated at Portland, Maine this 10th day of February, 2006.

ACADIA INSURANCE COMPANY

By its Counsel:

/s/Leonard W. Langer

/s/Marshall J. Tinkle
BBO# 565513

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
(207) 874-6700
lwlanger@tchl.com

**CERTIFICATE OF SERVICE**

I, Leonard W. Langer, hereby certify that on February 10, 2005, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  David S. Smith Esq., Cianciulli & Ouellette, 163 Cabot St., Beverly,  01915, counsel for Plaintiffs.

/s/  Leonard W. Langer

Acadia/Gaffey
Opp to Mot for Partial SJ