# EXHIBIT B

Page 1

```
 1                    Volume: I
                      Pages: 1-70
 2                    Exhibits: 1
 3        UNITED STATES DISTRICT COURT
 4          DISTRICT OF MASSACHUSETTS
 5
 6   BRIAN GAFFEY AND KEVIN GAFFEY,
              Plaintiffs
 7
           vs.          Docket No.
 8                      CA 04CV12354-RGS
     ACADIA INSURANCE COMPANY,
 9             Defendant
10
11
12        DEPOSITION of BRIAN H. GAFFEY, a
     witness called by and on behalf of the Defendant,
13   taken pursuant to the Federal Rules of Civil
     Procedure, before Heidi B. Stutz, Certified
14   Shorthand Reporter No. 146599S and Notary Public in
     and for the Commonwealth of Massachusetts, at the
15   offices of Cianciulli & Ouellette, 163 Cabot Street,
     Beverly, Massachusetts, on Friday, November 18,
16   2005, commencing at 12:50 p.m.
17
18
19
20
21
22
23
24
```

Page 2

```
 1  APPEARANCES:
 2     DAVID S. SMITH, ESQ.
       Cianciulli & Ouellette
 3     163 Cabot Street
       Beverly, Massachusetts 01915
 4       on behalf of the Plaintiffs
 5     LEONARD W. LANGER, ESQ.
       Tompkins, Clough, Hirshon & Langer, P.A.
 6     Three Canal Plaza
       P.O. Box 15060
 7     Portland, Maine 04112-5060
       207-874-6700
 8       on behalf of the Defendant
 9  ALSO PRESENT: Barbara Taylor
                  Kevin Gaffey
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2
    WITNESS:       DIRECT  CROSS  REDIRECT  RECROSS
 3
 4  BRIAN GAFFEY     4            61          64
 5
    EXHIBITS:      DESCRIPTION             PAGE
 6
 7     1    Amended Notice of Taking
            Deposition                      4
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              P R O C E E D I N G S
 2            (Deposition Exhibit No. 1
 3             marked for identification.)
 4  Whereupon:
 5            BRIAN H. GAFFEY,
 6  having been satisfactorily identified and duly sworn
 7  by the Notary Public, was examined and testified as
 8  follows:
 9            MR. LANGER: Are you going to have
10  Mr. Gaffey read and sign?
11            MR. SMITH: Yes. Same stipulations.
12            MR. LANGER: That I'll agree to.
13            DIRECT EXAMINATION
14  BY MR. LANGER:
15     Q. Good afternoon, Mr. Gaffey. My name is
16  Leonard Langer. I represent Acadia Insurance
17  Company in the action that's been brought on your
18  behalf in the United States District Court for the
19  District of Maine.
20            MR. SMITH: Massachusetts.
21     Q. Massachusetts, correct.
22            You were here during the course of
23  Kevin Gaffey's deposition this morning and you heard
24  the instructions that I gave him at that time. Are
```

Page 5

1  those satisfactory to you?
2     A.  Yes.
3     Q.  Could you please state your full name and
4  address?
5     A.  Brian Gaffey and address is 76 Lawrence
6  Road, Boxford, Massachusetts.
7     Q.  And your date of birth is November 23rd,
8  1962?
9     A.  Yes.
10    Q.  And your social security number is
11 0231-58-8642?
12    A.  Yes.
13    Q.  Are you taking any sort of medication that
14 would impede your ability to understand or respond
15 to my questions?
16    A.  No.
17    Q.  Is there any reason that you believe the
18 deposition shouldn't go forward this afternoon?
19    A.  No.
20    Q.  Have you ever been deposed before today?
21    A.  No.
22    Q.  Other than the testimony you gave in the
23 hearing in Rhode Island, have you ever testified in
24 any other lawsuit or legal matter?

Page 6

1     A.  Yes.
2     Q.  And what other times have you testified in
3  a lawsuit or legal matter?
4     A.  Once before, Salem district court.  It had
5  to do with a car in college.
6     Q.  Was it a personal injury accident?
7     A.  No.
8     Q.  Fender bender?
9     A.  No.  It was like I sold a lady a car and
10 she decided that she didn't want it any more and she
11 wanted me to buy it back and I didn't want to buy it
12 back.
13    Q.  What was the ultimate resolution?
14    A.  We split it.
15    Q.  Let me show you what's been marked as
16 Exhibit No. 1 which is a copy of the Notice of
17 Deposition that I forwarded to Mr. Smith.
18        (Document handed to witness.)
19    Q.  Have you seen that before?
20    A.  Yes.
21    Q.  Attached to the Notice of Deposition are a
22 list of categories of documents that you were asked
23 to produce today.  Mr. Smith has produced a package
24 of materials pursuant to an earlier request.  Are

Page 7

1  you aware of any documents that are responsive to
2  any of those categories that you have not provided
3  to Mr. Smith?
4     A.  No.
5     Q.  Did you review any documents to prepare
6  for your testimony today?
7     A.  I reviewed the packet that David sent to
8  me.
9     Q.  That Mr. Smith sent to you?
10    A.  Yes.
11        MR. LANGER:  Just for the record, is
12 that the same packet that you provided to me?
13        MR. SMITH:  Yes.
14        MR. LANGER:  Okay.
15    Q.  Other than the documents that have been
16 produced by Mr. Smith and that you reviewed in
17 preparation for the deposition, are you aware of any
18 other documents that relate to your ownership of the
19 Aquasport?
20    A.  No.
21    Q.  Are you aware of any other documents that
22 relate to the subject matter of this litigation that
23 you have reviewed prior to preparing for the
24 deposition?

Page 8

1     A.  Other than a news article, no.
2     Q.  That was a news article regarding Mr.
3  Friedman?
4     A.  Yeah, various news articles over the past
5  couple years, I probably read, seen a couple of them
6  in the newspaper.
7     Q.  Okay.  As I understand it, Mr. Friedman
8  was recently sentenced here in Massachusetts?
9     A.  Yes.
10    Q.  Did you appear at the sentencing?
11    A.  Yes.
12    Q.  And did you give testimony at that time
13 with regard to the situation that provides the basis
14 of this lawsuit?
15    A.  No.
16    Q.  What did you testify to at the sentencing?
17    A.  I did a witness statement.  That was it.
18    Q.  Was it a written statement?
19    A.  No.
20    Q.  What, if you can, best you can recall,
21 what did you tell the sentencing judge?
22    A.  I told him that, best of my recollection,
23 what I said was that, you know, the theft of my
24 boat, it wasn't as simple as just that.  There's



Page 9

1  been other, you know, I've experienced legal fees,
2  there's been -- I'm still paying a note on the boat,
3  you know, a personal note, and, you know, this guy
4  ripped me off.
5     Q.   And was Mr. Friedman sentenced that day?
6     A.   Yes, he was.
7     Q.   And to the best of your recollection, what
8  sentence did he receive?
9     A.   I believe it was three to five years state
10 prison.
11    Q.   Walpole, huh?
12    A.   No.  They said he was probably going to go
13 to Concord.
14    Q.   Did the court enter a restitution order?
15    A.   No.  They said that once he leaves prison
16 that he would have to go to trial again and then a
17 restitution, they were going to have some type of a
18 hearing on that down the road, I recall hearing
19 that.
20    Q.   Where did you go for the sentencing, which
21 court?
22    A.   Salem.
23    Q.   Other than talking to Mr. Smith, did you
24 talk to anybody else about the testimony you might

Page 10

1  be giving today?
2     A.   My brother.
3     Q.   Do you recall your brother testifying that
4  he had dinner with you last night?
5     A.   Yes.
6     Q.   And you discussed the case.
7     A.   Yes.
8     Q.   Can you recall the contents of the
9  discussions you had last night?
10    A.   They were pretty much generalities around
11 Dale Friedman and how we were kind of glad he was in
12 jail.  That's where he deserved to be.
13    Q.   Did you discuss the specifics of the
14 various occurrences in the summer of 2003?
15    A.   No.
16    Q.   Other than your brother and Mr. Smith,
17 have you ever discussed the facts surrounding the
18 case with anyone else?
19    A.   My wife.
20    Q.   I think you told us off the record that
21 you also have twin daughters?
22    A.   Yes.  Son and daughter.
23    Q.   Twins, son and daughter.  And they are
24 four years old?

Page 11

1     A.   Five and a half.
2     Q.   I'm not getting any of this right.
3          Do you have any other children?
4     A.   No.
5     Q.   Briefly describe for me your educational
6  history.
7     A.   Graduated high school, St. John's Prep,
8  Danvers, class of '80.  And then Providence College
9  in Providence, Rhode Island, class of '84 with a BS
10 in marketing.
11    Q.   Have you had any formal education beyond
12 Providence College?
13    A.   No.
14    Q.   Can you describe for me briefly your work
15 history since you got out of college in '84?
16    A.   Went to work for M&M Mars, Incorporated,
17 Hackettstown, New Jersey.  Worked there for 13
18 years.  Left there, started my own marketing
19 company.  And then after that went to work for
20 Gillette Corporation and currently am with Procter &
21 Gamble.
22    Q.   Always in a marketing capacity?
23    A.   Sales marketing.
24    Q.   So you were with M&M Mars until around

Page 12

1  1997?
2     A.   Approximately, yeah.
3     Q.   And how long did you operate your own
4  marketing company?
5     A.   Approximately a year and a half.
6     Q.   What was the name of the company?
7     A.   It wasn't my own company.  It was a
8  start-up division for a reinsurance company or an
9  insurance company.
10    Q.   And what was the name of the company?
11    A.   The name of our company was Core
12 Marketing.
13    Q.   C-O-R-E?
14    A.   Yes.
15    Q.   Where were they located?
16    A.   We were in Newburyport, Mass.
17    Q.   And you did that until sometime in 1998?
18    A.   Yes.
19    Q.   And how long were you at gill let?
20    A.   I've been there since 1998.  Gillette is
21 now purchased by Procter, so I have to say I work
22 for Procter now.
23    Q.   Your brother testified this morning that
24 prior to your joint acquisition of the Aquasport you

Page 13

1 had owned a 19-foot Aquasport?
2   A.  Yes.
3   Q.  Was that the first boat you had owned?
4   A.  Yes.
5   Q.  And when did you acquire the 19-foot
6 Aquasport?
7   A.  I'd have to say it was around '97, '98, in
8 that time frame.
9   Q.  And did you own that by yourself?
10  A.  Yes.
11  Q.  Did you sell that in the summer of 2001
12 when you and your brother purchased the 1999
13 Aquasport?
14  A.  Yes.
15  Q.  Was there a broker involved?
16  A.  No.
17  Q.  Let me show you what was marked this
18 morning in your brother's deposition as Exhibit
19 No. 3, which is a sales agreement for the 1999
20 Aquasport Osprey.
21      (Document handed to witness.)
22  Q.  Would you agree that's a true and
23 accurate copy of the sales agreement?
24  A.  Yes.

Page 14

1   Q.  And that's your signature at the bottom?
2   A.  Yeah.
3   Q.  You have to answer yes.
4   A.  Yes.
5   Q.  Was there a broker involved in this
6 transaction?
7   A.  No.
8   Q.  Who is Shawn Perkins?
9   A.  He's the person we bought the boat from.
10  Q.  Had you ever met him before you purchased
11 the boat?
12  A.  Never.
13  Q.  Other than the 19-foot Aquasport, the 1999
14 Aquasport, and the current Grady White, have you
15 ever owned any other vessels?
16  A.  No, other than canoes or something like
17 that.
18  Q.  Okay. When you purchased the Aquasport
19 in, the 1999 Aquasport in the summer of 2001, you
20 purchased it for $24,000?
21  A.  Yes.
22  Q.  And then it was insured for $37,000?
23  A.  Yes.
24  Q.  Were you the one that dealt with insurance

Page 15

1 for the vessel?
2   A.  Yes.
3   Q.  And who did you talk to about insuring the
4 vessel?
5   A.  Who did I talk to, what agency?
6   Q.  Yes.
7   A.  Blackadar Reinsurance. I believe they're
8 in Portsmouth, New Hampshire.
9   Q.  Do you remember who you talked to there?
10  A.  The name Kim is coming to mind, but...
11  Q.  Kim?
12  A.  Possibly, yeah.
13  Q.  Had they insured your 19-foot Aquasport?
14  A.  Yes.
15  Q.  How did it come about that you had
16 purchased a boat for 24,000 but insured it for
17 37,000?
18  A.  We purchased it for 24, had the boat
19 surveyed by a certified marine surveyor, and his
20 report said the current value of the boat was 37.
21  Q.  And did you discuss that with the broker
22 at Blackadar Marine?
23  A.  I believe I sent them the survey or at
24 least I discussed it with them, and they recommended

Page 16

1 that I insure it for the higher amount because of
2 the survey. And I believe when I had that
3 conversation, because I wasn't sure, it I was like
4 what do I do? Do I insure it for the 24 or the 37?
5 And they at the time, I believe, contacted the
6 insurance company to find out what they should do,
7 what was acceptable.
8   Q.  And their response, "their" being
9 Blackadar Marine's response was to insure it for the
10 higher value?
11  A.  To insure for the current value, yes.
12  Q.  The 37,000?
13  A.  The 37, yeah.
14  Q.  How would you describe your use of the
15 Aquasport during the period from August '01 to May
16 of '03?
17  A.  I tried to use it as much as I can, but
18 that was limited because I have a family with little
19 children at the time. I like to go fishing with my
20 brother and so on the weekends maybe we'd get a
21 chance to go fishing and I like to take the kids to
22 the beach. So limited use.
23  Q.  You sat through your brother's deposition
24 this morning. Is there anything that you recall his

Page 17

1  testifying to that you disagree with?
2     A.  The only thing I heard Kevin say, I
3  believe it was one of the conversations, the phone
4  conversations with Miss Jordan, the first one I had
5  I had one my own, because I recall he wasn't there.
6  But other conversations, another conversation he was
7  there.
8     Q.  Is there anything else in his testimony
9  that you felt either he left something out or that
10 it was inaccurate in some way?
11    A.  Let's see.  I think everything was pretty
12 accurate.  Nothing stood out.
13    Q.  Okay.  In May of 2003 what was your reason
14 for wanting to sell the Aquasport and acquire the
15 Mako?
16    A.  Upgrade.
17    Q.  Just moving, continuing to move up to a
18 bigger boat?
19    A.  Yeah.  We saw it as being a more seaworthy
20 vessel that we could take out a little further and
21 maybe do some offshore fishing with.
22    Q.  And the agreement was, with Dale Friedman
23 -- let me strike that.
24        Was Dale Friedman the broker for the

Page 18

1  Mako?
2     A.  Yeah, the boat that we saw was on his lot
3  and he owned that brokerage company.
4     Q.  Was that the first time you had ever met
5  Dale Friedman?
6     A.  I'd have to say yes.
7     Q.  Had you -- strike that.
8         How did you come to be aware that
9  the Mako was on his lot and was for sale?
10    A.  Drive by.
11    Q.  Did you regularly frequent boat yards just
12 to see what's there?
13    A.  Yeah, we did.  That one was out by the
14 road, so it kind of caught my attention.  I think I
15 was with Kevin and we pulled in and poked around.
16    Q.  Was there any sort of a written agreement
17 that you had with Mr. Friedman with regard to the
18 sale of your Aquasport and the acquisition of the
19 Mako?
20    A.  I believe it was verbal.  And, you know, I
21 recall, you know, we did have the boat surveyed and
22 we went to the same surveyor that we used for the
23 Aquasport.  The agreement we had was just as Kevin
24 had said, which was, it was he was going to market

Page 19

1  the boat for a couple weeks and he was going to try
2  and sell it for us.  If he didn't, he would buy it
3  back, and that would allow us to buy the Mako if
4  that's what we intended to do after the survey.
5  Survey was no good, so we didn't go forward with the
6  sale.
7     Q.  And you and your brother had previously
8  given him a deposit?
9     A.  Yeah.
10    Q.  Of $3,900?
11    A.  Yeah.
12    Q.  You have to say yes.
13    A.  Yes.
14    Q.  And when the boat didn't survey out, Mr.
15 Friedman gave you your deposit back?
16    A.  Yes.
17    Q.  Remember what the asking price for the
18 Mako was?
19    A.  I'd have to say 39,000, because I believe
20 the 3,900 was 10 percent deposit.
21    Q.  During the negotiations surrounding the
22 potential purchase of the Mako were you the sort of
23 point man or was Kevin handling the negotiations?
24    A.  For that I believe I was.

Page 20

1     Q.  Was the first time you met Mr. Friedman
2  when you pulled into the lot the day you went to
3  look at the boat?
4     A.  I think so.
5     Q.  And did you come to an agreement that day
6  on the deal that was going to come together whereby
7  he would market your boat in return for your buying
8  the Mako and if he couldn't sell your boat, he'd buy
9  it?
10    A.  Yes.
11    Q.  Was there just one sort of deal?
12    A.  My recollection is, yeah, it was just one
13 sort of deal.  We walked in, saw it, we might have
14 saw it on our own and then gone back and he was
15 there.  But I'm thinking it was just Kevin and I
16 looked at it, we said, wow, that's really nice, we
17 recognized it as being a good deal, something we'd
18 be interested in, and this guy walked over to you
19 like a used car salesman and said, hey, nice boat,
20 huh?
21    Q.  Used boat salesman?
22    A.  Used boat salesman.
23    Q.  Let me show you what was marked this
24 morning at Kevin Gaffey's deposition as Exhibit No.

Page 21

1  4.
2      (Document handed to witness.)
3  Q.  Do you recognize that document?
4  A.  Yes.
5  Q.  That's a printout of Sea Dog Yacht Sales'
6  website with regard to your vessel?
7  A.  Yes.
8  Q.  Did you provide Mr. Friedman with any of
9  the information that's contained in Exhibit 4?
10  A.  Yes.
11  Q.  What information did you provide Mr.
12  Friedman?
13  A.  A specific here would be the Faruno 1650
14  DF-colored depth fish combo plotter. I believe I
15  would have had to have told him that because that
16  would have been something I would have kept at home
17  and he wouldn't have known that.
18  Q.  Anything else?
19  A.  Maybe I told him about the max speed,
20  because I know that's subjective.
21  Q.  Page 1 of Exhibit 4 notes that there are
22  only a hundred hours on the engine. Is that
23  information you had provided to him?
24  A.  Yes.

Page 22

1  Q.  When you purchased the boat in the summer
2  of 2001 how many hours did it have on it at that
3  time?
4  A.  Boy, it wasn't many, so we probably had to
5  estimate because there was no hour meter on the
6  boat. And based off of the usage that this guy
7  Shawn, the person we purchased the boat from told
8  us, we estimated that there was less than 50 hours
9  on it. And then based on our usage, we said, well,
10  we probably used it a good 50, too, so a hundred
11  hours.
12  Q.  So during the course of the two years you
13  owned it you figured you probably put 50 hours on
14  it?
15  A.  We didn't have two full seasons with it.
16  Basically when we purchased it, if you look at the
17  bill of sale, the bill of sale is August. So at
18  that point we probably got the boat and had it for a
19  couple of weeks and put it away. And then when we
20  put it up for sale, it was in -- or at least when
21  this took place in May, it only had maybe, I don't
22  know, maybe another few hours on it. It wouldn't be
23  realistic to say that we put 50 hours on it in
24  two years, because those aren't the time frames

Page 23

1  we're looking at.
2  Q.  Let me rephrase it. I'm not trying to be
3  tricky. Between August of 2001 and May of 2003 you
4  figure you put about 50 hours on the boat?
5  A.  Yeah.
6  Q.  And how many hours do you think you used
7  the boat in 2003 between May and August?
8  A.  In 2003 May and August? Minimal.
9  Q.  Ten, 20?
10  A.  Maybe 25 hours, something like that.
11  Q.  Okay. In May of 2003 did you ever look at
12  the Sea Dog website to see what sort of an ad Mr.
13  Friedman had put for your boat?
14  A.  I may have, but I don't recall
15  specifically if I had. I do know that I saw the ad
16  later on and at that point when I did see it it was
17  in August.
18  Q.  Do you remember looking at the Sea Dog
19  website in May, in the period of May 2003 to see
20  what was available?
21  A.  I probably would have, yeah.
22  Q.  Was there a similar ad that you recall for
23  the Mako?
24  A.  I'd have to say there was.

Page 24

1  Q.  Did you print it out?
2  A.  No.
3  Q.  Now, when did you first become aware that
4  Mr. Friedman still had Exhibit No. 4 on his website
5  after May of 2003?
6  A.  I'd have to say it was early August and I
7  recall going on to his website and being surprised
8  that our boat was on there.
9  Q.  Why were you looking at the Sea Dog
10  website in early August of 2003?
11  A.  I was on vacation and had some time.
12  There was a computer, so I went to see what he had
13  for sale.
14  Q.  Still looking to trade up to a bigger,
15  more seaworthy vessel?
16  A.  No, that wasn't -- I was just looking.
17  Q.  And you found what's been marked as
18  Exhibit No. 4?
19  A.  Yes.
20  Q.  Did you print it out that day?
21  A.  No.
22  Q.  Now, again, it's sort of, at the bottom
23  there's, looks like a website reference and then
24  it's dated 8/7/03.

6 (Pages 21 to 24)

Page 25

1  A. Yeah.
2  Q. Did you print it out?
3  A. No.
4  Q. Do you know who printed out what has been
5  marked as Exhibit 4?
6  A. I received this from back in the Rhode
7  Island case. This was information they sent to us.
8  I never -- when I viewed this boat or this listing I
9  never saw it on Yacht World. I would have gone into
10 the seadog.com website to see that.
11 Q. So you saw it on the Sea Dog website?
12 A. Yeah. So this would have been a link.
13 Q. Is Exhibit 4 an accurate printout of what
14 you saw on the Sea Dog website?
15 A. I would have to say yes, because it
16 appears to be, I would think it's a link. He would
17 be the only person who would have put this on, so it
18 would have to be.
19 Q. And when you saw it there what did you do?
20 A. I was surprised because I had never signed
21 an agreement with him giving him permission to
22 market the boat. So I probably said, you know, told
23 my wife and I believe I talked to Kevin about it and
24 I said you're not going to believe that Dale

Page 26

1  Friedman's trying to sell our boat on his website.
2  And I said I never gave him permission, did you?
3  And he said no.
4  Q. Did you call Dale Friedman when you saw it
5  and said, hey, why are you listing my boat?
6  A. I didn't, no. But my brother told me that
7  probably like around the same time, because I was
8  away and when I came back I think I called him, so
9  Kevin said -- I said, hey, how are you doing? He
10 said I got a call from Dale Friedman. And I
11 remember thinking, hey, I was calling, I think at
12 the time I was calling to tell him that I saw this
13 or it was one of the topics we were going to
14 discuss.
15 Q. And his response was I got a call from
16 Dale Friedman saying he had a buyer for the boat?
17 A. Somebody was interested in the boat.
18 Q. And do you recall Kevin telling you that
19 the sales price or the potential purchase price was
20 27 to $30,000?
21 A. I don't recall a specific number. I
22 recall him saying that -- I recall being, one, this
23 price that he had it was $32,000 and I recall that
24 maybe I figured it had to be around that, around

Page 27

1  that price, or he may have told me, I don't recall.
2  Q. This morning your brother said that he was
3  sort of the point man for dealing with Dale Friedman
4  with regard to the occurrences after early August of
5  2003.
6  A. Yes.
7  Q. Did you ever talk with Dale Friedman at
8  any time from the time your brother first told you
9  he had gotten a call from him up until the time that
10 you found that the boat was no longer at Sea Dog?
11 A. I believe, yes, because I went to his
12 office with Kevin and they had a little trailer set
13 up or whatever and when I was in there I think I may
14 have had like a brief hi, how are you doing type
15 conversation and that's about it. No specifics.
16 Kevin was dealing with him regarding the specifics.
17 Q. And when did you go to Sea Dog's office
18 with Kevin this one time?
19 A. Let me see. It would have been prior to
20 the boat being shipped down there, so I would have
21 to say when we delivered -- at least -- the initial
22 closing date was going to be like August 15th, so we
23 were down there prior to that because that's when he
24 told us, and I was there, that the closing wasn't

Page 28

1  going to take place on that day. So it would have
2  been prior to the date that he had noted as the
3  closing.
4  Q. Was that the only time prior to
5  discovering that the boat was not at Sea Dog that
6  you went to the brokerage?
7  A. Between which period of time?
8  Q. Between early August and the time you
9  discovered the boat wasn't there.
10 A. I believe, yeah, I believe yes. There may
11 have been one other, because -- yes, there was one
12 other time, because I did see the boat, I went, I
13 did see the boat in the yard after he, after they
14 had brought it there. And that may have been like
15 through the gate, just making sure it was there.
16 Q. So after it had been sea-trialed and then
17 was moved to Sea Dog pending the closing, that's
18 when you saw the boat at the yard?
19 A. Yeah, probably. I believe I remember
20 seeing it there. Whether the place was open or not,
21 I don't remember.
22 Q. Let me show you what was marked this
23 morning as Exhibit No. 5 which your brother
24 identified as the purchase and sale agreement.

7 (Pages 25 to 28)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

1ab02fe5-8786-43f6-b0ca-ac823c37156c

Page 29

1  (Document handed to witness.)
2  Q. Do you remember discussing that with your
3  brother on the phone?
4  A. I remember discussing a purchase and sale
5  agreement, yeah.
6  Q. Let me show you what's been marked as
7  Exhibit No. 6.
8  (Document handed to witness.)
9  Q. Which was the payoff on your brother's
10 bank loan and the second page of Exhibit 6 is a
11 seller's final accounting. Is this your signature
12 at the bottom of page 2?
13 A. Yes.
14 Q. Now, you indicated a moment ago that you
15 had your own bank loan --
16 A. Yes.
17 Q. -- with regard to the --
18 A. Well, it's not a bank loan.
19 Q. Describe for me the type of loan you had
20 with regard to the purchase of the vessel in --
21 A. I took a loan against my 401(k).
22 Q. And how much did you borrow from your
23 401(k)?
24 A. $10,000.

Page 30

1  Q. And has that been paid off?
2  A. No.
3  Q. So you're still making payments on that?
4  A. Yes.
5  Q. How much are the payments?
6  A. Approximately $80 every two weeks. $160 a
7  month.
8  Q. On page 2 of Exhibit No. 4 of your
9  brother's deposition there's some handwriting that
10 says $27,250, or 27,250. Do you know whose
11 handwriting that is?
12 A. No. It's not my handwriting.
13 Q. And to your knowledge, it's not your
14 brother's, either?
15 A. To my knowledge, it's not his, either.
16 Q. Okay. On page 2 of Exhibit 4 there is a
17 reference to kjsportfishing@aol.com. Do you know
18 who that is?
19 A. No idea.
20 Q. There is a description again on page 2 of
21 Exhibit 4 that says, "This is a 1999 Osprey that was
22 purchased as a leftover and not used until 2000."
23 Is that information that you provided to Mr.
24 Friedman?

Page 31

1  A. I would have had to have because he
2  wouldn't have known that.
3  Q. And is that information you got from Mr.
4  Perkins?
5  A. Yes, that would have been information he
6  gave to us. And it would have been based on his
7  receipt. So we may have made the assumption based
8  on what his receipt for the boat was. But I believe
9  Shawn probably did tell us.
10 Q. That he didn't acquire it until 2000?
11 A. Yeah. I think that was probably a selling
12 point for him for us. That's what led us to the low
13 hours also.
14 Q. When your brother talked to you about the
15 purchase and sale agreement did he tell you that the
16 buyer was Pamela Jordan?
17 A. No.
18 Q. In your opinion, did the 27,000 sales
19 price reflected in the purchase and sale agreement
20 reflect a fair value for the vessel?
21 A. I would have liked more, but it was
22 acceptable.
23 Q. When you signed the payoff, second page of
24 Exhibit No. 6 to Kevin Gaffey's deposition, do you

Page 32

1  know where you were located when you signed that?
2  A. I heard Kevin say that we were there and I
3  thought that that's probably where we were. Because
4  I'm looking at here and I'm seeing this date of 8/16
5  and I know we -- the closing on the purchase and
6  sale was 8/15, so we probably drove down there and
7  wanted to get this, find out what was going on,
8  because, you know, we'd passed that date. So we may
9  have gone down there and he may have given us these
10 forms kind of to move the process along.
11 Q. Do you have a specific recollection of
12 going down there and signing it on August 16th?
13 A. Yeah, I do.
14 Q. And so it's your testimony that you were
15 at Sea Dog Yacht Sales on August 16th and you recall
16 Mr. Friedman giving you this form and your signing
17 it?
18 A. My recollection would be that Kevin would
19 have dealt with him and I was more of in the
20 background, and then Kevin would have said, hey
21 Brian, this is a payoff thing, sign it and, boom, I
22 would have signed it.
23 Q. So you relied upon the information being
24 provided by your brother?

8 (Pages 29 to 32)

Page 33

1  A. Yes.
2  Q. And you understood that what you and your
3  brother would receive from the sale was the $24,300,
4  which was actually the sale price less the
5  commission that was being paid to Mr. Friedman?
6  A. Yes.
7  Q. And then however you divided up the
8  $24,300 was up to the two of you?
9  A. Correct.
10 Q. Did you envision when you signed Exhibit
11 No. 6 that Mr. Friedman was going to pay off Eastern
12 Bank directly or that approximately $6,750 was going
13 to be used by your brother to pay off the loan?
14 A. I don't recall having that thought. It
15 was Kevin's form and however it was going to be
16 handled, I didn't pay much attention to it.
17 Q. If it was okay with Kevin, it was okay
18 with you?
19 A. Yes.
20 Q. Now, let me show you what was marked at
21 Kevin Gaffey's deposition as Exhibit No. 8.
22       (Document handed to witness.)
23 Q. Do you recognize that document?
24 A. Yes.

Page 34

1  Q. Is that your signature at the bottom?
2  A. Yes.
3  Q. And Elizabeth Warren who is the notary, I
4  think your brother identified her as your wife's
5  boss?
6  A. Yeah.
7  Q. Or at least at the time she was your
8  wife's boss?
9  A. Yes, she is still.
10 Q. And is it your recollection that after you
11 and your brother signed this bill of sale it was
12 delivered to Mr. Friedman?
13 A. Yes.
14 Q. Did you go with your brother and
15 hand-deliver it to him?
16 A. I believe I did.
17 Q. Going back to the bank loan payout, at the
18 top of page 2, again it appears to be cut off, but
19 it says, "Notarized copies returned." Your brother
20 recalled that that referred to two copies of, two or
21 more copies of the bill of sale that you and your
22 brother had signed being returned to Mr. Friedman.
23 Is that your recollection?
24 A. I would say that's, possibly that's what

Page 35

1  that is, yeah, probable.
2  Q. Okay. Do you recognize the handwriting?
3  A. I don't -- I recognize my brother's
4  signature. I don't recognize that as being his
5  writing. It could be, though.
6  Q. Okay. Your brother testified this morning
7  that when you went to Sea Dog sometime in late
8  August when you first learned that the boat wasn't
9  there and Dale Friedman wasn't there, either, that
10 you may have had some conversations with other boat
11 owners. Did you -- I guess the question is did you?
12 A. I recall having a conversation with
13 somebody who was in that office and it was, I wasn't
14 sure at the time when I saw him who he was, but I
15 believe after I spoke with him I determined that he
16 was an employee. And I don't recall having any
17 specific conversation with boat owners. I knew
18 there were people around there walking around trying
19 to find where their boats were and things like that,
20 but I don't remember any specific person other than
21 that one employee.
22 Q. Other than the conversation you had with
23 Dale Friedman when you went and signed the payoff
24 document, have you ever had any other conversations

Page 36

1  with Mr. Friedman at any other time from that point
2  up to today?
3  A. No.
4  Q. Have you ever talked, from the day you
5  were in the Sea Dog office when you found your boat
6  was gone have you ever talked with any other boat
7  owners who had boats that disappeared during this
8  time up until today?
9  A. Yes.
10 Q. What other boat owners have you talked
11 with?
12 A. I don't know their names, but when I was
13 at his trial there were other people there and, from
14 what I understand, they were involved in the same
15 situation. I don't know the specifics of their
16 situation.
17 Q. Okay. Other than at the trial, you
18 haven't called them up and said what happened in
19 your case or anything like that?
20 A. No. There was one other guy, I recognized
21 his name in the newspaper and I called him up. I
22 don't even know if I spoke to him. I may have
23 spoken to his wife or something and the guy never
24 called me back. I wanted to find out what was going

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

1ab02fe5-8786-43f6-b0ca-ac823c37156c

Page 37

1  on with him.
2    Q.  Do you recall his name?
3    A.  I don't recall, no.
4    Q.  When you and your brother drove down to
5  Sea Dog in late August and discovered that the boat
6  wasn't there, what did you do after you found out
7  that the boat was gone and Mr. Friedman was gone?
8    A.  I freaked out. I couldn't believe the
9  boat was missing. We couldn't get any answers. And
10 that one person that I mentioned that was, must have
11 been an employee, his recommendation was, he said,
12 hey, there's been a lot of -- the police have been
13 here. My recommendation is go to the police,
14 something has, you know, gone wrong here. And
15 that's what we did.
16   Q.  That same day?
17   A.  We drove immediately, I believe.
18   Q.  Do you remember the name of the detective
19 that you talked with?
20   A.  Inspector Gary Lattime, Salisbury.
21   Q.  He was a detective with the Salisbury
22 police department?
23   A.  Yeah.
24   Q.  And what did Detective Lattime tell you?

Page 38

1    A.  He told us that we weren't the first
2  people to come in to the station and that they were
3  investigating what's going on and he suggested we
4  make out a police report and that he would be in
5  touch with us and that's it.
6    Q.  When was the next time you talked, if at
7  all, with Detective Lattime?
8    A.  I recall making one other trip down to
9  Salisbury and at the second trip we got a chance to
10 spend maybe a few minutes with him in his office.
11 We shared with him, you know -- Kevin was with me
12 and we shared with him details of our relationship
13 or dealings with Sea Dog. And at that point he
14 asked me a specific question about how the boat came
15 up for sale and I told him -- he asked me if we had
16 an agreement, a sales agreement, marketing
17 agreement. And I had said no, that I actually found
18 the boat out on the website. And he suggested I
19 make a second report out, because he thought it was
20 potential theft and fraud.
21   Q.  Did you tell him at the second time you
22 went to see him that you knew where the boat was?
23   A.  Well, I knew where the boat was, or I knew
24 who had the boat because I had, one, called that

Page 39

1  woman. Her name was on the purchase and sale. She
2  told me she had my boat. And I had, you know, given
3  him the address based off of the purchase and sale,
4  her address was on it. She lived in Cranston.
5    Q.  So did you give that information to the
6  detective?
7    A.  I'm sure I did. And actually, I know that
8  this, he told me the woman, Pamela Jordan, had
9  contacted him also. So he had the information
10 before, I didn't even need to give it to him.
11   Q.  So she had been proactive and called up
12 and said I've got the Gaffey brothers' boat?
13   A.  She told me, after my conversation I got
14 out of her that she said she filed a police report
15 with the Salisbury police.
16   Q.  When was the first time that you talked
17 with Pamela Jordan?
18   A.  The first time I spoke with her was when
19 -- it must have been in obviously late August.
20 Kevin had made some investigative calls to Sea Dog
21 trying to find, what's his name, Gale Friedman
22 (sic), and we weren't getting any feedback from the
23 people. They were either hanging up the phone or
24 weren't answering. So we were like, well,

Page 40

1  something's going on here. Why don't we find out
2  who this person is?
3        And we called up, I called up Pamela
4  Jordan myself to find out, because I think we had
5  found out during that process that our, making those
6  phone calls, that our boat was no longer at Sea Dog,
7  so I wanted to find out where my boat was. So I
8  called her up and I asked her, I said, hey, my
9  name's Brian Gaffey. I said do you have a green
10 Aquasport? She's like, oh, yeah. I go, well,
11 that's my boat. She goes, oh, great, great. We
12 talked about it and she -- I asked her, I said have
13 you been driving the boat? She said yes. And I
14 said, well, how did you drive the boat? You can't
15 possibly have it registered because I have the
16 title. She said, well, the title is in the mail, I
17 was told. And at that point I said, well, you know,
18 we never had a closing. I don't know how you got my
19 boat because I never gave permission for this thing
20 to be shipped down there.
21        And at that point she was very
22 nervous and I recall the conversation, I was trying
23 to be somewhat nice to her, but the conversation,
24 she said, well, maybe we need to get some answers on

Page 41

1  this. I'll call my broker in the morning.
2        And then I know Kevin had called the
3  broker to find out where the boat was and to get
4  some answers. Maybe he knew where Dale was or
5  something like that. Because at that point we
6  didn't know that there was a crime per se. We just
7  knew that our boat was missing and Dale was out
8  somewhere that they couldn't find him.
9    Q.  The first conversation you had with Pam
10 Jordan, was that before you had gone to Sea Dog and
11 met with the employee at Sea Dog or afterwards?
12   A.  It would have to be before, because after
13 I saw the employee there, that's when I went to the
14 police station.
15   Q.  And so you had talked to Pamela Jordan
16 even before you went to the police station the first
17 time?
18   A.  Yes. Hold on. Yes.
19   Q.  And at any time during your conversation
20 with Ms. Jordan the first time did you ask her to
21 return the boat to you?
22   A.  I found out, I wanted to find out, first
23 of all, if she had my boat. Second of all, from
24 talking to her, I knew not to ask her, you know,

Page 42

1  demand my boat back because she was very, you know,
2  upset from the information that I had given her at
3  that point. So I was trying to kind of calm her
4  down a little bit and I don't believe I directly
5  came out and said give me back my boat.
6    Q.  Did you ever say we'll come down and get
7  our boat?
8    A.  Well, see, when I spoke to her, we didn't
9  know that Dale was gone for good. We didn't know
10 that, you know, really the whole situation. So I
11 was trying to, one, kind of like fact-finding, find
12 out, one, she had the boat and what was going on,
13 and then, you know, at that point it wasn't
14 definitive that he had stolen the boat, that he was
15 gone.
16   Q.  Did she tell you during that first
17 telephone conversation that she had sent $27,000 to
18 Sea Dog?
19   A.  She did. She told me that she had wired
20 money directly into his account. And I didn't know
21 any of this, these type of details. But she said
22 that she -- that was one of the reasons she was very
23 nervous because she sent this money in. And I said,
24 well, I know nothing of it and that's it.

Page 43

1    Q.  Did you ever talk to her broker?
2    A.  No, never.
3    Q.  Now, how long was the conversation with
4  Miss Jordan, the first one?
5    A.  I would say ten-minute conversation, maybe
6  it was 15 minutes, you know, short, brief.
7    Q.  At the end of that conversation were you
8  satisfied that she had the boat and it was safe?
9    A.  Yeah, because she told me she had ridden
10 it. I asked her if it was safe, if it was in -- I
11 asked her are you keeping it on -- she said it was
12 on a slip, the boat is very safe. I said okay. And
13 then, yeah, so I knew where the boat, that she had
14 the boat.
15   Q.  Did she tell you that it was insured at
16 that point?
17   A.  I asked her that question. I asked her
18 how she could be riding the boat because it can't
19 possibly -- how did you insure it without a bill of
20 sale or without a title? And she said that it was
21 covered under her homeowner's. That sounded strange
22 to me, but I just accepted that. Because I knew the
23 boat was -- I never once cancelled my registration
24 or my insurance on the boat because it was still my

Page 44

1  property.
2    Q.  When was the second time you spoke with
3  Miss Jordan?
4    A.  Well, it would have been after we, the
5  next day or so after we went down and found out what
6  was going on at Sea Dog and after we filed our
7  police report. I probably went away, I think I went
8  away for the weekend with my family and then came
9  back and made a, either I made a follow-up call to
10 her or she called me.
11   Q.  And what do you recall about the second
12 conversation you had with her?
13   A.  It was, you know, we both realized we had
14 been victimized. So she was very emotional and
15 crying. You know, she's a person and, you know, was
16 affected by it.
17   Q.  So this was approximately a week after
18 your first conversation?
19   A.  I'd have to say it was probably about
20 that, yeah.
21   Q.  And how long did that conversation last?
22   A.  Like I said, maybe 10, 15 minutes or
23 something. Tried to get off the phone as quick as I
24 could.

11 (Pages 41 to 44)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

1ab02fe5-8786-43f6-b0ca-ac823c37156c

Page 45

1  Q. And do you recall, did you call her or did
2  she call you?
3  A. Don't recall that.
4  Q. During that call did you again satisfy
5  yourself that she had the boat and that it was safe?
6  A. Yes.
7  Q. And did you suggest to her that she ought
8  to either return the boat to you or that you would
9  come and get it?
10 A. I was, at that point I had talked to --
11 one, I don't know, I didn't know specifically where
12 that boat was berthed. And I didn't want to, at the
13 time I knew I could have gone down there probably
14 and got it. You know, whether that was the right
15 thing to do sore the wrong thing to do at the time I
16 didn't know. And I didn't want to spook her into
17 thinking that's what I was going to do because she
18 knew she didn't have the title and she knew it
19 wasn't her boat. So I didn't want to give her any
20 type of indication that I was going to come down
21 and, you know, have somebody take it away.
22 Q. Did you think that there was any reason
23 that you couldn't go get your boat?
24 A. At the time, no. It was my boat. I had

Page 46

1  the title.
2  Q. Did you have any additional phone
3  conversations with Miss Jordan after that second
4  call?
5  A. Yeah. I mean, we tried to keep it
6  amicable, realizing that we were both victims. I
7  believe at the time -- see, I hadn't, you know,
8  spoken to attorneys or anything like that. The
9  police indicated to me, they said don't inform your
10 insurance company and don't inform any attorneys.
11 We think we can have this handled through the
12 district attorney. So that's what they were saying
13 to us and they told us that's what they were saying
14 to other victims.
15      And I believe during that time
16 Pamela and I probably had another conversation
17 because I know the detectives from Newburyport,
18 Newbury and Salisbury had all the people come in and
19 discuss what happened. And I know that I knew she
20 was coming down for that.
21 Q. Okay. Did you go to that meeting?
22 A. Yes.
23 Q. And was she there?
24 A. I don't know. It was just Kevin and I.

Page 47

1  Q. I see. There wasn't a meeting with
2  everybody together?
3  A. No.
4  Q. Individuals went in to talk to the
5  detectives?
6  A. Yes.
7  Q. And that was the second meeting you had
8  with Detective Lattime?
9  A. That would have been the third.
10 Q. The third meeting. And what happened at
11 the third meeting with the detective?
12 A. There was several detectives and they
13 basically gave us kind of an overview of what had
14 happened, that this guy, you know, was MIA, you
15 know, there was a number of victims, and they
16 wanted -- and I think that was kind of it. It was
17 very brief. But they wanted us to know that they
18 were going to help us and that the district attorney
19 was involved, getting involved, and that kind of
20 stay still right now.
21 Q. And so the third conversation you would
22 have had with Miss Jordan was sort of about these
23 upcoming meetings with the police department?
24 A. Would have been like she may have called

Page 48

1  me on the cell phone and said, Brian, how do I get
2  to the courthouse or something like that, or the
3  police station.
4  Q. Short conversation, couple of minutes?
5  A. At best, yeah.
6  Q. Did you discuss the condition of the
7  vessel or its location?
8  A. The only -- no, no. I may have said just
9  to check, is the boat okay? At the time I do recall
10 there was a hurricane coming and I was very
11 concerned about my boat. And, you know, I actually
12 called her about that and I wanted to know if the
13 boat was going to be in the water or pulled for the
14 hurricane. And she said based on where it was
15 berthed that everything, it would be okay. And then
16 I may have asked her, you know -- I think that's
17 about what I had talked to her about.
18 Q. Did you talk to her at any time after
19 that?
20 A. At the trial in Rhode Island.
21 Q. Any time prior to the trial in Rhode
22 Island?
23 A. I'd say no. Once I received papers on
24 that or, you know, I hadn't spoken to her and that's

12 (Pages 45 to 48)

Page 49

1  it.
2  Q. So there were three, maybe four
3  conversations at most with Ms. Jordan up to the time
4  you saw her at trial?
5  A. Yeah, there were a few, yeah.
6  Q. During any of the conversations that you
7  had with Ms. Jordan did she ever ask you to send her
8  the title to the vessel?
9  A. Never.
10 Q. Did you ever discuss whether she had a
11 bill of sale?
12 A. I asked her questions. I asked her in the
13 first phone conversation I had with her and she said
14 she was driving the boat, and I asked her, well, how
15 can you drive the boat if it's not registered and
16 insured? She goes, well, I have a piece of paper.
17 And I said, well, what's the piece of paper? I said
18 do you have a -- what's it say? And she said, she
19 goes, well, I don't -- I think it's, it's not really
20 -- she didn't think it was a bill of sale. What she
21 described to me was what I considered at the time
22 the purchase and sale, because she said it only had
23 Kevin's signature on it. So at the time I believed
24 that she was walking around with the initial

Page 50

1  purchase and sale agreement with no bill of sale.
2  Q. Let me show you what's been marked
3  previously as Kevin Gaffey Exhibit No. 9.
4      (Document handed to witness.)
5  Q. And ask if that's your signature at the
6  bottom of the page.
7  A. Definitely not.
8  Q. When was the first time you saw Exhibit 9?
9  A. The first time I saw that was in the
10 papers that were sent to me by her attorney, Dominic
11 Mosca. And it had a bill of sale in there -- no,
12 actually, I think the first time may have been even
13 at the trial. There was a letter sent to us
14 requesting a duplicate bill of sale and I think
15 maybe, yeah, maybe that was in it, I'm not sure.
16 But they were looking for a duplicate of this, I
17 guess.
18 Q. Did you ever ask anybody why they wanted a
19 duplicate bill of sale?
20 A. My attorney did.
21 Q. And what do you think the response was?
22     MR. SMITH: Objection. Well, what
23 do you understand the response to be?
24     MR. LANGER: Right.

Page 51

1      MR. SMITH: Fine.
2      MR. LANGER: Well, what I want to
3  know, I'm not asking for legal advice. I want to
4  know what he was told by Mosca as to why they wanted
5  a duplicate bill of sale.
6      MR. SMITH: That's fine.
7  A. All that took place between my attorney
8  and Mosca.
9  Q. What did your attorney -- and I'm not
10 asking for his advice, but what did he tell you
11 Mosca told him about why they wanted a duplicate
12 bill of sale?
13     MR. SMITH: Objection. That's still
14 attorney/client privilege, assuming that it's a
15 conversation that took place between the two of
16 them.
17     MR. LANGER: But it's only
18 attorney/client if he's providing legal advice. All
19 I'm asking for is to repeat what some other attorney
20 told him. I'll ask it this way.
21     MR. SMITH: Okay.
22 Q. Did your attorney ever tell you what Mr.
23 Mosca said in response to why they wanted a
24 duplicate bill of sale?

Page 52

1  A. No.
2  Q. Okay. Did you ever discuss with Miss
3  Jordan how the boat handled?
4  A. In initiating some conversation and some
5  dialogue with her I asked her questions about the
6  boat. I wanted to make sure that the condition of
7  it was fine and that she was treating it well, so I
8  probably did ask her something like that.
9  Q. Did you ask her or talk about the
10 electronics on the vessel?
11 A. I probably would have, because they're
12 very expensive and I wanted to make sure they were
13 safe and if she was goofing around with them, I
14 didn't want her to break them or anything like that.
15 Q. And at the end of your conversation you
16 were satisfied that everything was in good order and
17 safe?
18 A. Yeah, very much so. Because I realized
19 after speaking to her this was, you know, that --
20 yeah, I did.
21 Q. Did you get the impression that she was an
22 experienced boater and knew what she was doing?
23 A. Yes, I did. I asked her questions about
24 her experience boating and what size boat she

13 (Pages 49 to 52)

Page 53

1  previously had, so I felt pretty good.
2     Q.  What did she tell you about the
3  previous --
4     A.  I think she said she had a boat that was
5  very similar.  It was a Mako.
6     Q.  Did you ask her to call her broker about
7  the status of the purchase price?
8     A.  The status of the purchase price?
9     Q.  What happened to the money that she said
10 she had sent?
11    A.  I don't believe I did.  I believe I wanted
12 Kevin to talk to Larson, who was the broker, and I
13 was dealing with her.  I don't recall ever saying,
14 ever saying that.  I was more concerned when I dealt
15 with her with the boat.
16    Q.  Did your brother ever tell you that he had
17 spoken with Mr. Larson?
18    A.  Yes.
19    Q.  And what did your brother tell you?
20    A.  He told me that, well, one, at the time
21 when we were doing all this we didn't know, we kind
22 of had a feeling that Dale was a bad guy.  We didn't
23 know the people that were listed on this purchase
24 and sale agreement were even real or valid buyers,

Page 54

1  so a lot of the work we were doing was to validate
2  it, one, to find out where that boat was, and on
3  Kevin's side to find out if this broker really
4  existed.
5        And when he told me he called this
6  guy, basically Kevin told him, or that, you know,
7  something was going on, you know, that we didn't
8  know.  And the guy said, you know, Kevin said, hey,
9  we didn't have a closing.  You know, at that time
10 when he spoke to him, I'm not sure if we knew the
11 boat -- yeah, so she had the boat.  We knew the boat
12 was missing and I think that's kind of it.  He said
13 that the broker would find Dale.  He has some other
14 numbers for him and that he would find out what the
15 story was.
16    Q.  Did that conversation with Mr. Larson take
17 place before the first conversation with Pamela
18 Jordan?
19    A.  I think they took place simultaneously.
20 Because Kevin and I probably talked and I said I'm
21 going to call Jordan, you call Larson.
22    Q.  How did you know that Mr. Larson was the
23 broker?
24    A.  Because it said Boats Unlimited, and I

Page 55

1  believe --
2     Q.  Where did it say Boats Unlimited?
3     A.  On the purchase and sale agreement, I
4  believe.  Because that's all we had to go by.  And
5  when he probably called up Boats Unlimited, he found
6  out Paul Larson was the president of the company.
7  So we had to go through information to find out
8  where this place was located and who the people were
9  to talk to.
10    Q.  Let me show you what was previously marked
11 as Exhibit No. 5, which is the purchase and sale
12 agreement.
13        (Document handed to witness.)
14    Q.  And ask if you can --
15    A.  Boats Unlimited (indicating).  That's
16 where we found it.  And we assumed that it was in
17 Rhode Island and we called up information and got
18 that number.
19    Q.  And so Kevin spoke with Mr. Larson at
20 about the same time you were trying to get a hold of
21 Pamela Jordan?
22    A.  Yes.
23    Q.  And Mr. Larson informed you, or informed
24 your brother that he had some other numbers for Dale

Page 56

1  Friedman and would try and track him down?
2     A.  Yeah.
3     Q.  Did you ever speak to Mr. Larson other
4  than at the trial in Rhode Island?
5     A.  You know, I never spoke to him.  Even at
6  the trial it was more like, hi, how are you doing.
7  That was it.  Never anything else.  I listened to
8  his testimony.
9     Q.  Now, at some point Ms. Jordan through her
10 attorney filed suit to try and resolve the ownership
11 issue?
12    A.  Yes.
13    Q.  And I asked your brother this morning why
14 he didn't want to litigate the issue of title in
15 Rhode Island.  Were you adverse to litigating the
16 issue of title in Rhode Island, as well?
17    A.  I just took the advice of my attorney.
18    Q.  Did you expect after the case was
19 dismissed in Rhode Island that it would be rebrought
20 in Massachusetts?
21    A.  Can you say that again?
22    Q.  After the case in Rhode Island was
23 dismissed did you believe that the case was going to
24 be rebrought in Massachusetts?

14 (Pages 53 to 56)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874



1ab02fe5-8786-43f6-b0ca-ac823c37156c

Page 57

1    A.  I thought that was potential.
2    Q.  And were you prepared to litigate the
3  issue of ownership in Massachusetts?
4    A.  I had to contemplate it.  I knew it was
5  going to be expensive.  I didn't know if, you know,
6  what I was going to do.
7    Q.  Let me show you what's previously been
8  marked as Exhibit No. 10 and ask you on page 2 if
9  that's your signature.
10        (Document handed to witness.)
11   A.  Yes, it is.
12   Q.  And again Exhibit 11 at your brother's
13  deposition, on page 2, is that your signature?
14        (Document handed to witness.)
15   A.  Yes, it is.
16   Q.  And on Exhibit No. 12, a bill of sale to
17  Pamela Jordan for the sum of $27,000, is that your
18  signature?
19        (Document handed to witness.)
20   A.  Yes.
21   Q.  And in March of 2004 you received, you and
22  your brother received $7,000 from Miss Jordan?
23   A.  Yes.
24   Q.  And $5,000 from Mr. Larson?

Page 58

1    A.  Yes.
2    Q.  Prior to September 3rd of 2003, which I'll
3  represent to you was the date you spoke with Isaac
4  Howe at Acadia --
5    A.  September --
6    Q.  3.
7    A.  Okay.
8    Q.  Well, I'll ask you --
9    A.  Actually, that sounds a little early to
10  me.
11   Q.  Okay.  When's the first time you recall
12  speaking with anybody at Acadia regarding this
13  incident?
14   A.  First thing I did was I called my agent
15  and I --
16   Q.  Who did you speak at Blackadar?
17   A.  I don't recall the lady's name, but
18  whoever my case manager was, they would have
19  directed me right to that person.  I'm thinking Kim
20  or Jane is coming to mind, Kim or Jane, one or the
21  other.
22   Q.  Okay.  And what was the discussion you had
23  with whomever?
24   A.  I told them that my boat was involved in

Page 59

1  the Sea Dog fiasco, that it had been stolen, and I
2  just wanted to let her know.  And actually, I think
3  at the point when I contacted her, that was after
4  the police had said hold off, guys, don't call
5  insurance companies, don't call the attorneys yet.
6  We want to see if we can get this all handled
7  through the district attorney.  And then I wasn't
8  getting the type of response from them that I
9  wanted.  I was getting pretty nervous that my boat
10  was out in Rhode Island, and so what I did was I
11  said, okay, enough is enough and I called Acadia --
12  not Acadia, but I called Blackadar to make sure that
13  they understood the situation.
14        And at that point she said they
15  would, she was going to call Acadia and then Acadia,
16  in turn, got in touch with me.  So I'm thinking that
17  was in later September after we already had
18  conversations with the police.
19   Q.  So somebody from Acadia contacted you?
20   A.  Yes.
21   Q.  Was that Mr. Howe?
22   A.  He's the only person I ever spoke with
23  from Acadia.
24   Q.  Other than the time that you spoke to him

Page 60

1  on the phone and provided a statement on the phone,
2  did you talk to him at any other time?
3    A.  No, I don't think so.  Just to deal with
4  this.
5    Q.  Have you ever talked to anybody at Acadia
6  at any other time?
7    A.  No.
8    Q.  After you received a letter from Acadia
9  saying that they couldn't cover your claim did you
10  call anybody either at Blackadar or at Acadia to
11  discuss that?
12   A.  I believe I called Blackadar to let them
13  know, because I wanted to find out what I should do
14  because my boat, I still owned it and I needed to
15  have it insured, I would assume.  And their
16  instruction to me was to keep it insured.
17   Q.  And so did you --
18   A.  And I kept it insured straight through
19  until after the court case in Rhode Island.
20   Q.  And then did you cancel the policy?
21   A.  I cancelled the policy once we, once I
22  signed over the title with my brother to Pam Jordan.
23   Q.  So in March of 2004?
24   A.  I believe that's probably -- I'm not sure

Page 61

1  of the date, but I'm assuming that's probably close.
2    Q.  Well, the date on the bill of sale is
3  March 23rd, 2004.
4    A.  Yeah. So it would be around then.
5    Q.  Within a couple weeks?
6    A.  I would think so, yeah.
7    Q.  And the Grady White that you now own --
8    A.  Yes.
9    Q.  -- is that insured with Acadia?
10   A.  It's insured with Acadia.
11   Q.  Have you had any instance or opportunity
12 to speak with anybody at Acadia regarding the Grady
13 White?
14   A.  No.
15   Q.  Have you had any problems with the
16 insurance on the Grady White?
17   A.  None. I haven't had any claims, though.
18   Q.  That's good.
19       MR. LANGER: Why don't we take a
20 couple minutes? I don't think I have much more.
21       (Recess 2:07-2:11 p.m.)
22       MR. LANGER: I don't have any other
23 questions.
24       CROSS EXAMINATION

Page 62

1  BY MR. SMITH:
2    Q.  Who was your attorney initially?
3    A.  Bert Snyder.
4    Q.  Okay.
5    A.  Looney & Grossman.
6    Q.  And then who else was your attorney, this
7  guy in Rhode Island?
8    A.  Patrick Dougherty.
9    Q.  Okay. Were you instructed by anybody not
10 to get the boat?
11   A.  Yeah. I was instructed pretty much by
12 everybody not to get the boat because --
13   Q.  Who do you mean by "everybody"?
14   A.  The police, people who had legal
15 backgrounds, and I believe my brother had spoken to
16 other people, too, who had instructed him. Their
17 advice to him was not to do it.
18   Q.  Was the people your brother spoke to the
19 governmental officials?
20       MR. LANGER: Objection. Leading.
21   Q.  Who did your brother speak to?
22   A.  Captain Agganis of the Coast Guard.
23   Q.  Captain Agganis of the Massachusetts
24 Environmental Police?

Page 63

1    A.  Yes.
2        MR. LANGER: Objection.
3        MR. SMITH: Just trying to get you
4  the right department.
5    Q.  Any other people that you know of?
6    A.  No. It was just the overall consensus was
7  not to do that because if we did, we would be sued
8  and then we could lose our boat.
9    Q.  Exhibit number -- you gave a recorded
10 statement to Acadia, right?
11   A.  Yes, I did.
12   Q.  And who took that statement?
13   A.  Isaac Howe.
14   Q.  Did you have a conversation, you had a
15 conversation before he took the recorded statement,
16 correct?
17   A.  Yes.
18   Q.  And then you took the recorded statement?
19   A.  Yes.
20   Q.  And then you had some additional
21 conversation with him after that?
22   A.  Yes.
23   Q.  What did you tell him in that part after
24 the recorded statement?

Page 64

1    A.  One thing that was definitely worth
2  mentioning is I told him, he never asked me about
3  the bill of sale that my brother and I had put
4  together in anticipation of a close, and after the
5  recorder was off I brought it up to him. I said,
6  you know, there was a bill of sale that my brother
7  and I had put together. And he asked, well, did she
8  sign it? I said no. He said, well, then it doesn't
9  matter. And that was the end of the conversation.
10       MR. SMITH: Okay. I have nothing
11 further.
12       REDIRECT EXAMINATION
13 BY MR. LANGER:
14   Q.  You told Mr. Howe that you and your
15 brother had signed a bill of sale?
16   A.  Yes.
17   Q.  Did you provide Mr. Howe with a copy of
18 that bill of sale?
19   A.  He never asked me for it. I provided him,
20 I provided him the purchase and sale and I don't
21 recall the other stuff that I had had, but I -- the
22 bill of sale wasn't in the packet I sent to him and
23 because she hadn't signed it, I believe that's why I
24 didn't. It wasn't executed. That's why I didn't

16 (Pages 61 to 64)

Page 65

1  send it in. And then I asked him about it and I
2  asked him if he needed it and he said no. That's
3  the bill of sale that I was referring to in my
4  conversation with him.
5       MR. SMITH: For the record, you're
6  pointing to Exhibit 8.
7    Q. Other than the Salisbury police
8  department, who with a legal background told you not
9  to go get the boat?
10   A. I believe my attorney did.
11   Q. Which attorney is that?
12   A. Bert Snyder. I believe Tim McHugh, who I
13 had had, who's an attorney who I had some
14 conversations with had suggested that. And my
15 father's attorney, he doesn't, he wasn't -- it was
16 just in a conversation with him, suggested that we
17 not. He's actually the one who suggested we talk to
18 Tim McHugh.
19   Q. What's the name of your father's attorney?
20   A. Herb Cohen, Boston attorney.
21   Q. He was the one that suggested you talk to
22 Tim McHugh?
23   A. I believe so. Or it was somebody in
24 Herb's office that suggested it.

Page 66

1    Q. Did you talk with Mr. McHugh prior to the
2  lawsuit in Rhode Island being started?
3    A. Yes.
4    Q. Did you talk to Bert Snyder before the
5  lawsuit in Boston was started?
6    A. Before -- yeah. He was my attorney.
7    Q. Well, were you served with a copy of the
8  summons and complaint in the Rhode Island case and
9  then hired Mr. Snyder or did you hire him before the
10 lawsuit was served on you?
11   A. I believe I had been kind of going out
12 trying to get advice and Bert was one of the
13 attorneys I had spoken to. And then once I was, had
14 those papers sent to me, that's when I called Bert
15 back.
16   Q. Did you hire him before the papers were
17 sent to you to be your attorney?
18   A. No. I think once I was being sued, that's
19 when I needed the attorney.
20   Q. When you talked with Tim McHugh, did you
21 hire him to be your attorney at that point?
22   A. No. It was a consultation over the phone.
23   Q. What did Mr. McHugh tell you about going
24 to get the boat in Rhode Island?

Page 67

1       MR. SMITH: Well, objection. Well,
2  he took, obviously, the advice not to, he already
3  stated that. But after that you are getting into
4  attorney/client privilege.
5       MR. LANGER: Wasn't his attorney.
6       MR. SMITH: He paid him.
7       THE WITNESS: I paid him.
8       MR. SMITH: He paid and then you
9  have, you should have the bill for that.
10      MR. LANGER: Tim McCue?
11      MR. SMITH: Yeah.
12   Q. You paid him for the time you spoke with
13 him on the phone before you hired him?
14   A. I never hired him. I spoke with him on
15 the phone and he charged me for it.
16   Q. He sent you a bill?
17   A. Yeah. Everybody sends you bills.
18      MR. KEVIN GAFFEY: He certainly did.
19 And a Merry Christmas, too.
20   A. I believe it was $236 or something like
21 that, so it must have been a ten-minute phone
22 conversation.
23      MR. LANGER: I have no other
24 questions.

Page 68

1       MR. SMITH: I'm all set.
2       MR. LANGER: Again, I'll maintain
3  the original exhibits.
4       (Whereupon, the deposition in the
5        above-entitled matter was concluded
6        at 2:20 p.m.)

17 (Pages 65 to 68)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

1ab02fe5-8786-43f6-b0ca-ac823c37156c

Page 69

```
 1              CERTIFICATE
 2   I, BRIAN H. GAFFEY, do hereby certify under the
     pains and penalties of perjury that I have read the
 3   foregoing transcript of my testimony given on
     November 18, 2005, and I further certify that said
 4   transcript is a true and accurate record of said
     testimony (with the exception of the following
 5   corrections listed below):
 6   Page      Line      Correction
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22   Dated at              , this
23   day of          , 2005.
24
```

Page 70

```
 1   COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF SUFFOLK
 2
 3
         I, HEIDI B. STUTZ, Certified Shorthand
 4   Reporter No. 146599S and Notary Public duly
     commissioned and qualified in and for the
 5   Commonwealth of Massachusetts, do hereby certify
     that BRAIN H. GAFFEY, the witness whose testimony is
 6   hereinbefore set forth, came before me on the 18th
     day of November, 2005, at 12:50 p.m., who was by me
 7   duly sworn to testify to the truth and nothing but
     the truth of his knowledge touching and concerning
 8   the matters in controversy in this case; that he was
     thereupon examined upon his oath, and his
 9   examination reduced to typewriting under my
     direction; and that the transcript is a true record
10   of the testimony given by the witness to the best of
     my knowledge, skill and ability.
11
         I further certify that I am neither
12   attorney nor counsel for, nor related to or employed
     by any of the parties to the action in which this
13   deposition is taken; and further that I am not a
     relative or employee of any attorney or counsel
14   employed by the parties hereto or financially
     interested in the action.
15
         IN WITNESS WHEREOF, I have hereunto set
16   my hand this 21st day of November, 2005.
17
18
19
20
21       HEIDI B. STUTZ
22
23
24
```

18 (Pages 69 to 70)