# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 04-CV-12354-RGS

| | |
|---|---|
| BRIAN AND KEVIN GAFFEY | ) |
| | ) |
| Plaintiffs | ) |
| v. | ) |
| | ) |
| ACADIA INSURANCE | ) |
| COMPANY | ) |
| | ) |
| Defendant | ) |

### DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED STATEMENT OF MATERIAL FACTS

NOW COMES Defendant, Acadia Insurance Company ("Acadia"), by and through its counsel, Tompkins, Clough, Hirshon & Langer, P.A., and pursuant to Rule 56, F.R.Civ.P., and Rule 56.1, Local Rules of the United States District Court for the District of Massachusetts, respectfully moves this Honorable Court for summary judgment in its favor and against Plaintiffs, Brian Gaffey and Kevin Gaffey.

The grounds for this motion are that there is no genuine issue of material fact as to whether there was a "theft" of Plaintiffs' vessel within the terms of Acadia's insurance coverage, and that Acadia is entitled to judgment as a matter of law, as set forth more fully in Acadia's accompanying Memorandum of Law.

In support of this motion, Acadia relies on the pleadings and the depositions of Brian Gaffey and Kevin Gaffey, with exhibits, as cited below.

STATEMENT OF MATERIAL FACTS

1.  Plaintiffs owned a 1999 Aquasport vessel, Massachusetts Registration No. MS 5532 B.  *See* Complaint, ¶5.

2.  Acadia issued to Plaintiffs a yacht policy, Policy No. YPA 0071550-11, for their vessel, for the policy period from October 10, 2002 to October 10, 2003.  *See* Plaintiffs' Exhibit G.

3.  The policy states in pertinent part:

> LOSSES COVERED – Subject to all terms, conditions and exclusions set forth elsewhere in this policy and to limitations as to the amount set forth below and on the Declaration Page, Section A, we will pay for the following which occurred during the policy period:
>
> 1.  Sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause[.]
> …
> LOSSES NOT COVERED – We will not pay any loss, damage or expense caused by or resulting, whether exclusively or concurrently, from:
> …
> 3.  Theft or the unexplained disappearance of insured property from the 3yacht, unless there are visible marks of forcible entry or removal, or the entire yacht is stolen[.]

*See id*. 2, 4.

4.  The policy further provides, with respect to total loss or total constructive loss: "You will, if we ask, transfer title of that property to us or to a salvage buyer designated by us."  *See id*. at 3.

5.  Additionally, the policy provides:

> TRANSFER OF INTEREST – If you give, sell, conditionally sell, transfer, mortgage or pledge the insured yacht or any interest in it, policy coverage will terminate without notice to you unless such change is accepted by us in writing.

*See id*. at 8.

6. The Gaffeys purchased the vessel for $24,000.00. *See* Deposition of Kevin Gaffey ("Kevin Dep.") at 21 and Exhibit 3; Deposition of Brian Gaffey ("Brian Dep.") at 14.

7. In May 2003, the Gaffeys entered into an agreement with Dale Friedman, a boat broker with Sea Dog Yacht Sales, whereby Friedman would attempt to sell their Aquasport or, if he could not do so, buy it from them for $24,000.00, subject to the Gaffeys purchasing a Mako motor yacht from Friedman. *See* Kevin Dep. at 27; Brian Dep. at 20.

8. The agreement between the Gaffeys and Friedman was oral. *See* Kevin Dep. at 29-30; Brian Dep. at 18.

9. The Gaffeys understood that pursuant to their agreement, Friedman would market their vessel. *See* Kevin Dep. at 28-29.

10. The Gaffeys furnished Friedman with pertinent data on the vessel, such as length and beam, fuel tank capacity, what equipment came with the boat, and where the boat was located. *See id.* at 31-33; Brian Dep. at 21.

11. In May 2003 Kevin Gaffey reviewed an advertisement for the Aquasport generated by Friedman, incorporating the pertinent information. *See* Kevin Dep. at 30-31 and Exhibit 4.

12. As of May 2003, the Gaffeys were prepared to sell their vessel through Friedman. *See id.* at 34.

13. In July or August 2003, Friedman called Kevin Gaffey and advised that he had an interested buyer who was willing to pay $27,000.00 to $30,000.00 for the boat. *See id.* at 35, 38.

14. The Gaffeys decided to pursue this prospect. *See id.* at 41.

3

15. Friedman sent the Gaffeys a purchase and sale agreement, indicating that the buyer was Pamela Jordan of Cranston, Rhode Island, that the purchase price was $27,000.00, and that Friedman would receive a ten percent commission. *See id.* at 42 and Exhibit 5.

16. The Gaffeys deemed the purchase price to be fair and acceptable. *See id.* at 38; Brian Dep. at 31.

17. The Gaffeys agreed that Kevin would sign the purchase and sale agreement on behalf of both of them; and he did so on August 11, 2003. *See id.* at 43, 45 and Exhibit 5.

18. The Gaffeys understood that they were authorizing Dale Friedman to proceed with the sale and to pay him a commission as their broker. *See id.* at 44.

19. On August 13, 2003 Kevin Gaffey obtained a payoff statement on the secured loan for the Aquasport and provided the payoff statement to Friedman. *See id.* at 48 and Exhibits 6-7.

20. On August 16, the Gaffeys executed and delivered to Friedman a Sellers Final Accounting, setting forth how the sale proceeds would be distributed. *See id.* at 49, 52 and Exhibit 6; Brian Dep. at 32.

21. On August 17 both of the Gaffeys signed a notarized bill of sale, selling the Aquasport to Ms. Jordan for $27,000.00. *See* Kevin Dep. at 55 and Exhibit 8; Brian Dep. at 34.

22. The Gaffeys gave the signed purchase sale agreement and the signed bill of sale to Dale Friedman. *See* Kevin Dep. at 57-58.

23. The Gaffeys authorized Dale Friedman to move the Aquasport from the marina where they had been keeping the vessel to Friedman's place of business. *See id.* at 58-59.

24. The Gaffeys authorized Friedman to operate the vessel and to conduct sea trials in connection with Ms. Jordan's purchase of the vessel. *See id.* at 59-60.

25. The Gaffeys told Friedman that the keys were in the boat. *Id.* at 60.

26. The night after the Gaffeys realized that neither Friedman nor the Aquasport were still at Sea Dog Yacht Sales, Brian Gaffey called Ms. Jordan; and she confirmed at that time that she had paid for and taken possession of the vessel. *See id.* at 76-77; Brian Dep. at 42.

27. Ms. Jordan confirmed that she had wired the $27,000.00 purchase price directly to Friedman's account. *See* Brian Dep. at 42.

28. The Gaffeys and Ms. Jordan each felt they had been victimized by Friedman, who had similarly victimized others. *See id.* at 36, 44, 47.

29. As a result of the initial phone call to Ms. Jordan, the Gaffeys knew from then on where the vessel was and that it was safe. *See id.* at 43, 45, 52.

30. The Gaffeys realized they had the ability to repossess the Aquasport; according to Brian Gaffey, "at the time I knew I could have gone down there probably and got it." *Id.* at 45.

31. The Gaffeys refrained from taking back the Aquasport, because they had been advised by both the police and a number of lawyers that if they did so, they could be sued by Ms. Jordan and could lose their boat. *See id.* at 62-63, 65.

32. On August 29, after Friedman's defalcation, Kevin Gaffey paid off the loan on the Aquasport, and the bank mailed him the title. *See* Kevin Dep. at 66-68.

33. Also on August 29, the Gaffeys signed a statement with the Salisbury Police Department, stating: "We have not received $24,300.00 from sale; - cash was paid by wire from buyer to Sea Dog – Dale Friedman in second week of August." *See* Plaintiff's Exhibit D at Bates Stamp 87.

34. Ms. Jordan sued the Gaffeys in Rhode Island over title to the vessel; but the Gaffeys succeeded in having the suit dismissed for lack of personal jurisdiction. *See id.* at 81-82.

35. The Rhode Island Court dismissed the case without prejudice, with the expectation that Ms. Jordan would re-file in Massachusetts. See Plaintiff's Exhibit D at Bates Stamp 132.

36. Shortly thereafter, the Gaffeys and Ms. Jordan came to an out-of-court resolution, whereby the Gaffeys received a total of $12,000.00 from Ms. Jordan and her broker in exchange for a release and the transfer of title to the vessel. *See id.* at 84 and Exhibits 10-11; Brian Dep. at 57-58.

37. The Gaffeys executed a new bill of sale dated March 23, 2004, selling the Aquasport to Ms. Jordan "for the sum of $27,000.00." *See* Kevin Dep. at 85 and Exhibit 12; Brian Dep. at 57.

38. The Gaffeys concede that Ms. Jordan did not commit any theft; rather, Friedman committed theft. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment at 10.[1]

Dated at Portland, Maine this 10th day of February, 2006.

                                         ACADIA INSURANCE COMPANY

                                         By its Counsel:

                                         /s/Leonard W. Langer

                                         /s/Marshall J. Tinkle
                                         BBO# 565513

---

[1] A statement made by a party through counsel in connection with litigation constitutes admissible evidence. *See*, *e.g.*, *United States v. Amato*, 356 F.3d 216, 220 (2d Cir. 2004); F.R. Evid. §801(d)(2)(D).

TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
(207) 874-6700
lwlanger@tchl.com

**CERTIFICATE OF SERVICE**

    I, Leonard W. Langer, hereby certify that on February 10, 2006, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  David S. Smith Esq., Cianciulli & Ouellette, 163 Cabot St., Beverly,  01915, counsel for Plaintiff.

                                                /s/  Leonard W. Langer

Acadia/Gaffey
Cross-mot. For SJ