# EXHIBIT A

1

```
 1                                    Volume: I
                                      Pages: 1-91
 2                                    Exhibits: 1-13

 3                 UNITED STATES DISTRICT COURT

 4                 DISTRICT OF MASSACHUSETTS

 5

 6     BRIAN GAFFEY AND KEVIN GAFFEY,
                      Plaintiffs
 7
               vs.                      Docket No.
 8                                      CA 04CV12354-RGS
       ACADIA INSURANCE COMPANY,
 9                      Defendant

10

11

12               DEPOSITION of KEVIN GAFFEY, a
       witness called by and on behalf of the Defendant,
13     taken pursuant to the Federal Rules of Civil
       Procedure, before Heidi B. Stutz, Certified
14     Shorthand Reporter No. 146599S and Notary Public in
       and for the Commonwealth of Massachusetts, at the
15     offices of Cianciulli & Ouellette, 163 Cabot Street,
       Beverly, Massachusetts, on Friday, November 18,
16     2005, commencing at 9:55 a.m.

17

18

19

20

21

22

23

24
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

2

```
 1   APPEARANCES:

 2        DAVID S. SMITH, ESQ.
          Cianciulli & Ouellette
 3        163 Cabot Street
          Beverly, Massachusetts 01915
 4             on behalf of the Plaintiffs

 5        LEONARD W. LANGER, ESQ.
          Tompkins, Clough, Hirshon & Langer, P.A.
 6        Three Canal Plaza
          P.O. Box 15060
 7        Portland, Maine 04112-5060
          207-874-6700
 8             on behalf of the Defendant

 9   ALSO PRESENT:  Barbara Taylor
                    Brian Gaffey
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

3

```
1                        I N D E X

2
    WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS
3

4   KEVIN GAFFEY        4        86

5
    EXHIBITS:              DESCRIPTION              PAGE
6

7    1      Amended Notice of Taking
            Deposition                              4
8
     2      Boat Registration                       9
9
     3      Sales Agreement                        20
10
     4      Web page ad                            29
11
     5      Fax dated 8/11/03 with P&S             42
12
     6      Bank Loan Payoff & Seller's Final
13          accounting                             47

14   7      Promissory Note                        54

15   8      Bill of Sale                           54

16   9      Bill of Sale                           62

17   10     Certificate of Title                   67

18   11     General Release                        84

19   12     Bill of Sale                           84

20   13     Portion of 1/9/04 transcript
            (Cover page & pgs 34 & 35)             88
21

22

23

24   ***ALL EXHIBITS KEPT BY ATTORNEY LANGER***


              HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
                        617-523-1874
```

4

1                    P R O C E E D I N G S

2                    (Deposition Exhibit No. 1

3                    premarked for identification.)

4    Whereupon:

5                    KEVIN P. GAFFEY,

6    having been satisfactorily identified and duly sworn

7    by the Notary Public, was examined and testified as

8    follows:

9                    DIRECT EXAMINATION

10        BY MR. LANGER:

11        Q.    Good morning, Mr. Gaffey.

12        A.    Good morning.

13        Q.    My name is Leonard Langer.  I represent

14    Acadia Insurance Company in the action that's been

15    brought on behalf of you and your brother in the

16    United States District Court for the District of

17    Massachusetts.

18                    I'm going to ask you a series of

19    questions this morning.  If you don't understand any

20    of my questions, please feel free to ask me to

21    repeat it until you do understand it.  Please wait

22    until I finish my question before you answer it even

23    though you may know what the question is after I get

24    two or three words out, because it's difficult for

1    the court reporter to take down two of us talking at

2    the same time.  Please try and make sure you answer

3    verbally rather than a shake of your head or even an

4    uh-huh, because again that's difficult for the court

5    reporter to take down.  If Mr. Smith objects to any

6    of my questions, please wait until he finishes his

7    objection and then answer the question, unless he

8    instructs you not to answer the question.  If you

9    want to take a break at any time, just let me know

10   and we'll try and accommodate you as best we can.

11              Do you understand those guidelines.

12       A.   I understand the guidelines.

13       Q.   Okay.  Are they satisfactory to you?

14       A.   They are fine, indeed.

15              MR. SMITH:  Usual stipulations?

16              MR. LANGER:  That's fine.  Those are

17   all objections save as to form until trial.

18              MR. SMITH:  Yes.

19              MR. LANGER:  Usual stipulations

20   differ from --

21       Q.   Could you please state your full name and

22   address?

23       A.   It's Kevin Patrick Gaffey and it's 13

24   Timber Lane, Topsfield, Mass. 01983.

6

1          Q.    And your date of birth is ███████████?

2          A.    That's correct.

3          Q.    And your social security number is

4    ███████████?

5          A.    That's correct.

6          Q.    Are you currently taking any kind of

7    medication that would impede your ability to

8    understand or answer my questions?

9          A.    Not to my knowledge, no.

10         Q.    What documents did you review in order to

11   prepare for the deposition here today?

12         A.    What documents?  Could you please repeat

13   that?

14         Q.    Sure.  What documents, what written

15   materials, if any, did you review in order to

16   prepare for your deposition today?

17         A.    I believe the entire case matter, all the

18   evidence, exhibits, my deposition, the trial, my

19   testimony.

20         Q.    That was down in Rhode Island?

21         A.    In Rhode Island, right.

22         Q.    Did you review the documents that your

23   attorney recently produced in this case?

24         A.    I reviewed everything that I think is

7

1    pertinent, yes.

2         Q.   Okay.  Let me show you what's been marked

3    as Exhibit No. 1, which is the notice of deposition

4    for today's deposition.

5                   (Document handed to witness.)

6         Q.   Have you seen that before?

7         A.   Let's see.  Yes, I did.  This was e-mailed

8    to me, right.

9         Q.   Okay.  And attached to the notice is a

10   request that you produce a number of categories of

11   documents.

12        A.   Right, absolutely.

13        Q.   And I will represent to you that Mr. Smith

14   recently produced a package of materials.  Are you

15   aware of any other documents that you have not

16   provided to your counsel that would be responsive to

17   the notice of deposition?

18        A.   No.  These are in fact the listing of all

19   the documents that I reviewed the other night.

20        Q.   Okay.

21        A.   And they are all the documents that I know

22   of relating to the case.

23                   MR. LANGER:  David, you're not aware

24   of any other documents?

8

1              MR. SMITH:  No, I am not.  I've

2    given you everything.  The only thing I didn't give

3    you was a mortgage statement for the boat, or a loan

4    thing, but it wasn't really responsive to your

5    request.  If you want a copy of that, I'll give you

6    that.

7              MR. LANGER:  I would like a copy of

8    that.

9              MR. SMITH:  At a break I'll get it

10   for you.

11             MR. LANGER:  Okay.

12       Q.   Mr. Gaffey, let me just ask you to turn to

13   paragraph 5 of the notice or attached, the document

14   request.

15       A.   Okay.

16       Q.   It asks specifically for the 2002-2003

17   registration for the 1999 Aquasport.  The document

18   that was produced --

19       A.   Is the current one.

20       Q.   Says expires August 28, 2005.  To your

21   knowledge, do they issue a new registration for

22   every year?

23       A.   I want to say that it's every two years.

24   I thought that's -- that's what I thought it was.

9

1      Q.    Okay.   Is there, to your knowledge, a

2   registration that was in effect in 2002-2003 that

3   would be different than the one that expired in

4   August of 2005?

5      A.    Looking at what you have there, that one

6   was renewed.   That was the one that I had just

7   renewed, so the one that you're asking about in '02

8   and '03, that would have been prior to this.

9             MR. LANGER:   Okay.   Maybe we should

10   just mark this since we're talking about it.

11             (Deposition Exhibit No. 2

12               marked for identification.)

13      Q.    Let me show you what's been marked as

14   Exhibit No. 2, which is the registration that

15   indicates it expires in August 28th of 2005.

16      A.    Right.

17      Q.    Is it your understanding that there would

18   have been a separate registration that was in effect

19   in 2002-2003?

20      A.    I know in fact that there was, because I

21   renewed it.   And this was -- I believe I renewed it

22   in August of '03.

23      Q.    Do you have a copy of that registration in

24   your files?

10

```
1        A.   It's not in my files, no.

2        Q.   So you don't have a copy of the

3   registration, to the best of your knowledge?

4        A.   To the best of my knowledge, I don't have

5   one.  I may have discarded it at the time because

6   this was the most valid, this was the valid document

7   to use.

8        Q.   Does your signature appear on Exhibit 2?

9        A.   That's my signature.

10       Q.   Can you tell me why you were renewing the

11  registration for the 1999 Aquasport -- strike that.

12            The registration that you are

13  renewing is not for the same vessel that you allege

14  was stolen in 2003, is that correct?

15       A.   Wait a second.  Could you repeat that

16  again?

17       Q.   Let me ask this, what boat did you just

18  renew the registration for that's marked as Exhibit

19  No. 2?

20       A.   This registration, if I can -- let me take

21  a look at that.

22       Q.   Sure.

23       A.   Because we're spending a lot of time on

24  this.  Okay.  MS5532B is the Aquasport at the time
```

11

1    that we owned that was a Mass. registration.   So

2    that was the boat in issue.

3         Q.   Can you -- so this is the boat that you're

4    alleging was stolen in August of 2003?

5         A.   That is true.

6         Q.   Can you tell me why -- let me strike that.

7              When was this registration that

8    expires in August of 2005, when was that

9    registration renewed?

10        A.   That -- well, there's a process with this.

11   The Massachusetts Department of Fish and Wildlife

12   Environmental Law, they send out a form, I think

13   it's a couple months prior to the expiration.   And

14   you send it back and with the fee and they send you

15   out a form and then I signed it.   That's -- so it

16   was probably a couple months prior to this date at a

17   minimum.

18        Q.   So would that, when would you have sent

19   that in?

20        A.   I'd have to say during the summer.

21        Q.   Of which year?

22        A.   Of 2003, I believe.

23        Q.   So this registration, Exhibit No. 2, would

24   have been effective in August of 2003, to the best

12

1    of your knowledge?

2          A.   Yeah, yeah.  There was no, there was no

3    gap in the registrations or anything of that.

4          Q.   To the best of your knowledge, is Exhibit

5    No. 2 a true and accurate copy of the registration

6    that you signed for the 1999 Aquasport?

7          A.   Yes.

8          Q.   Have you ever been deposed before, Mr.

9    Gaffey?

10         A.   No.

11         Q.   Not in this case or any other case?

12         A.   I don't know the true definition of

13   "deposition" or "being deposed," but not like this,

14   no.

15         Q.   Other than the testimony that you gave in

16   Rhode Island back in early 2004, I believe --

17         A.   Right.

18         Q.    -- have you ever given testimony under

19   oath before in any proceeding?

20         A.   Yes.

21         Q.   What type of proceeding was that?

22         A.   Actually, let me think about that.  The

23   only reason why I said yes was because I was a juror

24   in Newburyport.  I don't know if that was oath or

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

13

1    not.

2         Q.   Fortunately jurors don't have to testify.

3         A.   Yeah.  So I'd say no, I can't say that I

4    have.

5         Q.   Okay.  So other than the one time in Rhode

6    Island in a related case to this case, you've never

7    provided testimony under oath before?

8         A.   It's been a long life.  You know, there

9    may have been one time when I worked for my father

10   when someone assaulted a customer in the store and I

11   had to provide testimony as being a witness.

12        Q.   Okay.

13        A.   That may have been one, one time that I

14   can remember.  I think that's about all.

15        Q.   Have you ever been a party to a lawsuit

16   other than this one?

17        A.   No, not that I can recall.

18        Q.   Other than the documents you reviewed in

19   preparation for the testimony today, have you ever

20   reviewed other documents related to either your

21   ownership or the sale of the 1999 Aquasport?

22        A.   I don't know that, if I understand that

23   question.

24        Q.   Okay.  Other than the documents you

14

1    reviewed to prepare for your testimony here today,

2    which have been produced and you've identified them,

3    have there ever been any other documents that you've

4    reviewed, read, seen, that relate either to your

5    ownership of the 1999 Aquasport or which relate to

6    its disappearance and ultimately its sale in either

7    August of '03 or March of '04?

8         A.    No.

9         Q.    Other than Mr. Smith, did you talk to

10   anybody else to help you prepare for your testimony

11   today?

12        A.    Today?

13        Q.    Not just today, but in order to prepare

14   for your testimony today have you talked to anybody

15   other than Mr. Smith?

16        A.    I've discussed with it my brother.  He was

17   my partner in the ownership of the boat.

18        Q.    Other than talking to your brother with

19   Mr. Smith present, when was the last time you talked

20   to him about the testimony you thought you might be

21   giving today?

22        A.    Talk to who?

23        Q.    Your brother.

24        A.    Other than today?

15

1          Q.    Other than with Mr. Smith present.

2          A.    Oh.  Last night.

3          Q.    What did you and your brother discuss last

4     night?

5          A.    We just reviewed the facts on the case.

6          Q.    As best you can recall, what did you talk

7     about?

8          A.    Well, we talked about -- let me think.  We

9     talked about -- I can't even think what we talked

10    about.  I don't even know.  We were just having

11    dinner up at -- what was the name of that place?  I

12    don't know.  It was just conversation at dinner.

13         Q.    Other than your brother and Mr. Smith, did

14    you talk to anybody else about the testimony you

15    might be giving today?

16         A.    No.

17         Q.    Briefly describe for me your educational

18    history.

19         A.    I have a Bachelor of Arts.

20         Q.    From which institution?

21         A.    New England College.

22         Q.    When did you receive your Bachelor of

23    Arts?

24         A.    In 1990.

16

1          Q.    And when did you graduate from high

2    school?

3          A.    In 1986.

4          Q.    And from which high school?

5          A.    Masconomet Regional High School, Boxford.

6          Q.    Have you had any formal education beyond

7    New England College?

8          A.    No.

9          Q.    Would you describe for me your work

10    history from the time you finished college in 1990

11    up until the present?

12          A.    Let's see.

13          Q.    Generally.  I don't need it to the day or

14    hour.

15          A.    I'm trying here.  All right.  Generally I

16    worked for Mass. General Hospital Partners Health

17    Care for ten years as an accountant, cash

18    management, general financial accounting skills.

19    And now I'm working with Brookwood Financial

20    Partners here in Beverly.  It's a venture capital

21    firm.  I'm doing general accounting.

22          Q.    So you worked at MGH from 1990 to about

23    2000?

24          A.    It was -- exact dates were I'd say '91 to

1    '99.  Prior to that I was working for my father, he

2    was self-employed, as a clerk, stock hand.

3        Q.    What type of store?

4        A.    Convenience store.

5        Q.    Whereabouts?

6        A.    He had three, so it was during summers and

7    weekends I'd work between Salem, Danvers and Malden.

8        Q.    Okay.  And then in 1999 you moved from MGH

9    to Brookwood Financial?

10       A.    That's correct, yeah.  That was in

11   November.

12       Q.    Are you a CPA?

13       A.    No, I'm not.

14       Q.    Describe for me your experience with

15   owning vessels.

16       A.    Okay.  Well, I have to say that my

17   experience has been generally good.

18       Q.    That's good.  When was the first time you

19   owned a vessel?

20       A.    First time I owned a vessel was this

21   particular one in question and it was a partnership

22   with my brother.

23       Q.    Is that the only vessel that you have ever

24   owned?

18

```
 1          A.    No.   I am also a joint owner in a boat
 2     right now, as well.
 3          Q.    What type of vessel is that?
 4          A.    It's a pleasure craft.
 5          Q.    What's the size?
 6          A.    It is 26.11 is the, I believe that's the
 7     LOA on it.
 8          Q.    Okay.  And what's the manufacturer?
 9          A.    It's a Grady White.
10          Q.    And when did you acquire the Grady White?
11          A.    I want to say it was -- let's see.  This
12     was our second year on it.
13          Q.    So sometime in 2004?
14          A.    Yeah, it was in I want to say April or
15     May.
16          Q.    And are you the sole owner?
17          A.    No, I'm not.
18          Q.    Who are the other owner or owners?
19          A.    My father and my brother.
20          Q.    Your brother Brian?
21          A.    Yes, my only brother.
22          Q.    And your father's name is?
23          A.    Patrick Gaffey, Patrick Hugh.
24          Q.    Other than those two boats, have you ever
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

19

1    owned any other vessels?

2        A.    In terms of ownership, no.

3        Q.    What's your experience with other vessels

4    either in your family or friends, relatives that

5    might have had --

6        A.    Well, before this boat in question my

7    brother owned a boat which was an Aquasport.  It was

8    a 19-foot center console downsized from this one.

9    He owned it for a few years.  And we used that boat

10   and it pretty much got us introduced to boating.

11       Q.    How long, if you know, did Brian own the

12   19-foot Aquasport?

13       A.    Gee, I couldn't tell you exactly.  I think

14   it was somewhere in the neighborhood of five years.

15       Q.    Okay.  Other than your brother's Aquasport

16   and the two boats you've had an ownership in, have

17   you used other boats or had experience on other

18   boats?

19       A.    I'd have to say no.

20       Q.    Now, as I understand, in 2001, in August

21   of 2001 you and your brother purchased a 1999

22   Aquasport?

23       A.    If that's the one -- I'm not sure if

24   that's the year that it was manufactured.  Is this

20

1    the boat you're referring to (indicating)?

2                    MR. LANGER:  Mr. Gaffey is referring

3    to Exhibit No. 2.

4        Q.    Yes.

5        A.    Okay, 1999.

6        Q.    I believe it refers here to a 1999

7    Aquasport.

8        A.    Okay, yeah, that's the one.

9        Q.    So you purchased that in August of 2001?

10       A.    Yes, if that's what my bill of sale said

11   with Shawn Perkins.  These dates are all running

12   together for me.

13                   MR. LANGER:  Would you mark that as

14   Exhibit 3?

15                   (Deposition Exhibit No. 3

16                     marked for identification.)

17       Q.    Let me show you what's been marked as

18   Exhibit No. 3 and ask if you recognize that

19   document.

20                   (Document handed to witness.)

21       A.    Definitely recognize this document.

22       Q.    Is that the bill of sale when you and your

23   brother acquired the 1999 Aquasport?

24       A.    Yes, it is.

21

1        Q.    Is that your signature at the bottom?

2        A.    Yes, it is.

3        Q.    Purchase price for the vessel was $24,000?

4        A.    Yeah, that's exactly what it is.

5        Q.    Do you recall how that purchase price was

6    arrived at?

7        A.    To tell you the truth, my brother

8    negotiated that sale price.  My recollection of that

9    is he identified that as a potential -- we were

10   discussing a boat to buy, to move up from the

11   19-foot that he had owned, maybe together, and we

12   thought, he thought that this was a boat that we

13   could look at and he identified it in the newspaper.

14       Q.    So he was the one that negotiated the

15   price and the conditions?

16       A.    Yeah.  He was, Brian's pretty savvy that

17   way as far as knowing what boats were going for and

18   things like that.

19       Q.    Okay.  And were you involved after you

20   purchased the boat in arranging for insurance for

21   the boat or is that something that Brian did?

22       A.    Brian worked on the insurance on that

23   boat, as well.

24       Q.    Okay.

22

```
 1        A.   I was really secondary there.  I was

 2   paying the bills.

 3        Q.   Sounds like a good deal.

 4              Do you know what the vessel was

 5   insured for back in 2001?

 6        A.   Well, I knew, I knew that when we had it

 7   surveyed the surveyor valued it a lot higher than

 8   what we purchased it for and then I realize that --

 9   well, from that point, I believe that's what we had

10   the boat insured for was the amount that it was

11   surveyed for.  But Brian handled that part of it, as

12   well.

13        Q.   Okay.  Were you involved at all in making

14   the decision to have the vessel surveyed?

15        A.   Yes.

16        Q.   Was the boat surveyed before or after you

17   purchased it?

18        A.   Before.

19        Q.   And based on the survey, you agreed to

20   purchase the boat?

21        A.   Yes.

22        Q.   Or at least in part on the survey?

23        A.   It was -- I think, I mean, I speak for

24   myself that it was due to the survey that we decided
```

23

1    to purchase the boat because it came back clean.

2    They told us it was a good boat, it was a good

3    investment.

4         Q.    Now, between August of 2001 and May of

5    2003 --

6         A.    Can you repeat those dates again?

7         Q.    Sure.  August 2001, which was when you

8    purchased the boat, and May of 2003, just describe

9    for me generally your use of the boat.

10        A.    I mean, weekends, days off, fishing, just

11   having a good time and enjoying life.

12        Q.    Would you use it every weekend or every

13   other weekend?

14        A.    Not every weekend, no.  You know, these

15   boats that I've owned, my mission isn't to use them

16   every time or every minute that I have off or spare.

17   I just want them available if I want to go boating

18   that day.  I don't know if that answers your

19   question.

20        Q.    Would you say that you would use it more

21   or that your brother would use it more?

22        A.    Well, during those days I think we used it

23   equally.  Today it's a little bit different with the

24   boat that we own now.

24

1       Q.    Why is that?

2       A.    Because Brian has twins and I don't.

3       Q.    Okay.  Now, in May of 2003 you made a

4    decision to sell the boat, is that correct?

5       A.    In May of 2003.  I don't know if we

6    actually made a decision to sell the boat.  I think

7    we were thinking of selling the boat.  The decision

8    to sell the boat hadn't been made.

9       Q.    Did you talk with Dale Friedman at Sea Dog

10   Boat Sales or Yacht Sales in May of 2003 about

11   selling the Aquasport and purchasing a Mako?

12      A.    I was there for the discussions.  I know

13   Brian worked the deal at that time when we met Dale.

14      Q.    When was the first time you met Dale

15   Friedman?

16      A.    I couldn't even tell you.  I would have to

17   say in and around that time frame.

18      Q.    Mr. Friedman wasn't involved when you

19   purchased the Aquasport in 2001?

20      A.    Absolutely not.  I don't even know if he

21   even existed.

22      Q.    "He" being Sea Dog Yacht Sales?

23      A.    Yeah, yeah.

24      Q.    Okay.  So were you the one that made

25

1    contact with him in May of 2003 or was that your

2    brother that contacted him?

3        A.    Contacted Dale Friedman?

4        Q.    Yes.

5        A.    I don't know.  That's a tricky question to

6    answer.  I'd have to say, you know, that Brian and

7    I, we used to spend time driving the marinas that

8    would, had boats for sale and we were always, you

9    know, looking to see if there was a deal that we

10   could do.  I couldn't, I don't even know how to

11   answer that question.

12       Q.    What's your first recollection of talking

13   to Mr. Friedman?

14       A.    Probably during that, during that process.

15       Q.    And describe for me as best you can recall

16   the first meeting you had or the first conversation

17   you had with Mr. Friedman sometime around May of

18   2003.

19       A.    I know that we were going to have a boat,

20   the Mako, surveyed and I liked the boat.  We thought

21   it was a step up from this Osprey.  This is just a

22   general, the direction.  I'm not sure if this

23   conversation actually took place or not with him,

24   but this was the direction of the sale or if there

26

1    ever was going to be one.  I know that they wanted a

2    deposit and I wrote them a check for a deposit.

3         Q.   "Them" being Sea Dog?

4         A.   Sea Dog, yeah.

5         Q.   All right.

6         A.   Pending a survey.

7         Q.   What was the check for, do you remember?

8         A.   It was for $3,900.

9         Q.   What was the purchase price of the Mako?

10        A.   From recollection, I can't tell you

11   exactly.  I think it was 10 percent.  It might have

12   been 39,000.

13        Q.   And Mr. Friedman was the broker for the

14   Mako?

15        A.   I believe so, yeah.

16        Q.   Were you willing to pay him a commission

17   for your purchase of the Mako had the purchase gone

18   through?

19        A.   If the purchase had gone through,

20   everything was going to be done by the books.  He

21   would have received his commission, yes.  And I

22   think that's what the $3,900 represented up front.

23        Q.   Now, was there an agreement with Mr.

24   Friedman that if you bought the Mako, he would act

                HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
                            617-523-1874

27

1    as the broker for the Aquasport?

2         A.   You know, you're getting into an area that

3    I don't know if there was an agreement or not.  I

4    know that Brian was, had discussions with him on it

5    and I know that he was going to buy our boat, but I

6    wasn't having, I wasn't negotiating with Dale.

7         Q.   So your brother handled the negotiations

8    with Mr. Friedman?

9         A.   More clearly, yeah.

10        Q.   Do you recall reaching an agreement with

11   your brother based on his conversations with Mr.

12   Friedman that Mr. Friedman was going to try and sell

13   the Aquasport and if he couldn't sell it, he'd buy

14   it from you for $24,000?

15        A.   Yes, yes, yes.

16        Q.   And that was all contingent on your buying

17   the Mako?

18        A.   Yes, I believe so.

19        Q.   Do you believe that $24,000 for the

20   Aquasport in May of 2003 was a fair price?

21        A.   Well, yeah.  I mean, that's what we

22   decided.  We weren't going to lose any money on the

23   deal.

24        Q.   Now, as I understand it, the Mako didn't

28

1    survey out?

2         A.    Right.

3         Q.    And so you made a decision not to buy the

4    Mako?

5         A.    That's correct.

6         Q.    And you got your deposit back?

7         A.    Yes.

8         Q.    And you and your brother and Mr. Friedman

9    parted ways at that point?

10        A.    Yes.

11        Q.    Now, when you were discussing the Mako

12   with Mr. Friedman did you authorize him to advertise

13   the Aquasport for sale?

14        A.    Authorize.  I don't believe I authorized

15   him.

16        Q.    I'm sorry, I didn't mean to interrupt you.

17        A.    Yeah, but I believe that there were some

18   photos on the web page.

19        Q.    You understood when you were discussing

20   the possibility of buying the Mako and were having

21   it surveyed that Mr. Friedman was going to market

22   your boat and so if you ended up buying the Mako,

23   he'd be able to either sell your boat or at least he

24   would take title to it?

29

1        A.    That's a fair assumption, yeah.

2                    MR. LANGER:  Can you mark that as

3    Exhibit 4?

4                    (Deposition Exhibit No. 4

5                     marked for identification.)

6        Q.    In May of 2003 --

7        A.    May of '03, okay.

8        Q.    -- do you recall signing any sort of

9    brokerage agreement or other agreement with Mr.

10   Friedman for the sale of the Aquasport?

11       A.    I can't say that I do.

12       Q.    Would it be fair to say that it was a

13   verbal agreement that you had with him with regard

14   to the purchase of the Mako and the sale of the

15   Aquasport?

16       A.    I really, I would say yes, I would say

17   yes, yeah.  I don't have any documents to prove that

18   otherwise.

19       Q.    Right.  You've looked through your files

20   with regard to both the potential purchase of the

21   Mako and then the later sale of the Aquasport --

22       A.    Right.

23       Q.    -- to see all the documents you have in

24   your possession?

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

30

```
 1        A.    Right.

 2        Q.    And you didn't find any written agreement?

 3        A.    Right, because I would have seen it the

 4   other night and immediately I would have been able

 5   to recall that, yeah.

 6        Q.    So the agreement that you had with Mr.

 7   Friedman in May of 2003 was a verbal agreement?

 8        A.    I have to say so, yeah.

 9        Q.    Let me show you what's been marked as

10   Exhibit No. 4 and ask if you recognize that

11   document.

12               (Document handed to witness.)

13        A.    I recognize it.

14        Q.    Fair to say that this is a printout of the

15   advertisement for the 1999 Aquasport on Sea Dog

16   Yacht Sales' Internet site?

17        A.    Yes.

18        Q.    When was the first time you either saw the

19   Internet site or saw the printout?

20        A.    You're asking for dates here.

21        Q.    Well, generally.

22        A.    I'd have to say in or around that May Mako

23   transaction.

24        Q.    Did you go on the Sea Dog site to see
```

31

1    whether he was advertising your boat?

2        A.   I don't even have a computer, tell you the

3    truth.  I use one at work.  I can't stand computers,

4    so you know.

5        Q.   You think somebody would have printed out

6    a copy and shown it to you?

7        A.   No one would actually print a copy out and

8    say, here, look at this.

9        Q.   Do you remember seeing it when you were at

10   Brian's house or maybe at work taking a look?

11       A.   We may, I know we may have looked at it at

12   Brian's house.  I know this exhibit came from the

13   Rhode Island hearing, I recall that.

14       Q.   I understand.  But what I'm trying to find

15   out is when you first would have either looked at

16   the website or had seen a printout of what was on

17   the website.

18       A.   Like I say, I think it must have been in

19   May.

20       Q.   Okay.  Were you involved at all in

21   providing Mr. Friedman the information that was then

22   posted on the Sea Dog website?

23       A.   Well, let me take a look.

24                I may have told him the fuel tank

32

1    capacity, the length and the beam, may have told him

2    what belonged with the boat, the T top.  Yeah, I

3    would say I would -- not everything entirely, but

4    part of it.

5         Q.   Did you take Mr. Friedman down to look at

6    the boat?

7         A.   I never took him in person, no, anywhere.

8         Q.   Did you provide him with any photographs

9    of the boat?

10        A.   I never provided him with any photographs

11   at any time.

12        Q.   The photographs that appear in Exhibit

13   No. 4, are those photographs of your vessel?

14        A.   They are, indeed.

15        Q.   Can you tell from looking at the

16   photographs in Exhibit 4 where the vessel was

17   located when they were taken?

18        A.   Yeah.

19        Q.   Where was the vessel located?

20        A.   That was at Riverfront Marina in Newbury,

21   Massachusetts right off of Route 1A.

22        Q.   Is that typically where you kept the boat?

23        A.   At the time.  Actually, when we owned the

24   boat or during our ownership of the boat that's

33

1    where it was a hundred percent of the time.

2        Q.    Do you remember telling Mr. Friedman that

3    that's where you kept the boat?

4        A.    Yes, I do.

5        Q.    When the boat wasn't in the water where

6    was it kept?

7        A.    It was on blocks in storage there.

8        Q.    So it was either in the water or at the

9    marina in Newbury 12 months of the year?

10       A.    Absolutely.

11       Q.    Now, after the deal with the Mako fell

12   through --

13       A.    Wait a second.  I have to -- we may have

14   -- sorry.  We may have brought that to Brian's house

15   one winter for storage.

16       Q.    Okay.  Do you remember which winter?

17       A.    I think it might have been the first one.

18   I think we only did that once because it tore up his

19   yard.

20       Q.    So after that first year it was stored at

21   the marina during the winter?

22       A.    Yeah.

23       Q.    Okay.  After the Mako deal fell through

24   did you make any attempt to continue to market the

34

1    boat?

2        A.    No, I didn't.

3        Q.    Had you and your brother pretty much made

4    a decision in the spring of 2003 that you wanted to

5    sort of trade up to a bigger boat?

6        A.    Well, there's so many dynamics involved in

7    buying a boat.  I mean, at the time it may have

8    seemed like a good deal, but then -- or a good idea,

9    but then after, when the survey came back, something

10   may have happened in my life when I decided, you

11   know, we're not going to buy another boat.  I

12   couldn't tell you what those facts are, because

13   mostly I don't remember, but I know my life was

14   pretty fluid at the time.

15       Q.    Are you married?

16       A.    No.  But I was looking for a place just to

17   live, you know.

18       Q.    And fair to say that in May of 2003 you

19   were prepared to sell the Aquasport?

20       A.    Yeah.

21       Q.    And move on a different vessel?

22       A.    Or -- yeah, yeah.

23       Q.    Okay.  When was the next time after May of

24   2003 when you had any discussions with Mr. Friedman

35

1    about selling the Aquasport?

2        A.    2003.  When I had a discussion with him.

3    Actually, when he called me.

4        Q.    Okay.

5        A.    Yeah.  He called me at home I want to say

6    sometime in August out of the blue.

7        Q.    Early August, late August?

8        A.    It could have even been, let's see, July.

9    It would have been early August or late July, in

10   those summer months preceding this fiasco that's why

11   we're sitting here today.

12       Q.    Okay.  So Mr. Friedman called you late

13   July, early August.  What did he tell you?

14       A.    He told me that he had someone that was

15   interested in the boat and I was, like, what are you

16   talking about?

17       Q.    Well, as best you can recall the actual

18   conversation, what did he say?

19       A.    Essentially that.  He said, first of all,

20   there's someone on the phone named Dale Friedman and

21   I didn't -- so I didn't even, wasn't even being --

22   Brian and I hadn't even had a discussion that it was

23   being up for sale.  And he was telling me that he

24   had a buyer, someone who was interested in the boat.

36

1    And I recall telling him, gee, I don't even know if

2    this boat's even for sale.  I don't own it, my

3    brother and I own it.  We have to discuss it.  I'll

4    get back to you.

5          Q.   Okay.  Was it a five-minute conversation,

6    ten minutes?

7          A.   At the most that, because I know that's

8    exactly what I would have said to him at the time.

9          Q.   Do you have a specific recollection of

10   that or do you just believe that's what you would

11   have told him?

12         A.   No, that's most definitely what I said to

13   him.

14         Q.   Okay.  And after you talked with Mr.

15   Friedman did you call your brother?

16         A.   Yeah, I did.

17         Q.   Same day?

18         A.   Probably moments after, if not.  There

19   might have been phone records of that call.

20         Q.   And what did you tell your brother?

21         A.   Just that.

22         Q.   What was his response?

23         A.   He couldn't believe it, either, you know,

24   that this boat was for sale and that, you know,

37

1    there was a buyer for it.

2        Q.   After your discussion with your brother or

3    during your discussion with your brother did you

4    decide to find out more about what the buyer was

5    prepared to pay you for the boat?

6        A.   I just know we were going to get back to

7    him.  We had to think about it.  I know Brian was

8    going on vacation.  We weren't, it wasn't like I was

9    jumping on it.

10        Q.   Was it you that got back to Mr. Friedman

11    or was it your brother?

12        A.   I believe I did.

13        Q.   And how long after the first conversation

14    did you call him back?

15        A.   I would have to say within the week.

16        Q.   And describe for me as best you can recall

17    the conversation you had with Mr. Friedman when you

18    called him back.

19        A.   My general recollection of that

20    conversation would be just finding out more facts on

21    what this potential buyer wanted to pay for the

22    boat.

23        Q.   And what did Mr. Friedman tell you?

24        A.   I think they said something like, I don't

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

38

```
 1    know, like 27, 30,000 or something like that.
 2         Q.    Did he tell you anything else?
 3         A.    I can't tell you for sure.
 4         Q.    Do you think that was a fair price for the
 5    boat?
 6         A.    At the time I thought it was a pretty fair
 7    price, yeah.
 8         Q.    And what else did Mr. Friedman tell you
 9    other than 27 to 30,000 for the boat?
10         A.    I can't, I can't tell you because I don't
11    remember.
12         Q.    Okay.  Back in the spring, in May when you
13    --
14         A.    Back in May, yeah.
15         Q.    -- May of 2003 when you talked with Mr.
16    Friedman about selling the boat the first time did
17    you give him a number, a price that you wanted to
18    get for the boat?
19         A.    I think it was somewhere in the ballpark
20    of 27,000, 24,000, somewhere around there.
21         Q.    Okay.  And after Mr. Friedman talked to
22    you in August and said that he thought he had a
23    buyer in the 27 to 30,000 range, did you call your
24    brother again?
```

39

1       A.   Could you repeat that again?

2       Q.   Sure.  When you called Mr. Friedman back

3  --

4       A.   Okay, we're fast-forwarding up in August?

5       Q.   We're back in August, I apologize.  And

6  you called him back and wanted to get more details

7  about the potential buyer he said he had for your

8  boat.

9       A.   Yeah.

10      Q.   And he told you he thought the price would

11 be 27 to $30,000.

12      A.   Right.

13      Q.   And you can't recall anything else he told

14 you at that time?

15      A.   Specifically, I can't tell you.

16      Q.   Okay.  After he gave you the information,

17 did you call your brother up at that point?

18      A.   I believe isn't this what I had just told

19 you?  I'm not sure, but I did call my brother after

20 he called me the first time, yeah.

21      Q.   Then you called him back?

22      A.   Yeah.

23      Q.   And he gave you a price?

24      A.   Right.

40

```
 1       Q.   Did you then call your brother a second

 2  time and tell him what Mr. Friedman had told you

 3  about what you could get for your boat?

 4       A.   I'm getting caught up in this.  We're

 5  going to have to start over.  I'm not sure what

 6  you're getting at.

 7       Q.   Mr. Friedman called you out of the blue --

 8       A.   Yeah.

 9       Q.    -- one day and said I've got a buyer for

10  your boat.

11       A.   Yeah.

12       Q.   And as a result of that conversation, you

13  called your brother and said I just got a call from

14  Dale Friedman, he's got a buyer for our boat.

15       A.   Right.

16       Q.   And after that conversation, you said

17  about a week later you called Friedman back.

18       A.   Yeah.

19       Q.   And you said give me the particulars about

20  what this person is offering us for the boat.

21       A.   Right.

22       Q.   And Mr. Friedman said I think I can get 27

23  to $30,000.

24       A.   Okay.
```

41

1       Q.   Do you recall any other specifics that he

2   gave you during that phone call?

3       A.   No, I don't.

4       Q.   Okay.  After that -- did that phone call

5   last five minutes, ten minutes?  How long did it

6   last?

7       A.   Every conversation I had with him was

8   short.

9       Q.   After that second conversation you had

10  with him did you then call your brother and tell him

11  that Dale Friedman says we can get 27 to $30,000 for

12  our boat?

13      A.   I would absolutely have called him, yeah.

14      Q.   Do you recall what your brother told you

15  at that point?

16      A.   I think the consensus at that time was

17  let's see where this goes, let's go forward with it.

18      Q.   Fair to say that you and your brother were

19  willing to sell your boat for $27,000 after that

20  conversation?

21      A.   It's fair to say we were willing to enter

22  into the bargaining of it.

23      Q.   And would it be fair to say that you were

24  willing to sell the boat at that point for $27,000?

42

1      A.   We were willing to bargain for the price,

2    yeah.

3      Q.   Had somebody said to you I'll pay you

4    $27,000, would you have said okay?

5      A.   Yeah, I think so, I think so.

6                MR. LANGER:  Mark that as Exhibit 5.

7                (Deposition Exhibit No. 5

8                  marked for identification.)

9      Q.   Mr. Gaffey, let me show you what I've

10   marked as Exhibit No. 5 and ask if you recognize

11   that document.

12               (Document handed to witness.)

13     A.   I recognize the first page.  I recognize

14   the second page and the third page.  This was faxed

15   to me at work and I signed it.

16     Q.   Okay.  Exhibit No. 5 originally was a fax

17   that Mr. Friedman sent to you at work, is that

18   correct?

19     A.   That's true.

20     Q.   And it enclosed a purchase and sale

21   agreement for the sale of the Aquasport?

22     A.   It was a purchase and sale agreement that

23   was faxed to me at work, that's true.

24     Q.   And the buyer was a woman named Pamela

43

1    Jordan?

2         A.    At the time that's all I knew.

3         Q.    And she lived in Rhode Island?

4         A.    At the time, yeah.  This is everything I

5    knew of the transaction.

6         Q.    And the purchase price was $27,000?

7         A.    That's right.

8         Q.    And you read through it and it was

9    satisfactory to you and you signed it, is that

10   correct?

11        A.    Actually, I talked about it with Brian.

12        Q.    Okay.  So before you signed it did you

13   call your brother?

14        A.    Yeah.

15        Q.    And you went over the contents of the

16   purchase and sale agreement?

17        A.    Yeah.

18        Q.    And the two of you agreed that it was

19   satisfactory?

20        A.    I asked him if I could sign it and he said

21   sure.

22        Q.    Did you send it over to your brother then

23   to sign?

24        A.    No.

44

1          Q.    You then sent it back to Mr. Friedman?

2          A.    That's right.

3          Q.    Do you believe that you had authorized Mr.

4     Friedman to go forward with the sale of your boat

5     based on your signature?

6                    MR. SMITH:  Objection.  Go ahead.

7          A.    I don't know how to answer.  What do I do?

8          Q.    You can answer that.

9          A.    Did I authorize him?

10         Q.    Did you believe when you signed that

11    purchase and sale agreement and sent it back to Mr.

12    Friedman that you had authorized him to move forward

13    with the sale of your boat?

14                   MR. SMITH:  Objection.

15         Q.    You can answer it.

16         A.    Okay.  Yes.

17         Q.    And the purchase price was $27,000?

18         A.    Yes.

19         Q.    And Mr. Friedman was going to get a

20    commission?

21         A.    That's true.

22         Q.    In fact, you made a change to the purchase

23    and sale agreement to limit his commission to

24    10 percent?

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

45

1      A.    I did.  I didn't know what -- you know, I

2    just, I wanted to make it clear there that's what it

3    was, because I didn't know what other hidden fees or

4    whatever, you know, there's like all these little

5    costs and things like that.  I just wrote it in

6    there black and white equivalent to 10 percent.

7      Q.    And you turned around and faxed it back to

8    Mr. Friedman?

9      A.    Yes, I did.

10      Q.    You told him in the cover sheet you made a

11    change to number 3?

12      A.    That's true.

13      Q.    Now, after you sent that back did you

14    believe at that time that your brother was going to

15    sign this document?

16      A.    No.

17      Q.    You were acting on behalf of both you and

18    your brother with Mr. Friedman, isn't that true?

19      A.    That's true, yeah.  I had his authority to

20    sign it, I thought.

21      Q.    Now, after you -- strike that.

22            This fax is dated August 11th, 2003?

23      A.    Yeah.

24      Q.    And that also is the date that you signed

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

46

1    the purchase and sale agreement?

2        A.    That's true.

3        Q.    Now, did you talk with Mr. Friedman on

4    August 11th?

5        A.    I most certainly did, yeah.

6        Q.    Okay.  Describe for me the telephone

7    conversation you had with Mr. Friedman on August

8    11th.

9        A.    It was probably extremely brief saying

10   that I'm faxing this over to you, sign it, just what

11   it says, this lady, she's in Block Island and fax it

12   back to me and we can get this thing going.  And he

13   was rushing it and so that's -- and then I signed

14   it.  And that's the reason why Brian didn't sign it.

15       Q.    Okay.  And you sent it back to him?

16       A.    Yeah.

17       Q.    When was the next time you talked with Mr.

18   Friedman after August 11th?

19       A.    Let's see, that was August 11th?  I don't

20   know.  I can't give you an exact date.

21       Q.    Well, do you remember the content of the

22   conversation?

23       A.    I don't know.  Let me look at this some

24   more, maybe I'll remember something.

47

1          I know that, I just recall that we

2     were, we wanted a closing.

3          Q.   Okay.

4          A.   And that's what we were looking for.

5               MR. LANGER:  Mark that as the next

6     exhibit.

7               (Deposition Exhibit No. 6

8                marked for identification.)

9          Q.   Mr. Gaffey, let me show you what's been

10    marked as Exhibit No. 6 and ask if you recognize

11    that document.

12              (Document handed to witness.)

13         A.   I recognize this document.

14         Q.   What is that document?

15         A.   Well, first of all, there's two separate

16    documents here.

17         Q.   Okay.  What's the first page?

18         A.   The first one is, it's a payoff.  I had

19    called my bank and asked for a payoff and the per

20    diem.

21         Q.   Is this a loan that you and your brother

22    had taken out to purchase the Aquasport?

23         A.   No.  This was my own loan.

24         Q.   This was a loan you had taken out --

48

1          A.    Yeah.

2          Q.    -- for your half of the Aquasport?

3          A.    Not even half.  I owned ten thousand, so

4     this was my ten thousand, yeah.  This was the

5     balance.

6          Q.    So you were looking for a payoff on your

7     loan?

8          A.    Yeah.

9          Q.    Now, when you had purchased the vessel did

10    Eastern Bank have a lien on the vessel to secure its

11    loan of $10,000 to you?

12         A.    Absolutely.

13         Q.    Now, page 1 is on Sea Dog fax cover sheet?

14         A.    Right.

15         Q.    And did you prepare that document or did

16    Mr. Friedman prepare it?

17               MR. SMITH:  Can I just object for a

18    quick second?  You said a fax cover sheet.

19               MR. LANGER:  I'll rephrase it.

20         Q.    First page of Exhibit No. 6 is on a sheet

21    with Sea Dog Yacht Sales at the top?

22         A.    Yeah.

23         Q.    And did you prepare that document or did

24    Mr. Friedman?

49

```
 1        A.   I filled in the information that was

 2   required.  This is my writing.

 3        Q.   Did you do that at Sea Dog Yacht Sales or

 4   in your office?

 5        A.   I can't tell you exactly.  I'd have to

 6   look at a calendar.  Because if the 13th was a

 7   weekend -- it's most likely that I got the

 8   information, filled this out, and personally brought

 9   this back to him.

10        Q.   "Him" being Mr. Friedman?

11        A.   Yeah.  But if I looked at a calendar, I

12   could tell you for sure what I did.  Because if the

13   13th was the weekend, I would have gone up there.

14        Q.   Gone up to?

15        A.   To Sea Dog, yeah.

16        Q.   Okay.  Now, second page of Exhibit No. 6,

17   what is that?

18        A.   That is a seller's final accounting.  And

19   that was done at Sea Dog on the 16th of August 2003.

20        Q.   Okay.  So the first page is dated August

21   13th?

22        A.   Right.

23        Q.   And that's your handwriting?

24        A.   Yeah.
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

50

1      Q.    You don't recall whether you filled it out

2   at Sea Dog or took it back to Sea Dog on that day?

3      A.    I definitely didn't fill this out at Sea

4   Dog because I would have had to get this information

5   from the bank and then I filled it in on my own

6   time.  And I wouldn't have done that at Sea Dog.

7      Q.    Would you have then faxed the first page

8   of Exhibit 6 to your bank?

9      A.    No.  This has my social security number on

10  here and banking information.  It's something I

11  wouldn't have faxed, no.

12     Q.    So would you have hand-delivered that to

13  Eastern Bank?

14     A.    I wouldn't have, no.  This is something

15  that, this is information that Eastern Bank gave me

16  that I put on here and then gave to Sea Dog.

17     Q.    Okay.  So page 1 is information you got

18  from Eastern Bank?

19     A.    Yeah.

20     Q.    And filled it out on the 11th -- or excuse

21  me, on the 13th?

22     A.    On the 13th, yes.

23     Q.    And then you gave that to Mr. Friedman?

24     A.    That's correct.

51

1        Q.    And do you recall whether you faxed it to

2    Mr. Friedman or hand-delivered it to Mr. Friedman?

3        A.    I would not have faxed this to him because

4    it's got my social security number, it's got all my

5    vitals on there.

6        Q.    Okay.  Now, it's actually at the bottom of

7    the first page, but somewhat upside down there is,

8    looks like a fax reference from Sea Dog.

9        A.    Yeah.

10       Q.    Do you know how that got to be there?

11       A.    No.  I mean, that could be -- I don't even

12   know.  He may have faxed that to me and then I

13   filled it out, but I didn't fax it back to him.

14       Q.    Okay.  Do you know what Mr. Friedman did

15   with page 1 of Exhibit 6 after you gave it to him?

16       A.    I don't know what he did with it, no.

17       Q.    Now, we were talking about page 2 which

18   you correctly identified as a seller's final

19   accounting.

20       A.    Yeah.

21       Q.    And is it fair to say that that's

22   information that was provided to you by Eastern

23   Bank?

24       A.    No.  That information -- can I answer the

52

1    question?

2        Q.    Sure.

3        A.    That information was information that Dale

4    Friedman provided to Brian and I that we signed and

5    agreed to.

6        Q.    Okay.  And that was your understanding of

7    how the sale proceeds from the vessel were going to

8    be distributed?

9        A.    Right.  6,744.55, the payoff amount on the

10   13th was the 6,728.05.  So $1.65 a day tells you how

11   many days after we agreed.

12       Q.    When you -- and this was prepared at Sea

13   Dog?

14       A.    Yes, it was.

15       Q.    Okay.  Is that your signature at the

16   bottom?

17       A.    Yes, it is.

18       Q.    And to your knowledge, is that your

19   brother's signature?

20       A.    He was with me, yes, it is.

21       Q.    And the purpose of this document was both

22   you and your brother's acknowledgment that of the

23   sale proceeds, you were going to end up with

24   $17,555.45?

53

```
 1        A.    Yeah, after the lien was paid off and

 2   there was a closing, that's what was going to

 3   happen.

 4        Q.    Okay.  On the 16th of August when did you

 5   anticipate there would be a closing?

 6        A.    I recall him telling me that there were

 7   some issues with the money, what's her name, Jordan,

 8   getting the money and it was moved up in the month

 9   to around the 26th or so.

10        Q.    Did you realize that the longer the

11   closing was delayed, that the numbers on page 2 of

12   Exhibit 6 would change a little bit?

13        A.    Yeah, I did.  That's why we had the per

14   diem amount on there.

15        Q.    But there was no question in your mind

16   that Mr. Friedman was going to get $2,700 out of the

17   sale?

18        A.    Yeah.  He got more than that.

19        Q.    And that the bank would get somewhere

20   between 6,744 and another number depending on how

21   long it took you to close?

22        A.    Right.

23        Q.    Now --

24             MR. SMITH:  Can we take a break at
```

54

1    some point before you get into another document?

2                    MR. LANGER:  This is fine, this is

3    fine.

4                    MR. SMITH:  All right.

5                    (Recess 11:01-11:12 a.m.)

6                    (Deposition Exhibit Nos. 7-8

7                     marked for identification.)

8        Q.   Mr. Gaffey, a moment ago you indicated

9    that you had taken out a loan from Eastern Bank for

10   $10,000 to help defray your portion of the purchase

11   price of the boat?

12       A.   Yes, I did.

13       Q.   And that was the information that was

14   being gathered in Exhibit 6?

15       A.   Uh-huh, yes.

16       Q.   Let me show you what's been marked as

17   Exhibit 7.

18                    (Document handed to witness.)

19       Q.   Is that in fact a copy of the promissory

20   note that you signed back in August of '01?

21       A.   Yes, it is.

22       Q.   Let me show you what's been marked as

23   Exhibit No. 8 and ask if you recognize that

24   document.

55

```
 1                  (Document handed to witness.)

 2        A.   Yeah, I recognize this document, too.

 3        Q.   Okay.

 4        A.   Yes.

 5        Q.   Exhibit 8 is a bill of sale for your

 6   Aquasport to Pamela Jordan?

 7        A.   It's a bill of sale, uh-huh.

 8        Q.   And there are two signatures at the bottom

 9   under the reference "Sellers."  Is one of those

10   signatures yours?

11        A.   Yes.

12        Q.   Is, to the best of your knowledge, is the

13   other one your brother's?

14        A.   Yes.

15        Q.   And did you in fact sign that bill of sale

16   on August 17th, 2003?

17        A.   I did.

18        Q.   And where were you when you signed the

19   bill of sale?

20        A.   I was in the office with Elizabeth Warren.

21        Q.   Was that at Sea Dog's?

22        A.   No.  It was in Topsfield.

23        Q.   Okay.  Who had provided the bill of sale

24   to you?
```

56

1         A.    That was Dale.

2         Q.    Mr. Friedman?

3         A.    Dale Friedman, right.

4         Q.    Okay.  And is that, to the best of your

5    knowledge, his handwriting at the top of the page?

6         A.    I don't even know whose handwriting that

7    is.

8         Q.    Okay.  And you were in Topsfield, where in

9    Topsfield?

10        A.    At the Prudential Real Estate building.

11        Q.    Okay.  Why were you there?

12        A.    My brother's wife is a real estate agent

13   and her boss is Elizabeth Warren and she's a notary.

14        Q.    Okay.  So the two of you went to that

15   office to sign the bill of sale and have your

16   signatures notarized?

17        A.    Uh-huh.

18        Q.    You have to answer yes.

19        A.    Yes.

20        Q.    What did you do with the bill of sale

21   after you signed it on August 17th?

22        A.    Well, it was a draft.  We gave it to Dale

23   for a closing that never took place.

24        Q.    But you say it's a draft.  Did you

57

1    envision any changes that would be made to the bill

2    of sale after -- when you signed it?

3        A.    Well, the date could have changed.  I know

4    that the title had to go along with that, too.

5        Q.    So you and your brother signed the bill of

6    sale and returned it to Mr. Friedman?

7        A.    Uh-huh, yes, yes, I did.

8        Q.    And the purpose of returning it to Mr.

9    Friedman was to facilitate the sale of your vessel

10   to Ms. Jordan?

11       A.    It was a draft for -- it was essentially

12   an escrow, my understanding was for safekeeping.  It

13   was an agreement that, look, we are really

14   interested in selling this boat and this is our best

15   faith in doing that.

16       Q.    Okay.  So you'd signed a P&S, is that

17   correct?

18       A.    The purchase and sale agreement, myself,

19   yes.

20       Q.    And you had given that to Mr. Friedman?

21       A.    Yes.

22       Q.    And you then, you and your brother then

23   signed a bill of sale on August 17th and gave that

24   to Mr. Friedman?

58

1          A.    Uh-huh, yes.

2          Q.    Now, at some point you had a discussion

3     with Mr. Friedman about moving the boat from its,

4     from the marina to Sea Dog?

5          A.    Yes.

6          Q.    Was that a conversation you had or your

7     brother had?

8          A.    I had that conversation.

9          Q.    Okay.  When was that conversation with Mr.

10    Friedman?

11         A.    Oh, jeez.  I can't give you an exact date,

12    but I know it was, I think it was after, it may have

13    been after this.

14         Q.    Okay.  You're referring to Exhibit No. 8?

15         A.    Yeah.

16         Q.    So after August 17th you had a

17    conversation with Mr. Friedman in which you

18    authorized him to move the boat from the marina to

19    Sea Dog's place of business?

20         A.    I can't say for absolute certainty if it

21    was after, but I can't give you an exact date, to

22    tell you the truth.

23         Q.    Fair to say, though, that you did have a

24    conversation with him --

59

1        A.   I did.

2        Q.   -- around this time in which you

3   authorized --

4        A.   Yes.

5        Q.   --  Mr. Friedman to move the boat from the

6   marina to his place of business?

7        A.   I did, yeah.

8        Q.   Did you also authorize Mr. Friedman to

9   have sea trials for the boat at the marina for Ms.

10  Jordan?

11       A.   Yes.

12       Q.   Did you attend and participate in the sea

13  trials?

14       A.   No.

15       Q.   To your knowledge, were there in fact sea

16  trials of the vessel at the marina?

17       A.    To my knowledge, I can't tell you because

18  I never saw them.

19       Q.   Fair enough.  Had you provided the keys to

20  the boat to Mr. Friedman so that they could operate

21  it?

22       A.    I never provided them because the keys

23  were in the boat.

24       Q.   Did you tell Mr. Friedman the keys were in

1     the boat and you can go ahead and operate it for sea

2     trial purposes?

3         A.    We told him the keys were in the boat.

4         Q.    You expected him to make the boat

5     available for sea trials to Miss Jordan?

6         A.    To tell you the truth, Miss Jordan was not

7     part of, I recall that she was not part of the

8     trial, the sea trials.  It was I think that he was

9     doing it, their own mechanic was doing it at Sea

10    Dog.

11        Q.    Sea Dog's mechanic?

12        A.    Sea Dog's mechanic, yeah.  I don't think

13    -- and Pamela Jordan was going to get the report of

14    that.

15        Q.    Fair to say that you had authorized Mr.

16    Friedman to operate the boat for purposes of a sea

17    trial to report its condition to Ms. Jordan?

18        A.    Yes.

19        Q.    Now, at the top of Exhibit No. 6 there

20    appears to be some handwriting, although some of

21    it's cut off.  It appears to say, "Notarized copies

22    returned."

23        A.    Uh-huh.

24        Q.    Is that how you would read it?

61

1          A.   It looks that way.

2          Q.   Is that your handwriting?

3          A.   It could be.

4          Q.   Do you have any recollection as to why you

5     would have put "Notarized copies returned" at the

6     top of page 2 of Exhibit 6?

7          A.   I think the only recollection that I could

8     have had was that at the time when this was done,

9     and this was the day after -- that's exactly what it

10    was.  We were at Sea Dog on the 16th.  We executed

11    this document and he asked us for two notarized

12    copies.  We returned it on the following day.

13         Q.   Okay.  Just so the record is clear, you're

14    referring to page 2 of Exhibit 6 which was the

15    payout information that's dated August 16th.  At

16    that time Mr. Friedman provided you with two copies

17    of a bill of sale?

18         A.   I'm not sure if it was two.  I can't tell

19    you if it was two or not.

20         Q.   Again --

21         A.   But it says two there.  You know, I can't

22    tell you.

23         Q.   But your best recollection is that the

24    reference at the top of page 2 of Exhibit 6 where it

62

1    says "Notarized copies returned," the copies that

2    are referred to are the bill of sale dated August

3    17th, 2003 that you and your brother signed --

4         A.    Yeah.

5         Q.    -- in Topsfield?

6         A.    Yes.

7                   MR. LANGER:  Mark that as Exhibit 9.

8                   (Deposition Exhibit No. 9

9                      marked for identification.)

10        Q.    Mr. Gaffey, let me show you what's been

11   marked as Exhibit No. 9 and ask if you recognize

12   that document.

13                  (Document handed to witness.)

14        A.    I recognize this one, too.

15        Q.    Okay.  What is Exhibit No. 9?

16        A.    This is a forged document.

17        Q.    It's a bill of sale running from you and

18   your brother to Ms. Jordan?

19        A.    This isn't even from me.  I didn't sign

20   this.

21        Q.    I'm not asking you, I'm asking you is the

22   -- I'll strike that.

23                  Is that your signature at the bottom

24   of Exhibit No. 9?

63

1        A.    No.

2        Q.    To your knowledge, is that your brother's

3    signature?

4        A.    No, it is not his signature.

5        Q.    Now, after you had authorized the movement

6    of the vessel from the marina to Sea Dog did you

7    have any other conversations with Mr. Friedman?

8        A.    None that really stick out in my mind

9    right now, no.

10        Q.    Okay.  And well, let me ask you this,

11    after you authorized him to move the vessel to Sea

12    Dog did you ever speak with him again?

13        A.    That's a more open question.  I would have

14    to say yes.

15        Q.    So when was the next time?  Was it within

16    a day or two or a couple of days?

17        A.    After we delivered the boat, or after the

18    boat was, they moved it to Sea Dog, I can't even

19    tell -- I don't even know.  Without a document that

20    says that this was when --

21        Q.    I'm trying to figure out whether you have

22    a recollection of speaking with Mr. Friedman at any

23    time after you had authorized him to move the boat

24    up until today.

64

1          A.   Up until today?

2          Q.   Right.

3          A.   Recollection of talking with him.  Well, I

4      had a lot of conversations with him after that,

5      yeah.  I remember calling him, asking him, you know,

6      about the closing.

7          Q.   Well, tell me, let's start off the first

8      conversation that you can recall after the boat was

9      moved, what did you discuss during that

10     conversation?

11         A.   Well, I recall asking, you know, when the

12     closing was going to be.  I know we agreed on a

13     certain date.  We wanted to get this thing done in

14     Massachusetts and at Sea Dog.  And he kept telling

15     me that the buyer hadn't sent the money and that's

16     why the date kept getting moved out.  I recall

17     having conversations or attempting to get in touch

18     with him on those dates and I know that he kept

19     moving the date up.

20         Q.   When you say "date up," further and

21     further in August?

22         A.   Yeah, further and further, yeah.

23         Q.   Okay.  And would it be fair to say that if

24     Mr. Friedman had called you up and said, Kevin, I've

65

1    got a check for you in the amount of approximately

2    17,500 and some dollars, come and get it, that would

3    have been satisfactory to you?

4        A.   I don't think so, no.

5        Q.   Why not?

6        A.   Because I wanted a certified check and I

7    wanted confirmation that my lien was going to get

8    paid off.

9        Q.   If he had called you and said I have a

10   certified check payable to you and your brother for

11   17,500 and some odd dollars and I've paid off the

12   lien from the bank, that have been satisfactory to

13   you?

14       A.   If there was proof from the bank, yeah,

15   that it was paid off.

16       Q.   Let me show you what's been marked as

17   Exhibit No. 7.

18            (Document handed to witness.)

19       Q.   We've already identified that as the note

20   that you signed for Eastern Bank.

21       A.   Right.

22       Q.   There's a stamp in the middle of that that

23   says "Paid August 29th, 2000."

24       A.   Yes.

66

```
 1        Q.    Do you know how that stamp got to be put

 2   there?

 3        A.    Well, I didn't put that stamp there, but I

 4   made payment.

 5        Q.    2003, excuse me.

 6        A.    I made the payment.

 7        Q.    When did you make the payment?

 8        A.    It would have been days -- I have it in my

 9   checkbook.

10        Q.    You wrote the bank a check for

11   approximately $6,750 on August 29th, 2003?

12        A.    On the 29th, it couldn't have been the

13   29th, no.  I can tell you this, the days leading up

14   to that payment went like this.  The day that I went

15   to Sea Dog and found that my boat was no longer

16   there and we never had a closing and we never

17   received payment and there was nothing there and

18   Dale wasn't available and no one knew where he was

19   and I filed the police report, I went down the next

20   day and paid that note off because I wanted to make

21   sure that I had the title.  I actually had called

22   the bank and made sure that the title was there,

23   that they still had it.  I was really concerned

24   about that title because that was the only thing
```

1    that I had any proof of my ownership of that boat in

2    my mind.  So I went to the bank and I only had

3    $10,000 in my savings account and I paid that off.

4         Q.    And did they stamp the note that day and

5    give it back to you?

6         A.    I assume they did, because they must have.

7         Q.    And did they give you the title to the

8    boat that day?

9         A.    They didn't give it to me that day, but

10   they mailed it to me.

11                    MR. LANGER:  Mark that as the next

12   exhibit.

13                    (Deposition Exhibit No. 10

14                      marked for identification.)

15        Q.    Mr. Gaffey, let me show you what's been

16   marked as Exhibit No. 10.

17                    (Document handed to witness.)

18        Q.    Do you recognize that document?

19        A.    This is the title.

20        Q.    And on the front of the title Eastern Bank

21   has released the lien on August 29th, 2003?

22        A.    That's true.

23        Q.    And is it your recollection that that

24   title was mailed to you at some point after August

68

1    29th?

2         A.   Yes, I received it.

3         Q.   Do you still have a copy of the cancelled

4    check that you used for the bank to pay off the

5    bank?

6         A.   My records aren't that great, my bank

7    statements.  I would assume I must have it

8    somewhere, but I can't find it.

9         Q.   Have you looked for either the statement

10   or the check?

11        A.   I haven't looked for it, no.

12        Q.   Would you look for it and if you find it,

13   provide a copy to Mr. Smith?

14        A.   I do have a receipt of the payment that I

15   received from the bank that corresponds with the

16   payoff.  I do have that.

17             MR. SMITH:  Didn't I give that to

18   you?

19             MR. LANGER:  I don't believe so.

20             THE WITNESS:  I don't think so.  I

21   have that.

22             MR. SMITH:  Hold on.

23             THE WITNESS:  I don't think so.  I

24   was talking to --

69

```
 1                    MR. LANGER:  Hold on until Mr. Smith
 2    gets back.
 3                    MR. SMITH:  Off the record for a
 4    second.
 5                    (Discussion off the record.)
 6         Q.   Mr. Gaffey, you're going to review your
 7    records to try and find either the receipt that you
 8    received from the bank and provide that to Mr.
 9    Smith.  Your recollection is that you paid with a
10    check?
11         A.   I know I paid with a check, yeah.
12         Q.   Okay.
13         A.   And I'll do the best I can to find that
14    check.  I can't guarantee that I will find it.
15         Q.   Either the check or your statement that
16    would reflect the payment and the receipt would be
17    --
18         A.   Okay.
19         Q.   You had described a moment ago the
20    conversation, a conversation you had had with Mr.
21    Friedman where he indicated that Ms. Jordan hadn't
22    sent the money and therefore the closing was
23    delayed.
24         A.   Uh-huh.
```

70

1          Q.    You have to answer yes or no.

2          A.    Excuse me, yes.

3          Q.    Do you recall having any other

4    conversations with Mr. Friedman after that

5    conversation?

6          A.    I'd have to say no, because I remember

7    talking to other people in that office and we were

8    looking for Dale.

9          Q.    Did you have any conversations with

10   anybody else in Mr. Friedman's office before you

11   learned that your vessel was no longer at the Sea

12   Dog facility?

13         A.    Only in discussions with this transaction,

14   you know, trying to find out what was going on and

15   where was Dale and things like that.

16         Q.    Was this all before you learned that the

17   boat was no longer at Sea Dog Yacht Sales or was it

18   after?

19         A.    I mean, I have talked to, I have talked to

20   other people in the office, but -- could you please

21   repeat that question?

22         Q.    Sure.  What I'm trying to find out is at

23   some point you discovered that your boat was not at

24   Sea Dog.

71

1        A.    Yeah.

2        Q.    Now, from the time you had the last

3   conversation with Mr. Friedman where he said Ms.

4   Jordan hasn't sent her money, so the closing --

5        A.    Right.

6        Q.    Up until the time you discovered that your

7   boat was not at Sea Dog --

8        A.    Right.

9        Q.    -- did you have any conversations with

10   anybody at Sea Dog during that time?

11        A.    No.  After we had, like, a discussion of

12   when the closing was going to be and then I remember

13   calling, you know, and trying to figure out, you

14   know, when that closing was going to happen, and

15   then the next thing I know that the boat's gone and

16   Dale's gone.  Those are my recollections.

17        Q.    As far as the division of labor between

18   you and your brother --

19        A.    Yeah.

20        Q.    -- were you the one that was handling the

21   negotiations with Sea Dog for the sale of the

22   vessel?

23        A.    For the most part, yeah.

24        Q.    To your knowledge, did your brother ever

72

1    call Dale Friedman and talk with him about the sale

2    of the vessel or was that sort of your job?

3         A.   I think I was the one that was handling

4    the deal, yeah, yes.

5         Q.   Okay.  At some point you found out the

6    boat was not at Sea Dog?

7         A.   Yeah, I did.

8         Q.   How did you find out that it wasn't there?

9         A.   I called up and asked, because I couldn't

10   get a hold of Dale.

11        Q.   And who did you talk to at Sea Dog?

12        A.   I don't know his name.

13        Q.   It was a man, not a woman?

14        A.   It was a man.

15        Q.   Tell me as best you can recall what the

16   conversation entailed.

17        A.   I said -- I think there was probably like

18   three or four days that I had called looking for

19   Dale and he wasn't there, and then finally I said is

20   my boat there?  And they said -- they asked me who I

21   was and they said that it's gone.  And I didn't know

22   what to do at that point.  I called Brian and said

23   we've got a big problem here.  Dale's not -- can't

24   find Dale and the boat's gone.

73

1          Q.    Do you know roughly when that was?  Are we

2    still in August or into September?

3          A.    That was like, I want to say a day before

4    we filed the police report that we actually went to

5    Sea Dog.  It was like two days prior to the filing

6    of the police report.

7          Q.    And so that was when you had this

8    telephone call?

9          A.    Yeah, right.

10         Q.    Did you then call your brother and told

11   him that the boat's not there, and what happened

12   then?

13         A.    We went up to Sea Dog the next day or

14   perhaps even that day.  I can't tell you if it was a

15   Friday or not.  If it was a Friday, we went up

16   there.

17         Q.    And did you talk with anybody at Sea Dog?

18         A.    We met someone at the door and there were

19   a lot of unhappy people there.  And our boat was

20   gone and it was chaos.  And there was no Dale.  And

21   we asked where our boat was and no one knew where it

22   was.

23         Q.    Did you talk to any other boat owners that

24   day about what their situation might be?

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

74

1        A.    I don't think I did, but I think my

2    brother may have.  I know there were some really

3    unhappy people up there.

4        Q.    Okay.  So what happened after you went up

5    to Sea Dog and found out that your boat wasn't

6    there?

7        A.    I could have had a breakdown.  I was

8    really upset.  We went to the police station, filed

9    a report.  We didn't know what to do.

10       Q.    Did anybody at Sea Dog suggest you go to

11   the police department and file a report?

12       A.    I think they did.

13       Q.    And so you and your brother went to which

14   police department?

15       A.    Went to Salisbury.

16       Q.    And what did you tell them?

17       A.    I filled out the police report and it's in

18   my statement what I said.  I just said that, you

19   know, our boat's missing.  We're supposed to have a

20   closing that never happened.  There was no

21   transaction.  Our boat's gone.  And they said fill

22   out a report.  They didn't know if it was -- how to

23   classify it and they said that there were other

24   people had come in that day and were filing reports.

75

1    Q.   So you weren't the only one?

2    A.   No.

3    Q.   Do you remember the name of the officer

4    you talked with?

5    A.   I can't remember his name, but he was a

6    detective.

7    Q.   Now, did you think of calling Pamela

8    Jordan and asking her whether she had paid money or

9    whether she had your boat?

10    A.   Well, I think that night Brian and I

11    talked about what could we do, what can we do?  We

12    didn't even know where our boat was.  We didn't even

13    know who had it.  And we certainly didn't have any

14    money from any sale or any closing that ever took

15    place.

16    Q.   Well, the question was did you -- you knew

17    that Pamela Jordan was the prospective buyer?

18    A.   Yeah.  Well, we assumed it was -- at that

19    point in time we'd been had, yeah.

20    Q.   My question, Mr. Gaffey, is you knew at

21    that point that Pamela Jordan was the prospective

22    buyer?

23    A.   I assumed at that point that she was.

24    Q.   And you had her name and her address in

76

1     the purchase and sale agreement?

2           A.    I had her name and address, yes.

3           Q.    Did you attempt to call her to see whether

4     she had your boat or knew where the boat was?

5           A.    I didn't, but my brother did.

6           Q.    Okay.  That day or a couple of days later?

7           A.    I think it was that night, yeah.

8           Q.    And did he -- were you present when the

9     call was made?

10          A.    I most likely was.

11          Q.    What do you recall about that conversation

12    between your brother and Pamela Jordan?

13          A.    I just recall that she -- that we found

14    our boat, that we knew that someone had the boat and

15    that was at least a plus.

16          Q.    So the night you went to the police

17    department --

18          A.    Right.

19          Q.     -- and made your report --

20          A.    Right.

21          Q.     -- you knew that the boat was in Rhode

22    Island and you knew that Pamela Jordan had paid Mr.

23    Friedman the purchase price of the boat?

24          A.    Wait a second.  Could you please repeat

77

1    that?

2        Q.    Sure.  After the conversation your brother

3    had with Pamela Jordan --

4        A.    Right.

5        Q.    -- the night you made the police report,

6    you knew that she had the boat, is that correct?

7        A.    Well, I didn't really know she had the

8    boat.  She said she had the boat.  I hadn't seen it

9    with her, you know.

10       Q.    Do you have any reason to believe that she

11   was lying to your brother?

12       A.    At this point I didn't know.  I had been

13   lied to.  I didn't know who to --

14       Q.    Did your brother tell you that Pamela

15   Jordan told him --

16       A.    Yeah.

17       Q.     -- that she had the boat?

18       A.    Yeah, right.

19       Q.    And did your brother tell you that Pamela

20   Jordan had told him that she had paid Mr. Friedman

21   for the boat?

22       A.    Yes.

23       Q.    And so to the best of your knowledge, the

24   boat was in Wakefield, Rhode Island?

78

```
1         A.   To the best of my knowledge.

2         Q.   Did you call up the police that night and

3    tell them you knew where the boat was?

4         A.   I don't think I did, no.

5         Q.   Did you ever go back to the police

6    department and tell them you knew where the boat

7    was?

8         A.   The Salisbury police called us and both of

9    us went back, I'm not sure if it was that weekend or

10   it was a few days or a week or so later, but we did

11   ultimately go back I believe one time.

12        Q.   And when you went back did you tell them

13   that you knew where the boat was?

14        A.   I believe so.

15        Q.   And did you give them Ms. Jordan's address

16   and phone number?

17        A.   I believe so, yeah.

18        Q.   Have you ever talked to Pamela Jordan

19   yourself not with your brother?

20        A.   I talked to her.

21        Q.   When did you first talk to Pamela Jordan?

22        A.   I don't remember the exact date, but she

23   was really upset.  She cried a lot and I didn't want

24   to talk to her any more.
```

79

1      Q.   How many times did you talk to her?

2      A.   Very limited.  One, two.  It was one time

3    when I think she was, there was like a cell phone

4    involved, we got disconnected.  I tried calling her

5    back.  I don't know.  I tried not to talk to her.

6      Q.   So during the one to two times you talked

7    with her do you recall any of the specifics of what

8    either you told her or she told you?

9      A.   All I know, it was, essentially it was

10    just like a process where we were just trying to get

11    a feeling for who we were as individuals in this

12    process and how can we resolve it.  And the next

13    thing I know, I'm being sued.

14      Q.   Did she ever ask -- strike that.

15           During the one to two times you did

16    talk with her did you ever ask her to return the

17    boat to you?

18      A.   I'm not sure if I did.  I didn't want to

19    upset her any more.  Brian was dealing with her.

20      Q.   Okay.

21      A.   Plus I think the police were involved in

22    that situation.  I thought they were going to help

23    us out.  I thought they could sort this thing out

24    for us.  I didn't make any demands.

80

```
1        Q.    Have you ever talk to anybody at Acadia

2   Insurance?

3        A.    Only you, I think.

4        Q.    Other than today, you and I have never

5   spoken before today?

6        A.    No.

7        Q.    You never talked with --

8              THE WITNESS:   What's going on here?

9              MR. SMITH:   I was just teasing him,

10   I'm just teasing him.

11        Q.    You've never talked with anybody in the

12   Acadia claims department?

13        A.    No.  Oh, you know something?  I may have

14   talked to somebody, to tell you the truth.  After we

15   got the response back from, the initial response

16   that, I don't remember who the person was that Brian

17   made our initial contact with, I think it was a

18   letter or something.  I thought -- I wanted to call

19   this individual and talk to them, I don't know who

20   they were, and get a feel for the decision and that

21   I disagreed with the decision.  And that was that.

22   And I don't know who the person was.  I know it was

23   the name that, of the man that we made, he made the,

24   Brian made the initial report with.
```

81

```
 1        Q.    Isaac Howe?

 2        A.    Yeah, that's the guy.

 3        Q.    How many times did you speak with Mr.

 4   Howe?

 5        A.    I think it was just one time.

 6        Q.    And do you remember when you called?

 7        A.    It was in an afternoon.  I don't remember

 8   the date or anything like that.

 9        Q.    What did Mr. Howe tell you?

10        A.    Essentially that he couldn't help us.

11        Q.    Did he discuss the basis that Acadia was

12   denying your claim, why he was denying your claim?

13        A.    I don't remember the specifics of the

14   conversation other than, you know, there was really,

15   generally there was nothing you could do for us,

16   that you saw this as a non-claim item, you know.

17        Q.    And what did you tell him?

18        A.    I don't know.  I may have told him I

19   disagreed, gave him a five cent, you know,

20   disagreement conversation and, you know, told him

21   have a nice day.  I wasn't angry with him or

22   anything like that and that was about it.

23        Q.    A moment ago you said after you talked to

24   Ms. Jordan once or twice, the next thing you knew
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

82

1    you were being sued.

2         A.    Yeah.

3         Q.    And this was the action that was pending

4    in Rhode Island?

5         A.    Right.

6         Q.    And you contested, you and your brother

7    contested the court's jurisdiction over the two of

8    you in Rhode Island?

9         A.    Yes.

10        Q.    Why didn't you want to resolve the issue

11   of who owned the boat at that point?

12             MR. SMITH:  Objection.  You can

13   answer the question.  You might be calling for

14   attorney/client.

15             MR. LANGER:  I'm not asking him for

16   any advice, but I'm asking him why he didn't want

17   to.  He can answer it any way he wants.

18        Q.    But I don't want your attorney's advice as

19   far as what your attorney told you.

20        A.    As far as I was concerned, she was not

21   willing to negotiate.  She wanted the whole thing,

22   you know.  She wanted the whole boat.  And it was

23   just like an impossible situation, you know.

24        Q.    My question, Mr. Gaffey, is you understood

83

1    that the purpose of the lawsuit in Rhode Island was

2    to resolve the issue of who owned the boat, is that

3    correct?

4        A.   Well, that was the initial purpose, but

5    then secondly we did a jurisdiction where we

6    questioned should it even be tried in Rhode Island.

7        Q.   I understand.  But my question is the

8    lawsuit that was filed in Rhode Island, to the best

9    of your knowledge, was to resolve the issue of who

10   owned the boat?

11       A.   Right.

12       Q.   And you contested the court's jurisdiction

13   over you in Rhode Island?

14       A.   Right.

15       Q.   My question is why didn't you want to

16   resolve the issue of ownership at that time?

17       A.   I didn't want to drive to Rhode Island.  I

18   live in Massachusetts.  That's a long haul.  It's

19   days off.

20       Q.   Okay.  Now, the court initially or

21   eventually agreed with you that there was no

22   jurisdiction in Rhode Island.

23       A.   Uh-huh, yes.

24       Q.   And not long after that you and your

84

1    brother and Ms. Jordan came to a resolution of the

2    title questions?

3        A.    Yes.

4        Q.    And at that point she paid you an

5    additional $7,000?

6        A.    I believe she paid $7,000, if that's

7    what's in our documents.  I believe she paid $7,000.

8        Q.    And her broker paid you an additional

9    $5,000?

10       A.    That's correct.

11             MR. LANGER:  Mark that as whatever

12   the next number is and that the next number.

13             (Deposition Exhibit Nos. 11-12

14               marked for identification.)

15       Q.    Mr. Gaffey, let me show you what's been

16   marked as Exhibit No. 11.

17             (Document handed to witness.)

18       Q.    Do you recognize that document?

19       A.    Let me see what we've got here.  This is

20   the general release.  I signed it, I recognize it.

21       Q.    That is your signature on page 2?

22       A.    Absolutely.

23       Q.    And to the best of your knowledge, that's

24   your brother's signature?

85

1       A.   Yes.

2       Q.   Were you present when he signed it?

3       A.   Yes.

4       Q.   Let me show you what's been marked as

5  Exhibit No. 12 and ask if you recognize that

6  document.

7            (Document handed to witness.)

8       A.   Bill of sale, yes.

9       Q.   And is that your signature?

10      A.   Yes, it is.

11      Q.   And to your knowledge, is that your

12  brother's signature?

13      A.   Yes.

14      Q.   What's the date of that document?

15      A.   March 23rd, 2004.

16      Q.   And that bill of sale recites that you and

17  your brother sold the Aquasport to Pamela Jordan for

18  the sum of $27,000?

19      A.   Yes.

20      Q.   And referring back to Exhibit No. 10 to

21  page 2, it reflects -- I think you had already

22  identified your signature and your brother's

23  signature.  That reflects transfer of title of the

24  vessel to Pamela Jordan?

86

1        A.    True.

2                    MR. LANGER:  Why don't we take a

3    break for a minute?  I'm just about done, I think.

4                    (Recess 11:56-12:02 p.m.)

5                    MR. LANGER:  I have no other

6    questions for Kevin Gaffey.

7                    MR. SMITH:  Okay.  I'll clarify

8    two points.

9                    CROSS EXAMINATION

10      BY MR. SMITH:

11      Q.    Kevin --

12      A.    Yes.

13      Q.    -- Mr. Langer talked about, early on when

14   he was questioning you, about moving forward towards

15   the sale of the boat.  What did you understand, when

16   did you understand the sale to take place?  When was

17   it going to take place?

18      A.    Sale was going to take place with the

19   closing.  It was going to be, we were going to

20   exchange cash, have a title transfer and the boat

21   was, we were going to release the boat at Sea Dog.

22      Q.    Okay.  I'm going to ask you during the

23   Rhode Island proceeding, I want to just clarify one

24   part of that record, give you an opportunity to do

                HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
                          617-523-1874

87

1    that.

2               MR. SMITH:  Len, I'll mark these

3    pages as an exhibit.  I just want to do it after we

4    finish.

5               MR. LANGER:  What pages are you

6    talking about?

7               MR. SMITH:  I was going to mark page

8    34 and 35 of the transcript from the Rhode Island

9    action.

10              MR. LANGER:  Well, I mean, you can

11   -- sure.  I'll wait and see.

12       Q.   At the bottom it says -- you were in a

13   series of discussions with, you were being asked

14   questions --

15              Let me back up.  You've read the

16   transcript today?

17       A.   Yes.

18       Q.   And is there something you want to clarify

19   on this, in this transcript?

20       A.   There's one thing I would like to clarify

21   and that was my answer to question "Have you ever

22   signed any bill of sale in connection with the

23   Aquasport?"  And the reason why I did answer no at

24   the time was because I was responding to the

88

1   evidence that was in front of me at the time.  In my

2   mind if I had answered yes, I would have had to have

3   respond with any bill of sale I signed at any time.

4   That's how I made a distinction.

5                     MR. SMITH:  I have nothing further.

6   Just if you want to ask him on those.

7                     MR. LANGER:  Do you have the cover

8   sheet?

9                     MR. SMITH:  Yeah, I just want to

10  make a copy of that because I want -- can I make a

11  copy and let you stamp that one instead?

12                    MR. LANGER:  Sure.

13                    MR. SMITH:  Thanks.

14                    (Deposition Exhibit No. 13

15                     marked for identification.)

16                    MR. LANGER:  Just for the record,

17  we've marked as Exhibit 13 the cover sheet of the

18  transcript of testimony of January 9th, 2004, as

19  well as pages 34 and 35.

20                    I have no other questions.

21                    For the record, I'll maintain the

22  original exhibits and provide copies to Mr. Smith.

23                    MR. SMITH:  And we will forward you

24  a copy of any of the bank information that shows

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

89

1    that he paid off that promissory note.

2                    MR. LANGER:  Okay.

3                    (Whereupon, the deposition in the

4                     above-entitled matter was concluded

5                     at 12:07 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

90

```
 1              C E R T I F I C A T E

 2    I, KEVIN P. GAFFEY, do hereby certify under the
      pains and penalties of perjury that I have read the
 3    foregoing transcript of my testimony given on
      November 18, 2005, and I further certify that said
 4    transcript is a true and accurate record of said
      testimony (with the exception of the following
 5    corrections listed below):

 6    Page        Line          Correction

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22    Dated at                      , this
      day of              , 2005.
23

24    HBS                    DEPONENT
```

HENNESSEY CORP. D/b/a ROBERT H. LANGE CO.
617-523-1874

91

```
 1   COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF SUFFOLK
 2

 3
            I, HEIDI B. STUTZ, Certified Shorthand
 4   Reporter No. 146599S and Notary Public duly
     commissioned and qualified in and for the
 5   Commonwealth of Massachusetts, do hereby certify
     that KEVIN P. GAFFEY, the witness whose testimony is
 6   hereinbefore set forth, came before me on November
     18, 2005, at 9:55 a.m. who was by me duly sworn to
 7   testify to the truth and nothing but the truth of
     his knowledge touching and concerning the matters in
 8   controversy in this case; that he was thereupon
     examined upon his oath, and his examination reduced
 9   to typewriting under my direction; and that the
     transcript is a true record of the testimony given
10   by the witness to the best of my knowledge, skill
     and ability.
11
            I further certify that I am neither
12   attorney nor counsel for, nor related to or employed
     by any of the parties to the action in which this
13   deposition is taken; and further that I am not a
     relative or employee of any attorney or counsel
14   employed by the parties hereto or financially
     interested in the action.
15
            IN WITNESS WHEREOF, I have hereunto set
16   my hand this 21st day of November, 2005.

17

18

19

20

21                      HEIDI B. STUTZ

22

23

24
```

# Sales Agreement for 1999 Aquasport Osprey

Purchase and Sell Agreement made by and between
Shawn Perkins 431 Main St. Amesbury, MA 01913
Phone: 978-388-5580 (Seller), and
Kevin Gaffey, 13 Timber Lane, Topsfield, Mass. 01983
Phone: 978-887-8162 (Buyer), and
Brian Gaffey, 76 Lawrence Road, Boxford, Mass. 01921
Phone: 978-887-7008 (Buyer).

Whereas, for good consideration the parties mutually agree
that:

1. Seller agrees to sell, and Buyer agrees to buy the
following described property:

1 1999 Aquasport Osprey serial number: AQABHA61A999 with
the following accessories:
  1 Furuno 1650DF Chart plotter, Fish Finder, GPS unit
  1 Anchor with 100' rope
  5 Adult Lifejackets
  1 Coastguard approved Flare kit
  1 Fire extinguisher
  3 Dock lines and bumpers
  1 Canvas bow cover

1 1999 Mercury Outboard model number 1-200422UD serial
number: 0G885890

2. Buyer agrees to pay to Seller and Seller agrees to
accept as total purchase price the sum of $24,000, payable
by bank certified check.

3. Seller warrants it has good and legal title to said
property, full authority to sell said property, and that
said property shall be sold free and clear of all liens,
encumbrances, liabilities and adverse claims of every
nature and description what so-ever.

4. Said property is sold in "as is" condition, Seller
disclaiming any warranty of merchantability, fitness or
working order or condition of the property except that it
shall be sold in its present condition.

6. This agreement shall be binding upon and inure to the
benefit of the parties, their successors, assigns and
personal representatives.

Signed this 27 day of August , 19 2001

**Buyers:**  Kevin Gaffey

Brian Gaffey

**Seller:**  Shawn Perkins

EXHIBIT

K Gaffey #3
11/18/05 HBS

978.465.6148

1.03 03:27p    Sea Dog Yacht Sales, Inc.    978 465 6148    p.1



**Sea Dog Yacht Sales Inc.**
Boat Brokerage & Marine Services
Phone: 978-465-9063 Fax: 978-465-6148
161 Bridge Road Salisbury, MA 01952
http://www.seadogyachtsales.com

**EXHIBIT**

K Gaffey #5
11/18/05    ABS

## FACSIMILE TRANSMITTAL SHEET

From

To: KEVIN GAFFEY

Company

Fax Number 978-927-0499

Phone Number:

To:

From: DALE. F.

Date: 8/11/03

Total No. Pages Including Cover: 3

Sender's Reference Number:

KEVIN —

PLEASE SIGN + FAX BACK.

SHE'LL SIGN TOMORROW AM

(SHE'S ON BLOCK ISLAND TODAY)

THANX,

DALE

ALL #3

ADD'L PLEASING

KPB



**Sea Dog Yacht Sales Inc.**
Boat Brokerage & Marine Services
Phone: 978-465-9063    Fax: 978-465-6148
161 Bridge Road Salisbury, MA 01952
http://www.seadogyachtsales.com

## Purchase & Sales Agreement

This agreement is made by and between _PAMELA JORDON_ of
_54 FORDSON AVE. CRANSTON, RI 02910_ ("Buyer"), and
_KEVEN + BRAIN GAFFEY_ of _76 LAURINGERD. BOXFORD, MA_ ("Seller"),
and owner of the _1999  22' AQUASPORT_ ("Yacht"), and named _____
The Selling Broker is _BOATS UNLIMITED_ Listing Broker is _SEA DOG YACHT SALES_.

The Selling Price of the "Yacht" is _TWENTY SEVEN THOUSAND_ ————— dollars
(US $ _27.000_ ). The "Deposit" amount shall be equivalent to 10% of the "Selling Price" and
as such is _TWENTY SEVEN HUNDRED_ ————— Dollars (US $ _2,700_ ),
and is due upon execution of this agreement. The Deposit will be Paid to the "Selling Broker" and
held by "Selling Broker" in their escrow account pending the successful close of this sale. The
balance will be paid at closing in the form of Bank Check, Wire or Cash.

The "Brokers" strongly recommend the "Buyer" have the "Yacht" surveyed. Said survey (and
related costs) is solely at "Buyers" expense. "Broker(s)" also agrees to provide "Buyer" with a full
and accurate Inventory of the "Yacht" prior to survey. The "Seller" agrees that the "Yacht" will be
accessible for survey and all included Inventory will be at the "Yacht" day of survey. "Seller" further
agrees that the "Buyer" and/ or his agents may survey the "Yacht" (with proper notice to "Seller")
and location of survey must be approved by "Seller". It is understood that the "Buyers" offer to
purchase is subject to survey and/ or Sea-Trial and that the selling price may be negotiated after
the survey. Should the boat be on-stands, it is the buyers' responsibility to pay to haul the boat to
and from sea trial (minimum of $125).

The "Buyer" agrees that the Surveyor(s) contracted by the "Buyer" has been selected by the
"Buyer" and that the Brokers will not be held liable for any omissions, errors or incorrect information
that may "come to light" as a result of the survey.

The "Buyer" must notify the "Selling Broker" of his acceptance or rejection of the "Yacht" (and its
Inventory) no later than Three o'clock PM local time on/ or before _8/15/03_ (in writing). It is
the "Buyer's" responsibility to accept or reject the "Yacht" by the above date and to secure
satisfactory finance and/ or insurance for the "Yacht".

Should the "Buyer" reject the "Yacht" (under the provisions of this agreement). Both the "Buyer"
and "Seller" agree that the "Buyer's" deposit may be immediately returned to the "Buyer" (minus
any costs incurred by "Buyer"). If the buyer fails to accept of reject the boat by dates specified
above and/or fails to close on boat by date below the buyers deposit may be forfeited.

Should the "Buyer" accept the "Yacht" (under the provisions of this agreement), both the "Buyer"
and "Seller" agree that the "Closing" shall occur by Three o'clock PM local time on/ or before
_8/15/03_ at the office of _SEA DOG + VCA CRANSTON_

*Sea Dog Yacht Sales*
*Purchase & Sales Agreement, Continued*

The "Seller" shall deliver the "Yacht" "Free and Clear" of any liens, mortgages or applicable bills at time of closing or, if there are outstanding liens, mortgages or applicable bills "Seller" agrees that "Brokers" may deduct the applicable funds from the proceeds of the sale. "Seller" further agrees that the "Brokers" Commission is to be paid at Closing and that "Brokers" are authorized to deduct Commissions from the proceeds of the sale.

It is understood by the "Buyer" of the "Yacht" that neither the "Brokers(s)" nor "Seller" have made any express or implied warranties regarding the "Yacht". The "Buyer" further agrees that the "Broker" and "Seller" shall not be held liable for any apparent or hidden defects in the "Yacht". It is the "Buyer's" sole responsibility to examine the "Yacht" (and all applicable inventories) and accept responsibility for determining the condition of the "Yacht".

**It is understood and agreed by the "Buyer" that the "Buyer" will pay a $95.00 administrative closing fee at the time of close.** _____ *(Initial)*

Additional Provisions:

① DEPOSIT FULLY REFUNDABLE SUBJECT TO
SURVEY + SEA-TRIAL.                    KPG

② SELLER RESERVES THE RIGHT TO NEGOTIATE ONLY
MAJOR ISSUES AFTER SURVEY —        KPG

③ Total COMMISSION paid IS Equivalent to 10% — TEN Percent.
                                                KPG

Buyer: _____ Date: ___/___/___

Buyer: _____ Date: ___/___/___

Seller: *Kevin P Gagne* Date: 8 /11 /03

Seller: _____ Date: ___/___/___

Should "Buyer" elect not to survey the "Yacht", He/ She acknowledges that the "Broker(s)" has reviewed the survey process (with the "Buyer") and the "Buyer" understands that the Boat is sold "As Is-Where is" with no express or implied warranty from "Broker(s)" or "Seller".

Buyer: _____N/A_____ Date: ___/___/___ Phone # _____

Revised March 24, 2003





K Gaffey #6
11/18/05

## Pay Off on Bank Boat Loan   ~   Required Information

Name of Bank : _Eastern Bank_   ABA _011301798_
Street Address : _195 Market St_
City : _Lynn_   State : _MA_   Zip : _01901_

Post Office Address not accepted.  Must have an actual Street Address
for processing and expediting Title and other information.

Mailed to the Attention Of : _Loan Admin Dept_
Federal Express delivery, to Bank Personnel responsible for Loan Information

Telephone # _781 - 599 - 2100_

Name(s) the Loan is under : _Kevin P. Gaffey_
Social Security Number : _031 - 62 - 4437_
Date of Birth : _7 / 27 / 65_

Social Security Number : _____-_____-_____
Date of Birth : _____ / _____ / _____

Account Number on the Loan: _78247454_

Pay Off Amount : $ _6,728.05_   Through (date ): _8 / 13 / 2003_

Per Diem : $ _1.65_

Name of Individual who provided the above information : 
_Greg @ Eastern_   Date : _8 / 13 / 2003_

11.25.01

# Sellers Final Accounting

Date: 8/16/03

Boat inventory # _____

Seller Name: Gaffey

Broker: HA / Boats Unlimited

Boat manufacturer: Aquasport

Year, size and model: 1999 22' c/c

Final sell price: 27,000

Final commission: 2,700

Total due to seller: 24,300

Monies due Sea Dog from seller (Amounts & Description)

_____

_____

_____

_____

_____

_____

BANK PAYOFF = 6,744⁵⁵

Final net due seller: 17,555⁴⁵

Payments made to seller & check number(s):

_____

_____

I have reviewed and agree with the above accounting:

X _____    8/16/03
Signature                       Date

**SIMPLE INTEREST PROMISSORY NOTE**

**MY PAYMENT PROMISE.** Each person who signs below ("I") jointly and severally promises to pay to Eastern Bank ("you") or your order at any of the offices, the principal sum of $ 10,025.00 plus interest on the unpaid daily principal balance at the rate of 3.99 %per year including after any default (subject to provisions of applicable law) until the day this loan is paid in full. I agree that you may adjust the rate at which I am required to pay interest on this note if the section of this note entitled "Interest Rate and Payment Adjustments" is completed. I agree to repay this loan in consecutive monthly installments as set forth below in the disclosure section entitled "Payment Schedule", subject to adjustment as may be provided below in the section of this note entitled "Interest Rate and Payment Adjustments", except that the final payment shall be for the amount of principal and interest then due. The entire balance of principal, interest and other charges, if not sooner paid, is due and payable on 9/27/06 (the "Maturity Date").

The final payment, finance charge, and total of payments disclosed below are estimated and assume each payment is received by you on its due date. I understand that interest is computed daily and that late payments increase these amounts while early payments decrease them. Any increase or decrease will be reflected in my final payment for which you will bill me prior to its due date.

**INTEREST RATE AND PAYMENT ADJUSTMENTS.** If checked here ( ), the interest rate on this note may be adjusted periodically during the term of this note. Adjustments shall be effective on _____ 19 _____ and on the same day of the month every _____ ( ) months thereafter (the "Adjustment Dates"). On each Adjustment Date, the interest rate shall be adjusted to the rate that is _____ percentage points above the highest interest rate designed as the "U.S. Prime Rate," as most recently published in the "Money Rates" section of The Wall Street Journal, or any successor thereto, 7 days prior to the Adjustment Date. The interest rate will never be increased above the maximum rate permitted by law. If this loan is secured by a dwelling, the interest rate will never be increased above the maximum rate permitted by law or 18% per year, whichever is lower.

Each time the interest rate is adjusted, the amount of my monthly payments will also be adjusted, effective on the first payment due date following the Adjustment Date. The amount of the adjusted payments will be the amount necessary for me to pay this loan in full by the final due date, with interest at the rate then in effect.

**PREPAYMENT.** I may repay this note in whole or in part at any time without penalty.

**LATE PAYMENT CHARGE.** I agree to pay the late charge set forth below in the disclosure section captioned "LATE CHARGE".

**RIGHT TO OFFSET.** If I am in default under this note, you can, but do not have to, apply any balance in any account I maintain with you to reduce or extinguish this debt.

**DELAY IN ENFORCEMENT.** You can waive or delay enforcing any of your rights without losing them. You can waive or delay enforcing a right as to one person obligated to repay this loan without waiving it as to any other. You do not have to give me notice of your waiver or delay.

**DEFAULT.** I'll be in default on this note (1) if any monthly installment is not paid by its due date; (2) if any promise or obligation to you under any agreement or mortgage securing this loan is broken or not complied with; (3) if any person obligated to repay this loan, including any guarantor, makes an assignment for the benefit of creditors or if any proceeding under any bankruptcy or insolvency law is begun by or against any such person; or (4) if any real estate described in "Security" below is sold or otherwise transferred. If I am in default, subject to provisions of applicable law, you can declare the entire unpaid balance of this note immediately due and payable without notifying me.

**COLLECTION COSTS.** If there is a default under this note, I agree to pay you the costs of collection, including reasonable attorneys' fees, incurred by you in enforcing my obligations under this note.

**WAIVER.** I and any endorser or guarantor waive presentment, demand, notice and protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or endorsement of this note, and all suretyship defenses generally.

**VARIOUS OTHER ITEMS.** You can accept late or partial payments, even though marked "Payment in full", without losing any of your rights under this note. You can change the terms of payment or release any security at the request of any one person liable on this note without notifying any other such person. My heirs and legal representatives will also be responsible for payment of this note.

**LAW THAT APPLIES.** This note shall be governed by Massachusetts law. If any part of this note violates applicable law, that part of the note shall be deemed to be amended to afford you the maximum rights allowed by law and the rest of the note shall not be affected.

---

**TRUTH IN LENDING DISCLOSURES OF EASTERN BANK**

| **ANNUAL PERCENTAGE RATE** (The cost of my credit as a as a yearly rate.) | **FINANCE CHARGE** (The dollar amount this credit will cost me.) | **AMOUNT FINANCED** (The amount of credit provided to me or on my behalf) | **TOTAL OF PAYMENTS** (The amount I will have paid after I have made all payments as scheduled) |
|---|---|---|---|
| 8.99 % | $ 2,459.80 | $ 10,025.00 | $ 12,484.80 |

**PAYMENT SCHEDULE.**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 60 | 208.08 | The 27th day of each month beginning September 2001 |

**PREPAYMENT.** If I pay off early, I will not have to pay a penalty.

**LATE CHARGE.** If a payment is more than 15 days overdue, you will be charged a late charge in the amount of:
☐ (Mortgage secured) 3% of the overdue payment.
☑ (Not mortgage secured) The lesser of 5% of the overdue payment or (i) $10, if the loan is over $6,000; or (ii) $5.

**SECURITY.** If checked here ( ), I am giving you a security interest in the following property:
1999 Aquasport Osprey 225

**FILING FEES** $ 50 —

**VSI INSURANCE.** If this loan is secured by a motor vehicle, vendors single interest insurance is required. I may purchase this insurance from an insurer of my choice acceptable to you, or I may purchase it from you at a cost of $ 25. — If initialed here KPG I prefer to buy it from you.

**ITEMIZATION OF AMOUNT FINANCED.** The Amount Financed, as disclosed above, includes:

1. Amount given to me directly .................................... $ _____
2. Amount paid on my account ..................................... $ _____
3. Amount paid to others on my behalf .......................... $ _____
consisting of:
   a. $ _____ to public officials;
   b. $ _____ to insurance companies;
   c. $ _____ to _____
   d. $ _____ to _____
4. Prepaid Finance Charge (loan processing fee) . . . . $ _____

4, as applicable:

☑ (Non-Rescindable Loans) The Borrower(s) acknowledge(s) receipt of a completed copy of this Promissory Note and Disclosure.

☐ (Rescindable Loans) Each Borrower acknowledges receipt of a completed copy of this Promissory Note and Disclosure and two completed copies of the Notice of Right to Cancel.

Executed under seal. If Security Agreement on reverse side is applicable (see below), any Borrower signing below acknowledges reading the Security Agreement on the reverse side before signing and understands that if any Borrower has any right, title or interest in the collateral that by signing below, such Borrower is signing not only the note but is also signing the Security Agreement.

Borrower: _____

Borrower: _____

Loan Number _____

**EXHIBIT**

K Gatley # 7
11/18/05

**PROPERTY INSURANCE.** If this loan is secured, except if I am placing the property in my possession, I must obtain property insurance from an insurer of my choice that is acceptable to you.

**CONTRACT TERMS.** See the contractual provisions for additional information about non-payment, default, the right to accelerate the maturity of the obligation, and prepayment penalties.

**ITEMIZATION.** I have the right to receive an itemization of the amount financed.

☐ I want an itemization.          ☑ I do not want an itemization.
Initials                              Initials

**VARIABLE RATE:** If checked here ( ), this loan contains a variable rate feature and (check applicable box): ( ) variable rate disclosures describing this feature were provided to me earlier. ( ) the annual percentage rate on this loan may increase on _____, 19___, and every _____ months thereafter (the "Adjustment Dates"), to reflect the value of the Prime Rate most recently published in the "Money Rates" section of The Wall Street Journal 7 days before the Adjustment Date plus _____ percentage points, provided that the rate will never be increased above the maximum rate permitted by law. If this loan is secured by a dwelling, the rate will never be increased over the maximum rate permitted by law or 18% per year, whichever is lower. If the annual percentage rate increases, the amount of my monthly payments will also increase. For example, if the interest rate on this loan increased to _____% after _____ months, the amount of the remaining monthly payments would increase to $ _____.

**INSURANCE: YOU CANNOT BE DENIED CREDIT SIMPLY BECAUSE YOU CHOOSE NOT TO BUY CREDIT INSURANCE. CREDIT LIFE INSURANCE AND CREDIT ACCIDENT AND HEALTH INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT. INSURANCE WILL NOT BE PROVIDED UNLESS YOU SIGN AND AGREE TO PAY THE ADDITIONAL CHARGE, WHICH IS DISCLOSED BELOW FOR THE ENTIRE TERM OF THIS LOAN.** Insurance eligibility is subject to limitations. See Credit Insurance Certificate for specific details.

| Type | Term | Premium | Option | Borrowers' Initials |
|---|---|---|---|---|
| Credit Life Insurance | months | $_____ | I want credit life insurance | N/A |
|  | months | $_____ | We want credit life insurance | N/A |
|  | N/A | N/A | I/We do not want credit life insurance | KPG |
| Credit Accident & Health Insurance | months | $_____ | I want credit A & H insurance | N/A |
|  | N/A | N/A | I do not want credit A&H insurance | KPG |

**SECURITY AGREEMENT** — ( ) If checked here, the agreement on the reverse side is applicable. Any person signing below is not signing as a party to this note but is signing as a party to the Security Agreement on the reverse side and acknowledges reading both the note and the Security Agreement.

Description of Property Given as Security:
1999 Aquasport Osprey
Serial #- AQABHA51A999.

Address at which property described above will be kept, if applicable.



EXHIBIT

K Gaffey #8
11/18/05  #BS

# BILL OF SALE

Size 22' Make **AQUASPORT** Model 225 Year 999

Ser# AQABHA51A999 Engine Make mercury Year 1999

HP 200 Ser# 0C885890 // Color Green

Documentation#/Reg#_____ Color Green

Trailer Make N/A Year — VIN# —

Capacity —

Selling Price 27,000 Boat Value 27,000 Trailer Value N/A

Sellers Name KEVIN & BRIAN GAFFEY

Address 76 LAWRENCE RD.

City Boxford State MA ZIP 01921

Buyers Name PAMELA JORDAN    N 401-781-5714

Address 54 FORDSON AVE.    cell - 374-2419

City CRANSTON State RI ZIP 02910

The seller further warrants that said vessel is free and clear of all liens, bills mortgages, taxes, or encumbrances of any kind or nature and hereby agrees to indemnify and save harmless the Buyer against and from any and all claims arising by reason of anything happening or occurring prior to date hereof and all expenses in connection herewith.

The said vessel is being sold "AS IS and WHERE IS" and without any warranties expressed or implied, of any kind, including but not limited to merchantability or fitness for any particular purpose or use with respect to both the hull and engines as well as all tackle, gear, and equipment, mechanical, electrical, or otherwise. By accepting tender of this Bill of Sale, Buyer acknowledges an opportunity to inspect, survey, and otherwise test said vessel and it's equipment and in so doing accepts the vessel in said condition and under the aforesaid terms.

I declare under penalty of false statement that the information furnished above is true and complete to the best of my knowledge and belief.

SELLER(s)_____ :BUYER(s)_____

_____    _____

Signed before me this 17th day of August, 2003 massachusetts

Elizabeth Warren Notary Public for the State of ~~Rhode Island~~, County of

Essex , my commission expires 12 / 18 / 03

ELIZABETH ANNE WARREN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 18, 2009

EXHIBIT

K Gaffey #9
11/18/05 HEI

# BILL OF SALE

Size 22' Make AQUASPORT Model 225 Year 999
Ser # AQABHA51A999 Engine Make mercury Year 1999
HP 200 Ser# 06885890 "
Documentation#/Reg# MS 5532B Color Green

Trailer Make N/A Year — VIN# —
Capacity —
Selling Price 27,000 Boat Value 27,000 Trailer Value N/A

Sellers Name Kevin & Brian Gaffey
Address 76 Lawrence Rd.
City Buxford State MA ZIP 01921

Buyers Name Pamela Jordan
Address 54 Fordson Ave.
City Cranston State RI ZIP 02910

The seller further warrants that said vessel is free and clear of all liens, bills mortgages, taxes, or encumbrances of any kind or nature and hereby agrees to indemnify and save harmless the Buyer against and from any and all claims arising by reason of anything happening or occurring prior to date hereof and all expenses in connection herewith.

The said vessel is being sold "AS IS and WHERE IS" and without any warranties expressed or implied, of any kind, including but not limited to merchantability or fitness for any particular purpose or use with respect to both the hull and engines as well as all tackle, gear, and equipment, mechanical, electrical, or otherwise. By accepting tender of this Bill of Sale, Buyer acknowledges an opportunity to inspect, survey, and otherwise test said vessel and it's equipment and in so doing accepts the vessel in said condition and under the aforesaid terms.

I declare under penalty of false statement that the information furnished above is true and complete to the best of my knowledge and belief.

SELLER(s) _____ BUYER(s) Pamela A Jordan

Signed before me this 22 day of August, 2003.

_____ Notary Public for the State of Rhode Island, County of
WASHINGTON , my Commission expires 01 / 23 / 05

Exhibit F

**EXHIBIT**

CERTIFICATE OF TITLE

K Gaffey #10
11/18/05 CHBS

# THE COMMONWEALTH OF MASSACHUSETTS
## Division of Environmental Law Enforcement

| TITLE NUMBER | ISSUE DATE | MANUFACTURER |
|---|---|---|
| 288181 | 08-28-2001 | AQUASPORT |

| YEAR | TYPE | SERIAL NUMBER |
|---|---|---|
| 1999 | OPEN BOAT | AQABHA51A999 |

| USE | COLOR | HULL MATERIAL | LENGTH |
|---|---|---|---|
| PLEASURE | GREEN | FIBERGLASS | 24' 5" |

| CERT. NUMBER | STATUS (TITLE) | OWNERSHIP |
|---|---|---|
| | ACTIVE | CO-OWNER |

NAME & ADDRESS OF OWNER(S)

KEVIN GAFFEY
13 TIMBER LANE
TOPSFIELD, MA 01983

BRIAN H. GAFFEY
76 LAWRENCE RD
BOXFORD, MA 01921

FIRST LIEN HOLDER

EASTERN BANK
270 UNION STREET
LYNN, MA 01901

SECOND LIEN HOLDER

RELEASE OF LIENS
(FIRST LIEN) INTEREST IN THE DESCRIBED VEHICLE IS
HEREBY RELEASED

EASTERN BANK   AUG 29 2003
RELEASED
AUTHORIZED SIGNATURE _Nietzsche Brivito_

(SECOND LIEN) INTEREST IN THE DESCRIBED VEHICLE IS
HEREBY RELEASED

NAME _____ DATE _____
RELEASED
AUTHORIZED SIGNATURE _____



THE DIRECTOR OF THE DIVISION OF LAW ENFORCEMENT HEREBY CERTIFIES THAT AN APPLICATION FOR A CERTIFICATION OF TITLE FOR THE MOTORBOAT / ATV DESCRIBED HAS BEEN DULY FILED, PURSUANT TO THE PROVISIONS OF THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, AND BASED ON THE STATEMENTS OF THE APPLICANT AND THE RECORDS ON FILE WITH THIS AGENCY, THE APPLICANT NAMED IS THE OWNER(S) OF SAID MOTORBOAT / ATV.

THE DIRECTOR OF THE DIVISION OF LAW ENFORCEMENT FURTHER CERTIFIES THAT THE MOTORBOAT / ATV IS SUBJECT TO ANY SECURITY INTEREST SHOWN HEREIN.
DIRECTOR RICHARD A. MURRAY

VOID IF ALTERED

78247454

# Division of Law Enforcement
## Boating & Recreational Vehicles
### Administration & Registration Section
251 Causeway Street, Suite 101 • Boston, Massachusetts 02114

ASSIGNMENT OF TITLE

THIS IS TO BE COMPLETED BY THE SELLER and delivered to the purchaser with the Motorboat /ATV.
Purchaser must make application for a new Title with the Division of Law Enforcement and surrender the
assigned Title.

Date _____ 3-23-04 _____

The undersigned hereby certifies that the Motorboat / ATV described in
this title has been transferred to: _____ PAMELA JORDAN _____
Whose address is: _54 FORDSON AVE CRANSTON RI 01921_
with warranty to be free of all encumbrances except as follows:

Amount $ _____ Kind of Lien _____

in favor of: _____

whose address is: _____

Signature of Seller _____

_____

---

FIRST RE-ASSIGNMENT BY DEALER

The undersigned dealer hereby certifies that the Motorboat / ATV described in this title has been transferred to:

Whose address is: _____

with warranty to be free of all encumbrances as follows:

Amount $ _____ Kind of Lien _____

in favor of _____

whose address is: _____

Firm Name _____

Address _____

SIGNATURE OF AUTHORIZED AGENT _____

10M-7/01-2198001

EXHIBIT

K Gaffey #11
11/18/05 ABA

## GENERAL RELEASE, INDEMNIFICATION and MUTUAL COOPERATION AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS that we, Kevin Gaffey and Brian Gaffey, for and in consideration of the payment to us of Seven Thousand and 00/100 Dollars ($7,000.00), and other valuable consideration, including Pamela Jordan's agreement to reasonably cooperate with us with regard to the subject matter described below, do hereby forever remise, release, acquit, discharge and covenant to hold harmless Pamela Jordan and her family, heirs, successors and assigns (hereinafter all collectively referred to as the "RELEASED PARTIES") of and from all claims, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims and liabilities whatsoever of every name and nature, both in LAW and in EQUITY, which against the said RELEASED PARTIES we now have or ever had from the beginning of the world to this date and more especially on account of, but without limiting the generality of the foregoing, those claims arising out of or relating to the sale of a Aquasport boat, Model 225 (the "Subject Boat") and a Mercury outboard motor (collectively the "Boat Sale").

We further agree, jointly and severally, to defend, indemnify and hold harmless the RELEASED PARTIES from any claim or liability of any kind relative to the Boat Sale from any other person, entity or partnership including, but not limited to, Paul Larson, Boats Unlimited, Inc., Sea Dog Yacht Sales, Inc. and any lienholders of the Subject Boat. We have accepted payment of the sum specified herein as a complete settlement of a matter involving disputed issues of law and fact, and we fully assume

the risk that the facts or law may be otherwise than we believe. We understand that the payment of the sum specified above is in compromise of disputed claims and is not to be construed as an admission of liability on the part of any of the RELEASED PARTIES.

In consideration of the payment of the sum specified above and Pamela Jordan's agreement to reasonably cooperate with our prosecution of any claim arising out of the Boat Sale we will execute and provide to Pamela Jordan (1) a Certificate of Title (2) a Bill of Sale for the Subject Boat, and (3) any other document necessary in order to enable Pamela Jordan to register the Subject Boat in the state of Rhode Island and which is the subject of the Boat Sale and cooperate in all reasonable ways with Pamela Jordan to consummate the transfer of the title of the Subject Boat to her. We further represent and warrant that no other person or entity, other than Pamela Jordan, has any title interest in or lien on the Subject Boat.

Witness our hands and seals this ___23___ day of March, 2004.

_____
KEVIN GAFFEY

_____
BRIAN GAFFEY

- 2 -



*K. Gaffey #12*
*11/18/05 HBS*

# Bill of Sale

Sold to Pamela Jordan, 54 Fordson Ave., Cranston, RI 02910 a 1999 22 foot (24' loa)

Aquasport, model 225 Osprey, Hull No. AQABHA51A999 with a 1999 Mercury

outboard motor, 200 hp., Motor No. 06885890 for the sum of $27,000.

Kevin Gaffey                          Brian Gaffey

Date: 3-23-04