UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-12354-RGS

BRIAN GAFFEY AND KEVIN GAFFEY

v.

ACADIA INSURANCE CO.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

September 25, 2006

STEARNS, D.J.

On November 5, 2004, Brian Gaffey and Kevin Gaffey (the Gaffeys) filed this Complaint alleging that their insurer, Acadia Insurance Company (Acadia), failed to provide coverage after the theft of their insured boat.  On January 26, 2006, the Gaffeys moved for summary judgment on Count I of the Complaint.[1]  On February 10, 2006, Acadia filed a cross-motion for summary judgment.  A hearing on the motions was held on August 10, 2006.  The material facts of the case and the interpretation of the terms of the insurance contract are not in dispute.  The parties simply disagree as to the legal significance of the facts as they apply to the terms of the policy.

BACKGROUND

The undisputed facts are as follows.  In 2002, Acadia issued the Gaffeys a yacht policy, YPA 0071550-11 (Policy), for the period October 10, 2002 to October 10, 2003. The Policy insured a 1999 Aquasport Osprey vessel for its appraised value of $37,000.

---

[1]Count I of the Complaint alleges a breach of the insurance contract.  Count II, alleging a violation of G.L. c. 176D, was dismissed at oral argument on August 10, 2006.

The Policy stated:

> LOSSES COVERED – Subject to all terms, conditions and exclusions set forth elsewhere in this policy and to limitations as to the amount set forth below and on the Declaration Page, Section A, we will pay for the following which occurred during the policy period:
>
> > 1. Sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause[.] . . .
>
> WHAT WE WILL PAY - Subject to the Limit of Liability and Conditions set forth in the policy: . . .
>
> > 9. If any insured property is stolen and not recovered within 30 days after you present your claim to us or our agent, the property shall be considered totally lost.
>
> LOSSES NOT COVERED – We will not pay any loss, damage or expense caused by or resulting, whether exclusively or concurrently, from: . . .
>
> > 3. Theft or the unexplained disappearance of insured property from the yacht, unless there are visible marks of forcible entry or removal, or the entire yacht is stolen[.]

In the event of a total or constructive total loss of the insured property, the insured, if asked, was required "to transfer title of that property to us or to a salvage buyer designated by us."

The Gaffeys purchased the Aquasport in 2001 for $24,000. In May of 2003, the Gaffeys began negotiating the purchase of a Mako motor yacht with Dale Friedman, a yacht broker at Sea Dog Yacht Sales (Sea Dog) in Salisbury, Massachusetts.[2] The Gaffeys orally agreed to buy the Mako if Friedman could arrange the sale of their Aquasport. Friedman agreed to do so for a 10 percent broker's commission or, if he could not find a buyer for the vessel, to purchase the Aquasport himself for $24,000. The

---

[2]Friedman appears to have been the principal owner of Sea Dog.

Gaffeys gave Friedman the sales specifications, including the Aquasport's length and beam, its fuel tank capacity, appurtenances, and the location of the mooring slip. The Gaffeys then conducted a sea trial of the Mako, which proved unsatisfactory. Sea Dog refunded the Gaffeys' deposit and the Gaffeys considered the sale terminated.

In July or August of 2003, Brian Gaffey saw an advertisement on the internet listing the Aquasport for sale. At about the same time, Friedman contacted Kevin Gaffey and told him that a Cranston, Rhode Island woman, Pamela Jordan, was interested in purchasing the Aquasport for $27,000. The Gaffeys agreed to the sale. They authorized Sea Dog to conduct sea trials of the Aquasport and to transport the vessel from Newbury, Massachusetts to Sea Dog's facility in Salisbury, Massachusetts in anticipation of the closing. Later, the Gaffeys saw the Aquasport docked at Sea Dog.

On August 7, 2003, Jordan sent Friedman a deposit in the amount of $2,650. On or about August 11, 2003, Jordan and Kevin Gaffey (on behalf of himself and his brother), signed a purchase and sale agreement. On August 13, 2003, Kevin Gaffey gave Friedman a statement listing the payoff of the mortgage on the Aquasport. The mortgage was held by Eastern Bank. On August 15, 2003, Jordan wired the balance of the purchase price, $24,350, to a bank account owned by Sea Dog. On August 16, 2003, the Gaffeys gave Friedman an executed "Sellers Final Accounting" scheduling the desired distribution of the sale proceeds at the closing. On August 17, 2003, both Gaffeys signed a notarized bill of sale conveying the Aquasport to Jordan for $27,000.

Thereafter, Kevin Gaffey had several conversations with Friedman attempting to set a closing date. Friedman repeatedly deflected the inquiries, stating that Jordan was

having trouble obtaining funds.  Eventually, Friedman stopped returning the Gaffeys' calls.

Later, the Gaffeys learned that Friedman had disappeared and that the Aquasport was no

longer at the Sea Dog facility.[3]  Brian Gaffey then contacted Jordan to ask if she knew

anything about the whereabouts of the vessel or of Friedman.  Jordan told him that she

had taken possession of the Aquasport from Friedman after wiring him the purchase

money.

On August 29, 2003, the Gaffeys filed a report with the Salisbury Police stating that

the Aquasport had been removed from the Sea Dog facility without their permission.  The

Gaffeys were told by the police that Friedman was a suspect in a number of similar boat

swindles.  That same day, Kevin Gaffey paid off the mortgage and retrieved the Certificate

of Title for the Aquasport from Eastern Bank.  The Gaffeys then filed a claim with Acadia

reporting that the vessel had been stolen.

Shortly thereafter, Jordan sued the Gaffeys in the Rhode Island state court

demanding the transfer of the Certificate of Title.   After some preliminary court

proceedings, the Gaffeys and Jordan settled the case.  On March 23, 2004, in exchange

for an executed bill of sale and the Certificate of Title, Jordan paid the Gaffeys $12,000.

The Gaffeys then sought payment from Acadia.   They requested reimbursement of

$37,000, the insured value of the vessel, as well as the $9,184.17 in legal fees and costs

they had incurred in defending the Jordan lawsuit (less the $12,000 they had received from

Jordan).  Acadia denied coverage, maintaining that no theft of the vessel had occurred.

---

[3]Unbeknownst to the Gaffeys, Friedman had moved the Aquasport on August 22, 2003, to a mooring on the coast of Rhode Island.

DISCUSSION

The case presents an interesting yet straightforward legal question.  Acadia argues that there is no coverage because the Gaffeys' loss did not involve the "sudden and accidental, direct, physical loss of or damage to the *insured property*."  (Emphasis added).  According to Acadia, what was stolen was not the yacht, but the purchase money, a peril against which the Policy did not insure.[4]  Acadia argues that implicit in the authorization given to Friedman by the Gaffeys to proceed with the sale to Jordan was the authorization to transfer the vessel to Jordan's possession.  Thus, according to Acadia, when Friedman delivered the vessel to Jordan, he was not acting against any property interest of the Gaffeys, and therefore no theft occurred.  Cf. People v. Miller, 4 Utah 410, 11 P. 514 (1886).  The theft occurred, according to Acadia, when Friedman absconded with the $27,000 in purchase money *after* the sale of the Aquasport took place and *after* ownership of the boat had been conveyed to Jordan.

Acadia's argument would have appeal if a sale, as the argument presupposes, had in fact occurred.  It did not for two reasons.  First the Gaffeys never authorized Friedman to remove the vessel from the Sea Dog facility and transfer its possession prior to the closing for a simple reason: until the Eastern Bank mortgage was paid off, they did not

---

[4]Acadia contends that this is true because the Gaffeys knew where the vessel was and could have retrieved it.  The Gaffeys quite properly point to the legal advice they had received cautioning against a resort to self-help.  Acadia also argues that the Gaffeys did not lose complete possession of the vessel because they were able to eventually sell it to Jordan for $12,000.  The Gaffeys, however, argue persuasively that the $12,000 represents a compromise and not a true sale as both they and Jordna had viable claims to the boat.

have the right to sell the boat.[5]  Second, and for the same reason, the Gaffeys did not and could not have transferred the Certificate of Title as it was in the possession of Eastern Bank as the mortgagee.[6]  Thus, when Friedman removed the vessel from the Sea Dog facility prior to the closing on August 22, 2003, he stole the boat and not the purchase money.  Therefore, there is coverage under the Policy.

ORDER

For the foregoing reasons, the Gaffeys' motion for summary judgment is ALLOWED. Acadia's cross-motion for summary judgment is DENIED.  As the prevailing parties, the Gaffeys will file a proposed form of Final Judgment within ten (10) days of the date of this Order.  Acadia will have ten (10) days thereafter to file objections, if any.

---

[5]The parties make extensive arguments about the scope of Friedman's apparent authority as an agent of the Gaffeys, but that is an issue that at best pertains to Jordan in her dealings with Friedman and the Gaffeys and not the Gaffeys' dealings with Friedman and Acadia.  Apparent authority arises from "written or spoken words or any other conduct of the principal, which reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."  Restatement (Second) of Agency, § 27 (1958); Weisman v. Saetz, 11 Mass. App. Ct. 440, 442 (1981).  It is only the conduct of the principal, and not the conduct of the agent, that may create apparent authority.  Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745 (2000).  Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991).

[6]Acadia also argues that even if there is coverage, the Gaffeys breached the insurance contract by agreeing to sell the vessel to Jordan, instead of, as the Policy requires, seeking (if asked) "to transfer title of that property to us or to a salvage buyer designated by us."  The Gaffeys argue convincingly that (1) Acadia never asked for possession of the vessel, and (2) that in any regard, they only conveyed title to Jordan after Acadia had denied coverage under the Policy.  Perhaps more to the point, the transfer salvage provision of the Policy clearly pertains to a damaged vessel that might have a residual repair value, not a vessel that has been completely lost or destroyed by an act of nature or because of a theft.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE